**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) | Chapter 11 |
| AMTROL HOLDINGS, INC., *et al.*, | ) | Bankruptcy Case No. 06-11446 (KG) |
| Debtors. | ) | |
| NEW ENGLAND GAS COMPANY, *et al.*, | ) | |
| Appellants, | ) | |
| v. | ) | CA 07-75-GMS |
| AMTROL HOLDINGS, INC., *et al.*, | ) | |
| Appellees. | ) | |

# BRIEF OF APPELLEES, AMTROL HOLDINGS, INC., *ET AL.*

**EDWARDS ANGELL PALMER & DODGE LLP**
Stuart M. Brown (No. 4050)
Denise S. Kraft (No. 2778)
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 777-7770

Dated:  June 11, 2007
        Wilmington, Delaware

***Counsel for Appellees***

## TABLE OF CONTENTS

I.      INTRODUCTION AND PRELIMINARY STATEMENT .................................................1

II.     STATEMENT OF THE BASIS OF APPELLATE JURISDICTION...............................3

III.    STATEMENT OF ISSUES PRESENTED ON APPEAL ...................................................3

IV.     STANDARD OF APPELLATE REVIEW .........................................................................4

V.      STATEMENT OF THE FACTS .........................................................................................4

        A.      Debtors' Background......................................................................................4

        B.      Nature of the Parties' Historical Business Transactions ...........................5

VI.     STATEMENT OF THE CASE ...........................................................................................6

        A.      Pre-Plan Confirmation Case History .........................................................6

                1.      The Debtors' Bankruptcy Cases and the Utility Motion ............6

                2.      The January 11, 2007 Hearing........................................................8

                3.      Bankruptcy Court Ruling on Utility Motion ...............................9

        B.      Plan and Post-Plan Confirmation Case History......................................11

                1.      The Debtors' Plan and Disclosure Statement.............................11

                2.      The Confirmation Hearing and Ruling on Confirmation .........11

                3.      National Grid's Claims and Treatment Under the Plan............12

VII.    SUMMARY OF ARGUMENT.........................................................................................12

VIII.   ARGUMENT.....................................................................................................................13

        A.      National Grid's Appeal Should be Dismissed as Being
                Constitutionally Moot...................................................................................13

                1.      The Appeal is Constitutionally Moot ..........................................13

                2.      No Mootness Exception Applies Because This Case is Not
                        "Capable of Repetition, Yet Evading Review" .........................16

        B.      Appellants Improperly Raise An Issue on Appeal that was
                Not Designated ..............................................................................................18

C.    Applicable Statutory Provision ............................................................. 19

D.    Appellant's Factual Issues Lack Merit and Its
      Legal Conclusions are Unsupported .................................................... 21

      1.    The Bridge Order Was Not Obtained on an *Ex Parte* Basis ..................... 21

      2.    Because Amtrol Fully Complied with Section 366(b), the
            Bankruptcy Court Properly Approved the Adequate Assurance of
            Payment Procedures Set Forth in the Final Utility Order ......................... 22

      3.    Although Not Required To, Amtrol Also Fully Complied With
            Section 366(c)(2), As Modified By Section 366(c)(3) ............................. 23

      4.    The Bankruptcy Court's Finding that Appellee's Adequate
            Assurance of Payment Request of a Two-Month Deposit Should be
            Modified to the Payment of a Two-Week Deposit is Supported by
            the Record ...................................................................................... 25

IX.   CONCLUSION ............................................................................................ 27

WLM_508795_5.DOC/MOLIVERE

# TABLE OF AUTHORITIES

## Cases

A.B. Dick Co. v. Presstek, Inc., 338 B.R. 230 (D. Del. 2006) ........................................4

B.R. Griffin v. Box Brothers Holding Co., 194 B.R. 32 (D.Del. 1996)........................14

Bowie Produce Co., Inc. v. Magic American Café, Inc., 202 B.R. 24 (D.Del. 1996)....................3

Church of Scientology of California v. United States, 506 U.S. 9 (1992) ..............................13, 16

Deakins v. Monaghan, 484 U.S. 193 (1988) ..................................................13

DeFuinis v. Odegaard, 416 U.S. 312, 94 S. Ct. 1704 (1974) ......................................18

In re Bozzelli, 227 B.R. 770 (Bankr.E.D.Pa.1998) .........................................9

In re Caldor, Inc. NY, 199 B.R. 1 (S.D.N.Y. 1996) ......................................26

In re Federal Mogul-Global Inc., 348 F.3d 390 (3d Cir. 2003)......................................9

In re GGM, P.C., 165 F.3d 1026 (5th Cir. 1999) ..........................................19

In re Indian Palms Assocs. Ltd, 61 F.3d 197 (3d Cir. 1995)......................................9, 19

In re Material Engineering Assoc. Ltd., 168 B.R. 204 (Bankr. W.D.Mo. 1994) ...........................19

In re Penn Jersey Corp., 72 B.R. 981 (Bankr. E.D.Pa. 1987)........................................26

In re Peregrine Systems, Inc., 311 B.R. 679 (D.Del. 2004) .............................................9

In re United Artists Theater Co., 315 F.3d 217 (3d Cir. 2003) ......................................14

Insurance Corp of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694,
102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)............................................................19

Int'l Broth. Of Boilermakers v. Kelly, 815 F.2d 912 (3d Cir. 1987)............................................13

Keydata Corp., 12 B.R. 156 (1st Cir. BAP 1981)........................................................26

Magten Asset Management Corp v. Northwestern Corp., 352 B.R. 32 (D. Del.
2006)...........................................................................................4

Merck & Co., Inc. v. Apotex, Inc., 2007 WL 1470453 (D.Del.) ...................................15

MW Post Portfolio Fund Ltd. v. Norwest Bank Minnesota (In re Onco Investment
Co.), 2005 WL 2401908 (D.Del.)..............................................................13, 14

WLM_508795_5.DOC/MOLIVERE

Potomac Electric Power Co. v. The Rowe Companies, 2007 WL 656897
        (E.D.Va.)..................................................................................................13, 16, 17

Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978 (1988)..................................................16

TWA, Inc., 145 F.3d 124 (3d Cir. 1998)....................................................................19

Virginia Elec. & Power Co. v. Caldor, Inc-NY, 117 F.3d 646 (2d. Cir. 1997)............................26

Yeldell v. Tutt, 913 F.2d 533 (8th Cir. 1990)................................................................19

**Other Authorities**

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ........................................25

**Statutes**

11 U.S.C. § 101 ........................................................................................................1

11 U.S.C. § 105(a) .............................................................................................1, 7, 8, 25

11 U.S.C. § 366 ...............................................................................................passim

11 U.S.C. § 366(b).............................................................................................passim

11 U.S.C. § 366(c) .....................................................................................6, 10, 15, 23

11 U.S.C. § 366(c)(1)(A)........................................................................................25

11 U.S.C. § 366(c)(2) ......................................................................................23, 26

11 U.S.C. § 366(c)(3) ........................................................................................passim

11 U.S.C. § 366(c)(3)(A)....................................................................................13, 23

11 U.S.C. § 1101(2)...............................................................................................2

11 U.S.C. § 1141 ...............................................................................................2, 14

28 U.S.C. § 158(a)(3) .............................................................................................3

28 U.S.C.A. § 158(a) .............................................................................................3

**Rules**

Del Bankr. L.R. 9013-1(m)(ii)..................................................................................21

Del. Bankr. L.R. 9013-1(m) .....................................................................................21

Del. Bankr. L.R. 9013-1(m)(iii) .................................................................................21

Fed. R. Civ. P. 12(h)(3) ....................................................................................................19

Fed. R. Civ. P. 8001 .........................................................................................................3

Fed. R. Civ. P. 8003 .........................................................................................................3

Fed. R. Civ. P. 8006 ...................................................................................................11, 19

Fed. R. Evid. 201(b) .........................................................................................................9

Fed. R. Evid. 201(f) .........................................................................................................9

**Treatises**

2 Lawrence P. King, Collier on Bankruptcy ¶ 105.01, at 105-6 (15th ed. Rev. 2004) ...........................................................................................................25

**Legislative Materials**

H.R. Rep. No. 95-595, at 350 (1978) ..............................................................................25

1978 U.S.C.C.A.N. 5963, 6306 .......................................................................................14

I.    **INTRODUCTION AND PRELIMINARY STATEMENT**

This appeal arises as a result of the Notice of Appeal filed on January 19, 2007 by

New England Gas Company and Narragansett Electric Company (together, **"National Grid"** or

**"Appellant"**).  National Grid appeals from the Bankruptcy Court's January 11, 2007 Final Order

(I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II)

Establishing Procedures for Providing Deposits to Requesting Utilities, (III) Deeming Utility

Companies to Have Adequate Assurance of Payment, and (IV) Establishing Procedures for

Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) & 366 (the **"Final**

**Utility Order"**).  (Final Utility Order, App. at B-632 to B-636).[1]  The Final Utility Order

approved the form, manner and amount of adequate protection provided by Amtrol Holdings,

Inc. and its debtor direct and indirect, wholly-owned subsidiaries (collectively, **"Amtrol,"**

**"Debtors"** or the **"Appellee"**)[2] to National Grid and the Debtors' other utility providers.

National Grid protested that the Debtors failed to comply with the procedural and

substantive requirements of section 366 of title 11 of the United States Code, 11 U.S.C. § 101 *et*

*seq*. (as amended, the **"Bankruptcy Code"**) by failing to respond to National Grid's adequate

assurance demand of a two-month deposit in the amount of $302,018.00 and further failing to

provide National Grid with adequate assurance of payment.  The Debtors disputed National

Grid's procedural and substantive objections, arguing that the Debtors' process complied with

the requirements of section 366(b) and the Bankruptcy Court agreed.  This appeal follows.

---

[1]   References to the Appendix are noted throughout as "App. at B-___."
[2]   As discussed more fully below, on May 24, 2007, the Bankruptcy Court confirmed the Debtors' Plan, as defined infra., which became effective and was substantially consummated on June 5, 2007.  Pursuant to the Plan, the Debtors are now known as the "Reorganized Debtors," however, for purposes of clarity herein Appellee will be referred to only as the "Debtors" throughout this brief.

As a preliminary matter, National Grid's appeal of the Final Utility Order should be

dismissed both because this Court lacks jurisdiction[3] and as it is constitutionally moot. On

June 5, 2007 (the **"Effective Date"**), the Plan (as defined below) was substantially consummated

within the meaning of section 1101(2) of the Bankruptcy Code. On June 6, 2007, the Debtors

filed their Notice of the Occurrence of the Effective Date (the **"Effective Date Notice"**)

(Effective Date Notice, Bankr D.I. 426). Pursuant to the Plan, National Grid's pre-petition and

post-petition claims will be paid in full. Furthermore, by substantially consummating the Plan,

the Debtors no longer must comply with section 366 of the Bankruptcy Code or provide

adequate assurance of payment to National Grid. See Plan at Section 5.13 and Section 1141 of

the Bankruptcy Code. Accordingly, the Debtors respectfully request that this Court dismiss

National Grid's appeal either because the Court lacks jurisdiction or as constitutionally moot,

because the court cannot grant "any effectual relief whatever," since there is no longer a case or

controversy pending before the District Court.

In the event the Court exercises jurisdiction over this appeal of an interlocutory order and

does not find the appeal to be constitutionally moot, then this Court should affirm the

determination of the Bankruptcy Court in its findings of fact and conclusions of law in the Final

Utility Order that the Debtors fully complied with the procedural and substantive requirements of

section 366 and provided sufficient adequate assurance under the facts. National Grid's appeal is

grounded on a two months, "one size fits all" attitude, that if enforced, would provide National

Grid with what is tantamount to guarantee of payment, which guaranty is substantially more than

that to which it is entitled. The Bankruptcy Court is given wide discretion in determining core

---

[3]  (See Section II of the Brief infra.)

matters, including those under section 366. The Bankruptcy Court's decision here is well supported and grounded in fact.

## II.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The Final Utility Order, despite its title, is an interlocutory order of the Bankruptcy Court, as the Appellant maintained the right after entry of the Final Utility Order to file a motion to modify the adequate assurance provided. See 11 U.S.C. § 366(c)(3). Accordingly, this Court lacks jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(3) as leave by the Bankruptcy Court was neither requested nor granted pursuant to Federal Rules of Bankruptcy Procedure 8001 and 8003 (the "Bankruptcy Rule"). See Bowie Produce Co., Inc. v. Magic American Café, Inc., 202 B.R. 24, 26 (D.Del. 1996) ("Pursuant to § 158(a), [Appellant] must obtain leave of the court to pursue an interlocutory appeal.").

## III.   STATEMENT OF ISSUES PRESENTED ON APPEAL

1.    Whether this appeal should be dismissed as constitutionally moot because the Plan has been substantially consummated, the Debtors are no longer operating under the Bankruptcy Code and National Grid's pre-petition and post-petition claims will be paid in full?

2.    Whether the Bankruptcy Court erred in entering the Bridge Order?

3.    Whether the adequate assurance of payment procedures approved by the Bankruptcy Court in the third Ordered paragraph of the Final Utility Order violate the provisions of 11 U.S.C. § 366?

4.    Whether the Bankruptcy Court erred in holding that the Debtors' Utility Motion was a pleading filed pursuant to 11 U.S.C. § 366(b) that was ripe for an evidentiary hearing and adjudication at the January 11, 2007 hearing?

WLM_508795_5.DOC/MOLIVERE

5.      Whether the Bankruptcy Court erred in holding an evidentiary hearing at the January 11, 2007 hearing on the Utility Motion and the Objection to the Utility Motion filed by Appellants?

6.      Whether the Bankruptcy Court erred in holding that Appellant's adequate assurance of payment request of a two-month deposit should be rejected by the Court in these cases?

## IV.    STANDARD OF APPELLATE REVIEW

This Court reviews the Bankruptcy Court's findings of fact under a "clearly erroneous" standard, and reviews its legal conclusions *de novo*. See Magten Asset Management Corp v. Northwestern Corp., 352 B.R. 32, 34 (D. Del. 2006); A.B. Dick Co. v. Presstek, Inc., 338 B.R. 230 (D. Del. 2006). "When reviewing mixed questions of law and fact, this court will accept the Bankruptcy Court's findings of 'historical or narrative facts unless clearly erroneous, but [will] exercise plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Id.

## V.    STATEMENT OF THE FACTS

### A.    Debtors' Background

Amtrol is a leading international designer, manufacturer and marketer of expansion and pressure control products used in water systems applications and selected sectors of the heating, ventilation and air conditioning market. Amtrol's principal products include well water accumulators, hot water expansion controls, water treatment products, indirect-fired water heaters and returnable and non-returnable pressure-rated cylinders used primarily to store, transport and dispense refrigerant, heating and cooking gases. Many of these products are based

on a technology originated and developed by Amtrol, involving a pre-pressurized vessel with an internal diaphragm to handle fluids under pressure. (Utility Motion ¶5, App. at B-77 to B-78).

In the operation of their manufacturing, distribution and office facilities, Amtrol incurs utility expenses in the ordinary course of business for, among other things, water, sewer services, electricity, gas, local telephone service, and waste disposal. On an annual basis, Amtrol spends approximately $3.8 million for various utility services, with an average monthly cost of approximately $320,000.00. (Utility Motion ¶7, App. at B-78).

After Amtrol filed for bankruptcy, on January 11, 2007, it had $2 million in cash on hand and substantial availability of $12 - $13 million under a Debtor in Possession (**"DIP"**) Loan facility providing liquidity to pay its operating expenses, including utility expenses. (January 11, 2007 Hearing Transcript, App. at B-668).

B.    **Nature of the Parties' Historical Business Transactions**

National Grid is a provider of gas and electrical services to Amtrol. National Grid's billing cycle is established by the applicable tariffs and regulations of the Rhode Island Public Utility Commission. (January 11, 2007 Hearing Transcript, App. at B-674). Monthly invoices for services are due upon receipt, but National Grid's customers are given at least 20 days after an invoice is sent to make payment without being considered in default. (January 11, 2007 Hearing Transcript, App. at B-674). If the prior month's bill has not been paid, a default notice is issued by National Grid that provides 10 days to cure the default. (January 11, 2007 Hearing Transcript, App. at B-674). Under National Grid's invoicing procedures, if Amtrol failed to pay an invoice, it could receive up to 70 days of gas or electric utility service before National Grid could begin to terminate utility service to the Debtors for non-payment. (January 11, 2007 Hearing Transcript, App. at B-674).

WLM_508795_5.DOC/MOLIVERE

After Amtrol filed for bankruptcy, it fulfilled its obligations under §366(b) of the Bankruptcy Code by providing National Grid with adequate assurance of payment by placing in escrow an amount of cash equal to an average two weeks' utility expense. Amtrol filed the Utility Motion seeking the Bankruptcy Court's determination that the Debtor's provision of adequate assurance was satisfactory to the Court. National Grid demanded a post-petition adequate assurance deposit from Amtrol in the total amount of $302,018.00, which is the equivalent of two-months of average utility services provided to Amtrol by National Grid, and filed an objection to the Utility Motion. (January 11, 2007 Hearing Transcript, App. at B-674 to B-675). National Grid believes it may request a two-month deposit and that Amtrol is absolutely obligated to pay the request when made. (January 11, 2007 Hearing Transcript, App. at B-675). National Grid never filed a motion under Bankruptcy Code Section 366(c)

## VI.    STATEMENT OF THE CASE

### A.    Pre-Plan Confirmation Case History

#### 1.    The Debtors' Bankruptcy Cases and the Utility Motion

On December 18, 2006 (the **"Petition Date"**), Amtrol filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**). At the time of the commencement of the cases, Amtrol utilized approximately 27 utility companies (the **"Utility Companies"**). National Grid was one of the utility companies that provided Amtrol with gas and electric utility service.

On December 19, 2006, Amtrol filed a Motion for a Bridge Order and a Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Establishing Procedures for Providing Deposits to Requesting Utilities, (III) Deeming Utility Companies to Have Adequate Assurance of Payment, and (IV) Establishing Procedures for

Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) & 366 (the **"Utility Motion"**).  (Utility Motion, App. at B76 to B-98).  National Grid was served with a copy of the Utility Motion and Exhibit C to the Utility Motion by overnight mail, facsimile and email on December 19, 2006 as stated on the Affidavit/Declaration of Service filed with the Court on December 19, 2006.  (December 19, 2006 Declaration of Service, App. at B-446 to B-455).

On December 20, 2006, the Bankruptcy Court held a hearing (the **"First Day Hearing"**) to consider various emergent first day motions and related pleadings (the **"First Day Motions"**).  Included among the First Day Motions was the Debtors' Emergency Motion for Interim and Final orders (i) Authorizing Debtors to (A) Obtain Post-Petition Senior Secured Super-Priority Financing and (B) Use Cash Collateral of Pre-Petition Secured Lenders; (ii) Authorizing the Immediate Payoff of the Pre-Petition Secured Loans, (iii) Granting Adequate Protection to Pre-Petition Secured Lenders; and (iv) Scheduling Final Hearing (the **"DIP Motion"**) as well as the Utility Motion.  Objections to the First Day Motions were to be made prior to or at the First Day Hearing.  Prior to the First Day Hearing, Appellee was served with a notice of the hearing on the Utility Motion as stated in the Omnibus Notice of Motions and Hearing Thereon filed with the Court on December 21, 2006.[4]  (Omnibus Notice of Motions and Hearing Thereon, App. at B-100 to B-445).

At the First Day Hearing, upon consideration of the Utility Motion, the record and the sufficiency thereof, Bankruptcy Judge Gross entered a Bridge Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Establishing Procedures for

---

[4]  Despite Appellant's argument in footnote 1 on page 7 of their Opening Brief [D.I. 8], service of the Utility Motion was properly made upon Appellant.

Providing Deposits to Requesting Utilities, (III) Deeming Utility Companies to Have Adequate

Assurance of Payment, and (IV) Establishing Procedures for Resolving Requests for Additional

Assurance Pursuant to 11 U.S.C. §§ 105(a) & 366 (the **"Bridge Order"**).  (Bridge Order, App.

at B-456 to B-458).  Pursuant to the Bridge Order, interim relief was granted with a final hearing

to consider the Utility Motion scheduled for January 11, 2007 (the **"Final Hearing"**).  (Bridge

Order, App. at B-457 to B-458).

On January 8, 2007, Appellant filed an Objection to the Utility Motion (the **"Utility

Motion Objection"**).  (Utility Motion Objection, App. at B-528 to B-550).

### 2.    The January 11, 2007 Hearing

During the Final Hearing, and prior to consideration of the Utility Motion, the

Bankruptcy Court heard testimony and was presented with evidence in support of Debtors' DIP

Motion.  (January 11, 2007 Hearing Transcript, App. at B-654 to B-658).  At the conclusion of

the evidence, the Bankruptcy Court entered an order granting the DIP Motion (the **"Final DIP

Order"**).  (January 11, 2007 Hearing Transcript, App. at B-658.)

During the Final Hearing, and in support of the Utility Motion, Appellee proffered the

testimony of Debtors' Chief Financial Officer (January 11, 2007 Hearing Transcript, App. at

B-667 to B-670), raised the entry of the Final DIP Order for the Bankruptcy Court of which the

Bankruptcy Court took judicial notice, and brought to the attention of the Bankruptcy Court

several recent orders entered within the District of Delaware pursuant to section 366 of the

Bankruptcy Code (January 11, 2007 Hearing Transcript, App. at B-668; B-676 to B-678; B-692

WLM_508795_5.DOC/MOLIVERE

to B-693). The Utility Motion further expressly incorporated the First Day Affidavit by reference.[5] (Utility Motion, App. at B-78).

In support of its Objection, Appellant proffered the testimony of William Grossman, an employee with National Grid. (January 11, 2007 Hearing Transcript, App. B-673 to B-675). Additionally, Appellant's objection relied upon the First Day Affidavit, thereby incorporating the content into its argument. (Utility Motion Objection ¶¶ 13, 14, 15, 16, 17 and 18, App. B-535 to B-537). Moreover, counsel for Appellant directed the Bankruptcy Court to the First Day Affidavit. (January 11, 2007 Hearing Transcript, App. at B-686; B-691). Likewise, counsel for the Official Committee of Unsecured Creditors (the **"Committee"**) referenced the content of the Affidavit in voicing its support for the Final Utility Order. (January 11, 2007 Hearing Transcript, App. at B-690).

### 3.    Bankruptcy Court Ruling on Utility Motion

At the Final Hearing, upon the record adduced at the Final Hearing, the prior record of the cases, and after listening to arguments presented by Amtrol and National Grid and considering all the evidence before it, the Court entered an order approving the Debtors' provision of adequate assurance (the **"Final Utility Order"**). (Final Utility Order, App. B-632

---

[5]    "[T]he Bankruptcy Court may take judicial notice of facts that are not subject to reasonable dispute." In re Federal Mogul-Global Inc., 348 F.3d 390, 407 n.11 (3d Cir. 2003) (citing In re Indian Palms Assocs. Ltd., 61 F.3d 197, 205 (3d Cir. 1995) (stating that a Bankruptcy Court is "authorize[d] … to take judicial notice of an adjudicative fact if that fact is 'not subject to reasonable dispute'") (quoting Fed.R.Evid. 201(b)); In re Bozzelli, 227 B.R. 770, 771 (Bankr.E.D.Pa.1998) (stating that a Bankruptcy Court may "take judicial notice of adjudicative facts 'not subject to reasonable dispute … so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority') (quoting Indian Palms Assocs., 61 F.3d at 205)); In re Peregrine Systems, Inc., 311 B.R. 679, 691-92 (D.Del. 2004). See also Fed.R.Evid. 201(f) (judicial notice may be taken at any time).

WLM_508795_5.DOC/MOLIVERE

to B-636). At the conclusion of the Final Hearing, the Bankruptcy Court stated the basis of its

ruling as follows:

> Under the facts and circumstances of this case, I think we have a
> particularly strong D-I-P loan. We have a Debtor that is operating
> on a cash flow positive basis. We hope that it's going to be a short
> and sweet bankruptcy case before we get to a plan confirmation.
> Under those circumstances, and the specific circumstances of this
> case, I believe that the two weeks is adequate assurance for the
> utility.
>
> I might note that I make myself available readily and if there is a
> problem in payment to the utility, I'm certainly here to consider
> emergency relief if it's appropriate or necessary. And to revisit
> this issue. But on a going-forward basis, the Court is satisfied with
> the two weeks of deposit.

(January 11, 2007 Hearing Transcript, App. B-693 to B-694).

As adequate assurance to all its utilities, the Final Utility Order required Amtrol to

continue to provide an aggregate segregated escrow of $150,000, which amount is equal to the

average cost to Amtrol of two weeks of service from all utilities over the twelve-month period

preceding the Petition Date. (Final Utility Order, App. B-635).

On January 19, 2007, rather than exercise any rights afforded pursuant to Bankruptcy

Code Section 366(c), National Grid filed a Notice of Appeal of the Final Utility Order. (Notice

of Appeal, App. B-696 to B-697). In its appeal, National Grid claims that Amtrol failed to

comply with the procedural and substantive requirements of section 366 of the Bankruptcy Code

by failing to pay in full National Grid's adequate assurance demand of a two-month deposit in

the amount of $302,018 and further failing to provide National Grid with adequate assurance of

payment.

Thereafter, on January 26, 2007, Appellant filed their Designation of Items to be Included

in the Record and Statement of Issues on Appeal (the **"Appellants' Designation of Record"**)

WLM_508795_5.DOC/MOLIVERE

[D.I. 2]. On February 5, 2007, Appellees filed the Debtors' Designation of Additional Items to be Included in Record on Appeal Pursuant to Bankruptcy Rule 8006 (the **"Appellees' Designation of Record"**) [D.I. 3]. At no time in the past four months has Appellant filed a motion objecting to Appellees' Designation of Record.

### B.      Plan and Post-Plan Confirmation Case History

#### 1.      The Debtors' Plan and Disclosure Statement

Subsequent to the filing of the Appeal, on March 1, 2007, the Debtors filed their Joint Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors and the Debtors [Bankr. D.I. 190] (as amended, the **"Plan"**) and their Disclosure Statement Relating to the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors [Bankr. No. 191] (as amended, the **"Disclosure Statement"**). Debtors' First Amended Disclosure Statement [Bankr. D.I. 317] and First Amended Plan of Reorganization [Bankr. D.I. 318] were filed with the Bankruptcy Court on April 11, 2007.

On April 11, 2007, the Bankruptcy Court approved the Disclosure Statement and authorized the Debtors to solicit votes to accept or reject the Plan pursuant to the procedures set forth in the Disclosure Statement Approval Order (the **"Disclosure Statement Approval Order"**).

#### 2.      The Confirmation Hearing and Ruling on Confirmation

On May 24, 2007, the Bankruptcy Court held a hearing to consider confirmation of the Plan (the **"Confirmation Hearing"**). On that same date, the Bankruptcy Court issued its Findings of Fact, Conclusions of Law and Order Confirming First Amended Joint Chapter 11 Plan of Reorganization for Amtrol Holdings, Inc., Amtrol Inc., Water Soft LLC and Amtrol

WLM_508795_5.DOC/MOLIVERE

International Investments Inc., Proposed by The Official Committee of Unsecured Creditors and the Debtors (the **"Confirmation Order"**), confirming the Plan in all respects and overruling all objections to confirmation not otherwise withdrawn or resolved. In confirming the Plan, the Confirmation Order specifically found that National Grid as an unsecured creditor was afforded an adequate remedy at law for its claims. A copy of the Confirmation Order is attached hereto as Exhibit A.

### 3.    National Grid's Claims and Treatment Under the Plan

National Grid provided gas and electricity services to Amtrol both pre- and post-petition. Pursuant to the Utility Motion Objection, National Grid requested a post-petition adequate assurance deposit in the total amount of $302,018.00, which is the equivalent of a two-month deposit. On or about February 22, 2007, National Grid filed a general unsecured proof of claim in the amount of $10,406.33 (Claim No. 157). A copy of Claim No. 157 is attached hereto as Exhibit B. Subsequently, National Grid, d/b/a Narragansett Electric filed a general unsecured proof of claim in the amount of $214,921.40 (Claim No. 119). A copy of Claim No. 119 is attached hereto as Exhibit C. National Grid's claims are provided for in Class 3 of the Plan. A copy of the relevant portion of the Plan is attached hereto as Exhibit D at pp 16-19. In connection with the implementation of the Plan, Class 3 allowed claims are unimpaired and will receive the full amount of their pre-petition claim. A copy of the relevant portion of the Plan is attached hereto as Exhibit D at p 18.

## VII.    SUMMARY OF ARGUMENT

For the following reasons, the Court should affirm the decision of the Bankruptcy Court:

1.    The entry of the Bridge Order was proper pursuant to section 366 and the Bridge Order was not entered on an *ex parte* basis.

    WLM_508795_5.DOC/MOLIVERE

2.     The Bankruptcy Court properly approved the adequate assurance of payment procedures pursuant to section 366 and the Utility Motion.

3.     The Bankruptcy Court properly exercised its discretion in determining that Appellant's Objection was a pleading filed pursuant to section 366(c)(3)(A) and properly conducted a hearing on the Objection at the Final Hearing.

4.     The Record supported the Bankruptcy Court's ruling that Appellant's adequate assurance of payment request of a two month deposit should be modified to the payment of a two-week deposit.

## VIII.  ARGUMENT

### A.     National Grid's Appeal Should be Dismissed as Being Constitutionally Moot

#### 1.     The Appeal is Constitutionally Moot

"Constitutional mootness is a jurisdictional doctrine rooted in the requirement of Article III of the United States Constitution that 'the exercise of judicial power depends upon the existence of a case or controversy.'" See MW Post Portfolio Fund Ltd. v. Norwest Bank Minnesota (In re Onco Investment Co.), 2005 WL 2401908 at *4 (D.Del.) (quoting Int'l Broth. Of Boilermakers v. Kelly, 815 F.2d 912, 914 (3d Cir. 1987)). "Under Article III of the United States Constitution, federal courts may adjudicate only actual cases or controversies, rather than advising what the law would be for a hypothetical state of facts." See Potomac Electric Power Co. v. The Rowe Companies, 2007 WL 656897 (E.D.Va.) (citing Deakins v. Monaghan, 484 U.S. 193, 199 (1988)). "It has been long settled that a federal court has no authority to 'give opinions upon moot questions or abstract proposition, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" Id. (quoting Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992)). Thus, "'[i]f an event occurs while a case

WLM_508795_5.DOC/MOLIVERE

is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed" as constitutionally moot. See Id.; see also In re United Artists Theater Co., 315 F.3d 217, 226 (3d Cir. 2003); MW Post Portfolio Fund Ltd. v. Norwest Bank Minnesota (In re Onco Investment Co.), 2005 WL 2401908 (D.Del.); B.R. Griffin v. Box Brothers Holding Co., 194 B.R. 32, 38 (D.Del. 1996).

Section 366 of the Bankruptcy Code strikes a balance between the interests of debtors and utility companies. It is designed to protect debtors from utility service cutoffs, while also providing utility companies with adequate assurance that debtors will be able to pay for post-petition services. See H.R. Rep. No. 95-595, at 350 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6306. As such, pursuant to section 366(b), a debtor is obligated to provide adequate assurance to a utility in a particular manner and under a particular procedure. The Final Utility Order entered by the Bankruptcy Court establishes the adequate assurance and procedures required. However, these protections are no longer afforded once a company has emerged from bankruptcy. See Bankruptcy Code §1141 (property of the estate revests with the debtor upon confirmation, thereby negating application of Chapter III of the Bankruptcy Code).

Here, there is no question that National Grid's appeal is constitutionally moot. In their appeal, National Grid seeks the following relief:

> (i)    the reversal of the Final Utility Order together with a holding that the procedures approved in the Final Utility Order were not in compliance with section 366;
>
> (ii)   an order directing the Bankruptcy Court to compel Debtors to pay National Grid a two-month adequate assurance deposit; and
>
> (iii)  in recognition of National Grid's argument that the debtor must pay whatever a utility demands as adequate protection then seek relief from the court, an instruction to the Bankruptcy Court that a debtor must comply with section 366(c)(3) if it desires to modify a utility's adequate assurance of payment request.

Consideration of these issues in conjunction with the facts of the case clearly establish that the court cannot grant "any effectual relief whatever."

First, Appellant's request for a reversal of the Final Utility Order, together with a holding that the Final Utility Order was not in compliance with section 366, would provide no relief to Appellant. In these cases, the Plan has been both confirmed and substantially consummated, thereby emerging Amtrol from bankruptcy. Accordingly, reversal of the Final Utility Order will not provide National Grid—or any utility provider—"any effectual relief whatever." Now that the Final Utility Order is effectively moot, the issuance of a court decision finding that the Final Utility Order was not in compliance with section 366, would be tantamount to an advisory opinion. It is not the role of the District Court to issue advisory opinions. Merck & Co., Inc. v. Apotex, Inc., 2007 WL 1470453 at *4 (D.Del.). The issuance of such an advisory opinion, in the context of cases where the debtor has emerged from bankruptcy, would serve no purpose for Appellant and would not provide any relief.

Second, Appellant requests an order directing the Bankruptcy Court to pay National Grid a two-month adequate assurance deposit. As explained, Debtors have substantially consummated their Plan and have emerged from bankruptcy. Accordingly, National Grid is no longer entitled to the adequate assurance guaranteed by section 366. Therefore, it would be futile for the Court to issue an order directing the payment of a two-month deposit.

Finally, Appellant requests that this Court issue an instruction to the Bankruptcy Court that a debtor must comply with section 366(c)(3) if it desires to modify a utility's adequate assurance of payment request. National Grid asserts that Bankruptcy Code § 366(c) requires a debtor to pay whatever a utility demands as adequate protection then seek relief from the court. As set forth above, for this Court to rule in the abstract on the application of section 366 would be tantamount to an advisory opinion. "It has been long settled that a federal court has no authority to 'give opinions upon moot questions or abstract proposition, or to declare principles

WLM_508795_5.DOC/MOLIVERE

or rules of law which cannot affect the matter in issue in the case before it.'" Potomac Electric,
2007 WL 656897 (quoting Church of Scientology of California v. United States, 506 U.S. 9, 12
(1992)).

Because the Debtors have substantially consummated their Plan and have effectuated
their exit from Chapter 11, neither Appellant nor Appellee require any of the protections set forth
in the Final Utility Order.  Further, the adequate assurance provided for under section 366 of the
Bankruptcy Code is no longer necessary or applicable.  Accordingly, vacating the Final Utility
Order will only serve to "declare principles or rules of law which cannot affect the matter in
issue in the case." Church of Scientology of California, 506 U.S. at 12, 113 S. Ct. at 449.
Additionally, because National Grid's pre-petition and post-petition claims will be paid in full,
there is no risk of non-payment.  Consequently, this Court cannot grant Appellants "any effectual
relief whatever," and this appeal must be dismissed as constitutionally moot.

> **2.    No Mootness Exception Applies Because This Case is Not "Capable of
>         Repetition, Yet Evading Review"**

A limited exception to the mootness doctrine applies where a case is capable of
repetition, yet evading review.  See e.g., Spencer v. Kemna, 523 U.S. 1, 17, 118 S.Ct. 978, 988
(1988); see also Potomac Electric Power Company v. The Rowe Companies, 2007 WL 656897
(E.D.Va.).  The United States Supreme Court has stated that:

> the capable-of-repetition doctrine applies only in exceptional
> circumstances where the following two circumstances are
> simultaneously present: (1) the challenged action is in its duration
> too short to be fully litigated prior to cessation or expiration, and
> (2) there is a reasonable expectation that the same complaining
> party will be subject to the same action again.

Spencer, 523 U.S. 1, 17 (1998).

WLM_508795_5.DOC/MOLIVERE

Recently, and similar to the facts of the case before this Court, the District Court for the Eastern District of Virginia dismissed the appeal of various utility companies to a final order establishing procedures under section 366 of the Bankruptcy Code based on constitutional mootness. See, Potomac Electric Power Company v. The Rowe Companies, 2007 WL 656897 (E.D.Va.). In Potomac Electric, the Bankruptcy Court for the Eastern District of Virginia entered final orders establishing procedures and adequate assurance of payment to each utility pursuant to section 366 of the Bankruptcy Code. Thereafter, three utility companies that provided electric service to the debtor appealed the orders. After commencement of the appeal, debtor ceased operations at the locations serviced by the utility companies. Subsequently, the debtor moved the court to dismiss the appeal on the grounds of mootness and lack of standing. Upon consideration, the District Court granted the motion to dismiss the appeal, holding that because debtor discontinued its utility service, there was no risk of non-payment and thus, the appeal was constitutionally moot as the relief requested was no longer necessary. See Id. at *2. The utility companies, however, argued that the "capable of repetition, yet evading review" exception applied, thereby preventing dismissal by the district court. The District Court rejected this argument, finding that the utility companies failed to satisfy either requirement. First, the utility companies did not show that future, similarly situated chapter 11 debtors will cease operations as quickly, and second, the court found no reasonable expectation that the same parties will be subject to the same action in the future. Id. at *2-3.

Should National Grid assert the "capable of repetition, yet evading review" exception, it is clear from the facts that neither requirement is satisfied and the exception does not apply. First, while the Debtors' cases were quickly administered and their Plan substantially consummated, National Grid cannot show that the majority of future, similarly situated debtors

in possession will follow the same procedures and provide the same service of process as Amtrol or substantially consummate their plans of reorganization as quickly and that the time to fully litigate the issues on appeal are too brief to fall within the capable-of-repetition exception. Rather, opportunities abound for this very issue to be litigated in other cases pending in the District of Delaware and elsewhere. In fact, as acknowledged by National Grid in the Final Hearing, National Grid itself has filed similar objections to procedures orders under section 366 in numerous other bankruptcy cases in the District of Delaware. (January 11, 2007 Hearing Transcript, App. at B-681). These other cases are distinguishable from Debtors' cases in that none of them consummated their plans of reorganization as quickly as Amtrol. As such, National Grid cannot meet the first requirement.

Furthermore, the second requirement that there is a reasonable expectation that National Grid will be subject to the same action by Amtrol cannot be met. Because the Bankruptcy Court entered the Confirmation Order, thereby finding the Plan to be feasible, and because Amtrol has substantially consummated the Plan and exited chapter 11, there is no reasonable expectation that these same parties will be subject to the same action in the future. See, e.g., DeFuinis v. Odegaard, 416 U.S. 312, 318-19, 94 S. Ct. 1704, 1707 (1974) (challenge to law school admissions process moot where complaining party would graduate law school prior to decision). Accordingly, the capable-of-repetition exception does not apply.

**B.** **Appellants Improperly Raise An Issue on Appeal that was Not Designated**

Appellants' Opening Brief raises several procedural arguments relating to the service or designation of items, however, none of these arguments were raised in the Appellants'

WLM_508795_5.DOC/MOLIVERE

Designation of Record and, therefore, may not be considered by this Court.[6] An issue is waived if it is not listed in the statement of issues to be presented on appeal as required by Rule 8006. See In re GGM, P.C., 165 F.3d 1026 (5th Cir. 1999); accord TWA, Inc., 145 F.3d 124 (3d Cir. 1998). Pursuant to Bankruptcy Rule 8006, the Appellant must file a designation of the items to be included in the record on appeal and a statement of the issues to be presented. Thereafter, Appellee may file and serve a designation of additional items to be included in the record on appeal. Nowhere in Appellants' Designation of Record did they identify issues relating to the sufficiency of service of the Utility Motion (as raised in footnote 1 of the Opening Brief) or the admission or consideration of the First Day Affidavit, the Transcript from the First Day Hearing, or the Orders from other bankruptcy cases identified at the Final Hearing. Accordingly, this Court should not consider Appellants' newly raised issues and argument and should consider only the record as properly designated by the Appellant and the Appellee. See In re Indian Palms Associates, Ltd., 61 F.3d at 203-205 ("'Judicial notice may be taken at any stage of the proceeding,' including on appeal.") (internal citations omitted). Furthermore, any objection by Appellant to the inclusion of the Appellees' Designation of Record is improperly raised in their Opening Brief. Rather, such objection belongs in the form of a separate Motion to Strike pursuant to Rule 8011. See e.g., In re Indian Palms Associates, Ltd., 61 F.3d at 203-205.

## C.    Applicable Statutory Provision

Section 366 of the Bankruptcy Code provides:

---

[6] This is distinguishable from Amtrol's jurisdictional argument of constitutional mootness, as jurisdictional questions may be raised at any time including on direct appeal. See In re Material Engineering Assoc. Ltd., 168 B.R. 204, 210 (Bankr. W.D.Mo. 1994) ("The Court recognizes that lack of subject matter jurisdiction is a defense that may be raised at any time, including on appeal, and may not be waived.") (citing Insurance Corp of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); Yeldell v. Tutt, 913 F.2d 533, 537 (8th Cir. 1990); Fed.R.Civ.P. 12(h)(3)).

WLM_508795_5.DOC/MOLIVERE

(a)     Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b)     Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

(c)(1)(A)  For purposes of this subsection, the term "assurance of payment" means –

        (i)      a cash deposit

        (ii)     a letter of credit;

        (iii)    a certificate of deposit;

        (iv)    a surety bond;

        (v)     a prepayment of utility consumption; or

        (vi)    another form of security that is mutually agreed on between the utility and the debtor or the trustee.

(B)  For     purposes    of    this    subsection    and administrative expense priority shall not constitute an assurance of payment.

(2)   Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

(3)(A)   On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

(B)   In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider -

        (i)      the absence of security before the date of the filing of the petition;

        (ii)     the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition; or

        (iii)    the availability of an administrative expense priority.

> (4)   Notwithstanding any other provision of a law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the debtor before the date of the filing of the petition without notice or order of the court.

See 11 U.S.C. § 366.

**D.    Appellant's Factual Issues Lack Merit and Its Legal Conclusions are Unsupported**

**1.    The Bridge Order Was Not Obtained on an *Ex Parte* Basis**

National Grid claims that the Bridge Order was obtained on an *ex parte* basis. It was not. Among many other parties upon which service was properly made, Appellant received notice of the Utility Motion in accordance with the Federal Rules of Bankruptcy Procedure and the procedures established by the Bankruptcy Court. Pursuant to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware[7] 9013-1(m), motions filed with the petition in a chapter 11 case that seek relief of a "genuinely emergent nature required to preserve the assets of the estate and to maintain ongoing business operations" shall be served at least 24 hours in advance of a hearing on such motion, unless otherwise ordered by the Bankruptcy Court. See Del Bankr. L.R. 9013-1(m)(ii) and (iii). Here, National Grid received a facsimile, overnight and email copy of the Utility Motion and notice of the hearing on December 19, 2006 and chose not to appear at the First Day Hearings scheduled by the Bankruptcy Court on December 20, 2006. (December 19, 2006 Declaration of Service, App. at B-446 to B-455). Accordingly, National Grid received not one, but multiple notices, by multiple means of the First Day Hearings in accordance with Delaware's Local Rules of Bankruptcy Practice and Procedures and should not be heard to claim that the Bridge Order was

---

[7]   Cited herein as "Del. Bankr. L.R. ____"

WLM_508795_5.DOC/MOLIVERE

obtained on an *ex parte* basis. Even if the Bridge Order was entered on an *ex parte* basis, which

it was not, the order, by its very nature, was an interim order and subject to final approval.

### 2. Because Amtrol Fully Complied with Section 366(b), the Bankruptcy Court Properly Approved the Adequate Assurance of Payment Procedures Set Forth in the Final Utility Order

Section 366(b) imposes obligations on a debtor to provide adequate assurance to a utility

in a particular manner and under a particular procedure. Specifically, a *debtor* must:

(1)    within 20 days after the petition is filed;
(2)    furnish adequate assurance of payment;
(3)    in the form of a deposit or other security.

Amtrol satisfied these requirements as follows:

1. Bridge Order entered on December 20, 2006, within 2 days after the petition was filed;
2. Court determined on an interim basis that $150,000.00 was adequate assurance of payment to all utilities;
3. Adequate assurance of payment was given in the form of an escrow.

Section 366(b) further states that upon request of a party in interest, and after notice and a

hearing, the Bankruptcy Court may order modification of such assurance of payment furnished

by debtor. These requirements too were satisfied – National Grid objected to the Utility Motion

and requested a greater deposit as well as a hearing, National Grid had notice of the Final

Hearing, the Bankruptcy Court conducted the Final Hearing and the Final Utility Order was

entered based on the record made at the Final Hearing. It is the Final Utility Order that is the

subject of the Appeal. Clearly, the Appeal is unwarranted because Debtors complied fully with

the requirements of section 366(b), National Grid exercised its right under that section to request

modification from the Bankruptcy Court and the request was heard by the Bankruptcy Court and

denied.

WLM_508795_5.DOC/MOLIVERE

3.    **Although Not Required To, Amtrol Also Fully Complied With Section 366(c)(2), As Modified By Section 366(c)(3)**

If a debtor does not proceed under 366(b), then after 30 days following the commencement of the case, a utility may exercise its rights as set forth in 366(c). Section 366(c) requirements imposed upon the Debtors and the Bankruptcy Court likewise were satisfied.

Section 366(c)(2) and (3) shift the focus from what is required through affirmative action by Debtors in Section 366(b), to the rights of a utility. If the utility is not satisfied, then the utility must file a motion to modify the adequate assurance furnished by the debtor and received by the utility.

> Section 366(c)(2) provides in relevant part:
>
> Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.
>
> Section 366(c)(3)(A) provides in relevant part:
>
> On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

See 11 U.S.C. § 366.

In National Grid's Objection, it argued that it did not receive from the Debtors adequate assurance of payment for utility services that were satisfactory to National Grid. (National Grid Objection, App. at B-546 to B-550). National Grid reads this provision to require the Debtors to pay a deposit equal to the utility's demand, then the Debtors may seek relief from the Bankruptcy Court if the Debtors feel such demand was excessive. The Bankruptcy Code does not give the utility such a unilateral right, as any such right may cause many debtors to be in breach of their

WLM_508795_5.DOC/MOLIVERE

obligations under Section 366 if utilities' demands are unchecked in the first place and they are permitted to control the debtor's liquidity.

Amtrol fully complied with Section 366. At the Final Hearing, the Bankruptcy Court entered the Final Utility Order, which adopted Amtrol's position that it had provided a conforming form and a satisfactory amount of adequate assurance of future payment to all its utilities by depositing in an escrow account an amount equal to the average cost to Amtrol of two weeks of service over the twelve months preceding the Petition Date ($150,000.00). (Final Utility Order, App. at B-635).

If the Court were to adopt National Grid's position, then debtors would be required to pay whatever a utility demanded, then file a motion seeking a return of what was paid or risk having their utilities shut off after 30 days. National Grid's position punishes debtors who pro-actively seek a determination of the amount and nature of the adequate protection offered and furnished, through proper notice and a hearing, to avoid being held hostage to the demands of utilities.

Further, the Appeal is a case of form over substance. Even assuming *arguendo* that this Court were to find that the Section 366 procedures had not been followed to the letter, National Grid is unable to show that it has been harmed substantively for all the reasons stated by the Bankruptcy Court at the conclusion of the Final Hearing, i.e. a very strong DIP loan, Amtrol was operating (and continues to operate) on a cash flow positive basis and contemplation of a short bankruptcy case prior to plan confirmation.[8] (January 11, 2007 Hearing Transcript, App. at B-693 to B-694). As the Bankruptcy Court stated: "Under those circumstances, and the specific

---

[8] The Plan has now been approved and provides for payment in full of all general unsecured claims, including National Grid's claims.

WLM_508795_5.DOC/MOLIVERE

circumstances of this case, I believe that the two weeks is adequate assurance for the utility."

(January 11, 2007 Hearing Transcript, App. at B-694).

> **4.    The Bankruptcy Court's Finding that Appellee's Adequate Assurance of Payment Request of a Two-Month Deposit Should be Modified to the Payment of a Two-Week Deposit is Supported by the Record**

The Bankruptcy Court had the authority to grant the Final Utility Order pursuant to

sections 105(a) and 366 of the Bankruptcy Code.  Section 366 of the Bankruptcy Code is

designed to protect debtors from utility service cutoffs, while also providing utility companies

with adequate assurance that debtors will be able to pay for post-petition services.  See H.R. Rep.

No. 95-595, at 350 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6306.  In addition, section

105(a) of the Bankruptcy Code provides that the court "may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  The purpose

of section 105(a) is "to assure the bankruptcy court's power to take whatever action is

appropriate or necessary in aid of the exercise of their jurisdiction."  2 Lawrence P. King, Collier

on Bankruptcy ¶ 105.01, at 105-6 (15th ed. Rev. 2004).

Section 366(c)(1)(A) of the Bankruptcy Code, as amended by the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005, now provides that "adequate assurance of

payment" means (i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety

bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually

agreed on between the utility and the debtor or the trustee.  Accordingly, while the statute now

specifies the *form* of assurance that will be deemed to be adequate, it leaves the question of the

*amount* of assurance that must be provided squarely within the Bankruptcy Court's discretion.

Leaving the determination as to the amount of assurance that a debtor will need to

provide in the discretion of the court conforms with the pre-amendment caselaw, under which

WLM_508795_5.DOC/MOLIVERE

courts generally looked to the facts and circumstances of each case to ensure that utility companies were not subjected to an unreasonable risk of nonpayment for post-petition services. See, e.g., In re Keydata Corp., 12 B.R. 156, 158 (1st Cir. BAP 1981). Courts construing section 366(b) of the Bankruptcy Code have long recognized that adequate assurance of payment does not constitute an absolute guaranty of the debtor's ability to pay. See e.g., In re Caldor, Inc. NY, 199 B.R. 1, 3 (S.D.N.Y. 1996) ("Section 366(b) requires [a] [b]ankruptcy [c]ourt to determine whether the circumstances are sufficient to provide a utility with 'adequate assurance' of payment. The statute does not require an 'absolute guaranty of payment.'") (citation omitted); In re Penn Jersey Corp., 72 B.R. 981, 982 (Bankr. E.D.Pa. 1987) (stating that section 366(b) "contemplates that a utility receive only such assurance of payment as is sufficient to protect its interests given the facts of the debtor's financial circumstances...").

Further, courts have recognized that, in determining what constitutes "adequate" assurance, a bankruptcy court must "focus upon the need of the utility for assurance, and . . . require that the debtor supply no more than that, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." Virginia Elec. & Power Co. v. Caldor, Inc-NY, 117 F.3d 646, 650 (2d. Cir. 1997) (quoting Penn Jersey, 72 B.R. at 985).

A two-week deposit pursuant to the procedures set forth in sections 366(c)(2) and (3) was appropriate and provided adequate assurance to National Grid. The fundamental nature of section 366 has not been changed by the 2005 amendments—that the court has discretion to modify any request for assurance of payment and that the assurance of payment need only be adequate in light of the facts and circumstances of a given case—and given the specific facts of these cases, including the court-approved $115,000,000 DIP Loan, the Bankruptcy Court's determination that Appellant was provided with adequate assurance is supported by the record.

## IX.    CONCLUSION

For the foregoing reasons, this Court should affirm the entry of the Final Utility Order by

the Bankruptcy Court without further remand needed for any factual findings.

DATED:   June 11, 2007                    EDWARDS ANGELL PALMER & DODGE LLP


Stuart M. Brown (No. 4050)
Denise S. Kraft  (No. 2778)
William E. Chipman Jr. (No. 3818)
Mark D. Olivere (No. 4291)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 777-7770

Attorneys for Appellees

WLM_508795_5.DOC/MOLIVERE

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMTROL HOLDINGS, INC., *et al.*[1] | : | Case No. 06-11446 (KG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION FOR AMTROL HOLDINGS, INC., AMTROL INC., WATER
SOFT INC. AND AMTROL INTERNATIONAL INVESTMENTS INC., PROPOSED BY
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE DEBTORS**

Upon consideration of the First Amended Joint Chapter 11 Plan of Reorganization

for Amtrol Holdings Inc., Amtrol Inc., Water Soft LLC and Amtrol International Investments

Inc., Proposed by the Official Committee of Unsecured Creditors (the **"Committee"**) and the

Debtors (the **"Plan"**), at or in connection with the hearing on confirmation thereof (the

**"Confirmation Hearing"**); and upon the related First Amended Disclosure Statement Relating

to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

Proposed by the Debtors (the **"Disclosure Statement"**); and upon the order approving the

Disclosure Statement entered by the Court on April 11, 2007 (the **"Disclosure Statement

Approval Order"**) granting the following relief:

> a.      (i) approving the Disclosure Statement (as modified or amended) as
> containing "adequate information" with respect to the Plan, and (ii) authorizing
> the Debtors to solicit acceptances or rejections of the Plan from holders of
> impaired claims against the Debtors that are entitled to vote on the Plan, *i.e.*,
> holders of Class 4 Senior Note Claims[2] under the Plan, by the transmission of a

---

[1]    Additional Debtors include all of Amtrol Holdings, Inc.'s wholly-owned direct and indirect domestic subsidiaries: Amtrol Inc.; Water Soft LLC (f/k/a Water Soft Inc.); and Amtrol International Investments Inc.

[2]    The "Senior Note Claims" are claims arising under that certain Note Indenture Agreement, dated as of November 1, 1996, relating to the $115 million principal amount 10 ¼% Senior Subordinated Notes issued by Amtrol Inc.

CERTIFIED AS A TRUE COPY:
ATTEST:
DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT
BY:
Deputy Clerk 6/1/07

copy of the Disclosure Statement (as approved by this Court) in the manner set forth below;

b.    fixing the record date for holders of Class 4 Senior Note Claims to vote on the Plan (the **"Voting Deadline"**);

c.    fixing the time and manner for the solicitation of acceptances or rejections of the Plan and establishing voting and related procedures in connection therewith (the **"Voting Procedures"**);

d.    approving the forms of ballots to be used by the Debtors in connection with the solicitation of votes on the Plan;

e.    scheduling the Confirmation Hearing to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code;

f.    fixing the time and manner for filing objections to confirmation of the Plan (the **"Objection Deadline"**); and

g.    granting such other and further relief as the Court may deem just and proper;

and it appearing that due notice of the Voting Deadline, the Objection Deadline and the Confirmation Hearing has been given to holders of Claims against and Interests in the Debtors and all other parties-in-interest in accordance with the Disclosure Statement Approval Order, the Voting Procedures, the Bankruptcy Code and the Bankruptcy Rules; and upon the Affidavit of Service, dated April 18, 2007, of Travis K. Vandell of Kurtzman Carson Consultants, LLC as claims and noticing agent for the Debtors [Docket No. 332] (including all exhibits attached thereto, the **"Solicitation Affidavit"**), having been filed, attesting to the mailing to the parties identified therein of the Plan, the Disclosure Statement, notices, Ballots, and related solicitation materials and/or a notice of the Confirmation Hearing (the **"Solicitation Package"**), as appropriate, in accordance with the Disclosure Statement Approval Order; and upon the Affidavit of Kenneth L. Altman Certifying Tabulation of Votes Cast by Holders of Amtrol, Inc. Class 4, 10 5/8% Senior Subordinated Note Claims Due 2006 (CUSIP # 03234A AC 3) dated May 21, 2007 (including all exhibits attached thereto, the **"Voting Affidavit"**) [Docket No.

_508448_3.DOC/

390]; and upon the Memorandum of Law in Support of Confirmation of First Amended Joint Chapter 11 Plan of Reorganization for Amtrol Holdings, Inc., Amtrol Inc., Water Soft Inc. and Amtrol International Investments Inc., Proposed by the Official Committee of Unsecured Creditors and the Debtors (the **"Memorandum"**); and upon the Affidavit of Joseph L. DePaula in Support of Confirmation of the Plan dated May 18, 2007 (the **"DePaula Affidavit"**) [Docket No. 383]; and upon the Affidavit of Stuart E. Erickson in Support of Confirmation of the Plan dated May 18, 2007 [Docket No. 384] (the **"Erickson Affidavit"**); and objections having been filed by Century Indemnity Company, *et al.* [Docket No. 374], Oracle USA Inc. [Docket No. 380] and Ace American Insurance Company, *et al.* [Docket No. 381]; and all of the foregoing objections having been resolved by agreement or withdrawn; and the Bankruptcy Court having reviewed the Plan, the Disclosure Statement, the Disclosure Statement Approval Order, the Voting Procedures, the Voting Affidavit, the Solicitation Affidavit and the Memorandum; and the Confirmation Hearing having been held on May 24, 2007; and upon all of the evidence adduced and the arguments of counsel made at the Confirmation Hearing; and upon the entire record of the Debtors' Chapter 11 Cases, including all exhibits introduced into evidence at the Confirmation Hearing; and the Bankruptcy Court having taken judicial notice of the papers and pleadings on file in these Chapter 11 Cases; and after due deliberation; and sufficient cause appearing therefor, the Bankruptcy Court hereby makes the following Findings of Fact and Conclusions of Law and Orders as follows:

## I.    FINDINGS OF FACT

### A.    Definitions

All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

_508448_3.DOC/

**B.     Notice of Confirmation Hearing**

Notice of the Confirmation Hearing and the relevant deadlines for submission of objections and ballots, as prescribed by this Court in the Disclosure Statement Approval Order, was timely and properly provided, as more fully reflected in the Solicitation Affidavit, and such notice is adequate and sufficient pursuant to section 1128 of the Bankruptcy Code, Bankruptcy Rules 2002(b) and 3020(b) and other applicable law and rules.

**C.     Transmission of Ballots**

Ballots were transmitted to holders of Class 4 Senior Note Claims, the only Class eligible to vote on the Plan, in accordance with the Disclosure Statement Approval Order.

**D.     Good Faith Solicitation**

The Debtors solicited votes for the Plan in good faith and in a manner consistent with the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

**E.     Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

The Plan and the Debtors comply with all applicable provisions of the Bankruptcy Code, as required by section 1129 of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code.

**F.     Asbestos-Related Claims**

The Plan does not classify or treat: (i) asbestos-related claims or holders of asbestos-related claims; or (ii) insurance assets relating to asbestos-related claims and, therefore, asbestos-related claims and related insurance assets and claims pass through theses Chapter 11 Cases unaffected and unimpaired, and all parties' rights, claims and defenses with respect to these types of claims and assets are entirely preserved.

508448 3.DOC/

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

This Bankruptcy Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. The Confirmation Hearing is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2), and this Bankruptcy Court has jurisdiction to enter a Final Order with respect thereto. Venue of these Chapter 11 Cases in this Bankruptcy Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors constitute entities eligible for relief under section 109 of the Bankruptcy Code.

### B.    Good Faith Solicitation

The Debtors have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to section 1125(e) of the Bankruptcy Code, with respect to the formulation of the Plan, the solicitation of acceptances with regard thereto and the other property to be distributed thereunder. Pursuant to section 1125(e) of the Bankruptcy Code, the transmittal of solicitation materials, the solicitation of acceptances of the Plan and the offering, issuance and distribution of consideration pursuant to the Plan are not, and will not be, governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance of a plan of reorganization or the offer, issuance or purchase of securities.

### C.    Compliance with Section 1129 of the Bankruptcy Code

As set forth above, the Plan and the Debtors comply in all respects with the applicable requirements of section 1129 of the Bankruptcy Code, including, without limitation, the requirements of section 1129(b) of the Bankruptcy Code.

508448_3.DOC/

## III.    ORDER.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

### A.    Confirmation of the Plan

1.    The Plan, attached hereto as **Exhibit A**, as modified by the technical modifications set forth in paragraph 2 below[3], is confirmed in each and every respect pursuant to section 1129(b) of the Bankruptcy Code; provided, however, that if there is any direct conflict or ambiguity between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control; provided further, however, notwithstanding any language to the contrary in the Plan or this Confirmation Order, asbestos-related claims and related insurance assets and claims pass through theses Chapter 11 Cases unaffected and unimpaired, and all parties' rights, claims and defenses with respect to these types of claims and assets are entirely preserved.

2.    The following technical modifications to the Plan are hereby approved: (i) the addition of "Directors" to the defined term "Management Stock Incentive Plan" contained in Section 1.01 of the Plan, and corresponding changes throughout the Plan; (ii) the additional language included in Section 3.01 of the Plan adding Indemnity Insurance Company of North America, Employers Insurance Company of Wausau and Wausau Underwriters as "Insurers"; (iii) the additional language added to Section 3.01 of the Plan allowing the Insurance Agreements to be "Reinstated" in the event they are not executory contracts; and (iv) the

---

[3]    Pursuant to Bankruptcy Rule 3019, on May 24, 2007, the Debtors' filed a revised version of the Plan containing non-material proposed technical modifications to the Plan which do not adversely change the treatment of any Claim or Interest Holder who has not accepted in writing the modifications.

508448 3.DOC/

additional language added to Section 7.04 of the Plan limiting the scope of the exculpation provisions of the Plan.

3.    The Debtors have complied with the requirements of section 1125 of the Bankruptcy Code.

4.    The treatment of Claims and Interests as provided in the Plan is approved.

5.    The exhibits to the Plan, filed before or at the Confirmation Hearing, and the Plan Supplement, are deemed a part of the Plan and are incorporated by this reference. The failure to reference or discuss any particular provision of the Plan in this Confirmation Order shall have no effect on this Court's approval and authorization of, or the validity, binding effect and enforceability of, such provision; and each provision of the Plan is authorized and approved and shall have the same validity, binding effect and enforceability as every other provision of the Plan, whether or not mentioned in this Confirmation Order.

6.    Any and all objections to confirmation of the Plan that have not been withdrawn or resolved by stipulation are hereby overruled.

7.    With regard to Class 4 Senior Note Claims electing or defaulting to the Cash Payment Option, June 5, 2007 shall be the Distribution Record Date for cash distributions under the Plan;

8.    Except as set forth herein or in the Plan, the provisions of the Plan and this Confirmation Order will bind the Debtors, the Reorganized Debtors, and all creditors and shareholders of the Debtors (whether or not the Claims or Interests of these creditors and shareholders have voted to accept or reject the Plan, and whether or not these creditors and shareholders have filed proofs of Claim or Interest or are deemed to have filed proofs of Claim or Interest in these Cases).

_508448_3.DOC/

9.    The Debtors and the Reorganized Debtors may execute and deliver any and all documents or instruments and take any and all actions necessary or desirable to implement the Plan, this Confirmation Order, the Exit Financing Facility, the Corporate Restructuring as described in Section 5.04 of the Plan, the issuance of New Amtrol Common Shares and any other documents, instruments or other transactions contemplated under these documents. The Chief Executive Officer and the Chief Financial Officer of Amtrol Holdings are authorized — without further notice of, application to, or order of, this Court — to execute, deliver, file or record any documents and to take any other actions that those officers may determine to be necessary or desirable to effectuate the Plan, this Confirmation Order, the Exit Financing Facility, the Corporate Restructuring as described in Section 5.04 of the Plan, the issuance of New Amtrol Common Shares and any other corporate actions or transactions that are referred to in the Plan or this Confirmation Order. To the extent that, under applicable non-bankruptcy law, any of these actions or transactions would require the consent or approval of the shareholders of the Debtors or otherwise, or of the directors or officers of the Debtors or Reorganized Debtors, the entry of this Confirmation Order and section 303 of the Delaware General Corporation Law with regard to Holdings, constitutes that consent and approval.

10.    Pursuant to the commitment letter and fee letter terms and conditions set forth on Plan Schedule 1 (the **"Commitment Letter"**), upon the closing of the Exit Financing Facility, the Debtors and/or the Reorganized Debtors are authorized to pay the reasonable fees and expenses, including without limitation any obligations to indemnify any Indemnified Party (as defined in the Commitment Letter) due to the lenders under the Exit Financing Facility, with such fees and expenses being entitled to priority as administrative expense claims under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code, without further order of the Bankruptcy Court.

_508448_3.DOC/

11.     As of the Effective Date, except as provided in the Plan or this Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Interests, including, without limitation, any interest accrued on Claims from and after the Petition Date.

12.     The substantive consolidation of all of the Debtors as provided in Section 5.13 of the Plan is approved, provided, however, that such substantive consolidation shall not affect any obligation of any of the Reorganized Debtors to pay fees due and owing to the United States Trustee.

13.     As of the Effective Date, except as provided in the Plan or this Confirmation Order, the Confirmation: (i) discharges the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code or (z) the Holder of a Claim based on such debt has accepted the Plan; and (ii) satisfies, terminates or cancels all Interests and other rights of equity security holders in the Debtors.

14.     As of the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, shall be permanently enjoined from asserting against the Debtors or the Reorganized Debtors, or their respective successors or Property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests

508448_3.DOC/

based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, as provided in Section 7.03 of the Plan.

15.     As of the Effective Date, each of the executory contracts and unexpired leases listed on Plan Schedule 2, that are not the subject of a separate order of this Court providing for the assumption or rejection of such agreement (the **"Assumed Agreements"**), shall be deemed assumed by the appropriate Reorganized Debtor(s), pursuant to the terms set forth in Sections 3.01 and 3.02 of the Plan, subject to any consensual modification agreed to between the Debtors and each non-Debtor party to any such contract(s) or lease(s), and shall remain in full force and effect.

16.     Any Cure amounts due to any non-Debtor party to any of the Assumed Agreements shall be satisfied in the amount, if any, set forth in Plan Schedule 2 (including all modifications and supplements thereto), or pursuant to the terms set forth in Section 3.02 of the Plan.

17.     Notwithstanding anything to the contrary in this Confirmation Order or in the Plan, the Debtors shall not assign any of the contracts, licenses and/or agreements (collectively, the **"Oracle Agreements"**) to which Oracle USA, Inc. (or any of its predecessors-in-interest) (collectively, "Oracle") is a party with one or more of the Debtors, without the prior written consent from Oracle or upon further final and non-appealable order of this Court.    The assumption of any of the Oracle Agreements shall be in accordance with the Plan, this Confirmation Order and applicable bankruptcy and non-bankruptcy law.

18.     As of the Effective Date, the Reorganized Debtors shall be deemed to have assumed any and all obligations of the Debtors to indemnify any Indemnified Person with respect to all present and future actions, suits and proceedings against the Debtors, the

- 10 -

508448 3.DOC/

Reorganized Debtors or any Indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors or the Reorganized Debtors, pursuant to Section 3.05 of the Plan; provided, however, that nothing contained in this paragraph or the Plan shall expand the scope of any such indemnification obligations or waive any defenses available to the Debtors (or Reorganized Debtors) with respect thereto.

19.     Except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, all property of the Estates, to the fullest extent of section 541 of the Bankruptcy Code, and any and all other rights and assets of the Debtors of every kind and nature shall revest in the Reorganized Debtors, respectively, free and clear of all Liens, Claims and Interests other than (i) those Liens, Claims and Interests retained or created pursuant to the Plan or any document entered into in connection with the transactions described in the Plan, and (ii) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.

20.     Pursuant to Section 7.06 of the Plan, except as otherwise provided in the Plan or this Confirmation Order, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, on the Effective Date, all Causes of Action shall become the property of the Reorganized Debtors, and the Reorganized Debtors shall retain all Causes of Action that the Debtors had or had power to assert on behalf of their Estates immediately prior to the Effective Date, and may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of such Causes of Action; provided, however, that any and all of the Debtors' Preference Actions that are not the subject of pending litigation as of the Effective Date shall be waived, abandoned, discharged and released pursuant to the Plan.

_508448_3.DOC/

21.     After the Confirmation Date and until the Effective Date, the current directors and officers of each Debtor shall continue to serve in such capacities, subject to such changes as may be determined by the Board of Directors of a Debtor in accordance with the current Bylaws and Certificates of Incorporation of such Debtor (or comparable organizational documents) and are authorized to effectuate the Plan, this Confirmation Order, the Exit Financing Facility, the Corporate Restructuring, as described in section 5.04 of the Plan, the issuance of New Amtrol Common Shares and any other corporate actions or transactions that are referred to in the Plan or this Confirmation Order.

22.     The appointment or continuation in office as officers and directors of each of the Reorganized Debtors of each of the individuals identified by the Debtors in Plan Schedule 3 hereby is approved and ratified as being in the best interests of the Debtors, their creditors and equity security holders, and consistent with public policy, and such officers and directors are deemed elected and appointed as of the Effective Date.

23.     Except for purposes of evidencing a right to distributions or exchanges under the Plan, on the Effective Date, the Interests, including, without limitation, all the agreements and other documents evidencing the Existing Securities, shall be deemed terminated, cancelled, and of no further force or effect; provided, however, that the Senior Note Indenture shall continue in effect for the purposes of (i) allowing the Senior Note Trustee and its agents to make any distributions or exchanges on account of the Senior Notes pursuant to the Plan and to perform such other necessary administrative functions with respect thereto, and (ii) permitting the Senior Note Trustee and its agents to maintain and assert any rights on account of the Senior Note Trustee Claim.

_508448_3.DOC/

24.     The Committee shall continue to exist after the Confirmation Date until the Effective Date with the same power and authority, and the same ability to retain and compensate Professionals, as it had prior to the Confirmation Date.  On and as of the Effective Date, the Committee shall cease to exist, and the members of the Committee and their Professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases; provided, however, that the Committee shall continue in existence after the Effective Date for the sole purpose of participating in the fee application process for Professionals as provided in Section 6.04(b) of the Plan.  The Reorganized Debtors shall pay the reasonable expenses of the members of the Committee between the Confirmation Date and the Effective Date, if any.

25.     Applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (i) from the later of the Petition Date, or the date on which retention became effective, through the Effective Date or (ii) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(3) through (b)(5) of the Bankruptcy Code, shall be Filed no later than sixty (60) days after the Effective Date or such later date as the Bankruptcy Court approves, as provided in Section 6.04(b) of the Plan.

26.     Except as otherwise provided in the Plan or this Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Interests or rights:  (i) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective property; (ii) enforcing,

attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors or the Reorganized Debtors or their respective property; (iv) asserting a setoff that was not asserted prior to the applicable Bar Date, or right of subrogation other than with respect to a claim filed or deemed filed by the applicable Bar Date of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

27.     Except as otherwise provided in the Plan or this Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim, demand, debt, right, cause of action or liability that is released pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

28.     In exchange for the distributions provided for under the Plan, except as otherwise provided in the Plan or this Confirmation Order, each Holder of an Allowed Claim receiving such distribution pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section 7.03 of the Plan.

_508448 3.DOC/

29.     None of the Debtors, the Reorganized Debtors, the members of the Committee, the members of the Ad Hoc Noteholders Committee, the Prepetition Secured Parties, the DIP Lenders, the Senior Note Trustee nor any of their respective directors, officers, employees, members, attorneys, investment bankers, restructuring consultants and financial advisors, nor any other professional Persons employed by any of them (collectively, the **"Exculpated Persons"**), shall have or incur any liability to any Person for any act taken or omission from and after the Petition Date in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan.  The Exculpated Persons have no liability to any Debtor, Holder of a Claim, Holder of an Interest, other party in interest in the Cases or any other Person for actions taken or not taken in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the Plan or the property to be distributed under the Plan, including, without limitation, failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons are entitled to rely upon the advice of counsel with respect to their duties and responsibilities in the Cases, the management and operation of the Debtors and under the Plan.

30.     On the Effective Date, the Debtors and the Reorganized Debtors on behalf of themselves and as representatives of the Estates, release unconditionally, and are hereby deemed to release unconditionally, (i) each of the Debtors' officers and directors who served at any time during the Cases, (ii) any person that designated or elected such directors to the extent of alleged liability for actions or inactions of such directors, (iii) the members of the Committee, (iv) the

- 15 -

_508448_3.DOC/

members of the Ad Hoc Noteholders Committee, (v) the DIP Lenders, (vi) the Prepetition Secured Parties, (vi) the Senior Note Trustee and (viii) the attorneys, investment bankers, restructuring consultants and financial advisors of the foregoing, including the Debtors and the Reorganized Debtors, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including, without limitation, those arising under the Code), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on any act, omission, transaction, event or other occurrence taking place on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan; provided, however, that nothing in this paragraph shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under the Plan.

31.    On the Effective Date, the Debtors and the Reorganized Debtors on behalf of themselves and as representatives of the Estates, release unconditionally, and are hereby deemed to release unconditionally, (i) each of the Debtors' former and present officers and directors, (ii) any Person that designated or elected such directors to the extent of alleged liability for actions or inactions of such directors, (iii) the Prepetition Secured Parties, (iv) the members of the Ad Hoc Noteholders Committee, (v) the Senior Note Trustee and (vi) the attorneys, investment bankers, restructuring consultants and financial advisors of the foregoing, including the Debtors and the Reorganized Debtors (collectively, the **"Prepetition Releasees"**) from any and all

- 16 -                                                    _508448 3.DOC/

claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including, without limitation, those arising under the Code), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Petition Date in connection with or relating to Amtrol Holdings or any of its direct or indirect subsidiaries (the **"Prepetition Released Matters"**); provided, however, that nothing in this paragraph shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under the Plan.

32.    Except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, each Holder of an Unimpaired Claim is deemed to have unconditionally released the Prepetition Releasees from the Prepetition Released Matters in consideration of the obligations of the Debtors and Reorganized Debtors under the Plan to pay or reinstate such Claims in full.

33.    On the Effective Date, in consideration of the obligations of the Debtors and Reorganized Debtors under the Plan, each Holder of a Claim that is entitled to vote on the Plan is deemed to have unconditionally released the Prepetition Releasees from the Prepetition Released Matters; provided, however, that each holder of a Claim entitled to vote on the Plan that elected, by checking the box provided on the Ballot, not to grant the releases set forth in Section 7.05(c) of the Plan, shall not have unconditionally released the Prepetition Releasees from the Prepetition Released Matters.

34.    Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and this Confirmation Order, no provision thereof shall release any non-Debtor,

- 17 -                                                _508448_3.DOC/

including any current and/or former officer and/or director of the Debtors and/or any non-debtor included in the Prepetition Releasees, from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such person(s).

35.    All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

36.    In accordance with section 1145 of the Bankruptcy Code, the exemption from the requirements of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security or registration or licensing of an issuer of, or broker or dealer in, a security, shall apply to the New Amtrol Common Shares issued and distributed under the Plan.

37.    Pursuant to section 1146 of the Bankruptcy Code, the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, this Confirmation Order and the Exit Financing Facility and any documents relating to the Exit Financing Facility, shall not be subject to any stamp tax or similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to this Confirmation Order, accept any such instruments or documents without requiring the payment of any stamp tax or similar tax.

508448 3.DOC/

**B.    Effects of Confirmation**

38.    Immediately upon the entry of this Confirmation Order, the Plan and this Confirmation Order shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, any successors and assigns and the holders of Claims or Interests, and their respective successors and assigns, whether or not they voted to accept or reject the Plan.

**C.    Retention of Jurisdiction**

39.    The Bankruptcy Court hereby retains jurisdiction of these Chapter 11 Cases (a) pursuant to and for purposes of sections 105 and 1127 of the Bankruptcy Code, and (b) as set forth in the Section 8.01 of the Plan.

**D.    Miscellaneous**

40.    The determinations, findings, judgments, decrees and orders set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Each finding of fact set forth herein, to the extent it is or may be deemed a conclusion of law, also shall constitute a conclusion of law.  Each conclusion of law set forth herein, to the extent it is or may be deemed a finding of fact, also shall constitute a finding of fact.

41.    The headings contained within this Confirmation Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Confirmation Order.

Dated: May 24, 2007
      Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

_308448_3.DOC/

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| AMTROL HOLDINGS, INC., *et al.*[1] | : | Case No. 06-11446(KG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR AMTROL HOLDINGS, INC., AMTROL INC., WATER SOFT INC. AND AMTROL INTERNATIONAL INVESTMENTS INC., PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE DEBTORS

**EDWARDS ANGELL PALMER & DODGE LLP**
Stuart M. Brown (No. 4050)
William E. Chipman, Jr. (No. 3818)
919 North Market Street, 15th Floor
Wilmington, Delaware 19801

Counsel for the Debtors and Debtors-in-Possession

- and -

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joel A. Waite (No. 2925)
Pauline Morgan (No. 3650)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kelley A. Cornish
Andrew N. Rosenberg
1285 Avenue of the Americas
New York, New York 10019-6064

Counsel for the Official Committee of Unsecured Creditors

---

[1]  Additional Debtors include all of Amtrol Holdings, Inc.'s wholly-owned direct and indirect domestic subsidiaries: Amtrol Inc.; Water Soft LLC (f/k/a Water Soft Inc.); and Amtrol International Investments Inc.

## PLAN EXHIBITS

Exhibit A:    Amended and Restated Articles of Incorporation of each of the Reorganized
             Debtors

Exhibit B:    Amended By-Laws of each of the Reorganized Debtors

Exhibit C:    Existing corporate organizational structure of the Debtors

Exhibit D:    Contemplated corporate organizational structure of the Reorganized Debtors

Exhibit E:    Contemplated Shareholders Agreement

## PLAN SCHEDULES

Schedule 1:   Exit Financing Facility Term Sheet

Schedule 2:   List of Cure Amounts for Executory Contracts and Unexpired Leases Assumed
              under the Plan

Schedule 3:   List of Officers and Directors of each of the Reorganized Debtors

PLAN OF REORGANIZATION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................. 3
ARTICLE I DEFINITIONS, INTERPRETATION AND EXHIBITS .............................................. 4
    Section 1.01 Definitions ..................................................................................................................... 4
    Section 1.02 Rules of Interpretation ................................................................................................. 15
    Section 1.03 Computation of Time ................................................................................................... 15
ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............. 16
    Section 2.01 Administrative Claims ................................................................................................. 16
    Section 2.02 Senior Note Trustee Claim .......................................................................................... 16
    Section 2.03 Priority Tax Claims ...................................................................................................... 16
    Section 2.04 DIP Claim ..................................................................................................................... 17
    Section 2.05 Prepetition Secured Parties Claim ............................................................................... 17
    Section 2.06 Priority Non-Tax Claims ............................................................................................. 17
    Section 2.07 Other Secured Claims .................................................................................................. 18
    Section 2.08 Unsecured Claims ........................................................................................................ 18
    Section 2.09 Allowed Senior Note Claims ....................................................................................... 18
    Section 2.10 Intercompany Claims ................................................................................................... 19
    Section 2.11 Common Stock Claims and Interests ........................................................................... 19
ARTICLE III TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 19
    Section 3.01 Assumed and Rejected Contracts and Leases .............................................................. 19
    Section 3.02 Payments Related to Assumption of Executory Contracts and Unexpired Leases ...... 21
    Section 3.03 Postpetition Contracts and Leases ............................................................................... 21
    Section 3.04 Rejection Damages Bar Date ....................................................................................... 22
    Section 3.05 Continuation of Certain Indemnification Obligations ................................................. 22
    Section 3.06 Benefit Programs .......................................................................................................... 22
ARTICLE IV CONDITIONS PRECEDENT ................................................................................... 23
    Section 4.01 Conditions to Occurrence of Effective Date ................................................................ 23
    Section 4.02 Waiver of Conditions to Consummation ...................................................................... 23
    Section 4.03 Non-Consensual Confirmation .................................................................................... 23
ARTICLE V IMPLEMENTATION OF PLAN ................................................................................. 23
    Section 5.01 Pre-Effective Date Management and Operation of Debtors ......................................... 23
    Section 5.02 Dissolution of Committee ............................................................................................ 24
    Section 5.03 Pre-Effective Date Injunctions or Stay ........................................................................ 24
    Section 5.04 Corporate Restructuring ............................................................................................... 24
    Section 5.05 Certificates of Incorporation and By-Laws .................................................................. 25
    Section 5.06 Post-Effective Date Management and Operation of Reorganized Debtors ................... 25
    Section 5.07 Exit Financing Facility ................................................................................................. 26
    Section 5.08 Issuance of New Amtrol Common Shares .................................................................... 26
    Section 5.09 Transfer of Intercompany Claims ................................................................................ 26
    Section 5.10 Management and Directors Stock Incentive Program ................................................... 26
    Section 5.11 Effectuating Documents; Further Transactions ............................................................ 26
    Section 5.12 Exemption from Certain Transfer and Other Taxes ..................................................... 26
    Section 5.13 Substantive Consolidation of the Debtors .................................................................... 27
    Section 5.14 Cancellation of Existing Securities and Agreements ................................................... 27
    Section 5.15 Shareholders Agreement .............................................................................................. 28
ARTICLE VI DISTRIBUTIONS AND CLAIMS ALLOWNACE ................................................... 28
    Section 6.01 Cash Distributions ....................................................................................................... 28
    Section 6.02 Distributions to Holders of Allowed Senior Note Claims ........................................... 28
    Section 6.03 Miscellaneous Distribution Provisions ....................................................................... 29
    Section 6.04 Procedure for Determination of Claims and Interests .................................................. 30
ARTICLE VII EFFECT OF CONFIRMATION .............................................................................. 32
    Section 7.01 Revesting of Assets ...................................................................................................... 32
    Section 7.02 Discharge of Claims and Termination of Interests ....................................................... 32

**Section 7.03  Injunctions** ........................................................................................................... 32
**Section 7.04  Limitation of Liability** ............................................................................................ 33
**Section 7.05  Releases** .................................................................................................................. 34
Section 7.06  Retention and Enforcement, and Release, of Causes of Action .......................... 35
Section 7.07  Exclusions and Limitations on Exculpation, Indemnification, and Releases ...... 35
**ARTICLE VIII MISCELLANEOUS PROVISIONS** .......................................................................... 36
Section 8.01  Retention of Jurisdiction ...................................................................................... 36
Section 8.02  Terms Binding ...................................................................................................... 38
Section 8.03  Successors and Assigns ........................................................................................ 38
Section 8.04 Confirmation Order and Plan Control ................................................................... 38
Section 8.05  Governing Law ..................................................................................................... 38
Section 8.06  Severability ........................................................................................................... 39
Section 8.07  Incorporation by Reference .................................................................................. 39
Section 8.08  Modifications to this Plan ..................................................................................... 39
Section 8.09  Revocation, Withdrawal or Non-Consummation .................................................. 39
Section 8.10  Notices .................................................................................................................. 39

PLAN OF REORGANIZATION

# INTRODUCTION

This plan of reorganization, under chapter 11 of the Bankruptcy Code, dated April 11, 2007 (as amended, the **"Plan"**), is jointly proposed by: (i) Amtrol Holdings, Inc. (**"Amtrol Holdings"**); (ii) Amtrol Inc. (**"Amtrol Inc."**), (iii) Water Soft LLC (**"Water Soft"**[2]); (iv) Amtrol International Investments Inc. (**"Amtrol International"** and, together with Amtrol Holdings, Amtrol Inc. and Water Soft, the **"Debtors"** or the **"Company"**); and (v) the Official Committee of Unsecured Creditors (the **"Committee"**).

In general, this Plan provides for the substantive consolidation of all of the Debtors for voting and distribution purposes only, and provides for the Debtors' reorganization pursuant to the terms of this Plan. This Plan contemplates the payment in full in cash of all administrative claims and priority claims against the Debtors, and the repayment in full in cash of outstanding amounts under the Debtors' post-petition financing facility. Furthermore, this Plan provides for the treatment of allowed claims against, and interests in, the Debtors as follows:

- Each Holder of Amtrol Inc.'s 10 ⅜% Senior Subordinated Notes due December 2006 (the "Senior Notes") may elect to receive (i) its pro rata share of 100% of the newly issued common stock of Reorganized Amtrol Holdings, subject to dilution in respect of new common stock that may be issued pursuant to the Management and Directors Stock Incentive Program (as defined herein) of the Reorganized Debtors, or (ii) cash in the amount of sixty percent (60%) of the principal amount of such Holder's Senior Notes, provided, however, that such cash payment option shall not be available to Holders of the Senior Notes if more than 15% in principal amount of the Senior Notes elects or defaults to such cash payment option;

- Each Holder of an allowed unsecured claim (other than Holders of Senior Notes) will receive (i) at the Debtors' sole discretion, (a) payment in full in cash, or (b) reinstatement of its allowed claim, or (ii) such other treatment as agreed by the Debtors and the claimant; and

- No distributions will be made on account of the Debtors' issued and outstanding common stock, options or warrants, including claims arising out of or with respect to such common stock interests.

Reference is made to the First Amended Disclosure Statement, dated April 11, 2007, Relating to a First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code proposed by the Debtors and the Committee (the **"Disclosure Statement"**) accompanying the Plan for a discussion of the Debtors' history, businesses, results of operations, historical financial information, properties, projections for future operations, risk factors, a summary and analysis of the Plan, and certain related matters.

---

[2]  Water Soft LLC (f/k/a Water Soft Inc.).

ALL CREDITORS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND IN THE PLAN, THE DEBTORS AND THE COMMITTEE RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREUNDER AND APPROVED BY THE BANKRUPTCY COURT OR THE DEBTORS, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.

## ARTICLE I

## DEFINITIONS, INTERPRETATION AND EXHIBITS

Section 1.01 Definitions. Unless the context requires otherwise, the following terms shall have the following meanings whether used in the Plan or the Disclosure Statement with initial capital letters or otherwise, unless the context clearly requires otherwise. As used herein:

*"Ad Hoc Noteholders Committee"* means, collectively, Newport Global Advisors, L.P., Credit Suisse Securities (USA) LLC, AIG Global Investment Corp. and Cypress Management, and their respective affiliates, as Holders of a majority of the Senior Notes.

*"Administrative Agent"* means Barclays Bank PLC in its capacity as Administrative Agent under the DIP Credit Agreement.

*"Administrative Claim"* means (a) a Claim for any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary postpetition cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under section 365(b)(i) of the Bankruptcy Code to cure a default under an assumed executory contract or unexpired lease, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code or (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court, and (b) any U.S. Trustee's Fee Claims.

*"Administrative Claims Bar Date"* shall have the meaning set forth in Section 6.04(a) of this Plan.

*"Affiliate"* shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

*"Allowed Claim"* means, with reference to any Claim, (a) any Claim against the Debtors, or any of them, which has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim which is not a Disputed Claim, or (d) any Claim the amount or existence of which, if disputed, (i) has been determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (ii) has been allowed by Final Order of the Bankruptcy Court.

*"Allowed Senior Note Claims"* means the Claims of the Holders of the Senior Notes in the aggregate amount of $102,671,800.54 arising under or relating to the Senior Note Indenture, which shall be Allowed Claims pursuant to Section 2.09(b) of this Plan.

*"Avoidance Actions"* means any and all Causes of Action which a trustee, debtor-in-possession, any estate or other appropriate party in interest may assert under sections 502, 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724(a) of the Bankruptcy Code (other than those which are released or dismissed as part of and pursuant to the Plan), including the Debtors' rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by applicable law) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

*"Ballot"* means the ballot, other than a Master Ballot, upon which Beneficial Holders of Class 4 Senior Note Claims entitled to vote on this Plan shall: (i) indicate their acceptance or rejection of the Plan; (ii) indicate their election regarding receiving either the Stock Payment Option or the Cash Payment Option, as defined in Section 2.09(c) of this Plan; and (iii) indicate their election to opt out of the releases contained in Section 7.05(c) of the Plan, all in accordance with the instructions regarding voting.

*"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

*"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware or, if such court ceases to exercise jurisdiction over these Chapter 11 Cases or the Debtors, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases and the Debtors.

*"Bankruptcy Rules"* means (i) the Federal Rules of Bankruptcy Procedure and

the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, (iii) the Local Rules for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all additional amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

*"Barclays"* means Barclays Bank PLC and Barclays Capital.

*"Bar Date"* means the date (or dates) set by the Bankruptcy Court as the last day by which Holders of certain Claims must File Proofs of Claim against the Debtors in the Chapter 11 Cases.

*"Bar Date Order"* means the order of the Bankruptcy Court dated January 11, 2007 establishing the Bar Date. The Bar Date Order does not pertain to asbestos-related Claims or Holders of asbestos-related claims. No date has been or will be applied for by the Debtors as the date by which asbestos-related Claims must be asserted or filed, therefore, no asbestos-related Claims should be filed.

*"Beneficial Holder"* means the Person holding the beneficial interest in a Claim.

*"Borrower"* means Amtrol Inc. as borrower under the DIP Credit Agreement.

*"Business Day"* means any day that is not a Saturday, a Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), or a day on which banking institutions in the State of Rhode Island are authorized or obligated by law, executive order or governmental decree to be closed.

*"Cash"* means money, currency and coins, negotiable checks, balances in bank accounts and other lawful currency of the United States of America and its equivalents.

*"Cash Payment Option"* shall have the meaning set forth in Section 2.09(c) of this Plan.

*"Causes of Action"* means any and all actions, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, causes of action, choses in action, controversies, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, accruing to the Debtors, including but not limited to the Avoidance Actions.

*"Chapter 11 Cases"* means the bankruptcy cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

*"Claim"* means "claim" as defined in section 101(5) of the Bankruptcy Code, and supplemented by section 102(2) of the Bankruptcy Code, against any of the Debtors, whether or not asserted.

*"Claims Agent"* means the Debtors' Bankruptcy Court-approved claims agent, Kurtzman Carson Consultants LLC.

*"Class"* means each group or category of Claims or Interests as designated in **Article II** of the Plan.

*"Collateral Agent"* means Barclays Bank PLC and/or other financial institutions selected by Barclays Bank PLC under the DIP Credit Agreement to act in such capacity.

*"Committee"* means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

*"Common Stock"* means collectively, (a) the common stock of Amtrol Holdings issued and outstanding immediately prior to the Effective Date, (b) all options, warrants, conversion, privilege or other legal or contractual rights to purchase or receive the common stock of Amtrol Holdings, and (c) any rights associated with such common stock.

*"Common Stock Claim"* means any Claim with respect to the Common Stock of the kind described in section 510(b) of the Bankruptcy Code.

*"Confirmation"* means "confirmation" as used in section 1129 of the Bankruptcy Code.

*"Confirmation Date"* means the date on which the Confirmation Order is docketed by the clerk of the Bankruptcy Court.

*"Confirmation Hearing"* means the hearing(s) held before the Bankruptcy Court to consider Confirmation of the Plan.

*"Confirmation Objection Deadline"* means the date set forth in an order of the Bankruptcy Court as the deadline for objecting to Confirmation of this Plan.

*"Confirmation Order"* means the order docketed by the clerk of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*"Creditor"* means any Person that is the Holder of any Claim against any of the Debtors.

"*Cure*" means the distribution, within twenty (20) Business Days after the later of: (i) the Effective Date; (ii) such other time as may be agreed upon by the parties; or (iii) as ordered by the Bankruptcy Court pursuant to Section 3.02 of this Plan, of Cash or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court with respect to the assumption of an executory contract or unexpired lease in accordance with the provisions of **Article III** of this Plan.

"*Day(s)*" means, unless expressly otherwise provided, calendar day(s).

"*Debtors*" means Amtrol Holdings, Amtrol Inc., Water Soft and Amtrol International as debtors and debtors-in-possession in the Chapter 11 Cases.

"*DIP Claim*" means any Claim arising from or related to the DIP Credit Agreement and related agreements, and the DIP Loan.

"*DIP Credit Agreement*" means that certain Senior Secured Super Priority Debtor in Possession Credit Agreement, dated as of December 22, 2006, by and among the Borrower, the Guarantors, the Administrative Agent, Barclays Capital, in its capacity as Sole Lead Arranger and Sole Bookrunner, and as Syndication Agent, the Collateral Agent, The CIT Group/Business Capital, Inc., as Documentation Agent, and the DIP Lenders from time to time parties thereto.

"*DIP Lenders*" means Barclays and other lenders from time to time parties under the DIP Credit Agreement.

"*DIP Loan*" means that certain $115 million maximum principal amount senior secured, super-priority post-petition financing approved by the Bankruptcy Court, on the terms and subject to the conditions set forth in the Final DIP Order and the DIP Credit Agreement.

"*Disbursing Agent*" means the Reorganized Debtors or such other Entity that is designated by the Reorganized Debtors to make distributions pursuant to the Plan.

"*Disclosure Statement*" means the First Amended Disclosure Statement, dated April 11, 2007, relating to a First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code jointly proposed by the Debtors and the Committee, including all exhibits, appendices, schedules and annexes, if any, attached thereto, with respect to this Plan approved by order of the Bankruptcy Court, as the same may be altered, amended, supplemented or modified from time to time, prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3018.

"*Disputed Claim*" means any Claim that is not or has not become an Allowed Claim and is (a) scheduled by the Debtors as disputed, contingent or unliquidated, (b) scheduled by the Debtors in an undetermined amount, (c) scheduled by the Debtors as fixed, liquidated and not disputed but as to which the Holder thereof has Filed a Proof of Claim in an amount or priority greater than scheduled by the Debtors, or (d) not scheduled by the Debtors, but as to

which a Proof of Claim has been Filed, which is the subject of an objection, appeal or motion to estimate that has been filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order. *Each asbestos-related Claim is a Disputed Claim. However, this Plan does not classify or treat asbestos-related Claims. This Plan also does not classify or treat insurance assets of Claims relating to asbestos-related Claims. Asbestos-related Claims, and related insurance assets and Claims, will pass through these Chapter 11 Cases unaffected and unimpaired by this Plan.*

*"Distribution Record Date"* means the date set by order of the Bankruptcy Court for purposes of determining the Holders of Class 4 Allowed Senior Note Claims entitled to receive distributions under the Plan. *(With regard to Class 4 Allowed Senior Note Claims electing the Stock Payment Option, April 11, 2007 will be the Distribution Record Date. With regard to Class 4 Allowed Senior Note Claims electing or defaulting to the Cash Payment Option, the Distribution Record Date will be established by further order of the Court, prior to the Effective Date of the Plan.)*

*"Effective Date"* means the first Business Day that is (a) at least ten (10) Business Days following the date on which all conditions precedent set forth in Article IV have been satisfied or waived, if expressly waivable, and (b) no stay of the Confirmation Order is in effect.

*"Estates"* means the several estates created in these Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Cases.

*"Exculpated Person"* has the meaning set forth in **Section 7.04** of the Plan.

*"Existing Securities"* means the Senior Notes and the Common Stock.

*"Exit Financing Facility"* means the senior secured financing facility to be entered into by the Reorganized Debtors and the lender(s) thereunder as contemplated in **Section 5.07** of this Plan, providing for the principal terms and conditions set forth on **Plan Schedule 1**, to be filed on the Plan Supplement filing date.

*"File"*, *"Filed"* or *"Filing"* means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases; provided, however, that with respect to Proofs of Claim only, Filed shall mean received by the Claims Agent or other Person in the manner provided in the Bar Date Order.

*"Final Decree"* means the final decree in these Chapter 11 Cases entered by the Bankruptcy Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

*"Final DIP Order"* means that Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(c) and (B) to Utilize Cash Collateral of Pre-Petition Secured Parties, (II) Authorizing the Immediate Payoff of the Pre-Petition Credit Facilities and (III) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, entered by the Bankruptcy Court in these Chapter 11 Cases on January 11, 2007 [Docket No. 118].

*"Final Order"* means an order, ruling, decree, judgment, or the operation or effect of a judgment issued and entered by the Bankruptcy Court or by any state or other federal court or other court of competent jurisdiction, which has not been reversed, vacated, stayed, modified or amended and as to which (i) the time to appeal or petition for review, rehearing, *certiorari*, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, *certiorari*, reargument or retrial is pending or (ii) any appeal or petition for review, rehearing, *certiorari*, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, *certiorari*, reargument or retrial can be taken or granted.

*"Guarantors"* means Amtrol Holdings, Water Soft and Amtrol International and each existing and subsequently acquired or organized domestic subsidiary of the Borrower or Amtrol Holdings, as guarantors as required under the DIP Credit Agreement.

*"Holder"* means the holder of legal title to, or the Beneficial Holder of, a Claim and, when used in conjunction with a Class or type of Claim, means a Holder of a Claim in such Class or of such type.

*"Impaired"* means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*"Impaired Claim"* means a Claim, which is Impaired.

*"Indemnified Person"* means the Debtors and their respective Affiliates and each of their former and current officers, directors, employees, consultants, advisors, members, attorneys, accountants, financial advisors and Professionals.

*"Initial Distribution Date"* means the first Business Day that is ten (10) days (or such longer period as may be reasonably determined by the Reorganized Debtors) after the Effective Date.

*"Intercompany Claim"* means a Claim held by any Debtor (or any subsidiary or Affiliate of any Debtor).

*"Interest"* means all rights (including unpaid dividends) arising from any equity security (as defined in section 101(16) of the Bankruptcy Code) of any of the Debtors, including, without limitation, the Common Stock, but excluding Common Stock Claims.

*"Interim Distribution Date"* means any date after the Initial Distribution Date on which the Reorganized Debtors determine that a distribution shall be made in light of, among other things, resolutions of Disputed Claims and the administrative costs of such distribution.

*"Lien"* means, with respect to any asset or interest in Property (or the rents, revenues, income, profits or proceeds therefrom), and in each case, whether the same is consensual or non-consensual or arises by contract, operation of law, legal process or otherwise, any mortgage, lien, pledge, attachment, charge, easement or any other similar right, or other security interest or encumbrance or other legally cognizable security device of any kind in respect of any asset or interest in Property, or upon the rents, revenues, income, profits or proceeds therefrom.

*"Management and Directors Stock Incentive Program"* means a stock incentive plan pursuant to which, among other provisions, the Reorganized Debtors reserve New Amtrol Common Shares for award to certain members of management and directors of the Reorganized Debtors, at such times and in a manner to be determined in the sole discretion of the Board of Directors of Reorganized Amtrol Holdings, such reserved shares not to exceed seven percent (7%) on a fully diluted basis, of the aggregate New Amtrol Common Shares distributable under this Plan.

*"Master Ballot"* means the Ballot provided to a bank, brokerage firm or other nominee, or agent or proxy Holder holding Senior Notes in its own name or on behalf of a Holder or Beneficial Holder, or any agent thereof, used to accept or reject the Plan.

*"Miscellaneous Secured Claims"* means any Secured Claim other than the DIP Claim.

*"New Amtrol Common Shares"* means the new shares of common stock of Reorganized Amtrol Holdings to be issued pursuant to Section 5.08 of this Plan.

*"Objection"* means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim) other than a Claim or an Interest that is Allowed.

*"Person"* means a natural person or entity, including, without limitation, any individual, partnership, joint venture, association, corporation, limited liability company, limited liability partnership, trust, estate, unincorporated organization or governmental unit (or any agency, instrumentality or political subdivision thereof).

*"Petition Date"* means December 18, 2006, the date on which the Debtors Filed their respective voluntary petitions for relief commencing the Chapter 11 Cases.

*"Plan"* means this Joint Chapter 11 Plan of Reorganization for Amtrol Holdings, Inc., Amtrol Inc., Water Soft Inc. and Amtrol International Investments Inc., proposed by the Committee and the Debtors, including all exhibits, appendices, schedules and annexes, if any, attached hereto, as such Plan may be modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order and the terms and conditions of **Section 8.08** of the Plan.

*"Plan Documents"* means any contracts, instruments, securities, releases, indentures, and any other agreements or documents recorded, filed or delivered pursuant to, in the implementation of, or related to, the Plan or such other documents, including those documents attached as exhibits to the Plan or compiled in the Plan Supplement.

*"Plan Supplement"* means the compilation of documents and forms of documents specified in the Plan, other than those documents attached hereto as Exhibits, which will be Filed with the Bankruptcy Court not later than five (5) Business Days prior to the commencement of the Confirmation Hearing.

*"Prepetition Secured Parties"* has the meaning set forth in the Final DIP Order.

*"Priority Non-Tax Claim"* means a Claim to the extent that it is of the kind described in, and entitled to priority under, section 507(a)(3), (4), (5) or (6) of the Bankruptcy Code, other than an Administrative Claim and a Priority Tax Claim.

*"Priority Tax Claim"* means a Claim to the extent that it is of the kind described in, and entitled to priority under, section 507(a)(8) of the Bankruptcy Code.

*"Professional"* means any professional employed in these Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or to be compensated pursuant to sections 327, 328, 330, 331, 503(b)(2) or (4) or 1103 of the Bankruptcy Code.

*"Professional Claim"* means a Claim for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code relating to services incurred on and after the Petition Date and prior to and including the Effective Date in connection with an application made to the Bankruptcy Court in the Chapter 11 Cases.

*"Proof of Claim"* means any proof of Claim timely and properly Filed pursuant to the Bar Date Order.

*"Property"* means all assets or interests in property of the Debtors' respective Estates of any nature whatsoever, real or personal, tangible or intangible, including contract rights, accounts and Avoidance Actions and Causes of Action, previously or now owned by the Debtors, or acquired by the Debtors' respective Estates, as defined in section 541 of the Bankruptcy Code.

*"Reinstated"* or *"Reinstatement"* means (i) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (b) reinstating the maturity of such Claim as such maturity existed before such default, (c) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (d) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the Holder of such Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence or which prohibit certain transactions or actions contemplated by the Plan, or conditioning such transactions or action on certain factors, shall not be required to be cured in order to accomplish a Reinstatement.

*"Reorganized Amtrol Inc."* means Amtrol Inc. on and after the Effective Date.

*"Reorganized Amtrol International"* means Amtrol International on and after the Effective Date.

*"Reorganized Debtors"* means, collectively, Reorganized Amtrol Holdings, Reorganized Amtrol, Inc., Reorganized Water Soft and Reorganized Amtrol International on and after the Effective Date.

*"Reorganized Amtrol Holdings"* means Amtrol Holdings on and after the Effective Date.

*"Reorganized Water Soft"* means, to the extent the Bankruptcy Court grants the Merger Motion, Water Soft LLC on and after the Effective Date.

*"Schedules"* means the Schedules, Statements and Lists Filed by each of the Debtors, individually, with the Bankruptcy Court pursuant to section 521(1) of the Bankruptcy Code and Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

*"Secured Claim"* means a Claim that constitutes a secured claim under section 506(a) or 1111(b) of the Bankruptcy Code.

*"Senior Note Claim"* means a Claim arising under the Senior Notes.

*"Senior Notes"* means the $115 million principal amount $10^{5/8\%}$ Senior Subordinated Notes issued by Amtrol Inc. pursuant to the Senior Note Indenture entered into in November 1996 and due December 2006.

*"Senior Note Indenture"* means that certain Note Indenture Agreement, dated as of November 1, 1996, relating to the Senior Notes.

*"Senior Note Trustee"* means The Bank of New York, as Indenture Trustee under the Senior Note Indenture.

*"Senior Note Trustee Claim"* means the Claim of the Senior Note Trustee under the Senior Note Indenture for its reasonable fees and expenses accrued and unpaid arising from services provided under the Senior Note Indenture and this Plan, as agreed between the Senior Note Trustee and the Reorganized Debtors or determined by order of the Bankruptcy Court.

*"Stock Payment Option"* shall have the meaning set forth in Section 2.09(c) of this Plan.

*"Subsidiary Equity Interests"* means any share of common stock or other interest evidencing a present ownership interest in any of Amtrol Holdings' direct or indirect subsidiaries, whether or not transferable, and any options, warrants or rights, contractual or otherwise, to acquire any such interest.

*"Tax"* means any tax, charge, fee, levy, impost or other assessment by or against any Debtor or by any federal, state, local or foreign governmental authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation and withholding tax, together with any interest, penalties, fines or additions attributable to, imposed on, or collected by any such federal, state, local or foreign governmental authority.

*"Unclaimed Property"* means any distribution of Cash, New Amtrol Common Shares or any other Property attempted to be made to the Holder of an Allowed Claim pursuant to the Plan that (a) is unclaimed or returned to the Reorganized Debtors as undeliverable and no appropriate forwarding address is received within the later of (y) one (1) year after the Effective Date and (z) one (1) year after distribution is made to such Holders, or (b) in the case of a distribution made in the form of a check, is not negotiated within sixty (60) days of issuance (in which case such check shall be null and void), and no request for reissuance of such check is made by the claimant within the time periods set forth above.

*"Unimpaired Claim"* means any Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*"United States Trustee"* means the United States Trustee appointed under section 581(a)(3) of title 28 of the United States Code to serve in the District of Delaware.

*"Unsecured Claim"* means a Claim that is not an Administrative Claim, a U.S. Trustee Fee Claim, a Senior Note Trustee Claim, a DIP Claim, a Prepetition Secured Parties Claim, a Common Stock Claim, an Intercompany Claim, a Miscellaneous Secured Claim, a Senior Note Claim, a Priority Tax Claim, a Priority Non-Tax Claim or a Secured Claim.

*"U.S. Trustee Fee Claims"* means any fees assessed against the Debtors' Estates pursuant to section 1930(a)(6) of title 28 of the United States Code.

*"Voting Agent"* means Kurtzman Carson Consultants LLC.

Section 1.02  Rules of Interpretation.  All references to "the Plan" herein shall be construed, where applicable, to include references to this document and all its exhibits, appendices, schedules and annexes, if any (and any amendments thereto made in accordance with the Bankruptcy Code).  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular paragraph, subparagraph, or clause contained in the Plan.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.  The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any term used in the Plan that is not defined in the Plan, either in **Article I** hereof or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity).  Without limiting the preceding sentence, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan, unless superseded herein.  To the extent that the description of any Plan Document is inconsistent with the actual terms or conditions of such Plan Document, the terms and conditions of the Plan Document shall control.

Section 1.03  Computation of Time.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall govern.

## ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The following is a designation of the Classes of Claims and Interests classified under this Plan. A Claim or Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. Claims against more than one Debtor with respect to a single obligation, by reason of guaranty, joint or "control group" liability, or otherwise, shall be deemed to be a single Claim in the Allowed amount of such obligation for purposes of voting, allowance, distribution and all other purposes under this Plan. In accordance with section 1123(a)(1) of the Code, Administrative Claims and Priority Tax Claims have not been classified, although the treatment for such unclassified Claims is set forth below.

### A.    UNCLASSIFIED CLAIMS

Section 2.01  Administrative Claims.

(a)    General.  Subject to the provisions of Section 6.04(a) of this Plan or as otherwise specifically provided in this Plan, or unless otherwise agreed by the Holder of an Allowed Administrative Claim (in which event such other agreement shall govern), each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) at the sole option of the Reorganized Debtors (a) in the ordinary course of business as the Claim becomes due and owing or (b) on the Initial Distribution Date or (ii) on such other date as the Bankruptcy Court may order, including, without limitation, in the case of Professionals employed by the Debtors or the Committee who have filed applications for final compensation in accordance with Section 6.04(b) of this Plan, the date on which orders approving such compensation are entered.

(b)    U.S. Trustee Fee Claims.  On the Initial Distribution Date, the U.S. Trustee Fee Claims shall be paid in full in Cash. All such Claims payable after the Initial Distribution Date shall be assumed and paid by the Reorganized Debtors until entry of the Final Decree.

Section 2.02  Senior Note Trustee Claim.  The Reorganized Debtors shall pay the Senior Note Trustee Claim in full in Cash, without the need for the Senior Note Trustee to file an application for allowance with the Bankruptcy Court. Upon payment of such Senior Note Trustee Claim in full, the Senior Note Trustee shall be deemed to have released its charging lien and priority rights for payment of its fees and expenses under the Senior Note Indenture. Distributions received by holders of Allowed Senior Note Claims pursuant to the Plan will not be reduced on account of the payment of the Senior Note Trustee Claim.

Section 2.03  Priority Tax Claims.  Unless otherwise agreed by the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim shall receive, at the Reorganized Debtors' option, (a) on the Initial Distribution Date, Cash equal to the amount of such Allowed Priority Tax Claim, or (b)

Cash in equal installments paid on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the Petition Date, totaling the principal amount of such Claim, plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days.

Section 2.04 <u>DIP Claim</u>. On the Effective Date, the DIP Claim shall be paid in full in Cash, or otherwise satisfied in a manner acceptable to the DIP Lenders. Upon payment in full of the DIP Claim, any liens securing the DIP Claim will be released by the DIP Lenders. The provisions of the Final DIP Order relating to the L/C Fund (as defined therein) are incorporated herein by reference.

Section 2.05 <u>Prepetition Secured Parties Claim</u>. Pursuant to the Final DIP Order, the Prepetition Secured Parties were granted certain rights in that certain L/C Fund (as defined in the Final DIP Order), which rights shall remain in full force and effect as set forth in the Final DIP Order on and after the Effective Date. As provided in the Final DIP Order, the Indemnification Fund, the Section 507(b) Claim and the Prepetition Lenders' Administrative Claim (all as defined in the Final DIP Order) shall expire and terminate, and the Prepetition Secured Parties shall have no further rights with respect thereto, on and as of the Effective Date, if not earlier terminated. Within five (5) business days of the Effective Date, any remaining Cash being held by the Prepetition Secured Parties in the Indemnification Fund will be returned to the Reorganized Debtors along with a full accounting for any Cash expended. Upon the Effective Date, any and all Liens of the Prepetition Secured Parties on any of the Debtors' assets not otherwise released in the Final DIP Order, shall be deemed fully released.

## B.    CLASSIFIED CLAIMS AND INTERESTS

Section 2.06 <u>Class 1 – Priority Non-Tax Claims</u>.

(a)    <u>Classification</u>. Class 1 consists of all Priority Non-Tax Claims.

(b)    <u>Allowance</u>. Class 1 Claims shall be allowed or disallowed in accordance with Section 6.04(c) of this Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

(c)    <u>Treatment</u>. Unless otherwise agreed by the Holder of an Allowed Priority Non-Tax Claim (in which event such agreement shall govern), each Holder of an Allowed Class 1 Priority Non-Tax Claim shall be paid in full in Cash on the later of the Initial Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Allowed Claim.

(d)    <u>Impairment and Voting</u>. Class 1 Claims are unimpaired and the Holders thereof are not entitled to vote on this Plan.

Section 2.07  Class 2 – Other Secured Claims.

      (a)     Classification.  Class 2 consists of Other Secured Claims.

      (b)     Allowance.  Class 2 Claims shall be allowed or disallowed in accordance with Section 6.04(c) of this Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

      (c)     Treatment.  Other Secured Claims against the Debtors shall, at the sole option of the Reorganized Debtors, be (i) paid in full in Cash on the Initial Distribution Date (in which case the claimant shall execute and deliver any documents necessary to release all Liens securing such Secured Claim as the Reorganized Debtors may reasonably request), (ii) Reinstated, (iii) paid on such other terms as the Reorganized Debtors and the Holder of such Claim may agree, or (iv) satisfied through the surrender by the applicable Reorganized Debtor(s) of the collateral securing the Claim to the Holder thereof.

      (d)     Impairment and Voting.  Class 2 Claims are unimpaired and the Holders thereof are not entitled to vote on this Plan.

Section 2.08  Class 3 – Unsecured Claims.

      (a)     Classification.  Class 3 consists of Unsecured Claims.

      (b)     Allowance.  Class 3 Unsecured Claims shall be allowed or disallowed in accordance with Section 6.04(c) of this Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

      (c)     Treatment.  Each Holder of an Allowed Unsecured Claim shall receive (i) at the Reorganized Debtors' sole discretion, (a) payment in full in Cash on the later of the Initial Distribution Date and the date that is as soon as practicable after the date upon which such Claim becomes an Allowed Unsecured Claim, or (b) Reinstatement of its Allowed Unsecured Claim, or (ii) such other treatment as agreed by the Reorganized Debtors and the Holder of the Allowed Unsecured Claim.  The Bar Date Order does not pertain to asbestos-related Claims, and such Claims shall survive and pass through these Chapter 11 Cases unaffected and unimpaired, and shall not be subject to the discharge of Claims provided for pursuant to Section 1141 of the Bankruptcy Code and Section 7.02 of this Plan.  The provisions of Article VII of this Plan do not apply to asbestos-related Claims.

      (d)     Impairment and Voting.  Class 3 Unsecured Claims are unimpaired and the Holders thereof are not entitled to vote on this Plan.

Section 2.09  Class 4 – Allowed Senior Note Claims.

      (a)     Classification.  Class 4 consists of Allowed Senior Note Claims.

      (b)     Allowance.  The Allowed Senior Note Claims in the aggregate amount of $102,671,800.54 shall be Allowed Class 4 Claims pursuant to this Plan.

(c)    Treatment.  Each Holder of an Allowed Senior Note Claim shall receive, at its sole election as reflected on its Ballot or Master Ballot, as applicable, either (i) its pro rata share of 100% of the New Amtrol Common Shares, subject to dilution in respect of (a) New Amtrol Common Shares that may be issued pursuant to the Management and Directors Stock Incentive Program, and (b) such adjustments to the total issued New Amtrol Common Shares as may occur pursuant to Section 6.03(a) of the Plan (the **"Stock Payment Option"**), or (ii) Cash in the amount of sixty percent (60%) of the principal amount of such Holder's Senior Notes (the **"Cash Payment Option"**); provided, however, that Holders of Allowed Senior Note Claims that do not send in a Ballot, or do not check a box in Item 1 of the Ballot, or elect both the Cash Payment Option and the Stock Payment Option on the Ballot, or do not expressly make the Stock Payment Option on the Ballot, shall receive the Cash Payment Option; and provided, further, that the Cash Payment Option shall not be available to Holders of the Senior Notes if more than fifteen percent (15%) in principal amount of such Notes elect or default to the Cash Payment Option.

(d)    Impairment and Voting.  Class 4 Allowed Senior Note Claims are impaired and the Holders thereof are entitled to vote on this Plan.

Section 2.10  Class 5 – Intercompany Claims.

(a)    Classification.  Class 5 consists of Intercompany Claims.

(b)    Treatment.  Subject to Section 5.09 of this Plan, Intercompany Claims shall be discharged and the Holders of Intercompany Claims shall not be entitled to receive or retain any property on account of such Claims.

(c)    Impairment and Voting.  Class 5 Intercompany Claims are impaired and the Holders thereof are deemed not to have accepted this Plan.

Section 2.11  Class 6 – Common Stock Claims and Interests.

(a)    Classification.  Class 6 consists of Common Stock Claims and Interests.

(b)    Treatment.  Common Stock Interests shall be cancelled, and the Holders of Common Stock Claims and Interests shall not be entitled to receive or retain any property on account of such Claims and Interests.

(c)    Impairment and Voting.  Class 6 Common Stock Claims and Interests are impaired and the Holders thereof are deemed not to have accepted this Plan.

### ARTICLE III
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 3.01  Assumed and Rejected Contracts and Leases.  Each executory contract and unexpired lease to which any of the Debtors is a party shall be deemed automatically

PLAN OF REORGANIZATION

assumed as of the Effective Date, unless such executory contract or unexpired lease (a) has expired or terminated by its own terms, (b) has been previously rejected or assumed by order of the Bankruptcy Court, or (c) is the subject of a motion to assume or reject filed on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such deemed assumption as of the Effective Date.

Each executory contract and unexpired lease that is assumed under this Plan and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as part of this Plan.

The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

Century Indemnity Company, as successor to CCI Insurance Company, itself as successor to Insurance Company of North America; CIGNA Property & Casualty Co.; CIGNA Insurance Co.; Aetna Fire Underwriters; ACE American Insurance Company; Industrial Indemnity Company of North America; Indemnity Insurance Company of North America; ACE International Reinsurance Company; OneBeacon America Insurance Company, as successor-in-interest to American Employers' Insurance Company; Employers Insurance Company of Wausau; and Wausau Underwriters Insurance Company (collectively, **"Insurers"**) issued certain insurance policies for various policy periods (collectively, the **"Policies"**) that may provide pre-and/or post-petition coverage for the Debtors and/or all or part of certain Claims. In connection with the Policies, Insurers and Debtors may have entered into various related agreements (together with the Policies, collectively, the **"Insurance Agreements"**). Insurers have asserted that (i) the Insurance Agreements require Debtors, as insureds, to satisfy certain conditions in order for coverage to be provided; and (ii) certain Insurance Agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code and that such Insurance Agreements must be assumed as a condition to Insurers' continuing obligation to provide coverage.

Upon the Effective Date of the Plan, the Debtors intend to assume the Insurance Agreements pursuant to section 365 of the Bankruptcy Code including the assumption of all continuing obligations under the Insurance Agreements. To the extent Insurance Agreements are not executory contracts, they will remain in full force and effect in accordance with their terms and will be treated as "Reinstated" (as defined in Article I of the Plan) for purposes of payment of claims, including, without limitation, Claims for retrospective premiums, deductibles, self-insurance retentions, and the Reorganized Debtors will perform the insureds' obligations under the Insurance Agreements. The Plan shall not, and is not intended to, modify any of the rights or obligations of Insurers or the Debtors under any of the Insurance Agreements, and Debtors intend to remain bound by all of the terms, conditions, limitations and/or exclusions

contained in the Insurance Agreements, which shall continue in full force and effect. Notwithstanding anything contained in the Plan or the Disclosure Statement to the contrary, to the extent that there is an inconsistency between the Insurance Agreements and any provision of the Plan or Disclosure Statement, the terms of the Insurance Agreements shall control. No provision of the Plan, including, without limitation, substantive consolidation, as set forth in section 5.13 of the Plan, shall (i) expand or alter any insurance coverage under any of the Insurance Agreements, or shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Insurance Agreements, (ii) create any direct right of action against Insurers that did not otherwise exist, and/or (iii) be construed as an acknowledgment either that the Insurance Agreements cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Agreements. Confirmation of the Plan shall be without prejudice to any of Insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which Insurers may seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Agreements.

Section 3.02    Payments Related to Assumption of Executory Contracts and Unexpired Leases.  Any monetary amounts by which each executory contract and unexpired lease to be assumed under this Plan may be in default shall be satisfied by Cure in the amount, if any, set forth in **Plan Schedule 2** (to be filed and served on the non-debtor party twenty (20) days prior to the Confirmation Objection Deadline), or, in the event of an objection to such Cure amount, in the amount agreed between the parties or as ordered by the Bankruptcy Court. Objections, if any, to a Cure amount set forth on **Plan Schedule 2** shall be filed by the non-debtor party to the unexpired lease or executory contract with the Bankruptcy Court on or before the Confirmation Objection Deadline. If the non-debtor party to the unexpired lease or executory contract does not file an objection with the Bankruptcy Court to the amount of Cure set forth in **Plan Schedule 2** on or before the Confirmation Objection Deadline, or if notified of the assumption after the Confirmation Objection Deadline, within ten (10) days of such notice, such non-debtor party shall be deemed to accept such Cure amount. In the event of a dispute regarding (a) the nature or the amount of any Cure, (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, such dispute shall be determined by the Bankruptcy Court, or as the parties may otherwise agree. If the Debtors in their discretion determine that the amount asserted to be necessary to Cure an executory contract or unexpired lease would, if ordered by the Bankruptcy Court, make the assumption of such contract or lease imprudent, then the Debtors may elect to (i) reject the contract or lease pursuant to **Section 3.01** herein, or (ii) request an expedited hearing on the issue, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the contract or lease pending the outcome of the dispute. To the extent that the Debtor which is a party to the lease or contract is to be merged pursuant to **Section 5.04** of this Plan, upon assumption as contemplated herein, the Reorganized Debtor that is the surviving entity after such merger shall be the party to the lease or contract.

Section 3.03    Postpetition Contracts and Leases.  All contracts, agreements and leases entered into, or assumed by, the Debtors after the Petition Date shall be deemed assigned

by the Debtors to the Reorganized Debtors on the Effective Date.

Section 3.04  <u>Rejection Damages Bar Date</u>.  Except as provided by any separate Bar Date order previously entered by the Bankruptcy Court, if the rejection by a Debtor of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a proof of such Claim is filed with the Claims Agent and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Date or (b) other notice that the executory contract or unexpired lease has been rejected pursuant to an order of the Bankruptcy Court.

Section 3.05  <u>Continuation of Certain Indemnification Obligations</u>.  To the extent not inconsistent with the Plan and the Plan Documents, any obligations of the Debtors, pursuant to their respective articles of incorporation or by-laws, applicable state law or their specific agreement, to indemnify an Indemnified Person with respect to all present and future actions, suits and proceedings against the Debtors, the Reorganized Debtors or any Indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors or the Reorganized Debtors, shall survive Confirmation of the Plan and shall not be impaired by Confirmation of the Plan, but shall be deemed and treated as executory contracts that are assumed by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code, except to the extent any such obligation has been released, discharged or modified pursuant to the Plan or Plan Documents.  Any Claim of any Person other than an Indemnified Person based upon an indemnity obligation of the Debtors shall be deemed not to be an Allowed Claim and any obligation of the Debtors to indemnify any such Person shall terminate as of the day immediately preceding the Petition Date and cease to be of any further force or effect.

Section 3.06  <u>Continuation of Benefit Programs</u>.  Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Confirmation Date, all employee compensation and benefit plans, policies and programs of the Debtors, including agreements and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into prior to the Confirmation Date and not since terminated, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, life, accidental death and dismemberment plans and workers' compensation programs, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 3.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Confirmation Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Confirmation Date shall survive Confirmation of the Plan, except for (i) executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) executory contracts or plans as have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts; <u>provided</u>, <u>however</u>, that the Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue; <u>provided further</u>, <u>however</u>, that the Debtors' obligations under any of its three pre-petition Supplemental Employee Retirement Plans (each a

"SERP") shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 3.01 of the Plan, and Holders of such SERP Claims shall be treated in accordance with Section 2.08(c) of this Plan; provided further, however, that nothing herein shall extend or otherwise modify the duration of such period or prohibit the Debtors' ability or the Reorganized Debtors' ability to modify the terms and conditions of the retiree benefits as otherwise permitted by such plans and applicable non-bankruptcy law.

## ARTICLE IV

## CONDITIONS PRECEDENT

Section 4.01    Conditions to Occurrence of Effective Date.    The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with **Section 4.02** of this Plan: (i) the Confirmation Order shall have been entered, and no stay of such Order shall be in effect; (ii) the Reorganized Debtors shall have entered into definitive documentation with respect to the Exit Financing Facility, which shall be reasonably satisfactory to the Committee, and all conditions precedent under the Exit Financing Facility shall have been satisfied (but for the occurrence of the Effective Date); (iii) the Amended Certificates of Incorporation or any formation documents shall have been properly filed with the appropriate Secretaries of State; and (iv) all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained.

Section 4.02    Waiver of Conditions to Consummation.    The conditions set forth in Section 4.01 of this Plan may be waived, in whole or in part, upon the mutual written consent of the Debtors and the Committee, without notice to any other parties in interest or the Bankruptcy Court and without a hearing. No waiver or non-waiver of any such conditions shall diminish the application of the mootness doctrine with respect to the Confirmation of this Plan or any order entered in connection therewith, which doctrine shall apply to the fullest extent of applicable law.

Section 4.03    Non-Consensual Confirmation.    Because Classes 5 and 6 are deemed not to have accepted this Plan pursuant to section 1126(g) of the Code, as to such Classes and any other Class that votes to reject this Plan, the Debtors are seeking confirmation of this Plan in accordance with section 1129(b) of the Code, either under the terms provided herein or upon such terms as may exist if this Plan is modified in accordance with section 1127(d) of the Code.

## ARTICLE V

## IMPLEMENTATION OF PLAN

Section 5.01    Pre-Effective Date Management and Operation of Debtors.    After the Confirmation Date and until the Effective Date, the current directors and officers of each Debtor shall continue to serve in such capacities, subject to such changes as may be determined by the Board of Directors of a Debtor in accordance with the current Bylaws and Certificates of Incorporation of such Debtor (or comparable organizational documents).

Section 5.02  Dissolution of the Committee.  The Committee shall continue to exist after the Confirmation Date until the Effective Date with the same power and authority, and the same ability to retain and compensate Professionals, as it had prior to the Confirmation Date. On and as of the Effective Date, the Committee shall cease to exist, and the members of the Committee and their Professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases; provided, however, that the Committee shall continue in existence after the Effective Date for the sole purpose of participating in the fee application process for Professionals as provided in Section 6.04(b) of this Plan. The Reorganized Debtors shall pay the reasonable expenses of the members of the Committee between the Confirmation Date and the Effective Date, if any.

Section 5.03  Pre-Effective Date Injunctions or Stays.  All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

Section 5.04  Corporate Restructuring.  As of the Effective Date, the existing corporate organizational structure of the Company as set forth on Exhibit C to this Plan will be modified as follows:

(a)      New Amtrol Common Shares shall be distributed to the Holders of Class 4 Allowed Senior Note Claims, as provided in Section 2.09(c) hereof, and pursuant to the Management and Directors Stock Incentive Program;

(b)      Reorganized Amtrol Holdings shall remain the 100% shareholder of Reorganized Amtrol Inc.;

(c)      Reorganized Amtrol Inc. shall hold all of the Interests in three newly created, wholly-owned subsidiaries: (i) Amtrol Licensing, Inc., a Rhode Island Passive Investment Corporation; (ii) Amtrol Water Technology LLC, a single member Delaware limited liability company; and (iii) Amtrol North American Cylinders LLC, a single member Delaware limited liability company. Reorganized Amtrol Inc. also shall retain the Interests of Amtrol International Investments Inc., a Rhode Island corporation;

(d)      Prior to the Effective Date, Debtor Water Soft Inc., a Rhode Island corporation, shall merge with and into Water Soft LLC, a newly-created Delaware limited liability company, with Water Soft LLC being the surviving entity.  Water Soft LLC shall become a wholly-owned subsidiary of Amtrol Water Technology LLC;

(e)      Effective as of the Effective Date, Amtrol Inc. shall transfer all of its patents, trademarks, service marks, copyrights, trade secrets, know-how and any applications, registrations and rights related thereto, and other intellectual property rights (the "IP Assets") to Amtrol Licensing, Inc.;

(f)     Effective as of the Effective Date, Amtrol Inc. shall transfer its water technology assets (both real and personal) to Amtrol Water Technology LLC, along with its 100% equity interest in Amtrol Canada Ltd., which shall be a wholly-owned subsidiary of Amtrol Water Technology LLC;

(g)     Effective as of the Effective Date, Amtrol Inc. shall transfer its North American cylinder assets (both real and personal) to Amtrol North American Cylinders LLC; and

(h)     All foreign direct and indirect subsidiaries of Amtrol Holdings shall remain the direct and indirect subsidiaries of Amtrol International Investments Inc., unaffected by the corporate restructuring set forth in this Section 5.04.

The purpose of the asset transfers and the creation of new entities is to organize the Reorganized Debtors' businesses in a manner that reflects the product manufacturing, sales and marketing divisions. Amtrol Licensing Inc. will maintain all of the Reorganized Debtors' IP Assets and will license the IP Assets to the other entities, and possibly third parties, in exchange for royalties. A chart showing the corporate organizational structure of the Reorganized Debtors is attached as Exhibit D hereto.

Each Reorganized Debtor following the Effective Date may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

Section 5.05  Certificates of Incorporation and By-Laws Distributions.  As of the Effective Date, the certificates of incorporation and by-laws of each of the Debtors (or comparable organizational documents) shall be amended as necessary to satisfy the provisions of this Plan and the Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in section 1123(a)(6) of the Code (respectively, the "Amended Certificates of Incorporation" and the "Amended By-Laws").   The forms of Amended Certificates of Incorporation and Amended By-Laws, to be filed on or before the Plan Supplement filing date, shall become effective on the Effective Date. After the Effective Date, the Amended Certificates of Incorporation and Amended By-Laws shall be subject to such further amendments or modifications as may be made by law, or pursuant to such Amended Certificates of Incorporation and Amended By-Laws.

Section 5.06  Post-Effective Date Management and Operation of Reorganized Debtors.  As of the Effective Date, the directors and officers of each Debtor that is not a Reorganized Debtor shall be terminated.  The Debtors shall file Plan Schedule 3 with the Bankruptcy Court on or before the Plan Supplement filing date setting forth the offices, the names and affiliations of, and the compensation proposed to be paid to, the individuals intended to serve as directors and officers of each Reorganized Debtor on and after the Effective Date. The initial board of directors of Reorganized Amtrol Holdings shall consist of five members, as

follows: Larry T. Guillemette (current Chief Executive Officer of Amtrol Holdings); Ryan Langdon and Timothy T. Janszen (Newport Global Advisors, L.P., Noteholder); Richard Harris (Harris & Associates, Consulting Firm); and David Spalding (Vice President of Alumni Relations for Dartmouth College and prior Vice Chairman of The Cypress Group L.L.C.). The Committee deferred designation of four of the five members of the new board of directors of Reorganized Amtrol Holdings (other than its Chief Executive Officer, Larry T. Guillemette) to the members of the Ad Hoc Noteholders Committee, who selected the foregoing new board members. On and after the Effective Date, each Reorganized Debtor shall be governed in accordance with the Amended Certificates of Incorporation and Amended By-Laws.

Section 5.07  Exit Financing Facility.  The closing of the Exit Financing Facility shall occur on or before the Effective Date.

Section 5.08  Issuance of New Amtrol Common Shares.  On or as soon as practicable after the Initial Distribution Date, Reorganized Amtrol Holdings shall issue Ten Million (10,000,000) New Amtrol Common Shares for distribution in accordance with this Plan. The issuance of the New Amtrol Common Shares and the distribution thereof shall be exempt from registration under applicable securities laws (including without limitation, Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Code, and may be sold without registration to the extent permitted under section 1145 of the Code.

Section 5.09  Transfer of Intercompany Claims.  Prior to the discharge of Intercompany Claims as provided in Section 2.10(b) of this Plan, the Debtors shall have the right to retain, or effect such transfers and setoffs with respect to, Intercompany Claims as they may deem appropriate for accounting, tax and commercial business purposes, to the fullest extent permitted by applicable law, without affecting the treatment accorded those claims pursuant to Section 2.10(b) of this Plan.

Section 5.10  Management and Directors Stock Incentive Program.  As soon as practicable after the Effective Date, the Management and Directors Stock Incentive Program shall be adopted by the Board of Directors of Reorganized Amtrol Holdings.

Section 5.11  Effectuating Documents; Further Transactions.  The Chief Executive Officer and the Chief Financial Officer of Amtrol Holdings shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, without any further order of the Bankruptcy Court and without the requirement of any further action by any stockholder or director of any of the Debtors or Reorganized Debtors.

Section 5.12  Exemption from Certain Transfer and Other Taxes.  Pursuant to section 1146 of the Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest,

including with respect to the Exit Financing Facility, and any documents relating to the Exit Financing Facility, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in this Plan and (d) the issuance, renewal, modification or securing of indebtedness by such means including with respect to the Exit Financing Facility, and any documents relating to the Exit Financing Facility, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order and the Exit Financing Facility and any documents relating to the Exit Financing Facility, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept any such instruments or documents without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

Section 5.13   Substantive Consolidation of the Debtors.   On the Confirmation Date, the Debtors shall be substantively consolidated for all purposes related to the Plan, including, without limitation: (i) for purposes of voting, confirmation and distribution; (ii) all assets and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of the other Debtors; (iii) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors and such Claims shall be discharged on the Effective Date in accordance with Section 2.10(b) of this Plan (but subject to Section 5.09(b) of this Plan); (iv) no distributions shall be made under the Plan on account of Subsidiary Equity Interests, (v) other than as relating to the Exit Financing Facility, all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; and (vi) each and every claim filed or to be filed in the Case of any of the Debtors shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors.   Such substantive consolidation shall not (other than for purposes related to the Plan) affect: (i) the legal and corporate structure of the Reorganized Debtors; (ii) Subsidiary Equity Interests; (iii) pre and post Petition Date guarantees that are required to be maintained (a) in connection with executory contracts or unexpired leases that were entered into during the Cases or that have been or shall be assumed, (b) pursuant to the Plan or (c) in connection with the Interim DIP Order, the Final DIP Order or the Exit Financing Facility; and (iv) asbestos-related Claims.

Section 5.14   Cancellation of Existing Securities and Agreements.   Except for purposes of evidencing a right to distributions under this Plan, on the Effective Date all the agreements and other documents evidencing the Existing Securities shall be terminated,

cancelled, and of no further force or effect; provided, however, that the Senior Note Indenture shall continue in effect for the purposes of (i) allowing the Senior Note Trustee to make any distributions on account of the Senior Notes pursuant to this Plan and to perform such other necessary administrative functions with respect thereto, and (ii) permitting the Senior Note Trustee to maintain and assert any rights or liens on account of the Senior Note Trustee Claim.

Section 5.15  Shareholders Agreement.  On the Effective Date, the Reorganized Debtors and holders of New Amtrol Common Shares shall enter into a shareholders agreement. The form of shareholders agreement will be filed on or before the Plan Supplement filing date.

## ARTICLE VI

## DISTRIBUTIONS AND CLAIMS ALLOWANCE

Section 6.01  Cash Distributions.  Except as otherwise provided in this Plan, all distributions to be made to the Holders of Allowed Claims in Cash under this Plan shall be made on or as soon as practicable after the later of (a) the Initial Distribution Date and (b) the date that is as soon as practicable after the date upon which such Claim becomes an Allowed Claim.

Section 6.02  Distributions to Holders of Allowed Senior Note Claims.  As soon as practicable after the Effective Date, Reorganized Amtrol Holdings shall issue New Amtrol Common Shares and Cash, in a number and amount sufficient to make distributions on behalf of the Debtors to Holders of Allowed Class 4 Claims in accordance with Section 2.09(c) of this Plan and the elections made thereunder.  The distributions of Cash and New Amtrol Common Shares to Holders of Allowed Class 4 Claims shall be made as follows:

(a)    At the close of business on the Distribution Record Date, the transfer ledgers in respect of the Senior Notes shall be closed, and there shall be no further changes in the record Holders of the Senior Notes.  The Reorganized Debtors and the Senior Note Trustee shall have no obligation to recognize any transfer of Senior Notes occurring after the Distribution Record Date.  The Reorganized Debtors and the Senior Note Trustee shall be entitled instead to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

(b)    As soon as practicable after the Effective Date, Reorganized Amtrol Holdings shall make a distribution of Cash and the New Amtrol Common Shares to the Senior Note Trustee for the benefit of and further distribution to the Senior Note Holders as of the Distribution Record Date, in accordance with Section 2.09(c) of this Plan and the elections made thereunder.  The Senior Note Trustee shall, in turn, as soon as is practicable, make pro rata distributions to the record Holders of the Senior Notes pursuant to the terms of the Senior Note Indenture and the Plan.

Section 6.03  <u>Miscellaneous Distribution Provisions</u>.

(a)     <u>Fractional Plan Securities</u>.  Notwithstanding any other provision of this Plan, only whole numbers of shares of New Amtrol Common Shares shall be issued.  When any distribution on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Amtrol Common Shares that are not a whole number, the actual distribution of such Shares shall be rounded to the next higher or lower whole number of Shares as follows:  (i) fractions equal to or greater than ½ shall be rounded to the next higher whole number; and (ii) fractions less than ½ shall be rounded to the next lower number.   No consideration shall be provided in lieu of fractional shares that are rounded down.

(b)     <u>Distributions on Non-Business Days</u>.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

(c)     <u>Post-Consummation Effect of Evidences of Claims or Interests</u>. Notes, stock certificates and other evidence of Claims against or Interests in the Debtors shall, effective on the Effective Date, represent only the right to participate in the distributions contemplated by this Plan, if any, and shall not be valid or effective for any other purpose.

(d)     <u>No Distribution in Excess of Allowed Amount of Claim</u>. Notwithstanding anything to the contrary herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of the portion of such Claim that is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, but the payment or distribution provided hereunder shall be made on account of the portion of such Claim that is an Allowed Claim.  Holders of Allowed Claims shall not be entitled to receive any recoveries in excess of the full amount of their Allowed Claims.

(e)     <u>Disputed Payments</u>.  If any dispute arises as to the identity of the Holder of an Allowed Claim entitled to receive any distribution under this Plan, the Reorganized Debtors may retain such distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute.

(f)     <u>Delivery of Distributions</u>.  Subject to Bankruptcy Rule 9010 and Section 6.02 hereof, all distributions to any Holder of an Allowed Claim, except the Holder of an Allowed Senior Note Claim, shall be made at the address of such Holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such Holder that contains an address for such Holder different from the address reflected on such Schedules for such Holder.   All distributions to any Holder of an Allowed Senior Note Claim shall be made, in the first instance, to the Senior Note Trustee.

(g)    Unclaimed Property.  Holders of Allowed Class 3 Claims and Allowed Class 4 Claims to Unclaimed Property shall cease to be entitled thereto, and such Unclaimed Property shall revert to the Reorganized Debtors.

(h)    Voting of New Amtrol Common Shares.  New Amtrol Common Shares that are Unclaimed Property shall not be voted at any meeting of the stockholders of Reorganized Amtrol Holdings.

(i)    Setoffs and Recoupment.  The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Claim, claims of any nature that the Debtors or Reorganized Debtors may have against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim against the Debtors or the Reorganized Debtors shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any setoff or recoupment claim that the Debtors or the Reorganized Debtors may possess against such Holder.

(j)    Compliance with Tax Requirements.  In connection with this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to this Plan that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of this Plan, each Person that has received any distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

(k)    Disbursing Agent.  All distributions under the Plan shall be made by the Reorganized Debtors or the Disbursing Agent or such other entity as may be designated by the Reorganized Debtors as a Disbursing Agent, including the Senior Note Trustee.  No Disbursing Agent, including the Senior Note Trustee, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court; and, in the event that the Disbursing Agent or the Senior Note Trustee is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.  The amount of any reasonable fees and expenses incurred by the Disbursing Agent and the Senior Note Trustee on or after the Effective Date (including, without limitation, taxes) (which fees and expenses shall constitute part of the Senior Note Trustee Claim) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney fees and expenses) made by the Disbursing Agent and the Senior Note Trustee in making distributions under the Plan shall be paid in Cash by the Reorganized Debtors.

Section 6.04  Procedure for Determination of Claims and Interests.

(a)    Bar Date for Certain Administrative Claims.  With the exception of applications for compensation for fees and reimbursement of expenses Filed by Holders of Professional Claims for services rendered on or before the Effective Date as specified in

Section 6.04(b) hereof, and except as otherwise set forth herein or in an order of the Bankruptcy Court regarding a specific claim, all requests for payment of Administrative Claims shall be Filed no later than thirty (30) days after the Effective Date, or such later date as the Bankruptcy Court approves (the "**Administrative Claims Bar Date**"); provided, however, that no such request or application need be Filed with respect to (i) U.S. Trustee's Fee Claims; (ii) Claims, liabilities or obligations incurred in the ordinary course of the Debtors' respective businesses after the Petition Date unless a dispute exists as to any such liabilities, or unless the provisions of the Bankruptcy Code require the Filing of a request for payment as a precondition to payments being made on any such liability; (iii) any Claims held by any other party as to whom an order of the Court has been entered approving a later bar date for Filing Administrative Claims against the Debtors; and (iv) the Senior Note Trustee Claims. If requests for payment of Administrative Claims are not timely Filed, the Holders of such Claims shall be forever barred, estopped and enjoined from asserting such Claims in any manner against the Debtors or their Property or the Reorganized Debtors or their Property.

        (b)      Bar Date for Professionals.  Applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (i) from the latter of the Petition Date or the date on which retention was approved through the Effective Date or (ii) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(3) through (b)(5) of the Bankruptcy Code, shall be Filed no later than sixty (60) days after the Effective Date or such later date as the Bankruptcy Court approves, and shall be served on: (i) the Debtors, c/o Joseph L. DePaula, 1400 Division Road, West Warwick, Rhode Island 02893; (ii) counsel to the Debtors, William E. Chipman, Jr., Edwards Angell Palmer & Dodge LLP, 919 North Market Street, 15th Floor, Wilmington, Delaware 19801; (iii) counsel to the Committee, Pauline Morgan, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 and Kelley A. Cornish, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064; (iv) Mark Kenney, Esquire, Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2313, Wilmington, Delaware 19801; and (v) counsel to the Debtor-in-Possession Lender, Mitchell A. Seider, Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, New York 10022. Applications that are not timely Filed will not be considered by the Court. The Reorganized Debtors may pay any Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

        (c)      Objections To Claims.  Objections to any Claim filed by any party other than the Debtors (other than Administrative Claims governed by Sections 6.04(a) and (b) of this Plan) must be filed no later than twenty (20) days before the Effective Date; provided, however, that the Reorganized Debtors and only the Reorganized Debtors may file objections to Claims subsequent to the Effective Date through and including sixty (60) days after the Effective Date or such later date that may be approved by the Bankruptcy Court upon motion by the Reorganized Debtors without notice or a hearing. Payment or distribution shall be made on account of all or any portion of such Claim that is an Allowed Claim. To the extent any property is distributed to an entity on account of a Claim that is not an Allowed Claim, such property shall be held in trust for and shall promptly be returned to the Reorganized Debtors. On and after the

Effective Date, the Reorganized Debtors shall have authority to continue to prosecute, settle or withdraw objections to Claims.

## ARTICLE VII

## EFFECT OF CONFIRMATION

Section 7.01 <u>Revesting of Assets</u>. Except as otherwise explicitly provided in this Plan, on the Effective Date, all property of the Estates, to the fullest extent of section 541 of the Code, and any and all other rights and assets of the Debtors of every kind and nature shall revest in the Reorganized Debtors free and clear of all Liens, Claims and Interests other than (i) those Liens, Claims and Interests retained or created pursuant to this Plan or any document entered into in connection with the transactions described in this Plan, and (ii) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.

Section 7.02 <u>Discharge of Claims and Termination of Interests</u>. As of the Effective Date, except as provided in the Confirmation Order or otherwise provided herein, the rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Interests, including any interest accrued on Claims from and after the Petition Date. Except as otherwise provided in this Plan, or the Confirmation Order, Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Code or (z) the Holder of a Claim based on such debt has accepted this Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors. As of the Effective Date, except as otherwise provided in this Plan, or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or Property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in this Plan, or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Code, and such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

## Section 7.03 <u>Injunctions</u>.

(a)    Except as otherwise provided in this Plan, or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity

security holder that is terminated pursuant to the terms of this Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Interests or rights: (i) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors or the Reorganized Debtors or their respective property; (iv) asserting a setoff that was not asserted prior to the applicable Bar Date, or right of subrogation other than with respect to a claim filed or deemed filed by the applicable Bar Date of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan.

(b)     Except as otherwise provided in this Plan, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim, demand, debt, right, cause of action or liability that is released pursuant to this Plan are permanently enjoined from taking any of the following actions on account of such released Claims, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan.

(c)     In exchange for the distributions pursuant to this Plan, except as otherwise provided in this Plan, each Holder of an Allowed Claim receiving such distribution pursuant to this Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 7.03.

Section 7.04  Limitation of Liability.  None of the Debtors, the Reorganized Debtors, the members of the Committee, the members of the Ad Hoc Noteholders Committee, the Prepetition Secured Parties, the DIP Lenders, the Senior Note Trustee nor any of their respective directors, officers, employees, members, attorneys, investment bankers, restructuring consultants and financial advisors, nor any other professional Persons employed by any of them (collectively, the "Exculpated Persons"), shall have or incur any liability to any Person for any act taken or omission from and after the Petition Date in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with this Plan.  The Exculpated Persons shall have no liability to any Debtor, Holder of a Claim, Holder of an Interest, other party in interest in the Cases or any other Person for actions taken or not taken in

connection with, relating to or arising out of the Cases, the management and operation of the Debtors, this Plan or the property to be distributed under this Plan, including, without limitation, failure to obtain Confirmation of this Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in the Cases, the management and operation of the Debtors and under this Plan; provided, however, that nothing in this Section 7.04 shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under this Plan.

Section 7.05 Releases.

(a)     On the Effective Date, the Debtors and the Reorganized Debtors on behalf of themselves and as representatives of the Estates, release unconditionally, and are hereby deemed to release unconditionally, (i) each of the Debtors' officers and directors who served at any time during the Cases, (ii) any person that designated or elected such directors to the extent of alleged liability for actions or inactions of such directors, (iii) the members of the Committee, (iv) the members of the Ad Hoc Noteholders Committee, (v) the DIP Lenders, (vi) the Prepetition Secured Parties, (vi) the Senior Note Trustee and (viii) the attorneys, investment bankers, restructuring consultants and financial advisors of the foregoing, including the Debtors and the Reorganized Debtors, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including, without limitation, those arising under the Code), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on any act, omission, transaction, event or other occurrence taking place on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with this Plan; provided, however, that nothing in this Section 7.05(a) shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under this Plan.

(b)     On the Effective Date, the Debtors and the Reorganized Debtors on behalf of themselves and as representatives of the Estates, release unconditionally, and are hereby deemed to release unconditionally, (i) each of the Debtors' former and present officers and directors, (ii) any Person that designated or elected such directors to the extent of alleged liability for actions or inactions of such directors, (iii) the Prepetition Secured Parties, (iv) the members of the Ad Hoc Noteholders Committee, (v) the Senior Note Trustee and (vi) the attorneys, investment bankers, restructuring consultants and financial advisors of the foregoing, including the Debtors and the Reorganized Debtors (collectively, the "Prepetition Releasees") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including, without limitation, those arising under the Code), whether known or unknown,

foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Petition Date in connection with or relating to Amtrol Holdings or any of its direct or indirect subsidiaries (the "Prepetition Released Matters"); provided, however, that nothing in this Section 7.05(b) shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under this Plan.

        (c)      On the Effective Date, each Holder of an Unimpaired Claim shall be deemed to have unconditionally released the Prepetition Releasees from the Prepetition Released Matters in consideration of the obligations of the Debtors and Reorganized Debtors under the Plan to pay or reinstate such Claims in full. On the Effective Date, in consideration of the obligations of the Debtors and Reorganized Debtors under the Plan, each Holder of a Claim that is entitled to vote on this Plan shall be deemed to have unconditionally released the Prepetition Releasees from the Prepetition Released Matters; provided, however, that each holder of a Claim entitled to vote on this Plan may elect, by checking the box provided on the Ballot, not to grant the releases set forth in this Section 7.05(c).

        (d)      The Confirmation Order shall contain a permanent injunction to effectuate the releases granted in this Section 7.05.

        Section 7.06   Retention and Enforcement, and Release, of Causes of Action. Except as otherwise set forth in this Plan, pursuant to section 1123(b)(3)(B) of the Code, on the Effective Date, all Causes of Action shall become the property of the Reorganized Debtors, and the Reorganized Debtors shall retain all Causes of Action that the Debtors had or had power to assert on behalf of their Estates immediately prior to the Effective Date, and may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of such Causes of Action; provided, however, that any and all of the Debtors' claims and causes of action arising under section 547 of the Code that are not the subject of pending litigation as of the Effective Date (collectively, the "Preference Actions") shall be waived, abandoned, discharged and released pursuant to this Plan. Except with respect to Preference Actions and except as otherwise set forth in this Plan, nothing contained in this Plan shall constitute a release, satisfaction or settlement of the Causes of Action, nor constitute a waiver of the rights, if any, of the Debtors, the Reorganized Debtors to a jury trial with respect to any Cause of Action, or objection to any Claim or Interest, and nothing in this Plan or the Confirmation Order, including the allowance of any Claim of a defendant in any Cause of Action, shall constitute a waiver or release of any Cause of Action under the doctrine of res judicata nor shall any Cause of Action be barred or limited by any estoppel, whether judicial, equitable or otherwise.

        Section 7.07   Exclusions and Limitations on Exculpation, Indemnification, and Releases. Notwithstanding anything in this Plan to the contrary, including without limitation Section 7.05, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification or release provision, shall modify, release, or otherwise limit the liability of any Person not specifically released hereunder, including, without limitation, any Person that is a co-obligor or joint tortfeasor of a Released Party or that is otherwise liable under

theories of vicarious or other derivative liability. The Reorganized Debtors shall not provide indemnification on account of any such claims.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01  <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated), including the compromise, settlement and resolution of any request for payment of any Administrative Claim or Priority Claim, the resolution of any Objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest (to the extent permitted under applicable law);

(b)  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)  hear and determine motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors thereafter, including proceedings with respect to the rights of the Debtors to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or to bring any Avoidance Action, or to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have;

(d)  determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)  to ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(f)  construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan

and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

(g)    determine and resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

(h)    modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and section 15.04 of the Plan or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code, the Plan and the Plan Documents;

(i)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)    determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(l)    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(n)    continue to enforce the automatic stay through the Effective Date;

(o)    hear and determine (A) disputes arising in connection with the interpretation, implementation or enforcement of the Plan or (B) issues presented or arising under the Plan, including disputes among Holders and arising under agreements, documents or instruments executed in connection with the Plan;

(p)    enter a Final Decree closing the Chapter 11 Cases or converting them into chapter 7 cases;

(q)    recover all assets of the Debtors and Property of their respective Estates, wherever located;

(r)    hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; and

(s)    hear any other matter not inconsistent with the Bankruptcy Code.

Section 8.02    Terms Binding.    Upon the entry of the Confirmation Order, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan and executed by the Debtors or the Reorganized Debtors in connection with this Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Claim and Interest Holders and all other Persons that are affected in any manner by this Plan. Subject to the occurrence of the Effective Date, all agreements, instruments and other documents filed in connection with this Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter.

Section 8.03    Successors and Assigns.    The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor or assignee of such Person.

Section 8.04    Confirmation Order and Plan Control.    Except as otherwise provided in this Plan, in the event of any inconsistency between this Plan and the Disclosure Statement, any exhibit to this Plan or any other instrument or document created or executed pursuant to this Plan, this Plan shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

Section 8.05    Governing Law.    EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT

ENTERED INTO IN CONNECTION WITH THE PLAN, INCLUDING, WITHOUT LIMITATION, THE PLAN DOCUMENTS, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF DELAWARE OR THE UNITED STATES OF AMERICA.

Section 8.06    Severability.    If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of this Plan is invalid or unenforceable, such provision, subject to section 1127 of the Code, shall be severable from this Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of this Plan.

Section 8.07    Incorporation by Reference.    Each Exhibit or Schedule to this Plan is incorporated herein by reference.

Section 8.08    Modifications to this Plan.    Upon the mutual written consent of the Debtors and the Committee, this Plan, and any Exhibit or Schedule to this Plan, may be amended or modified at any time prior to the Confirmation Date in accordance with the Bankruptcy Code and Bankruptcy Rules.

Section 8.09    Revocation, Withdrawal or Non-Consummation.    The Debtors and the Committee, together, reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date. If the Debtors and the Committee, together, revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect. In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

Section 8.10    Notices.    Any notice required or permitted to be provided under this Plan shall be in writing and served by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors:

    AMTROL, INC.
    Mr. Joseph DePaula, Chief Financial Officer
    1400 Division Road
    West Warwick, Rhode Island 02893

With a copy to:

    EDWARDS ANGELL PALMER & DODGE LLP
    Stuart M. Brown (No. 4050)
    William E. Chipman, Jr. (No. 3818)
    919 North Market Street, 15th Floor
    Wilmington, Delaware 19801

        - and -

    EDWARDS ANGELL PALMER & DODGE LLP
    Douglas G. Gray
    2800 Financial Plaza
    Providence, Rhode Island 02903

If to the Committee:

    YOUNG CONAWAY STARGATT & TAYLOR, LLP
    Joel A. Waite (No. 2925)
    Pauline Morgan (No. 3650)
    The Brandywine Building
    1000 West Street, 17th Floor
    Wilmington, Delaware 19899

        - and -

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    Kelley A. Cornish, Esquire
    Andrew N. Rosenberg, Esquire
    1285 Avenue of the Americas
    New York, New York 10019-6064

Dated: April 11, 2007

**AMTROL HOLDINGS, INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer


**AMTROL INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer


**WATER SOFT INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer


**AMTROL INTERNATIONAL INVESTMENTS INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer


**OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AMTROL HOLDINGS, INC., ET AL.**

By: /s/ Ryan Langdon
    Name: Ryan Langdon
    Title: Chairman of Official Committee of Unsecured
          Creditors

**EDWARDS ANGELL PALMER & DODGE LLP**
Stuart M. Brown (No. 4050)
William E. Chipman, Jr. (No. 3818)
919 North Market Street, 15th Floor
Wilmington, Delaware 19801
(302) 777-7770
Counsel for the Debtors and Debtors-in-Possession

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joel A. Waite (No. 2925)
Pauline Morgan (No. 3650)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kelley A. Cornish, Esquire
Andrew N. Rosenberg, Esquire
1285 Avenue of the Americas
New York, New York 10019-6064

Counsel for the Official Committee of Unsecured Creditors

# Exhibit B

| UNITED STATES BANKRUPTCY COURT – DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

**Debtor and Case Number (Select One)**

- ☐ Amtrol Holdings, Inc. (06-11446)
- ☒ Amtrol Inc. (06-11447)
- ☐ Water Soft Inc. (06-11448)
- ☐ Amtrol International Investments Inc. (06-11449)

This Space For Court Use Only

# 157

**Received**

MAR 01 2007

**Kurtzman Carson**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

~~NATIONAL GRID~~
~~XXXXXXXXXXXXXXXXXX~~

Name and Address where notices should be sent:

~~NEW ENGLAND GAS COMPANY~~     NATIONAL GRID
~~XXXXXXXXXXX~~                 100 WEYBOSSET ST
~~PRIVIDENCE RI 02903~~         PROV  RI  02903
~~XXXXXXXXXX~~

Telephone Number: 401-272-5040 ext 2093

- ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
- ☐ Check box if you have never received any notices from the bankruptcy court in this case.
- ☐ Check box if the address differs from the address on the envelope sent to you by the court.

This Space For Court Use Only

Last four digits of account or other number by which creditor identifies debtor: 9103614,9102011,9109528,9100174

Check here ☐ replaces
if this claim ☐ amends   a previously filed claim dated: _____

**1. Basis for Claim**

- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other  GAS USAGE

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
    Last four digits of your SS #: _____
    Unpaid compensation for services performed
    from _____ to _____
    (date)        (date)

**2. Date debt was incurred:**
12/18/06

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

Unsecured Nonpriority Claim $ 10,406.33

- ☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim.**

- ☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority

Amount entitled to priority $_____

Specify the priority of the claim:

- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim.**

- ☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:

- ☐ Real Estate  ☐ Motor Vehicle  ☐ Other_____

Value of Collateral $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
- *Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $

|  |  |  |  |
|---|---|---|---|
| (Unsecured) | (Secured) | (Priority) | (Total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

This Space For Court Use Only

| Date: 2/16/07 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): DAVID SATAGAJ// COLL *David Satagaj* |
|---|---|

*Penalty for presenting fraudulent claim:* Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571



061144707020517492802131 24









# Exhibit C

| UNITED STATES BANKRUPTCY COURT — DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

**Debtor and Case Number (Select One)**

- ☐ Amtrol Holdings, Inc. (06-11446)
- ☒ Amtrol Inc. (06-11447)
- ☐ Water Soft Inc. (06-11448)
- ☐ Amtrol International Investments Inc. (06-11449)

This Space For Court Only

# 119

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

*NATIONAL GRID DBA Narragansett Electric*

National Grid
PO Box 960
Northborough MA 01532-0960

508-357-4000

- ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
- ☐ Check box if you have never received any notices from the bankruptcy court in this case.
- ☒ Check box if the address differs from the address on the envelope sent to you by the court.

This Space For Court Use Only

Last four digits of account or other number by which creditor identifies debtor: *ATTACHED*

Check here ☐ replaces
if this claim ☐ amends a previously filed claim dated: _____

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☒ Taxes
- ☒ Other *Utility - Electric*

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)         (date)

**2. Date debt was incurred:**
*December 18, 2006*

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

Unsecured Nonpriority Claim $ *214,921.40*

- ☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim.**
- ☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority
  Amount entitled to priority $_____

Specify the priority of the claim:
- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim.**
- ☐ Check this box if your claim is secured by collateral (including a right of setoff).
  Brief Description of Collateral:
  - ☐ Real Estate ☐ Motor Vehicle ☐ Other _____
  Value of Collateral $_____
  Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**5. Total Amount of Claim at Time Case Filed:** $ *214,921 40* (Unsecured) | -0- (Secured) | -0- (Priority) | *214,921.40* (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credit:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

This Space For Court Use Only

**Received**

**FEB 26 2007**

**Kurtzman Carson**

Date: *2/20/07* | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Michael J Larson* *Sr Analyst*

Penalty for presenting fraudulent claim: Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571



0611447070200517492701293S

AMTROL INC                          02/20/2007 - 11:14:31
1400 DIVISION RD  WEST WARWICK RI 02893
(401)8846300                              ID: LARSM0

---

### Customer Profile: Ck.Digit: 7, Acct #: 49-60806-17425-00, Cycle: 19

**Customer Information**

| | | | |
|---|---|---|---|
| Name: | AMTROL INC | Check Digit: 7 | Current Rate: G32031 / G321 |
| Address: | 1400 DIVISION RD | | Supplier Type: STANDARD OFFER 1 |
| | WEST WARWICK RI 02893 | | |
| Soc. Sec. #: - - | | Account Status: FINAL | Status Date: 12/18/06 |
| Phone #: (401) 884-6300 | | Alt #: (401) 535-1259 x | Turn On Date: 12/26/97 |
| Overflow: | ATTN DON LAFLEUR | | |
| | | CHAP 11 06-11446 12/18/06 | |
| Email: | | | |

Indicators
Over/3rd Party
DEPOSIT
OPEN ACCESS

**Customer Billing**

| Line # | Bill Date | Bill Rate | Bill Use | Net Bill | Read Code | Read Date | Use Day | |
|---|---|---|---|---|---|---|---|---|
| 01 | 01/05/07 | G320 | 99000 | 38732.91 | FINAL | 12/18/06 | 3666.7 | |
| | / / | G322 | 68000 | | FINAL | 12/18/06 | 2518.5 | |

Bill Detail

**Credit Information**

| | | NECO/Supplier: | |
|---|---|---|---|
| Credit Rating: | NORM | Total Overdue: | 99503.94 / .00 |
| Current Credit History: | TERM 1 | Total Current Amt: | 38732.91 / .00 |
| Termination Date: | / / | Medical: NONE | **Total Balance:** 138236.85 / .00 |
| Payment Plan Step: | | Last Trans Amt: | 47185.05+ |
| Misc. Credit Info: | CHAP 11 06-11446 12/18/06 | Trans Date: | 02/05/07 / / |
| | | Trans Type: | TRANSFER |

**Customer Activity**

| Line # | Date | Id | Data |
|---|---|---|---|
| | 12/20/06 | COYNE | COMMERCIAL ACCOUNTS FREE FORM/GENERAL INQU |
| | 01/02/07 | SASSO | EMAILED POWER BILLING TO CANCEL BACK TO 11/21/06 AND |

Change Pending Activity        Close

JAN 07

Account Number
60806 17425 00

Pay This Amount
$138236.85

Amount Enclosed
S

## national**grid**

IIIooollIIIollllloooIIIoollIoIIIooIlolaIIIIooIIoololI

#BWNFKLM **C016
#6080617425008#
AMTROL INC
ATTN DON LAFLEUR
1400 DIVISION RD
WEST WARWICK RI 02893-2323

749608061742500 0013823685

C    19
#    2   LO CHAP 11 06-11446 12/18/06

PLEASE MAIL YOUR NATURAL GAS PAYMENT SEPARATELY

---

## national**grid**

Duplicate

To Reach Us
Customer Service:        1-800-322-3223
Credit Department:       1-866-395-0315
E-mail:    CustomerService@us.ngrid.com
Website:   www.nationalgrid.com

| | | |
|---|---|---|
| SERVICE ADDRESS | LOAD ZONE RHODEISLAND | 749608061742500 |
| 1400 DIVISION RD WEST WARWICK RI | | AMTR, CY. 19 |

Pay This Amount

$138236.85

Account Number

60806 17425 00

JAN 05 2007

NEXT METER
READING DATE

JANUARY    25

| SERVICE PERIOD | | TYPE OF METER READING |
|---|---|---|
| NOV 21 TO DEC 18 2006    27 DAYS | | METER ORDER - FINAL |

| METER NUMBER | RATE | METER READING PRESENT | PREVIOUS | METER CONST | KWH USAGE | ACTUAL DEMAND |
|---|---|---|---|---|---|---|
| F04495615 | PEAK | 3734 | 3635 | 1000 | 99000 | |
| | SHOLDR | 4872 | 4804 | | 68000 | |
| | OFF PK | 7145 | 7013 | | 132000 | |
| G04495615 | PEAK | | | 1000 | | 910.0 KW |
| | SHOLDR | | | | | 910.0 KW |
| | OFF PK | | | | | 880.0 KW |
| H04495615 | PEAK | | | 1000 | | 1400.0 KVA |
| | SHOLDR | | | | | 1400.0 KVA |
| | OFF PK | | | | 299000 | 1360.0 KVA |

THE RENEWABLE ENERGY CHARGE IS BEING COLLECTED FOR THE PURPOSE OF
ACQUIRING A PORTION OF RHODE ISLAND'S ENERGY SUPPLY FROM RENEWABLE
SOURCES, AS REQUIRED BY R.I. GENERAL LAWS SECTION 39-26-1.

| MONTH | TOTAL KWH |
|---|---|
| J 07 | 299000 |
| D | |
| N | 362000 |
| O | 393000 |
| S | 406000 |
| A | 380000 |
| J | 419000 |
| J | 409000 |
| M | 390000 |
| A | 396000 |
| M | 428000 |
| F | 368000 |

BILLED DEMAND
LAST 12 MTHS

| | |
|---|---|
| MIN | |
| MAX | 1287.0 |
| AVG | 1149.0 |

Make space payable to *National Grid*
Mail to: Processing Center, Woburn MA 01807-0049. See reverse side.

JAN 07

Account Number
60806 17425 00



Pay This Amount
PAGE: 2
Amount Enclosed

## national**grid**

Illlllllllllllllllllllllllllllllllllllllllllllllllllll

#BWNFKLM **C016
#6080617425008#
AMTROL INC
ATTN DON LAFLEUR
1400 DIVISION RD
WEST WARWICK RI 02893-2323

74960806174250O 0013823685

C    19
#    2   LO CHAP 11 06-11446 12/18/06

PLEASE MAIL YOUR NATURAL GAS PAYMENT SEPARATELY

## national**grid**

Duplicate

**To Reach Us**
Customer Service:       1-800-322-3223
Credit Department:      1-866-395-0315
E-mail:        CustomerService@us.ngrid.com
Website:       www.nationalgrid.com

| SERVICE ADDRESS | LOAD ZONE RHODEISLAND | 749608061742500 |
|---|---|---|
| 1400 DIVISION RD WEST WARWICK RI | | AMTR, CY. 19 |

Pay This Amount

$138236.85

Account Number

60806 17425 00

DELIVERY SERVICES:
NATIONAL GRID
RATE: 200 KW DEMAND RATE G-32

| | | |
|---|---|---|
| PREVIOUS BALANCE | | $ 138236.85 |
| ADJUSTMENT | 01/05/07 | -38732.91 |
| BALANCE FORWARD | | 99503.94 |

JAN 05 2007

NEXT METER
READING DATE

JANUARY   25

| | | | | |
|---|---|---|---|---|
| CUSTOMER CHARGE | | | | 236.43 |
| DISTRIBUTION ENERGY | .00889 X | 299000 KWH= | | 2658.11 |
| DISTRIBUTION CHARGE | 2.01222 X | 1260.0 KVA= | | 2535.40 |
| TRANSMISSION CHARGE | 1.27000 X | 1260.0 KVA= | | 1600.20 |
| TRANSMISSION ADJUSTMNT | .00371 X | 299000 KWH= | | 1109.29 |
| TRANSITION CHARGE | .00575 X | 299000 KWH= | | 1719.25 |
| CONSERVATION CHARGE | .00230 X | 299000 KWH= | | 687.70 |
| TOTAL DELIVERY SERVICE | | | $ | 10546.38 |

| | | | | |
|---|---|---|---|---|
| SUPPLIER SERVICES - STANDARD OFFER: | | | | |
| ENERGY CHARGE PEAK | .09400 X | 99000 KWH= | 9306.00 | |
| ENERGY CHARGE SHLD | .09400 X | 68000 KWH= | 6392.00 | |
| ENERGY CHARGE OFPK | .09400 X | 132000 KWH= | 12408.00 | |
| TOTAL ENERGY CHARGE | | | $ | 28106.00 |

| | | | |
|---|---|---|---|
| MONTH | TOTAL KWH | | |
| J 07 | 299000 | | |
| D | 362000 | | |
| N | 393000 | | |
| O | 406000 | | |
| S | 380000 | | |
| A | 419000 | | |
| J | 409000 | | |
| J | 390000 | | |
| M | 396000 | | |
| A | 428000 | | |
| M | 368000 | | |
| F | | | |

| | | | |
|---|---|---|---|
| GROSS EARNINGS TAX | | | 1610.52 |
| EARNINGS TAX CREDIT | | | -1529.99 |
| TOTAL CURRENT BALANCE | | $ | 38732.91 |
| TOTAL ACCOUNT BALANCE | | $ | 138236.85 |

BILLED DEMAND
LAST 12 MTHS

MIN
MAX   1287.0
AVG   1149.0

Make check payable to National Grid
Mail to: Processing Center, Woburn MA 01807-0049 • See reverse side.

AMTROL INC                          02/20/2007 - 11:15:28
1400 DIVISION ST  POLE 139-1  WEST WARWICK RI 02893
 (401)8846300                           ID: LARSM0



DEC 06


Account Number
60806 17420 00


Pay This Amount
$873.10
Amount Enclosed
$

**national grid**

#BWNFKLM **C016
#6080617420003#
AMTROL INC
ATTN DON LAFLEUR
1400 DIVISION ST
WEST WARWICK RI 02893-2323

549608061742000 0000087310

```
C    20
#  2  LO CHAP 11 06-11446 12/18/06
```

PLEASE MAIL YOUR NATURAL GAS PAYMENT SEPARATELY

# national grid

Duplicate

**To Reach Us**
Customer Service:           1-800-322-3223
Credit Department:          1-866-395-0315
E-mail:   CustomerService@us.ngrid.com
Website:             www.nationalgrid.com

| SERVICE ADDRESS | LOAD ZONE RHODEISLAND | 549608061742000 |
|---|---|---|
| 1400 DIVISION ST P 139-1 WEST WARWICK RI | | AMTR, CY. 20 |

Pay This Amount
**$873.10**

Account Number

60806 17420 00

Bill Date

DEC 20 2006

| SERVICE PERIOD | | TYPE OF METER READING |
|---|---|---|
| NOV 22 TO DEC 18 2006 | 26 DAYS | METER ORDER - FINAL |

| METER NUMBER | RATE | METER READING PRESENT | PREVIOUS | KWH USAGE |
|---|---|---|---|---|
| 098768454 | C06 | 4601 | 4367 | 234 |
| 098768455 | C06 | 31608 | 29086 | 2522 |
| | | | | 2756 |

NEXT METER
READING DATE

DECEMBER  27

DELIVERY SERVICES:
NATIONAL GRID
RATE:  SMALL C&I RATE  C-06

| | | |
|---|---|---|
| PREVIOUS BALANCE | | $ 1048.74 |
| PAYMENT-THANK YOU | 11/28/06 | -239.04 |
| PAYMENT-THANK YOU | 11/30/06 | -350.36 |
| BALANCE FORWARD | | 459.34 |

| MONTH | TOTAL KWH |
|---|---|
| D 06 | 2756 |
| N | 4697 |
| O | |
| S | 678 |
| A | 445 |
| J | 1091 |
| J | |
| M | 2041 |
| A | 3254 |
| M | 3914 |
| F | 3673 |

| | | | |
|---|---|---|---|
| CUSTOMER CHARGE | | | 6.00 |
| DISTRIBUTION CHARGE | .03652 X | 2756 KWH= | 100.65 |
| *TRANSMISSION CHARGE | .00907 X | 2756 KWH= | 25.00 |
| TRANSITION CHARGE | .00575 X | 2756 KWH= | 15.85 |
| CONSERVATION CHARGE | .00230 X | 2756 KWH= | 6.34 |
| TOTAL DELIVERY SERVICE | | | $  153.84 |

| | | | |
|---|---|---|---|
| SUPPLIER SERVICES - STANDARD OFFER: | | | |
| ENERGY CHARGE | .09400 X | 2756 KWH= | 259.06 |
| TOTAL ENERGY CHARGE | | | $  259.06 |

| | |
|---|---|
| GROSS EARNINGS TAX | 17.20 |
| EARNINGS TAX CREDIT | -16.34 |

| TOTAL CURRENT BALANCE | $  413.76 |
|---|---|
| TOTAL ACCOUNT BALANCE | $  873.10 |

* INCLUDES A TRANSMISSION ADJUSTMENT IN THE AMOUNT OF $.00371 PER KWH

Make check payable to: *National Grid*
Mail to: Processing Center, Woburn MA 01807-0049 • See reverse side.

AMTROL INC                          02/20/2007 - 11:17:42
1400 DIVISION ST   WEST WARWICK RI 02893
  (401)8846300                              ID: LARSM0

## Customer Profile: Ck.Digit: 1, Acct #: 49-60888-72000-00, Cycle: 18

### Customer Information

| | |
|---|---|
| Name: | AMTROL INC |
| Address: | 1400 DIVISION ST |
| | WEST WARWICK   RI   02893 |
| Soc. Sec. #: | - - |
| Phone #: | (401)  884-6300 |
| Overflow: | |
| | CHP 11 06-11446 12/18/06 |
| Email: | |

Check Digit: 1
Account Status: FINAL
Alt #: (000) 000-0000  x

Current Rate: G32031    G321
Supplier Type: STANDARD OFFER 1
Status Date: 12/18/06
Turn On Date: 03/26/96

**Indicators**
Over/3rd Party
OPEN ACCESS

### Customer Billing

| Line # | Bill Date | Bill Rate | Bill Use | Net Bill | Read Code | Read Date | Use Day |
|---|---|---|---|---|---|---|---|
| 01 | 01/09/07 | G320 | 176000 | 69454.44 | FINAL | 12/18/06 | 6285.7 |
| | / / | G322 | 143000 | | FINAL | 12/18/06 | 5107.1 |

Bin Details

### Credit Information

| | | NECO/Supplier: | |
|---|---|---|---|
| Credit Rating: | POOR | Total Overdue: | .00 | .00 |
| Current Credit History: | TERM 1 | Total Current Amt: | 4738.16- | .00 |
| Termination Date: | / / | Medical: NONE | **Total Balance:** | **4738.16-** | .00 |
| Payment Plan Step: | | Last Trans Amt: | 76155.21 | Transports |
| Misc. Credit Info: | CHP 11 06-11446 12/18/06 | Trans Date: | 02/07/07 | poss petition |
| | | Trans Type: | PAYMENT | debt |

### Customer Activity

| Line # | Date | Id | Data |
|---|---|---|---|
| | 12/20/06 | COYNE | COMMERCIAL ACCOUNTS FREE FORM/GENERAL INQU |
| | 12/21/06 | @@@@@ | S751 ON CYCLE SKIPS & CODE-A-PHONE  READ CD = |

Change Pending Activity          Close

JAN 07

Account Number
60888 22000 00

Pay This Amount
$71417.05

Amount Enclosed
$

## national**grid**

#BWNFKLM **C016
#6088822000009#
AMTROL INC
1400 DIVISION ST
WEST WARWICK RI 02893-2323

149608882200000 0007141705

C     18
#   3   LO CHP 11 06-11446 12/18/06

PLEASE MAIL YOUR NATURAL GAS PAYMENT SEPARATELY

## national**grid**

Duplicate

*To Reach Us*
Customer Service:        1-800-322-3223
Credit Department:       1-866-395-0315
E-mail:     CustomerService@us.ngrid.com
Website:    www.nationalgrid.com

SERVICE ADDRESS      LOAD ZONE RHODEISLAND      149608882200000
1400 DIVISION ST WEST WARWICK RI                 AMTR, CY. 18

Pay This Amount
$71417.05

Account Number
60888 22000 00

Bill Date

JAN 09 2007

NEXT METER
READING DATE

JANUARY   24

SERVICE PERIOD                    TYPE OF METER READING
NOV 20 TO DEC 18 2006   28 DAYS        METER ORDER - FINAL

| METER NUMBER | RATE | METER READING PRESENT | METER READING PREVIOUS | METER CONST | KWH USAGE | ACTUAL DEMAND |
|---|---|---|---|---|---|---|
| F33333334 | PEAK | 20457 | 20281 | 1000 | 176000 | |
| | SHOLDR | 25868 | 25725 | | 143000 | |
| | OFF PK | 41219 | 40985 | | 234000 | |
| 633333334 | PEAK | | | 1000 | | 1450.0 KW |
| | SHOLDR | | | | | 1450.0 KW |
| | OFF PK | | | | | 1400.0 KW |
| H33333334 | PEAK | | | 1000 | | 1920.0 KVA |
| | SHOLDR | | | | | 1920.0 KVA |
| | OFF PK | | | | 553000 | 1850.0 KVA |

THE RENEWABLE ENERGY CHARGE IS BEING COLLECTED FOR THE PURPOSE OF
ACQUIRING A PORTION OF RHODE ISLAND'S ENERGY SUPPLY FROM RENEWABLE
SOURCES, AS REQUIRED BY R.I. GENERAL LAWS SECTION 39-26-1.

| MONTH | TOTAL KWH |
|---|---|
| J 07 | 553000 |
| D | |
| N | 647000 |
| O | 699000 |
| S | 727000 |
| A | 652000 |
| J | 733000 |
| J | 684000 |
| M | 689000 |
| A | 700000 |
| M | 736000 |
| F | 680000 |
| J 06 | 681000 |

BILLED DEMAND
LAST 12 MTHS

MIN
MAX   1980.0
AVG   1707.0

Make check payable to *National Grid*
Mail to: Processing Center, Woburn MA 01807-0049 • See reverse side.

JAN 07

Account Number
60888 22000 00


Pay This Amount
PAGE: 2
Amount Enclosed
$

## national**grid**

IIIuuulIllullululuuulIullulIullullulllIllullululdl

```
#BWNFKLM **C016
#6088822000009#
AMTROL INC
1400 DIVISION ST
WEST WARWICK RI 02893-2323
```

149608882200000 0007141705

```
C    18
#  3  LO CHP 11 06-11446 12/18/06
```

PLEASE MAIL YOUR NATURAL GAS PAYMENT SEPARATELY

## national**grid**

Duplicate

To Reach Us
Customer Service:      1-800-322-3223
Credit Department:     1-866-395-0315
E-mail:    CustomerService@us.ngrid.com
Website:   www.nationalgrid.com

SERVICE ADDRESS    LOAD ZONE RHODEISLAND    149608882200000
1400 DIVISION ST WEST WARWICK RI                AMTR, CY. 18
------------------------------------------------------------

**Pay This Amount**
$71417.05

DELIVERY SERVICES:
NATIONAL GRID
RATE: 200 KW DEMAND RATE  G-32

Account Number
60888 22000 00

| | | |
|---|---|---|
| PREVIOUS BALANCE | | $ 78093.59 |
| ADJUSTMENT | 01/08/07 | -76130.98 |
| BALANCE FORWARD | | 1962.61 |

Bill Date

JAN 09 2007

| | | | | |
|---|---|---|---|---|
| CUSTOMER CHARGE | | | | 236.43 |
| DISTRIBUTION ENERGY | .00889 X | 553000 KWH= | | 4916.17 |
| DISTRIBUTION CHARGE | 2.01250 X | 1728.0 KVA= | | 3477.60 |
| TRANSMISSION CHARGE | 1.27000 X | 1728.0 KVA= | | 2194.56 |
| TRANSMISSION ADJUSTMNT | .00371 X | 553000 KWH= | | 2051.63 |
| TRANSITION CHARGE | .00575 X | 553000 KWH= | | 3179.75 |
| CONSERVATION CHARGE | .00230 X | 553000 KWH= | | 1271.90 |
| TOTAL DELIVERY SERVICE | | | $ | 17328.04 |

NEXT METER
READING DATE

JANUARY   24

| | | | | |
|---|---|---|---|---|
| SUPPLIER SERVICES - STANDARD OFFER: | | | | |
| ENERGY CHARGE PEAK | .09400 X | 176000 KWH= | 16544.00 | |
| ENERGY CHARGE SHLD | .09400 X | 143000 KWH= | 13442.00 | |
| ENERGY CHARGE OFPK | .09400 X | 234000 KWH= | 21996.00 | |
| TOTAL ENERGY CHARGE | | | $ | 51982.00 |

| MONTH | TOTAL KWH |
|---|---|
| J 07 | 553000 |
| D | 647000 |
| N | 699000 |
| O | 727000 |
| S | 652000 |
| A | 733000 |
| J | 684000 |
| J | 689000 |
| M | 700000 |
| A | 736000 |
| M | 680000 |
| F | |
| J 06 | 681000 |

| | |
|---|---|
| GROSS EARNINGS TAX | 2887.92 |
| EARNINGS TAX CREDIT | -2743.52 |
| TOTAL CURRENT BALANCE | $ 69454.44 |
| TOTAL ACCOUNT BALANCE | $ 71417.05 |

BILLED DEMAND
LAST 12 MTHS

MIN
MAX   1980.0
AVG   1707.0

Make check payable to National Grid
Mail to: Processing Center, Woburn MA 01807-0049 • See reverse side.

AMTROL INC                          02/20/2007 - 11:18:55
318 PLUM ST  N KINGSTOWN RI 02852
 (000)0000000                                ID: LARSMO

## Customer Profile: Ck.Digit: 6, Acct #: 49-61313-52600-02, Cycle: 18

### Customer Information

| | | | |
|---|---|---|---|
| Name: | AMTROL INC | Check Digit: 6 | Current Rate: G02022 |
| Address: | 318 PLUM ST | | Supplier Type: STANDARD OFFER 2 |
| | N KINGSTOWN | RI 02852 | |
| Soc. Sec. #: | - - | Account Status: FINAL | Status Date: 12/18/06 |
| Phone #: | (000) 000-0000 | Alt #: (401) 295-5586 x | Turn On Date: 01/22/98 |
| Overflow: | ATTN DON LAFLEUR | 1400 DIVISION ST | |
| | W WARWICK  RI 02893 | CHAP11 06-11446 12/18/06 | |
| Email: | | | |

**Indicators**

Over/3rd Party
DEPOSIT
OPEN ACCESS

### Customer Billing

| Line # | Bill Date | Bill Rate | Bill Use | Net Bill | Read Code | Read Date | Use Day |
|---|---|---|---|---|---|---|---|
| 01 | 01/11/07 | G020 | 30480 | 4394.40 | FINAL | 12/18/06 | 1088.6 |
| 02 | 01/11/07 | G020 | 33760- | 4809.46- | CANC / ADJ | 11/20/06 | |

Bill Detail

### Credit Information

| | | NECO/Supplier: | |
|---|---|---|---|
| Credit Rating: | GOOD | Total Overdue: | .00 | .00 |
| Current Credit History: | NONE | Total Current Amt: | 415.06- | .00 |
| Termination Date: | / / | Medical: NONE | **Total Balance:** | **415.06-** | .00 |
| Payment Plan Step: | | Last Trans Amt: | 4809.46 | E Transfer to |
| Misc. Credit Info: | CHAP11 06-11446 12/18/06 | Trans Date: | 02/07/07 | post-petition / |
| | | Trans Type: | PAYMENT | debt |

### Customer Activity

| Line # | Date | Id | Data |
|---|---|---|---|
| | 01/11/07 | COYNE | C270 SUSPENSION REASON/HEAT RELATED/CORRESPONDENCE |
| | 01/11/07 | COYNE | CODE SUSP CH 11 PER BANKRUPTCY NOTICE |

Change Pending Activity          Close

JAN 07

Account Number 
61313 52600 02

Pay This Amount
$4394.40

Amount Enclosed
$

## national**grid**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

#BWNFKLM **C016
#6131352600026#
AMTROL INC
ATTN DON LAFLEUR
1400 DIVISION ST
W WARWICK RI 02893-2323

64961313526D002 0000439440

C    18
# 1  LO CHAP11 06-11446 12/18/06

PLEASE MAIL YOUR NATURAL GAS PAYMENT SEPARATELY

## national**grid**

Duplicate

*To Reach Us*
Customer Service:     1-800-322-3223
Credit Department:    1-866-395-0315
E-mail:      CustomerService@us.ngrid.com
Website:     www.nationalgrid.com

| SERVICE ADDRESS | LOAD ZONE RHODEISLAND | 649613135260002 |
| 318 PLUM ST N KINGSTOWN RI | | AMTR, CY. 18 |

Pay This Amount

$4394.40

Account Number

61313 52600 02

Bill Date

JAN 11 2007

NEXT METER
READING DATE

JANUARY   24

| | SERVICE PERIOD | TYPE OF METER READING |
| | NOV 20 TO DEC 18 2006   28 DAYS | METER ORDER - FINAL |

| METER NUMBER | RATE | METER READING PRESENT | PREVIOUS | METER CONST | KWH USAGE | ACTUAL DEMAND |
|---|---|---|---|---|---|---|
| 035589022 | G02 | 39571 | 39190 | 80 | 30480 | 92.0 KW |

DELIVERY SERVICES:
NATIONAL GRID
RATE:  GENERAL C&I RATE  G-02

|  |  |  |  |  |
|---|---|---|---|---|
| PREVIOUS BALANCE | | | $ | 4809.46 |
| ADJUSTMENT | | 01/11/07 | | -4809.46 |
| BALANCE FORWARD | | | | .00 |

| | | | |
|---|---|---|---|
| CUSTOMER CHARGE | | | 103.41 |
| DISTRIBUTION ENERGY | .00777 X | 30480 KWH= | 236.83 |
| DISTRIBUTION CHARGE | 3.22000 X | 82.0 KW = | 264.04 |
| TRANSMISSION CHARGE | 1.40000 X | 82.0 KW = | 114.80 |
| TRANSMISSION ADJUSTMNT | .00371 X | 30480 KWH= | 113.08 |
| TRANSITION CHARGE | .00575 X | 30480 KWH= | 175.26 |
| CONSERVATION CHARGE | .00230 X | 30480 KWH= | 70.10 |
| TOTAL DELIVERY SERVICE | | | $  1077.52 |

| | | | |
|---|---|---|---|
| SUPPLIER SERVICES - STANDARD OFFER: | | | |
| ENERGY CHARGE | .09400 X | 30480 KWH= | 2865.12 |
| TOTAL ENERGY CHARGE | | | $  2865.12 |

| | | | |
|---|---|---|---|
| GROSS EARNINGS TAX | | | 164.28 |
| RHODE ISLAND SVC TAX | 4106.92 X | 7.00%= | 287.48 |
| TOTAL CURRENT BALANCE | | | $  4394.40 |
| TOTAL ACCOUNT BALANCE | | | $  4394.40 |

| MONTH | TOTAL KWH |
|---|---|
| J 07 | 30480 |
| D | 34080 |
| N | 29520 |
| O | 33440 |
| S | 30240 |
| A | 34000 |
| J | 31840 |
| M | 31760 |
| A | 32800 |
| M | 35600 |
| F | 32480 |
| J 06 | 29600 |

BILLED DEMAND
LAST 12 MTHS

MIN
MAX   95.2
AVG   81.2

THE RENEWABLE ENERGY CHARGE IS BEING COLLECTED FOR THE PURPOSE OF
ACQUIRING A PORTION OF RHODE ISLAND'S ENERGY SUPPLY FROM RENEWABLE
SOURCES, AS REQUIRED BY R.I. GENERAL LAWS SECTION 39-26-1.

Make check payable to: *National Grid*
Mail to: Processing Center, Woburn MA 01807-0049 • See reverse side

# national**grid**

February 20, 2007

Amtrol Claims Processing
C/O Kurtzman Carson Consultants LLC
12910 Culver Blvd, Suite I
Los Angeles CA  90066

Re: Amtrol Holdings Inc. et al.
    Amtrol Inc. 06-11447 KG

Dear Sirs:

Enclosed please find our proof of claim in the above referenced case.

Thank you.

Sincerely,

*Mike Larson*

Mike Larson
Sr. Analyst, Credit & Collections
National Grid

P.O. Box 960
Northborough, MA  01532-0960
800-322-3223   Fax: 508.357.4728
www.granitestateelectric.com
www.masselectric.com
www.nantucketelectric.com
www.narragansett.com

# Exhibit D

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| AMTROL HOLDINGS, INC., *et al.*[1] | : | Case No. 06-11446(KG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR AMTROL HOLDINGS, INC., AMTROL INC., WATER SOFT INC. AND AMTROL INTERNATIONAL INVESTMENTS INC., PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE DEBTORS**

**EDWARDS ANGELL PALMER & DODGE LLP**
Stuart M. Brown (No. 4050)
William E. Chipman, Jr. (No. 3818)
919 North Market Street, 15th Floor
Wilmington, Delaware 19801

Counsel for the Debtors and Debtors-in-Possession

- and -

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joel A. Waite (No. 2925)
Pauline Morgan (No. 3650)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kelley A. Cornish
Andrew N. Rosenberg
1285 Avenue of the Americas
New York, New York 10019-6064

Counsel for the Official Committee of Unsecured Creditors

---

[1] Additional Debtors include all of Amtrol Holdings, Inc.'s wholly-owned direct and indirect domestic subsidiaries: Amtrol Inc.; Water Soft Inc.; and Amtrol International Investments Inc. On March 5, 2007, the Debtors filed a motion with this Court seeking the entry of an order authorizing: (i) the creation of Water Soft LLC, a Delaware limited liability company, as a wholly-owned subsidiary of Amtrol Inc.; and (ii) the merger of Water Soft Inc. with and into Water Soft LLC, with Water Soft LLC being the surviving entity (the "**Merger Motion**"). On April 10, 2007, the Court granted the Merger Motion. To the extent the merger occurs prior to the Confirmation Date of the Plan, the Plan will be deemed to have also been proposed by Water Soft LLC.

## PLAN EXHIBITS

Exhibit A:    Amended and Restated Articles of Incorporation of each of the Reorganized Debtors

Exhibit B:    Amended By-Laws of each of the Reorganized Debtors

Exhibit C:    Existing corporate organizational structure of the Debtors

Exhibit D:    Contemplated corporate organizational structure of the Reorganized Debtors

Exhibit E:    Contemplated Shareholders Agreement

i

## PLAN SCHEDULES

Schedule 1:    Exit Financing Facility Term Sheet

Schedule 2:    List of Cure Amounts for Executory Contracts and Unexpired Leases Assumed
under the Plan

Schedule 3:    List of Officers and Directors of each of the Reorganized Debtors

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................3
ARTICLE I DEFINITIONS, INTERPRETATION AND EXHIBITS ................................4
    Section 1.01  Definitions.............................................................................................4
    Section 1.02  Rules of Interpretation ........................................................................15
    Section 1.03  Computation of Time ...........................................................................15
ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....16
    Section 2.01  Administrative Claims ..........................................................................16
    Section 2.02  Senior Note Trustee Claim....................................................................16
    Section 2.03  Priority Tax Claims ..............................................................................16
    Section 2.04  DIP Claim ...........................................................................................17
    Section 2.05  Prepetition Secured Parties Claim.........................................................17
    Section 2.06  Priority Non-Tax Claims ......................................................................17
    Section 2.07  Other Secured Claims ..........................................................................18
    Section 2.08  Unsecured Claims ................................................................................18
    Section 2.09  Allowed Senior Note Claims.................................................................18
    Section 2.10  Intercompany Claims ...........................................................................19
    Section 2.11  Common Stock Claims and Interests......................................................19
ARTICLE III TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...19
    Section 3.01  Assumed and Rejected Contracts and Leases..........................................19
    Section 3.02  Payments Related to Assumption of Executory Contracts and Unexpired Leases ...........21
    Section 3.03  Postpetition Contracts and Leases.........................................................21
    Section 3.04  Rejection Damages Bar Date ................................................................21
    Section 3.05  Continuation of Certain Indemnification Obligations ..............................22
    Section 3.06  Benefit Programs..................................................................................22
ARTICLE IV CONDITIONS PRECEDENT ......................................................................23
    Section 4.01  Conditions to Occurrence of Effective Date ...........................................23
    Section 4.02  Waiver of Conditions to Consummation ................................................23
    Section 4.03  Non-Consensual Confirmation ..............................................................23
ARTICLE V IMPLEMENTATION OF PLAN .....................................................................23
    Section 5.01  Pre-Effective Date Management and Operation of Debtors........................23
    Section 5.02  Dissolution of Committee .....................................................................24
    Section 5.03  Pre-Effective Date Injunctions or Stay...................................................24
    Section 5.04  Corporate Restructuring .......................................................................24
    Section 5.05  Certificates of Incorporation and By-Laws .............................................25
    Section 5.06  Post-Effective Date Management and Operation of Reorganized Debtors ...25
    Section 5.07  Exit Financing Facility .........................................................................26
    Section 5.08  Issuance of New Amtrol Common Shares................................................26
    Section 5.09  Transfer of Intercompany Claims...........................................................26
    Section 5.10  Management Stock Incentive Program ...................................................26
    Section 5.11  Effectuating Documents; Further Transactions ......................................26
    Section 5.12  Exemption from Certain Transfer and Other Taxes .................................26
    Section 5.13  Substantive Consolidation of the Debtors..............................................27
    Section 5.14  Cancellation of Existing Securities and Agreements................................27
    Section 5.15  Shareholders Agreement ......................................................................28
ARTICLE VI DISTRIBUTIONS AND CLAIMS ALLOWNACE......................................28
    Section 6.01  Cash Distributions ...............................................................................28
    Section 6.02  Distributions to Holders of Allowed Senior Note Claims.........................28
    Section 6.03  Miscellaneous Distribution Provisions...................................................29
    Section 6.04  Procedure for Determination of Claims and Interests ..............................30
ARTICLE VII EFFECT OF CONFIRMATION .................................................................32
    Section 7.01  Revesting of Assets ..............................................................................32
    Section 7.02  Discharge of Claims and Termination of Interests ..................................32

**Section 7.03  Injunctions** ............................................................................................................32
**Section 7.04  Limitation of Liability** .............................................................................................33
**Section 7.05  Releases**.................................................................................................................34
Section 7.06  Retention and Enforcement, and Release, of Causes of Action ..............................35
Section 7.07  Exclusions and Limitations on Exculpation, Indemnification, and Releases ..........35
**ARTICLE VIII MISCELLANEOUS PROVISIONS** ........................................................................36
Section 8.01  Retention of Jurisdiction ..........................................................................................36
Section 8.02  Terms Binding ..........................................................................................................38
*Section 8.03  Successors and Assigns*............................................................................................*38*
Section 8.04 Confirmation Order and Plan Control ........................................................................38
Section 8.05   Governing Law.........................................................................................................38
Section 8.06   Severability .............................................................................................................39
Section 8.07  Incorporation by Reference.......................................................................................39
Section 8.08  Modifications to this Plan ..........................................................................................39
Section 8.09  Revocation, Withdrawal or Non-Consummation ......................................................39
Section 8.10  Notices .....................................................................................................................39

PLAN OF REORGANIZATION

# INTRODUCTION

This plan of reorganization, under chapter 11 of the Bankruptcy Code, dated April 11, 2007 (as amended, the **"Plan"**), is jointly proposed by: (i) Amtrol Holdings, Inc. (**"Amtrol Holdings"**); (ii) Amtrol Inc. (**"Amtrol Inc."**); (iii) Water Soft Inc. (**"Water Soft"**[2]); (iv) Amtrol International Investments Inc. (**"Amtrol International"** and, together with Amtrol Holdings, Amtrol Inc. and Water Soft, the **"Debtors"** or the **"Company"**); and (v) the Official Committee of Unsecured Creditors (the **"Committee"**).

In general, this Plan provides for the substantive consolidation of all of the Debtors for voting and distribution purposes only, and provides for the Debtors' reorganization pursuant to the terms of this Plan. This Plan contemplates the payment in full in cash of all administrative claims and priority claims against the Debtors, and the repayment in full in cash of outstanding amounts under the Debtors' post-petition financing facility. Furthermore, this Plan provides for the treatment of allowed claims against, and interests in, the Debtors as follows:

- Each Holder of Amtrol Inc.'s 10 ¾% Senior Subordinated Notes due December 2006 (the "Senior Notes") may elect to receive (i) its pro rata share of 100% of the newly issued common stock of Reorganized Amtrol Holdings, subject to dilution in respect of new common stock that may be issued pursuant to the Management Stock Incentive Program (as defined herein) of the Reorganized Debtors, or (ii) cash in the amount of sixty percent (60%) of the principal amount of such Holder's Senior Notes, provided, however, that such cash payment option shall not be available to Holders of the Senior Notes if more than 15% in principal amount of the Senior Notes elects or defaults to such cash payment option;

- Each Holder of an allowed unsecured claim (other than Holders of Senior Notes) will receive (i) at the Debtors' sole discretion, (a) payment in full in cash, or (b) reinstatement of its allowed claim, or (ii) such other treatment as agreed by the Debtors and the claimant; and

- No distributions will be made on account of the Debtors' issued and outstanding common stock, options or warrants, including claims arising out of or with respect to such common stock interests.

Reference is made to the First Amended Disclosure Statement, dated April 11, 2007, Relating to a First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code proposed by the Debtors and the Committee (the **"Disclosure Statement"**) accompanying the Plan for a discussion of the Debtors' history, businesses, results of operations,

---

[2]  Defined term also includes Water Soft LLC if the Merger Motion has been granted by this Court prior to confirmation of this Plan.

historical financial information, properties, projections for future operations, risk factors, a summary and analysis of the Plan, and certain related matters.

**ALL CREDITORS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND IN THE PLAN, THE DEBTORS AND THE COMMITTEE RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

**NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREUNDER AND APPROVED BY THE BANKRUPTCY COURT OR THE DEBTORS, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.**

## ARTICLE I

### DEFINITIONS, INTERPRETATION AND EXHIBITS

Section 1.01 <u>Definitions</u>. Unless the context requires otherwise, the following terms shall have the following meanings whether used in the Plan or the Disclosure Statement with initial capital letters or otherwise, unless the context clearly requires otherwise. As used herein:

*"Ad Hoc Noteholders Committee"* means, collectively, Newport Global Advisors, L.P., Credit Suisse Securities (USA) LLC, AIG Global Investment Corp. and Cypress Management, and their respective affiliates, as Holders of a majority of the Senior Notes.

*"Administrative Agent"* means Barclays Bank PLC in its capacity as Administrative Agent under the DIP Credit Agreement.

*"Administrative Claim"* means (a) a Claim for any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary postpetition cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under section 365(b)(i) of the Bankruptcy Code to cure a default under an assumed executory contract or unexpired lease, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code or (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court, and (b) any U.S. Trustee's Fee Claims.

*"Administrative Claims Bar Date"* shall have the meaning set forth in Section 6.04(a) of this Plan.

*"Affiliate"* shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

*"Allowed Claim"* means, with reference to any Claim, (a) any Claim against the Debtors, or any of them, which has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim which is not a Disputed Claim, or (d) any Claim the amount or existence of which, if disputed, (i) has been determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (ii) has been allowed by Final Order of the Bankruptcy Court.

*"Allowed Senior Note Claims"* means the Claims of the Holders of the Senior Notes in the aggregate amount of $102,671,800.54 arising under or relating to the Senior Note Indenture, which shall be Allowed Claims pursuant to Section 2.09(b) of this Plan.

*"Avoidance Actions"* means any and all Causes of Action which a trustee, debtor-in-possession, any estate or other appropriate party in interest may assert under sections 502, 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724(a) of the Bankruptcy Code (other than those which are released or dismissed as part of and pursuant to the Plan), including the Debtors' rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by applicable law) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

*"Ballot"* means the ballot, other than a Master Ballot, upon which Beneficial Holders of Class 4 Senior Note Claims entitled to vote on this Plan shall: (i) indicate their acceptance or rejection of the Plan; (ii) indicate their election regarding receiving either the Stock Payment Option or the Cash Payment Option, as defined in Section 2.09(c) of this Plan; and (iii) indicate their election to opt out of the releases contained in Section 7.05(c) of the Plan, all in accordance with the instructions regarding voting.

*"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

*"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware or, if such court ceases to exercise jurisdiction over these Chapter 11 Cases or the Debtors, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases and the Debtors.

*"Bankruptcy Rules"* means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, (iii) the Local Rules for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all additional amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

*"Barclays"* means Barclays Bank PLC and Barclays Capital.

*"Bar Date"* means the date (or dates) set by the Bankruptcy Court as the last day by which Holders of certain Claims must File Proofs of Claim against the Debtors in the Chapter 11 Cases.

*"Bar Date Order"* means the order of the Bankruptcy Court dated January 11, 2007 establishing the Bar Date. The Bar Date Order does not pertain to asbestos-related Claims or Holders of asbestos-related claims. No date has been or will be applied for by the Debtors as the date by which asbestos-related Claims must be asserted or filed, therefore, no asbestos-related Claims should be filed.

*"Beneficial Holder"* means the Person holding the beneficial interest in a Claim.

*"Borrower"* means Amtrol Inc. as borrower under the DIP Credit Agreement.

*"Business Day"* means any day that is not a Saturday, a Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), or a day on which banking institutions in the State of Rhode Island are authorized or obligated by law, executive order or governmental decree to be closed.

*"Cash"* means money, currency and coins, negotiable checks, balances in bank accounts and other lawful currency of the United States of America and its equivalents.

*"Cash Payment Option"* shall have the meaning set forth in Section 2.09(c) of this Plan.

*"Causes of Action"* means any and all actions, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, causes of action, choses in action, controversies, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, accruing to the Debtors, including but not limited to the Avoidance Actions.

"*Chapter 11 Cases*" means the bankruptcy cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

"*Claim*" means "claim" as defined in section 101(5) of the Bankruptcy Code, and supplemented by section 102(2) of the Bankruptcy Code, against any of the Debtors, whether or not asserted.

"*Claims Agent*" means the Debtors' Bankruptcy Court-approved claims agent, Kurtzman Carson Consultants LLC.

"*Class*" means each group or category of Claims or Interests as designated in **Article II** of the Plan.

"*Collateral Agent*" means Barclays Bank PLC and/or other financial institutions selected by Barclays Bank PLC under the DIP Credit Agreement to act in such capacity.

"*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

"*Common Stock*" means collectively, (a) the common stock of Amtrol Holdings issued and outstanding immediately prior to the Effective Date, (b) all options, warrants, conversion, privilege or other legal or contractual rights to purchase or receive the common stock of Amtrol Holdings, and (c) any rights associated with such common stock.

"*Common Stock Claim*" means any Claim with respect to the Common Stock of the kind described in section 510(b) of the Bankruptcy Code.

"*Confirmation*" means "confirmation" as used in section 1129 of the Bankruptcy Code.

"*Confirmation Date*" means the date on which the Confirmation Order is docketed by the clerk of the Bankruptcy Court.

"*Confirmation Hearing*" means the hearing(s) held before the Bankruptcy Court to consider Confirmation of the Plan.

"*Confirmation Objection Deadline*" means the date set forth in an order of the Bankruptcy Court as the deadline for objecting to Confirmation of this Plan.

"*Confirmation Order*" means the order docketed by the clerk of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

"*Creditor*" means any Person that is the Holder of any Claim against any of the Debtors.

*"Cure"* means the distribution, within twenty (20) Business Days after the later of: (i) the Effective Date; (ii) such other time as may be agreed upon by the parties; or (iii) as ordered by the Bankruptcy Court pursuant to Section 3.02 of this Plan, of Cash or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court with respect to the assumption of an executory contract or unexpired lease in accordance with the provisions of **Article III** of this Plan.

*"Day(s)"* means, unless expressly otherwise provided, calendar day(s).

*"Debtors"* means Amtrol Holdings, Amtrol Inc., Water Soft and Amtrol International as debtors and debtors-in-possession in the Chapter 11 Cases.

"*DIP Claim*" means any Claim arising from or related to the DIP Credit Agreement and related agreements, and the DIP Loan.

*"DIP Credit Agreement"* means that certain Senior Secured Super Priority Debtor in Possession Credit Agreement, dated as of December 22, 2006, by and among the Borrower, the Guarantors, the Administrative Agent, Barclays Capital, in its capacity as Sole Lead Arranger and Sole Bookrunner, and as Syndication Agent, the Collateral Agent, The CIT Group/Business Capital, Inc., as Documentation Agent, and the DIP Lenders from time to time parties thereto.

*"DIP Lenders"* means Barclays and other lenders from time to time parties under the DIP Credit Agreement.

*"DIP Loan"* means that certain $115 million maximum principal amount senior secured, super-priority post-petition financing approved by the Bankruptcy Court, on the terms and subject to the conditions set forth in the Final DIP Order and the DIP Credit Agreement.

*"Disbursing Agent"* means the Reorganized Debtors or such other Entity that is designated by the Reorganized Debtors to make distributions pursuant to the Plan.

*"Disclosure Statement"* means the First Amended Disclosure Statement, dated April 11, 2007, relating to a First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code jointly proposed by the Debtors and the Committee, including all exhibits, appendices, schedules and annexes, if any, attached thereto, with respect to this Plan approved by order of the Bankruptcy Court, as the same may be altered, amended, supplemented or modified from time to time, prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3018.

*"Disputed Claim"* means any Claim that is not or has not become an Allowed Claim and is (a) scheduled by the Debtors as disputed, contingent or unliquidated, (b) scheduled by the Debtors in an undetermined amount, (c) scheduled by the Debtors as fixed, liquidated and not disputed but as to which the Holder thereof has Filed a Proof of Claim in an amount or priority greater than scheduled by the Debtors, or (d) not scheduled by the Debtors, but as to

which a Proof of Claim has been Filed, which is the subject of an objection, appeal or motion to estimate that has been filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order. *Each asbestos-related Claim is a Disputed Claim. However, this Plan does not classify or treat asbestos-related Claims. This Plan also does not classify or treat insurance assets of Claims relating to asbestos-related Claims. Asbestos-related Claims, and related insurance assets and Claims, will pass through these Chapter 11 Cases unaffected and unimpaired by this Plan.*

*"Distribution Record Date"* means the date set by order of the Bankruptcy Court for purposes of determining the Holders of Class 4 Allowed Senior Note Claims entitled to receive distributions under the Plan. *(With regard to Class 4 Allowed Senior Note Claims electing the Stock Payment Option, April 11, 2007 will be the Distribution Record Date. With regard to Class 4 Allowed Senior Note Claims electing or defaulting to the Cash Payment Option, the Distribution Record Date will be established by further order of the Court, prior to the Effective Date of the Plan.)*

*"Effective Date"* means the first Business Day that is (a) at least ten (10) Business Days following the date on which all conditions precedent set forth in Article IV have been satisfied or waived, if expressly waivable, and (b) no stay of the Confirmation Order is in effect.

*"Estates"* means the several estates created in these Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Cases.

*"Exculpated Person"* has the meaning set forth in **Section 7.04** of the Plan.

*"Existing Securities"* means the Senior Notes and the Common Stock.

*"Exit Financing Facility"* means the senior secured financing facility to be entered into by the Reorganized Debtors and the lender(s) thereunder as contemplated in **Section 5.07** of this Plan, providing for the principal terms and conditions set forth on **Plan Schedule 1**, to be filed on the Plan Supplement filing date.

*"File", "Filed" or "Filing"* means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases; provided, however, that with respect to Proofs of Claim only, Filed shall mean received by the Claims Agent or other Person in the manner provided in the Bar Date Order.

*"Final Decree"* means the final decree in these Chapter 11 Cases entered by the Bankruptcy Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

*"Final DIP Order"* means that Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral of Pre-Petition Secured Parties, (II) Authorizing the Immediate Payoff of the Pre-Petition Credit Facilities and (III) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, entered by the Bankruptcy Court in these Chapter 11 Cases on January 11, 2007 [Docket No. 118].

*"Final Order"* means an order, ruling, decree, judgment, or the operation or effect of a judgment issued and entered by the Bankruptcy Court or by any state or other federal court or other court of competent jurisdiction, which has not been reversed, vacated, stayed, modified or amended and as to which (i) the time to appeal or petition for review, rehearing, *certiorari*, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, *certiorari*, reargument or retrial is pending or (ii) any appeal or petition for review, rehearing, *certiorari*, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, *certiorari*, reargument or retrial can be taken or granted.

*"Guarantors"* means Amtrol Holdings, Water Soft and Amtrol International and each existing and subsequently acquired or organized domestic subsidiary of the Borrower or Amtrol Holdings, as guarantors as required under the DIP Credit Agreement.

*"Holder"* means the holder of legal title to, or the Beneficial Holder of, a Claim and, when used in conjunction with a Class or type of Claim, means a Holder of a Claim in such Class or of such type.

*"Impaired"* means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*"Impaired Claim"* means a Claim, which is Impaired.

*"Indemnified Person"* means the Debtors and their respective Affiliates and each of their former and current officers, directors, employees, consultants, advisors, members, attorneys, accountants, financial advisors and Professionals.

*"Initial Distribution Date"* means the first Business Day that is ten (10) days (or such longer period as may be reasonably determined by the Reorganized Debtors) after the Effective Date.

*"Intercompany Claim"* means a Claim held by any Debtor (or any subsidiary or Affiliate of any Debtor).

*"Interest"* means all rights (including unpaid dividends) arising from any equity security (as defined in section 101(16) of the Bankruptcy Code) of any of the Debtors, including, without limitation, the Common Stock, but excluding Common Stock Claims.

*"Interim Distribution Date"* means any date after the Initial Distribution Date on which the Reorganized Debtors determine that a distribution shall be made in light of, among other things, resolutions of Disputed Claims and the administrative costs of such distribution.

*"Lien"* means, with respect to any asset or interest in Property (or the rents, revenues, income, profits or proceeds therefrom), and in each case, whether the same is consensual or non-consensual or arises by contract, operation of law, legal process or otherwise, any mortgage, lien, pledge, attachment, charge, easement or any other similar right, or other security interest or encumbrance or other legally cognizable security device of any kind in respect of any asset or interest in Property, or upon the rents, revenues, income, profits or proceeds therefrom.

*"Management Stock Incentive Program"* means a stock incentive plan pursuant to which, among other provisions, the Reorganized Debtors reserve New Amtrol Common Shares for award to certain members of management of the Reorganized Debtors, at such times and in a manner to be determined in the sole discretion of the Board of Directors of Reorganized Amtrol Holdings, such reserved shares not to exceed seven percent (7%) on a fully diluted basis, of the aggregate New Amtrol Common Shares distributable under this Plan.

*"Master Ballot"* means the Ballot provided to a bank, brokerage firm or other nominee, or agent or proxy Holder holding Senior Notes in its own name or on behalf of a Holder or Beneficial Holder, or any agent thereof, used to accept or reject the Plan.

*"Miscellaneous Secured Claims"* means any Secured Claim other than the DIP Claim.

*"New Amtrol Common Shares"* means the new shares of common stock of Reorganized Amtrol Holdings to be issued pursuant to Section 5.08 of this Plan.

*"Objection"* means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim) other than a Claim or an Interest that is Allowed.

*"Person"* means a natural person or entity, including, without limitation, any individual, partnership, joint venture, association, corporation, limited liability company, limited liability partnership, trust, estate, unincorporated organization or governmental unit (or any agency, instrumentality or political subdivision thereof).

*"Petition Date"* means December 18, 2006, the date on which the Debtors Filed their respective voluntary petitions for relief commencing the Chapter 11 Cases.

*"Plan"* means this Joint Chapter 11 Plan of Reorganization for Amtrol Holdings, Inc., Amtrol Inc., Water Soft Inc. and Amtrol International Investments Inc., proposed by the

Committee and the Debtors, including all exhibits, appendices, schedules and annexes, if any, attached hereto, as such Plan may be modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order and the terms and conditions of **Section 8.08** of the Plan.

*"Plan Documents"* means any contracts, instruments, securities, releases, indentures, and any other agreements or documents recorded, filed or delivered pursuant to, in the implementation of, or related to, the Plan or such other documents, including those documents attached as exhibits to the Plan or compiled in the Plan Supplement.

*"Plan Supplement"* means the compilation of documents and forms of documents specified in the Plan, other than those documents attached hereto as Exhibits, which will be Filed with the Bankruptcy Court not later than five (5) Business Days prior to the commencement of the Confirmation Hearing.

*"Prepetition Secured Parties"* has the meaning set forth in the Final DIP Order.

*"Priority Non-Tax Claim"* means a Claim to the extent that it is of the kind described in, and entitled to priority under, section 507(a)(3), (4), (5) or (6) of the Bankruptcy Code, other than an Administrative Claim and a Priority Tax Claim.

*"Priority Tax Claim"* means a Claim to the extent that it is of the kind described in, and entitled to priority under, section 507(a)(8) of the Bankruptcy Code.

*"Professional"* means any professional employed in these Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or to be compensated pursuant to sections 327, 328, 330, 331, 503(b)(2) or (4) or 1103 of the Bankruptcy Code.

*"Professional Claim"* means a Claim for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code relating to services incurred on and after the Petition Date and prior to and including the Effective Date in connection with an application made to the Bankruptcy Court in the Chapter 11 Cases.

*"Proof of Claim"* means any proof of Claim timely and properly Filed pursuant to the Bar Date Order.

*"Property"* means all assets or interests in property of the Debtors' respective Estates of any nature whatsoever, real or personal, tangible or intangible, including contract rights, accounts and Avoidance Actions and Causes of Action, previously or now owned by the Debtors, or acquired by the Debtors' respective Estates, as defined in section 541 of the Bankruptcy Code.

*"Reinstated"* or *"Reinstatement"* means (i) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii)

notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (b) reinstating the maturity of such Claim as such maturity existed before such default, (c) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (d) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the Holder of such Claim; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence or which prohibit certain transactions or actions contemplated by the Plan, or conditioning such transactions or action on certain factors, shall not be required to be cured in order to accomplish a Reinstatement.

*"Reorganized Amtrol Inc."* means Amtrol Inc. on and after the Effective Date.

*"Reorganized Amtrol International"* means Amtrol International on and after the Effective Date.

*"Reorganized Debtors"* means, collectively, Reorganized Amtrol Holdings, Reorganized Amtrol, Inc., Reorganized Water Soft and Reorganized Amtrol International on and after the Effective Date.

*"Reorganized Amtrol Holdings"* means Amtrol Holdings on and after the Effective Date.

*"Reorganized Water Soft"* means, to the extent the Bankruptcy Court grants the Merger Motion, Water Soft LLC on and after the Effective Date.

*"Schedules"* means the Schedules, Statements and Lists Filed by each of the Debtors, individually, with the Bankruptcy Court pursuant to section 521(1) of the Bankruptcy Code and Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

*"Secured Claim"* means a Claim that constitutes a secured claim under section 506(a) or 1111(b) of the Bankruptcy Code.

*"Senior Note Claim"* means a Claim arising under the Senior Notes.

*"Senior Notes"* means the $115 million principal amount $10^{5/8}\%$ Senior Subordinated Notes issued by Amtrol Inc. pursuant to the Senior Note Indenture entered into in November 1996 and due December 2006.

*"Senior Note Indenture"* means that certain Note Indenture Agreement, dated as of November 1, 1996, relating to the Senior Notes.

*"Senior Note Trustee"* means The Bank of New York, as Indenture Trustee under the Senior Note Indenture.

*"Senior Note Trustee Claim"* means the Claim of the Senior Note Trustee under the Senior Note Indenture for its reasonable fees and expenses accrued and unpaid arising from services provided under the Senior Note Indenture and this Plan, as agreed between the Senior Note Trustee and the Reorganized Debtors or determined by order of the Bankruptcy Court.

*"Stock Payment Option"* shall have the meaning set forth in Section 2.09(c) of this Plan.

*"Subsidiary Equity Interests"* means any share of common stock or other interest evidencing a present ownership interest in any of Amtrol Holdings' direct or indirect subsidiaries, whether or not transferable, and any options, warrants or rights, contractual or otherwise, to acquire any such interest.

*"Tax"* means any tax, charge, fee, levy, impost or other assessment by or against any Debtor or by any federal, state, local or foreign governmental authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem,* estimated, severance, stamp, occupation and withholding tax, together with any interest, penalties, fines or additions attributable to, imposed on, or collected by any such federal, state, local or foreign governmental authority.

*"Unclaimed Property"* means any distribution of Cash, New Amtrol Common Shares or any other Property attempted to be made to the Holder of an Allowed Claim pursuant to the Plan that (a) is unclaimed or returned to the Reorganized Debtors as undeliverable and no appropriate forwarding address is received within the later of (y) one (1) year after the Effective Date and (z) one (1) year after distribution is made to such Holders, or (b) in the case of a distribution made in the form of a check, is not negotiated within sixty (60) days of issuance (in which case such check shall be null and void), and no request for reissuance of such check is made by the claimant within the time periods set forth above.

*"Unimpaired Claim"* means any Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*"United States Trustee"* means the United States Trustee appointed under section 581(a)(3) of title 28 of the United States Code to serve in the District of Delaware.

*"Unsecured Claim"* means a Claim that is not an Administrative Claim, a U.S. Trustee Fee Claim, a Senior Note Trustee Claim, a DIP Claim, a Prepetition Secured Parties Claim, a Common Stock Claim, an Intercompany Claim, a Miscellaneous Secured Claim, a Senior Note Claim, a Priority Tax Claim, a Priority Non-Tax Claim or a Secured Claim.

*"U.S. Trustee Fee Claims"* means any fees assessed against the Debtors' Estates pursuant to section 1930(a)(6) of title 28 of the United States Code.

*"Voting Agent"* means Kurtzman Carson Consultants LLC.

Section 1.02  Rules of Interpretation.  All references to "the Plan" herein shall be construed, where applicable, to include references to this document and all its exhibits, appendices, schedules and annexes, if any (and any amendments thereto made in accordance with the Bankruptcy Code).  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular paragraph, subparagraph, or clause contained in the Plan.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.  The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any term used in the Plan that is not defined in the Plan, either in **Article I** hereof or elsewhere, but that is used in the Bankruptcy Code or the *Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in* accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity).  Without limiting the preceding sentence, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan, unless superseded herein.  To the extent that the description of any Plan Document is inconsistent with the actual terms or conditions of such Plan Document, the terms and conditions of the Plan Document shall control.

Section 1.03  Computation of Time.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall govern.

## ARTICLE II

### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The following is a designation of the Classes of Claims and Interests classified under this Plan. A Claim or Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. Claims against more than one Debtor with respect to a single obligation, by reason of guaranty, joint or "control group" liability, or otherwise, shall be deemed to be a single Claim in the Allowed amount of such obligation for purposes of voting, allowance, distribution and all other purposes under this Plan. In accordance with section 1123(a)(1) of the Code, Administrative Claims and Priority Tax Claims have not been classified, although the treatment for such unclassified Claims is set forth below.

## A.    UNCLASSIFIED CLAIMS

Section 2.01  Administrative Claims.

(a)    General.  Subject to the provisions of Section 6.04(a) of this Plan or as otherwise specifically provided in this Plan, or unless otherwise agreed by the Holder of an Allowed Administrative Claim (in which event such other agreement shall govern), each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) at the sole option of the Reorganized Debtors (a) in the ordinary course of business as the Claim becomes due and owing or (b) on the Initial Distribution Date or (ii) on such other date as the Bankruptcy Court may order, including, without limitation, in the case of Professionals employed by the Debtors or the Committee who have filed applications for final compensation in accordance with Section 6.04(b) of this Plan, the date on which orders approving such compensation are entered.

(b)    U.S. Trustee Fee Claims.  On the Initial Distribution Date, the U.S. Trustee Fee Claims shall be paid in full in Cash. All such Claims payable after the Initial Distribution Date shall be assumed and paid by the Reorganized Debtors until entry of the Final Decree.

Section 2.02  Senior Note Trustee Claim.  The Reorganized Debtors shall pay the Senior Note Trustee Claim in full in Cash, without the need for the Senior Note Trustee to file an application for allowance with the Bankruptcy Court. Upon payment of such Senior Note Trustee Claim in full, the Senior Note Trustee shall be deemed to have released its charging lien and priority rights for payment of its fees and expenses under the Senior Note Indenture. Distributions received by holders of Allowed Senior Note Claims pursuant to the Plan will not be reduced on account of the payment of the Senior Note Trustee Claim.

Section 2.03  Priority Tax Claims.  Unless otherwise agreed by the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim shall receive, at the Reorganized Debtors' option, (a) on the Initial Distribution Date, Cash equal to the amount of such Allowed Priority Tax Claim, or (b)

Cash in equal installments paid on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the Petition Date, *totaling the principal amount of such Claim, plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days.*

Section 2.04  DIP Claim.  On the Effective Date, the DIP Claim shall be paid in full in Cash, or otherwise satisfied in a manner acceptable to the DIP Lenders.  Upon payment in full of the DIP Claim, any liens securing the DIP Claim will be released by the DIP Lenders.  The provisions of the Final DIP Order relating to the L/C Fund (as defined therein) are incorporated herein by reference.

Section 2.05  Prepetition Secured Parties Claim.  Pursuant to the Final DIP Order, the Prepetition Secured Parties were granted certain rights in that certain L/C Fund (as defined in the Final DIP Order), which rights shall remain in full force and effect as set forth in the Final DIP Order on and after the Effective Date.  As provided in the Final DIP Order, the Indemnification Fund, the Section 507(b) Claim and the Prepetition Lenders' Administrative Claim (all as defined in the Final DIP Order) shall expire and terminate, and the Prepetition Secured Parties shall have no further rights with respect thereto, on and as of the Effective Date, *if not earlier terminated. Within five (5) business days of the Effective Date, any remaining Cash being held by the Prepetition Secured Parties in the Indemnification Fund will be returned to the Reorganized Debtors along with a full accounting for any Cash expended. Upon the Effective Date, any and all Liens of the Prepetition Secured Parties on any of the Debtors' assets not otherwise released in the Final DIP Order, shall be deemed fully released.*

## B.    CLASSIFIED CLAIMS AND INTERESTS

Section 2.06  Class 1 – Priority Non-Tax Claims.

(a)    Classification.  *Class 1 consists of all Priority Non-Tax Claims.*

(b)    Allowance.  Class 1 Claims shall be allowed or disallowed in accordance with Section 6.04(c) of this Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

(c)    Treatment.  Unless otherwise agreed by the Holder of an Allowed Priority Non-Tax Claim (in which event such agreement shall govern), each Holder of an Allowed Class 1 Priority Non-Tax Claim shall be paid in full in Cash on the later of the Initial Distribution Date and a date that is as soon as practicable after the date upon which such Claim *becomes an Allowed Claim.*

(d)    Impairment and Voting.  Class 1 Claims are unimpaired and the Holders thereof are not entitled to vote on this Plan.

Section 2.07  Class 2 – Other Secured Claims.

      (a)    Classification.  Class 2 consists of Other Secured Claims.

      (b)    Allowance.  Class 2 Claims shall be allowed or disallowed in accordance with Section 6.04(c) of this Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

      (c)    Treatment.  Other Secured Claims against the Debtors shall, at the sole option of the Reorganized Debtors, be (i) paid in full in Cash on the Initial Distribution Date (in which case the claimant shall execute and deliver any documents necessary to release all Liens securing such Secured Claim as the Reorganized Debtors may reasonably request), (ii) Reinstated, (iii) paid on such other terms as the Reorganized Debtors and the Holder of such Claim may agree, or (iv) satisfied through the surrender by the applicable Reorganized Debtor(s) of the collateral securing the Claim to the Holder thereof.

      (d)    Impairment and Voting.  Class 2 Claims are unimpaired and the Holders thereof are not entitled to vote on this Plan.

Section 2.08  Class 3 – Unsecured Claims.

      (a)    Classification.  Class 3 consists of Unsecured Claims.

      (b)    Allowance.  Class 3 Unsecured Claims shall be allowed or disallowed in accordance with Section 6.04(c) of this Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

      (c)    Treatment.  Each Holder of an Allowed Unsecured Claim shall receive (i) at the Reorganized Debtors' sole discretion, (a) payment in full in Cash on the later of the Initial Distribution Date and the date that is as soon as practicable after the date upon which such Claim becomes an Allowed Unsecured Claim, or (b) Reinstatement of its Allowed Unsecured Claim, or (ii) such other treatment as agreed by the Reorganized Debtors and the Holder of the Allowed Unsecured Claim.  The Bar Date Order does not pertain to asbestos-related Claims, and such Claims shall survive and pass through these Chapter 11 Cases unaffected and unimpaired, and shall not be subject to the discharge of Claims provided for pursuant to Section 1141 of the Bankruptcy Code and Section 7.02 of this Plan.  The provisions of Article VII of this Plan do not apply to asbestos-related Claims.

      (d)    Impairment and Voting.  Class 3 Unsecured Claims are unimpaired and the Holders thereof are not entitled to vote on this Plan.

Section 2.09  Class 4 – Allowed Senior Note Claims.

      (a)    Classification.  Class 4 consists of Allowed Senior Note Claims.

      (b)    Allowance.  The Allowed Senior Note Claims in the aggregate amount of $102,671,800.54 shall be Allowed Class 4 Claims pursuant to this Plan.

(c)    Treatment.  Each Holder of an Allowed Senior Note Claim shall receive, at its sole election as reflected on its Ballot or Master Ballot, as applicable, either (i) its pro rata share of 100% of the New Amtrol Common Shares, subject to dilution in respect of (a) New Amtrol Common Shares that may be issued pursuant to the Management Stock Incentive Program, and (b) such adjustments to the total issued New Amtrol Common Shares as may occur pursuant to Section 6.03(a) of the Plan (the **"Stock Payment Option"**), or (ii) Cash in the amount of sixty percent (60%) of the principal amount of such Holder's Senior Notes (the **"Cash Payment Option"**); provided, however, that Holders of Allowed Senior Note Claims that do not send in a Ballot, or do not check a box in Item 1 of the Ballot, or elect both the Cash Payment Option and the Stock Payment Option on the Ballot, or do not expressly make the Stock Payment Option on the Ballot, shall receive the Cash Payment Option; and provided, further, that the Cash Payment Option shall not be available to Holders of the Senior Notes if more than fifteen percent (15%) in principal amount of such Notes elect or default to the Cash Payment Option.

(d)    Impairment and Voting.  Class 4 Allowed Senior Note Claims are impaired and the Holders thereof are entitled to vote on this Plan.

Section 2.10  Class 5 – Intercompany Claims.

(a)    Classification.  Class 5 consists of Intercompany Claims.

(b)    Treatment.  Subject to Section 5.09 of this Plan, Intercompany Claims shall be discharged and the Holders of Intercompany Claims shall not be entitled to receive or retain any property on account of such Claims.

(c)    Impairment and Voting.  Class 5 Intercompany Claims are impaired and the Holders thereof are deemed not to have accepted this Plan.

Section 2.11  Class 6 – Common Stock Claims and Interests.

(a)    Classification.  Class 6 consists of Common Stock Claims and Interests.

(b)    Treatment.  Common Stock Interests shall be cancelled, and the Holders of Common Stock Claims and Interests shall not be entitled to receive or retain any property on account of such Claims and Interests.

(c)    Impairment and Voting.  Class 6 Common Stock Claims and Interests are impaired and the Holders thereof are deemed not to have accepted this Plan.

## ARTICLE III
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 3.01  Assumed and Rejected Contracts and Leases.  Each executory contract and unexpired lease to which any of the Debtors is a party shall be deemed automatically assumed as of the Effective Date, unless such executory contract or unexpired lease (a) has

expired or terminated by its own terms, (b) has been previously rejected or assumed by order of the Bankruptcy Court, or (c) is the subject of a motion to assume or reject filed on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such deemed assumption as of the Effective Date.

Each executory contract and unexpired lease that is assumed under this Plan and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as part of this Plan.

The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

Century Indemnity Company, as successor to CCI Insurance Company, itself as successor to Insurance Company of North America; CIGNA Property & Casualty Co.; CIGNA Insurance Co.; Aetna Fire Underwriters; ACE American Insurance Company; Industrial Indemnity Company of North America; ACE International Reinsurance Company; and OneBeacon America Insurance Company, as successor-in-interest to American Employers' Insurance Company (collectively, **"Insurers"**) issued certain insurance policies for various policy periods (collectively, the **"Policies"**) that may provide pre- and/or post-petition coverage for all or part of certain Claims. In connection with the Policies, Insurers and Debtors may have entered into various related agreements (together with the Policies, collectively, the **"Insurance Agreements"**). Insurers have asserted that (i) the Insurance Agreements require Debtors, as insureds, to satisfy certain conditions in order for coverage to be provided; and (ii) the Insurance Agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code and that the Insurance Agreements must be assumed as a condition to Insurers' continuing obligation to provide coverage.

Upon the Effective Date of the Plan, the Debtors intend to assume the Insurance Agreements pursuant to section 365 of the Bankruptcy Code including the assumption of all continuing obligations under the Insurance Agreements. The Plan shall not, and is not intended to, modify any of the rights or obligations of Insurers or the Debtors under any of the Insurance Agreements, and Debtors intend to remain bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Agreements, which shall continue in full force and effect. Notwithstanding anything contained in the Plan or the Disclosure Statement to the contrary, to the extent that there is an inconsistency between the Insurance Agreements and any provision of the Plan or Disclosure Statement, the terms of the Insurance Agreements shall control. No provision of the Plan, including, without limitation, substantive consolidation, as set forth in section 5.13 of the Plan, shall (i) expand or alter any insurance coverage under any of the Insurance Agreements, or shall be deemed to create any insurance coverage that does not

otherwise exist, if at all, under the terms of the Insurance Agreements, (ii) create any direct right of action against Insurers that did not otherwise exist, and/or (iii) be construed as an acknowledgment either that the Insurance Agreements cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Agreements. Confirmation of the Plan shall be without prejudice to any of Insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which Insurers may seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Agreements.

Section 3.02  <u>Payments Related to Assumption of Executory Contracts and Unexpired Leases</u>.  Any monetary amounts by which each executory contract and unexpired lease to be assumed under this Plan may be in default shall be satisfied by Cure in the amount, if any, set forth in **Plan Schedule 2** (to be filed and served on the non-debtor party twenty (20) days prior to the Confirmation Objection Deadline), or, in the event of an objection to such Cure amount, in the amount agreed between the parties or as ordered by the Bankruptcy Court. Objections, if any, to a Cure amount set forth on **Plan Schedule 2** shall be filed by the non-debtor party to the unexpired lease or executory contract with the Bankruptcy Court on or before the Confirmation Objection Deadline.  If the non-debtor party to the unexpired lease or executory contract does not file an objection with the Bankruptcy Court to the amount of Cure set forth in **Plan Schedule 2** on or before the Confirmation Objection Deadline, or if notified of the assumption after the Confirmation Objection Deadline, within ten (10) days of such notice, such non-debtor party shall be deemed to accept such Cure amount.  *In the event of a dispute* regarding (a) the nature or the amount of any Cure, (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, such dispute shall be determined by the Bankruptcy Court, or as the parties may otherwise agree.  If the Debtors in their discretion determine that the amount asserted to be necessary to Cure an executory contract or unexpired lease would, if ordered by the Bankruptcy Court, make the assumption of such contract or lease imprudent, then the Debtors may elect to (i) reject the contract or lease pursuant to **Section 3.01** herein, or (ii) request an *expedited hearing on the issue, exclude assumption or rejection of the contract or lease from the* scope of the Confirmation Order, and retain the right to reject the contract or lease pending the outcome of the dispute.  To the extent that the Debtor which is a party to the lease or contract is to be merged pursuant to **Section 5.04** of this Plan, upon assumption as contemplated herein, the Reorganized Debtor that is the surviving entity after such merger shall be the party to the lease or contract.

Section 3.03  <u>Postpetition Contracts and Leases</u>.  All contracts, agreements and leases entered into, or assumed by, the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

Section 3.04  <u>Rejection Damages Bar Date</u>.  Except as provided by any separate Bar Date order previously entered by the Bankruptcy Court, if the rejection by a Debtor of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a proof of such Claim is filed with the Claims Agent and served upon counsel to the

Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Date or (b) other notice that the executory contract or unexpired lease has been rejected pursuant to an order of the Bankruptcy Court.

Section 3.05  Continuation of Certain Indemnification Obligations.  To the extent not inconsistent with the Plan and the Plan Documents, any obligations of the Debtors, pursuant to their respective articles of incorporation or by-laws, applicable state law or their specific agreement, to indemnify an Indemnified Person with respect to all present and future actions, suits and proceedings against the Debtors, the Reorganized Debtors or any Indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors or the Reorganized Debtors, shall survive Confirmation of the Plan and shall not be impaired by Confirmation of the Plan, but shall be deemed and treated as executory contracts that are assumed by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code, except to the extent any such obligation has been released, discharged or modified pursuant to the Plan or Plan Documents.  Any Claim of any Person other than an Indemnified Person based upon an indemnity obligation of the Debtors shall be deemed not to be an Allowed Claim and any obligation of the Debtors to indemnify any such Person shall terminate as of the day immediately preceding the Petition Date and cease to be of any further force or effect.

Section 3.06  Continuation of Benefit Programs.  Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Confirmation Date, all employee compensation and benefit plans, policies and programs of the Debtors, including agreements and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into prior to the Confirmation Date and not since terminated, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, life, accidental death and dismemberment plans and workers' compensation programs, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 3.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Confirmation Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Confirmation Date shall survive Confirmation of the Plan, except for (i) executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) executory contracts or plans as have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts; provided, however, that the Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue; provided further, however, that the Debtors' obligations under any of its three pre-petition Supplemental Employee Retirement Plans (each a "SERP") shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 3.01 of the Plan, and Holders of such SERP Claims shall be treated in accordance with Section 2.08(c) of this Plan; provided further, however, that nothing herein shall extend or otherwise modify the duration of such period or prohibit the Debtors' ability or the Reorganized Debtors' ability to modify the terms and conditions of the retiree benefits as otherwise permitted by such plans and applicable non-bankruptcy law.

# ARTICLE IV

## CONDITIONS PRECEDENT

Section 4.01   Conditions to Occurrence of Effective Date.  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 4.02 of this Plan:  (i) the Confirmation Order shall have been entered, and no stay of such Order shall be in effect; (ii) the Reorganized Debtors shall have entered into definitive documentation with respect to the Exit Financing Facility, which shall be reasonably satisfactory to the Committee, and all conditions precedent under the Exit Financing Facility shall have been satisfied (but for the occurrence of the Effective Date); (iii) the Amended Certificates of Incorporation or any formation documents shall have been properly filed with the appropriate Secretaries of State; and (iv) all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained.

Section 4.02   Waiver of Conditions to Consummation.  The conditions set forth in Section 4.01 of this Plan may be waived, in whole or in part, upon the mutual written consent of the Debtors and the Committee, without notice to any other parties in interest or the Bankruptcy Court and without a hearing.  No waiver or non-waiver of any such conditions shall diminish the application of the mootness doctrine with respect to the Confirmation of this Plan or any order entered in connection therewith, which doctrine shall apply to the fullest extent of applicable law.

Section 4.03   Non-Consensual Confirmation.   Because Classes 5 and 6 are deemed not to have accepted this Plan pursuant to section 1126(g) of the Code, as to such Classes and any other Class that votes to reject this Plan, the Debtors are seeking confirmation of this Plan in accordance with section 1129(b) of the Code, either under the terms provided herein or upon such terms as may exist if this Plan is modified in accordance with section 1127(d) of the Code.

# ARTICLE V

## IMPLEMENTATION OF PLAN

Section 5.01   Pre-Effective Date Management and Operation of Debtors.  After the Confirmation Date and until the Effective Date, the current directors and officers of each Debtor shall continue to serve in such capacities, subject to such changes as may be determined by the Board of Directors of a Debtor in accordance with the current Bylaws and Certificates of Incorporation of such Debtor (or comparable organizational documents).

Section 5.02  <u>Dissolution of the Committee</u>.  The Committee shall continue to exist after the Confirmation Date until the Effective Date with the same power and authority, and the same ability to retain and compensate Professionals, as it had prior to the Confirmation Date. On and as of the Effective Date, the Committee shall cease to exist, and the members of the Committee and their Professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases; <u>provided, however</u>, that the Committee shall continue in existence after the Effective Date for the sole purpose of participating in the fee application process for Professionals as provided in Section 6.04(b) of this Plan. The Reorganized Debtors shall pay the reasonable expenses of the members of the Committee between the Confirmation Date and the Effective Date, if any.

Section 5.03  <u>Pre-Effective Date Injunctions or Stays</u>.  All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

Section 5.04  <u>Corporate Restructuring</u>.  As of the Effective Date, the existing corporate organizational structure of the Company as set forth on <u>Exhibit C</u> to this Plan will be modified as follows:

(a)     New Amtrol Common Shares shall be distributed to the Holders of Class 4 Allowed Senior Note Claims, as provided in Section 2.09(c) hereof, and pursuant to the Management Stock Incentive Program;

(b)     Reorganized Amtrol Holdings shall remain the 100% shareholder of Reorganized Amtrol Inc.;

(c)     Reorganized Amtrol Inc. shall hold all of the Interests in three newly created, wholly-owned subsidiaries: (i) Amtrol Licensing, Inc., a Rhode Island Passive Investment Corporation; (ii) Amtrol Water Technology LLC, a single member Delaware limited liability company; and (iii) Amtrol North American Cylinders LLC, a single member Delaware limited liability company. Reorganized Amtrol Inc. also shall retain the Interests of Amtrol International Investments Inc., a Rhode Island corporation;

(d)     Prior to the Effective Date, Debtor Water Soft Inc., a Rhode Island corporation, shall merge with and into Water Soft LLC, a newly-created Delaware limited liability company, with Water Soft LLC being the surviving entity.  Water Soft LLC shall become a wholly-owned subsidiary of Amtrol Water Technology LLC;

(e)     Effective as of the Effective Date, Amtrol Inc. shall transfer all of its patents, trademarks, service marks, copyrights, trade secrets, know-how and any applications, registrations and rights related thereto, and other intellectual property rights (the **"IP Assets"**) to Amtrol Licensing, Inc.;

(f)     Effective as of the Effective Date, Amtrol Inc. shall transfer its water technology assets (both real and personal) to Amtrol Water Technology LLC, along with its 100% equity interest in Amtrol Canada Ltd., which shall be a wholly-owned subsidiary of Amtrol Water Technology LLC;

(g)     Effective as of the Effective Date, Amtrol Inc. shall transfer its North American cylinder assets (both real and personal) to Amtrol North American Cylinders LLC; and

(h)     All foreign direct and indirect subsidiaries of Amtrol Holdings shall remain the direct and indirect subsidiaries of Amtrol International Investments Inc., unaffected by the corporate restructuring set forth in this Section 5.04.

The purpose of the asset transfers and the creation of new entities is to organize the Reorganized Debtors' businesses in a manner that reflects the product manufacturing, sales and marketing divisions. Amtrol Licensing Inc. will maintain all of the Reorganized Debtors' IP Assets and will license the IP Assets to the other entities, and possibly third parties, in exchange for royalties. A chart showing the corporate organizational structure of the Reorganized Debtors is attached as Exhibit D hereto.

Each Reorganized Debtor following the Effective Date may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

Section 5.05  Certificates of Incorporation and By-Laws Distributions. As of the Effective Date, the certificates of incorporation and by-laws of each of the Debtors (or comparable organizational documents) shall be amended as necessary to satisfy the provisions of this Plan and the Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in section 1123(a)(6) of the Code (respectively, the "Amended Certificates of Incorporation" and the "Amended By-Laws"). The forms of Amended Certificates of Incorporation and Amended By-Laws, to be filed on or before the Plan Supplement filing date, shall become effective on the Effective Date. After the Effective Date, the Amended Certificates of Incorporation and Amended By-Laws shall be subject to such further amendments or modifications as may be made by law, or pursuant to such Amended Certificates of Incorporation and Amended By-Laws.

Section 5.06  Post-Effective Date Management and Operation of Reorganized Debtors. As of the Effective Date, the directors and officers of each Debtor that is not a Reorganized Debtor shall be terminated. The Debtors shall file Plan Schedule 3 with the Bankruptcy Court on or before the Plan Supplement filing date setting forth the offices, the names and affiliations of, and the compensation proposed to be paid to, the individuals intended to serve as directors and officers of each Reorganized Debtor on and after the Effective Date. The initial board of directors of Reorganized Amtrol Holdings shall consist of five members, as follows: Larry T. Guillemette (current Chief Executive Officer of Amtrol Holdings); Ryan

Langdon and Timothy T. Janszen (Newport Global Advisors, L.P., Noteholder); Richard Harris (Harris & Associates, Consulting Firm); and David Spalding (Vice President of Alumni Relations for Dartmouth College and prior Vice Chairman of The Cypress Group L.L.C.). The Committee deferred designation of four of the five members of the new board of directors of Reorganized Amtrol Holdings (other than its Chief Executive Officer, Larry T. Guillemette) to the members of the Ad Hoc Noteholders Committee, who selected the foregoing new board members. On and after the Effective Date, each Reorganized Debtor shall be governed in accordance with the Amended Certificates of Incorporation and Amended By-Laws.

Section 5.07  Exit Financing Facility.  The closing of the Exit Financing Facility shall occur on or before the Effective Date.

Section 5.08  Issuance of New Amtrol Common Shares.  On or as soon as practicable after the Initial Distribution Date, Reorganized Amtrol Holdings shall issue Ten Million (10,000,000) New Amtrol Common Shares for distribution in accordance with this Plan. The issuance of the New Amtrol Common Shares and the distribution thereof shall be exempt from registration under applicable securities laws (including without limitation, Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Code, and may be sold without registration to the extent permitted under section 1145 of the Code.

Section 5.09  Transfer of Intercompany Claims.  Prior to the discharge of Intercompany Claims as provided in Section 2.10(b) of this Plan, the Debtors shall have the right to retain, or effect such transfers and setoffs with respect to, Intercompany Claims as they may deem appropriate for accounting, tax and commercial business purposes, to the fullest extent permitted by applicable law, without affecting the treatment accorded those claims pursuant to Section 2.10(b) of this Plan.

Section 5.10  Management Stock Incentive Program.  As soon as practicable after the Effective Date, the Management Stock Incentive Program shall be adopted by the Board of Directors of Reorganized Amtrol Holdings.

Section 5.11  Effectuating Documents; Further Transactions.  The Chief Executive Officer and the Chief Financial Officer of Amtrol Holdings shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, without any further order of the Bankruptcy Court and without the requirement of any further action by any stockholder or director of any of the Debtors or Reorganized Debtors.

Section 5.12  Exemption from Certain Transfer and Other Taxes.  Pursuant to section 1146 of the Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, including with respect to the Exit Financing Facility, and any documents relating to the Exit

Financing Facility, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in this Plan and (d) the issuance, renewal, modification or securing of indebtedness by such means including with respect to the Exit Financing Facility, and any documents relating to the Exit Financing Facility, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order and the Exit Financing Facility and any documents relating to the Exit Financing Facility, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept any such instruments or documents without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

Section 5.13  Substantive Consolidation of the Debtors.   On the Confirmation Date, the Debtors shall be substantively consolidated for all purposes related to the Plan, including, without limitation: (i) for purposes of voting, confirmation and distribution; (ii) all assets and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of the other Debtors; (iii) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors and such Claims shall be discharged on the Effective Date in accordance with Section 2.10(b) of this Plan (but subject to Section 5.09(b) of this Plan); (iv) no distributions shall be made under the Plan on account of Subsidiary Equity Interests, (v) other than as relating to the Exit Financing Facility, all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; and (vi) each and every claim filed or to be filed in the Case of any of the Debtors shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors.  Such substantive consolidation shall not (other than for purposes related to the Plan) affect: (i) the legal and corporate structure of the Reorganized Debtors; (ii) Subsidiary Equity Interests; (iii) pre and post Petition Date guarantees that are required to be maintained (a) in connection with executory contracts or unexpired leases that were entered into during the Cases or that have been or shall be assumed, (b) pursuant to the Plan or (c) in connection with the Interim DIP Order, the Final DIP Order or the Exit Financing Facility; and (iv) asbestos-related Claims.

Section 5.14  Cancellation of Existing Securities and Agreements.   Except for purposes of evidencing a right to distributions under this Plan, on the Effective Date all the agreements and other documents evidencing the Existing Securities shall be terminated, cancelled, and of no further force or effect; provided, however, that the Senior Note Indenture

shall continue in effect for the purposes of (i) allowing the Senior Note Trustee to make any distributions on account of the Senior Notes pursuant to this Plan and to perform such other necessary administrative functions with respect thereto, and (ii) permitting the Senior Note Trustee to maintain and assert any rights or liens on account of the Senior Note Trustee Claim.

Section 5.15 Shareholders Agreement. On the Effective Date, the Reorganized Debtors and holders of New Amtrol Common Shares shall enter into a shareholders agreement. The form of shareholders agreement will be filed on or before the Plan Supplement filing date.

# ARTICLE VI

## DISTRIBUTIONS AND CLAIMS ALLOWANCE

Section 6.01 Cash Distributions. Except as otherwise provided in this Plan, all distributions to be made to the Holders of Allowed Claims in Cash under this Plan shall be made on or as soon as practicable after the later of (a) the Initial Distribution Date and (b) the date that is as soon as practicable after the date upon which such Claim becomes an Allowed Claim.

Section 6.02 Distributions to Holders of Allowed Senior Note Claims. As soon as practicable after the Effective Date, Reorganized Amtrol Holdings shall issue New Amtrol Common Shares and Cash, in a number and amount sufficient to make distributions on behalf of the Debtors to Holders of Allowed Class 4 Claims in accordance with Section 2.09(c) of this Plan and the elections made thereunder. The distributions of Cash and New Amtrol Common Shares to Holders of Allowed Class 4 Claims shall be made as follows:

(a)    At the close of business on the Distribution Record Date, the transfer ledgers in respect of the Senior Notes shall be closed, and there shall be no further changes in the record Holders of the Senior Notes. The Reorganized Debtors and the Senior Note Trustee shall have no obligation to recognize any transfer of Senior Notes occurring after the Distribution Record Date. The Reorganized Debtors and the Senior Note Trustee shall be entitled instead to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

(b)    As soon as practicable after the Effective Date, Reorganized Amtrol Holdings shall make a distribution of Cash and the New Amtrol Common Shares to the Senior Note Trustee for the benefit of and further distribution to the Senior Note Holders as of the Distribution Record Date, in accordance with Section 2.09(c) of this Plan and the elections made thereunder. The Senior Note Trustee shall, in turn, as soon as is practicable, make pro rata distributions to the record Holders of the Senior Notes pursuant to the terms of the Senior Note Indenture and the Plan.

Section 6.03  <u>Miscellaneous Distribution Provisions</u>.

(a)  <u>Fractional Plan Securities</u>.  Notwithstanding any other provision of *this Plan, only whole numbers of shares of New Amtrol Common Shares shall be issued.*  When any distribution on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Amtrol Common Shares that are not a whole number, the actual distribution of such Shares shall be rounded to the next higher or lower whole number of Shares as follows:  (i) fractions equal to or greater than ½ shall be rounded to the next higher whole number; and (ii) fractions less than ½ shall be rounded to the next lower number.  No consideration shall be provided in lieu of fractional shares that are rounded down.

(b)  <u>Distributions on Non-Business Days</u>.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

(c)  <u>Post-Consummation Effect of Evidences of Claims or Interests</u>. Notes, stock certificates and other evidence of Claims against or Interests in the Debtors shall, effective on the Effective Date, represent only the right to participate in the distributions contemplated by this Plan, if any, and shall not be valid or effective for any other purpose.

(d)  <u>No Distribution in Excess of Allowed Amount of Claim</u>. Notwithstanding anything to the contrary herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of the portion of such Claim that is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, but the payment or distribution provided hereunder shall be made on account of the portion of such Claim that is an Allowed Claim.  Holders of Allowed Claims shall not be entitled to receive any recoveries in excess of the full amount of their Allowed Claims.

(e)  <u>Disputed Payments</u>.  If any dispute arises as to the identity of the Holder of an Allowed Claim entitled to receive any distribution under this Plan, the Reorganized Debtors may retain such distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute.

(f)  <u>Delivery of Distributions</u>.  Subject to Bankruptcy Rule 9010 and Section 6.02 hereof, all distributions to any Holder of an Allowed Claim, except the Holder of an Allowed Senior Note Claim, shall be made at the address of such Holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such Holder that contains an address for such Holder different from the address reflected on such Schedules for such Holder.  All distributions to any Holder of an Allowed Senior Note Claim shall be made, in the first instance, to the Senior Note Trustee.

       (g)     Unclaimed Property. Holders of Allowed Class 3 Claims and Allowed Class 4 Claims to Unclaimed Property shall cease to be entitled thereto, and such Unclaimed Property shall revert to the Reorganized Debtors.

       (h)     Voting of New Amtrol Common Shares. New Amtrol Common Shares that are Unclaimed Property shall not be voted at any meeting of the stockholders of Reorganized Amtrol Holdings.

       (i)     Setoffs and Recoupment. The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Claim, claims of any nature that the Debtors or Reorganized Debtors may have against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim against the Debtors or the Reorganized Debtors shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any setoff or recoupment claim that the Debtors or the Reorganized Debtors may possess against such Holder.

       (j)     Compliance with Tax Requirements. In connection with this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to this Plan that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of this Plan, each Person that has received any distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

       (k)     Disbursing Agent. All distributions under the Plan shall be made by the Reorganized Debtors or the Disbursing Agent or such other entity as may be designated by the Reorganized Debtors as a Disbursing Agent, including the Senior Note Trustee. No Disbursing Agent, including the Senior Note Trustee, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court; and, in the event that the Disbursing Agent or the Senior Note Trustee is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. The amount of any reasonable fees and expenses incurred by the Disbursing Agent and the Senior Note Trustee on or after the Effective Date (including, without limitation, taxes) (which fees and expenses shall constitute part of the Senior Note Trustee Claim) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney fees and expenses) made by the Disbursing Agent and the Senior Note Trustee in making distributions under the Plan shall be paid in Cash by the Reorganized Debtors.

Section 6.04  Procedure for Determination of Claims and Interests.

       (a)     Bar Date for Certain Administrative Claims. With the exception of applications for compensation for fees and reimbursement of expenses Filed by Holders of Professional Claims for services rendered on or before the Effective Date as specified in

Section 6.04(b) hereof, and except as otherwise set forth herein or in an order of the Bankruptcy Court regarding a specific claim, all requests for payment of Administrative Claims shall be Filed no later than thirty (30) days after the Effective Date, or such later date as the Bankruptcy Court approves (the "**Administrative Claims Bar Date**"); provided, however, that no such request or application need be Filed with respect to (i) U.S. Trustee's Fee Claims; (ii) Claims, liabilities or obligations incurred in the ordinary course of the Debtors' respective businesses after the Petition Date unless a dispute exists as to any such liabilities, or unless the provisions of the Bankruptcy Code require the Filing of a request for payment as a precondition to payments being made on any such liability; (iii) any Claims held by any other party as to whom an order of the Court has been entered approving a later bar date for Filing Administrative Claims against the Debtors; and (iv) the Senior Note Trustee Claims. If requests for payment of Administrative Claims are not timely Filed, the Holders of such Claims shall be forever barred, estopped and enjoined from asserting such Claims in any manner against the Debtors or their Property or the Reorganized Debtors or their Property.

(b)    Bar Date for Professionals. Applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (i) from the latter of the Petition Date or the date on which retention was approved through the Effective Date or (ii) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(3) through (b)(5) of the Bankruptcy Code, shall be Filed no later than sixty (60) days after the Effective Date or such later date as the Bankruptcy Court approves, and shall be served on: (i) the Debtors, c/o Joseph L. DePaula, 1400 Division Road, West Warwick, Rhode Island 02893; (ii) counsel to the Debtors, William E. Chipman, Jr., Edwards Angell Palmer & Dodge LLP, 919 North Market Street, 15th Floor, Wilmington, Delaware 19801; (iii) counsel to the Committee, Pauline Morgan, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 and Kelley A. Cornish, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064; (iv) Mark Kenney, Esquire, Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2313, Wilmington, Delaware 19801; and (v) counsel to the Debtor-in-Possession Lender, Mitchell A. Seider, Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, New York 10022. Applications that are not timely Filed will not be considered by the Court. The Reorganized Debtors may pay any Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

(c)    Objections To Claims. Objections to any Claim filed by any party other than the Debtors (other than Administrative Claims governed by Sections 6.04(a) and (b) of this Plan) must be filed no later than twenty (20) days before the Effective Date; provided, however, that the Reorganized Debtors and only the Reorganized Debtors may file objections to Claims subsequent to the Effective Date through and including sixty (60) days after the Effective Date or such later date that may be approved by the Bankruptcy Court upon motion by the Reorganized Debtors without notice or a hearing. Payment or distribution shall be made on account of all or any portion of such Claim that is an Allowed Claim. To the extent any property is distributed to an entity on account of a Claim that is not an Allowed Claim, such property shall be held in trust for and shall promptly be returned to the Reorganized Debtors. On and after the

Effective Date, the Reorganized Debtors shall have authority to continue to prosecute, settle or withdraw objections to Claims.

## ARTICLE VII

## EFFECT OF CONFIRMATION

Section 7.01 *Revesting of Assets*. *Except as otherwise explicitly provided in this Plan*, on the Effective Date, all property of the Estates, to the fullest extent of section 541 of the Code, and any and all other rights and assets of the Debtors of every kind and nature shall revest in the Reorganized Debtors free and clear of all Liens, Claims and Interests other than (i) those Liens, Claims and Interests retained or created pursuant to this Plan or any document entered into in connection with the transactions described in this Plan, and (ii) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.

Section 7.02 Discharge of Claims and Termination of Interests. As of the Effective Date, except as provided in the Confirmation Order or otherwise provided herein, the rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Interests, including any interest accrued on Claims from and after the Petition Date. *Except as otherwise provided in this Plan, or the Confirmation Order,* Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Code or (z) the Holder of a Claim based on such debt has accepted this Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors. As of the Effective Date, except as otherwise provided in this Plan, or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or Property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in this Plan, or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Code, and such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

### Section 7.03 Injunctions.

(a)     **Except as otherwise provided in this Plan, or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity**

security holder that is terminated pursuant to the terms of this Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Interests or rights: (i) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors or the Reorganized Debtors or their respective property; (iv) asserting a setoff that was not asserted prior to the applicable Bar Date, or right of subrogation other than with respect to a claim filed or deemed filed by the applicable Bar Date of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan.

(b)     Except as otherwise provided in this Plan, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim, demand, debt, right, cause of action or liability that is released pursuant to this Plan are permanently enjoined from taking any of the following actions on account of such released Claims, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan.

(c)     In exchange for the distributions pursuant to this Plan, except as otherwise provided in this Plan, each Holder of an Allowed Claim receiving such distribution pursuant to this Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 7.03.

Section 7.04  Limitation of Liability.  None of the Debtors, the Reorganized Debtors, the members of the Committee, the members of the Ad Hoc Noteholders Committee, the Prepetition Secured Parties, the DIP Lenders, the Senior Note Trustee nor any of their respective directors, officers, employees, members, attorneys, investment bankers, restructuring consultants and financial advisors, nor any other professional Persons employed by any of them (collectively, the "Exculpated Persons"), shall have or incur any liability to any Person for any act taken or omission from and after the Petition Date in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with this Plan.  The Exculpated Persons shall have no liability to any Debtor, Holder of a Claim, Holder of an Interest, other party in interest in the Cases or any other Person for actions taken or not taken in

connection with, relating to or arising out of the Cases, the management and operation of the Debtors, this Plan or the property to be distributed under this Plan, including, without limitation, failure to obtain Confirmation of this Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in the Cases, the management and operation of the Debtors and under this Plan.

Section 7.05 Releases.

(a)    On the Effective Date, the Debtors and the Reorganized Debtors on behalf of themselves and as representatives of the Estates, release unconditionally, and are hereby deemed to release unconditionally, (i) each of the Debtors' officers and directors who served at any time during the Cases, (ii) any person that designated or elected such directors to the extent of alleged liability for actions or inactions of such directors, (iii) the members of the Committee, (iv) the members of the Ad Hoc Noteholders Committee, (v) the DIP Lenders, (vi) the Prepetition Secured Parties, (vi) the Senior Note Trustee and (viii) the attorneys, investment bankers, restructuring consultants and financial advisors of the foregoing, including the Debtors and the Reorganized Debtors, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including, without limitation, those arising under the Code), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on any act, omission, transaction, event or other occurrence taking place on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of the Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with this Plan; provided, however, that nothing in this Section 7.05(a) shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under this Plan.

(b)    On the Effective Date, the Debtors and the Reorganized Debtors on behalf of themselves and as representatives of the Estates, release unconditionally, and are hereby deemed to release unconditionally, (i) each of the Debtors' former and present officers and directors, (ii) any Person that designated or elected such directors to the extent of alleged liability for actions or inactions of such directors, (iii) the Prepetition Secured Parties, (iv) the members of the Ad Hoc Noteholders Committee, (v) the Senior Note Trustee and (vi) the attorneys, investment bankers, restructuring consultants and financial advisors of the foregoing, including the Debtors and the Reorganized Debtors (collectively, the "Prepetition Releasees") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including, without limitation, those arising under the Code), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Petition Date in connection with or relating to Amtrol Holdings or any of its

direct or indirect subsidiaries (the "Prepetition Released Matters"); provided, however, that nothing in this Section 7.05(b) shall be construed to release or exculpate any person or entity from (i) fraud, willful misconduct or criminal conduct, (ii) any loans due and owing to the Debtors, and (iii) obligations under this Plan.

(c)     On the Effective Date, each Holder of an Unimpaired Claim shall be deemed to have unconditionally released the Prepetition Releasees from the Prepetition Released Matters in consideration of the obligations of the Debtors and Reorganized Debtors under the Plan to pay or reinstate such Claims in full. On the Effective Date, in consideration of the obligations of the Debtors and Reorganized Debtors under the Plan, each Holder of a Claim that is entitled to vote on this Plan shall be deemed to have unconditionally released the Prepetition Releasees from the Prepetition Released Matters; provided, however, that each holder of a Claim entitled to vote on this Plan may elect, by checking the box provided on the Ballot, not to grant the releases set forth in this Section 7.05(c).

(d)     The Confirmation Order shall contain a permanent injunction to effectuate the releases granted in this Section 7.05.

Section 7.06    Retention and Enforcement, and Release, of Causes of Action. Except as otherwise set forth in this Plan, pursuant to section 1123(b)(3)(B) of the Code, on the Effective Date, all Causes of Action shall become the property of the Reorganized Debtors, and the Reorganized Debtors shall retain all Causes of Action that the Debtors had or had power to assert on behalf of their Estates immediately prior to the Effective Date, and may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of such Causes of Action; provided, however, that any and all of the Debtors' claims and causes of action arising under section 547 of the Code that are not the subject of pending litigation as of the Effective Date (collectively, the "Preference Actions") shall be waived, abandoned, discharged and released pursuant to this Plan. Except with respect to Preference Actions and except as otherwise set forth in this Plan, nothing contained in this Plan shall constitute a release, satisfaction or settlement of the Causes of Action, nor constitute a waiver of the rights, if any, of the Debtors, the Reorganized Debtors to a jury trial with respect to any Cause of Action, or objection to any Claim or Interest, and nothing in this Plan or the Confirmation Order, including the allowance of any Claim of a defendant in any Cause of Action, shall constitute a waiver or release of any Cause of Action under the doctrine of res judicata nor shall any Cause of Action be barred or limited by any estoppel, whether judicial, equitable or otherwise.

Section 7.07    Exclusions and Limitations on Exculpation, Indemnification, and Releases. Notwithstanding anything in this Plan to the contrary, including without limitation Section 7.05, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification or release provision, shall modify, release, or otherwise limit the liability of any Person not specifically released hereunder, including, without limitation, any Person that is a co-obligor or joint tortfeasor of a Released Party or that is otherwise liable under theories of vicarious or other derivative liability. The Reorganized Debtors shall not provide indemnification on account of any such claims.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01    Retention of Jurisdiction.    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated), including the compromise, settlement and resolution of any request for payment of any Administrative Claim or Priority Claim, the resolution of any Objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest (to the extent permitted under applicable law);

(b)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)    hear and determine motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors thereafter, including proceedings with respect to the rights of the Debtors to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or to bring any Avoidance Action, or to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have;

(d)    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)    to ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(f)    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the

Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

(g)    determine and resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

(h)    modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and section 15.04 of the Plan or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code, the Plan and the Plan Documents;

(i)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)    determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(l)    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(n)    continue to enforce the automatic stay through the Effective Date;

(o)    hear and determine (A) disputes arising in connection with the interpretation, implementation or enforcement of the Plan or (B) issues presented or arising under the Plan, including disputes among Holders and arising under agreements, documents or instruments executed in connection with the Plan;

(p)    enter a Final Decree closing the Chapter 11 Cases or converting them into chapter 7 cases;

(q)    recover all assets of the Debtors and Property of their respective Estates, wherever located;

(r)    hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; and

(s)    hear any other matter not inconsistent with the Bankruptcy Code.

Section 8.02  Terms Binding.  Upon the entry of the Confirmation Order, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan and executed by the Debtors or the Reorganized Debtors in connection with this Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Claim and Interest Holders and all other Persons that are affected in any manner by this Plan. Subject to the occurrence of the Effective Date, all agreements, instruments and other documents filed in connection with this Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter.

Section 8.03  Successors and Assigns.  The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor or assignee of such Person.

Section 8.04  Confirmation Order and Plan Control.  Except as otherwise provided in this Plan, in the event of any inconsistency between this Plan and the Disclosure Statement, any exhibit to this Plan or any other instrument or document created or executed pursuant to this Plan, this Plan shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

Section 8.05  Governing Law.  EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT

ENTERED INTO IN CONNECTION WITH THE PLAN, INCLUDING, WITHOUT LIMITATION, THE PLAN DOCUMENTS, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF DELAWARE OR THE UNITED STATES OF AMERICA.

Section 8.06   Severability.   If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of this Plan is invalid or unenforceable, such provision, subject to section 1127 of the Code, shall be severable from this Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of this Plan.

Section 8.07   Incorporation by Reference.   Each Exhibit or Schedule to this Plan is incorporated herein by reference.

Section 8.08   Modifications to this Plan.   Upon the mutual written consent of the Debtors and the Committee, this Plan, and any Exhibit or Schedule to this Plan, may be amended or modified at any time prior to the Confirmation Date in accordance with the Bankruptcy Code and Bankruptcy Rules.

Section 8.09   Revocation, Withdrawal or Non-Consummation.   The Debtors and the Committee, together, reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date. If the Debtors and the Committee, together, revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect. In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

Section 8.10   Notices.   Any notice required or permitted to be provided under this Plan shall be in writing and served by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors:

> AMTROL, INC.
> Mr. Joseph DePaula, Chief Financial Officer
> 1400 Division Road
> West Warwick, Rhode Island 02893

With a copy to:

> EDWARDS ANGELL PALMER & DODGE LLP
> Stuart M. Brown (No. 4050)
> William E. Chipman, Jr. (No. 3818)
> 919 North Market Street, 15th Floor
> Wilmington, Delaware 19801

> - and -

> EDWARDS ANGELL PALMER & DODGE LLP
> Douglas G. Gray
> 2800 Financial Plaza
> Providence, Rhode Island 02903

If to the Committee:

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> Joel A. Waite (No. 2925)
> Pauline Morgan (No. 3650)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19899

> - and -

> PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
> Kelley A. Cornish, Esquire
> Andrew N. Rosenberg, Esquire
> 1285 Avenue of the Americas
> New York, New York 10019-6064

Dated:  April 11, 2007

**AMTROL HOLDINGS, INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer

**AMTROL INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer

**WATER SOFT INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer

**AMTROL INTERNATIONAL
INVESTMENTS INC.**

By: /s/ Larry T. Guillemette
    Name:  Larry T. Guillemette
    Title:  Chief Executive Officer

**OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR AMTROL HOLDINGS, INC.,
ET AL.**

By: /s/ Ryan Langdon
    Name:  Ryan Langdon
    Title:  Chairman of Official Committee of Unsecured
        Creditors

**EDWARDS ANGELL PALMER & DODGE LLP**
Stuart M. Brown (No. 4050)
William E. Chipman, Jr. (No. 3818)
919 North Market Street, 15th Floor
Wilmington, Delaware 19801
(302) 777-7770
Counsel for the Debtors and Debtors-in-Possession

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joel A. Waite (No. 2925)
Pauline Morgan (No. 3650)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kelley A. Cornish, Esquire
Andrew N. Rosenberg, Esquire
1285 Avenue of the Americas
New York, New York  10019-6064

Counsel for the Official Committee of Unsecured Creditors

# EXHIBIT A

## [TO BE PROVIDED WITH PLAN SUPPLEMENT]

# EXHIBIT B

**[TO BE PROVIDED WITH PLAN SUPPLEMENT]**

# EXHIBIT C

# AMTROL HOLDINGS, INC.
# LEGAL ENTITY ORGANIZATION CHART



12/06

# EXHIBIT D

## AMTROL INC. – REVISED CORPORATE ORGANIZATION



PRV_PRV_870824_1 (2).DOC/TWATSON

# EXHIBIT E

## [TO BE PROVIDED WITH PLAN SUPPLEMENT]

# Exhibit E

## UNREPORTED CASES

1.    <u>Merck & Co., Inc. v. Apotex, Inc.</u>, 2007 WL 1470453 (D.Del.)

2.    <u>MW Post Portfolio Fund Ltd. v. Norwest Bank Minnesota (In re Onco Investment Co.)</u>, 2005 WL 2401908 (D.Del.)

3.    <u>Potomac Electric Power Co. v. The Rowe Companies</u>, 2007 WL 656897 (E.D.Va.)

Tab 1



--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

Merck & Co., Inc. v. Apotex, Inc.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
MERCK & CO., INC., Plaintiff,
v.
APOTEX, INC., Defendant.
**C.A. No. 06-230(GMS).**

May 21, 2007.

**Background:** Pioneer drug company brought patent infringement action against generic competitor. Competitor counterclaimed for declaratory judgment of invalidity and noninfringement. Pioneer drug company moved to dismiss complaint, and generic manufacturer moved to amend its answer.

**Holdings:** The District Court, Sleet, J., held that:

(1) court lacked jurisdiction over counterclaim, and

(2) pioneer drug company's alleged manipulation of Drug Price Competition and Patent Term Restoration Act did not violate federal antitrust laws.

Pioneer drug company's motion granted.

**[1] Declaratory Judgment 118A**  0

118A Declaratory Judgment
Declaratory Judgment Act requires actual controversy between parties before federal court may exercise jurisdiction over action for declaratory judgment. 28 U.S.C.A. § 2201.

**[2] Declaratory Judgment 118A**  0

118A Declaratory Judgment
Actual controversy requirement in declaratory judgment action is met when facts alleged, under all circumstances, show that there is substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issue of declaratory judgment. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201.

**[3] Declaratory Judgment 118A**  0

118A Declaratory Judgment
District court lacked subject matter jurisdiction over generic drug manufacturer's counterclaim against pioneer drug company for declaratory judgment of patent invalidity and noninfringement, despite generic manufacturer's contentions that dismissal would operate to deny it right to compete with pioneer drug company for want of triggering event under Drug Price Competition and Patent Term Restoration Act, and would injure it by delaying its entry into market, where pioneer drug company presented generic manufacturer with comprehensive covenant not to sue and then voluntarily dismissed its patent infringement suit, and there was no evidence that generic manufacturer's delayed entry into market was any different than what it would have been had pioneer drug company never sued it. Federal Food, Drug, and Cosmetic Act, § 505(j)(5), 21 U.S.C.A. § 355(j)(5).

**[4] Antitrust and Trade Regulation 29T**

29T Antitrust and Trade Regulation
When determining whether party has standing to bring private action under antitrust laws, courts should consider: (1) causal connection between antitrust violation and harm to plaintiff and intent by defendant to cause that harm, with neither factor alone conferring standing; (2) whether plaintiff's alleged injury is of type for which antitrust laws were intended to provide redress; (3) directness of injury, which addresses concerns that liberal application of standing principles might produce speculative claims; (4) existence of more direct victims of alleged antitrust violations; and (5) potential for duplicative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 2

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

recovery or complex apportionment of damages.

**[5]** Antitrust and Trade Regulation 29T
🔑 0

29T Antitrust and Trade Regulation
Pioneer drug company's alleged manipulation of Drug Price Competition and Patent Term Restoration Act by filing patent infringement action against generic drug manufacturer after it filed abbreviated new drug application (ANDA) and then voluntarily dismissing suit after offering comprehensive covenant not to sue did not violate federal antitrust laws, even though pioneer drug company's actions placed generic manufacturer at competitive disadvantage, where pioneer drug company's actions were expressly sanctioned by Act or contemplated by its legislative history, and consequences to generic manufacturer were specific products of Act. Federal Food, Drug, and Cosmetic Act, § 505(j)(5), 21 U.S.C.A. § 355(j)(5).

**[6]** **Antitrust and Trade Regulation 29T**
🔑 0

29T Antitrust and Trade Regulation
When patentees attempt to extend their legal monopoly beyond that which is permitted by their statutory grants, such actions can trigger antitrust liability.

**[7]** **Antitrust and Trade Regulation 29T**
🔑 0

29T Antitrust and Trade Regulation
Any adverse effects within scope of patent or statutory right to exclude cannot be redressed by antitrust law.

Mary B. Graham, Esquire, and James W. Parrett, Jr., Esquire, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and John DeQ. Briggs, Esquire, John F. Lynch, Esquire, Kenneth W. Donnelly, Esquire, Aaron Myers, Esquire, of Howrey LLP, Washington, D.C., and Nicholas G. Barzoukas, Esquire, Suzy S. Harbison, Esquire, Jason C. Abair, Esquire, of Weil, Gotshal & Manges, Houston, Texas, and Paul D. Matukaitis, Edward W. Murray, Gerard M. Devlin, of Merck & Co., Inc. Attorneys

for Plaintiff.
Richard L. Horwitz, Esquire, and Kenneth L. Dorsney, Esquire, of Potter Anderson & Corroon, LLP, Wilmington, Delaware, and A. Sidney Katz, Esquire, Robert B. Breislatt, Esquire, Louise T. Walsh, Esquire, Michael Krol, Esquire, of Welsh & Katz, Ltd., Chicago, Illinois. Attorneys for Defendant.

**OPINION**

SLEET, District Judge.

**I. INTRODUCTION**

*1 The plaintiff Merck & Co., Inc. (" Merck" ) filed suit against the defendant Apotex, Inc. (" Apotex" ) in the above-captioned matter, alleging that Apotex committed an act of patent infringement under 35 U.S.C. § 271(e)(2)(A). Merck moves to dismiss its complaint for lack of subject matter jurisdiction because, since filing suit, it has given Apotex a comprehensive covenant not to sue, which removed the controversy between the parties. For the reasons that follow, Merck's motion is granted.

**II. SUMMARY OF STATUTORY FRAMEWORK**

The provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 (the " Hatch-Waxman Amendments" ) govern the generic drug approval process.[FN1] The Food and Drug Administration (" FDA" or " Agency" ), provides the following summary explanation of the Act's statutory provisions, at http://www .fda.gov/cder/about/smallbiz/generic-exclusivity.htm, which the court incorporates in pertinent part:

The Hatch-Waxman Amendments are intended to balance two important public policy goals. First, drug manufacturers need meaningful market protection incentives to encourage the development of valuable new drugs. Second, once the statutory patent protection and marketing exclusivity for these new drugs has expired, the public benefits from the rapid availability of lower priced generic versions of the innovator drug.

The Hatch-Waxman Amendments amended the Federal Food, Drug, and Cosmetic (" FD & C" ) Act and created section 505(j). Section 505(j) established the abbreviated new drug application (" ANDA" ) approval process, which permits generic versions of previously approved innovator drugs to be approved

without submission of a full new drug application (" NDA" ). An ANDA refers to a previously approved new drug application (the " listed drug" ) and relies upon the Agency's finding of safety and effectiveness for that drug product. The timing of an ANDA approval depends in part on patent protections for the innovator drug. Innovator drug applicants must include in an NDA information about patents for the drug product that is the subject of the NDA. The FDA publishes patent information on approved drug products in the Agency's publication " Approved Drug Products with Therapeutic Equivalence Evaluations," otherwise known as the " Orange Book." The FD & C Act requires that an ANDA contain a certification for each patent listed in the Orange Book for the innovator drug. This certification must state one of the following: (i) that the required patent information relating to such patent has not been filed; (ii) that such patent has expired; (iii) that the patent will expire on a particular date; or (iv) that such patent is invalid or will not be infringed by the drug, for which approval is being sought.

A certification under paragraph I or II permits the ANDA to be approved immediately, if it is otherwise eligible. A certification under paragraph III indicates that the ANDA may be approved on the patent expiration date. A paragraph IV certification begins a process in which the question of whether the listed patent is valid or will be infringed by the proposed generic product may be answered by the courts prior to the expiration of the patent. The ANDA applicant who files a paragraph IV certification to a listed patent must notify the patent owner and the NDA holder for the listed drug that it has filed an ANDA containing a patent challenge. The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent is not valid or will not be infringed. The submission of an ANDA for a drug product claimed in a patent is an infringing act if the generic product is intended to be marketed before expiration of the patent, and therefore, the ANDA applicant who submits an application containing a paragraph IV certification may be sued for patent infringement. If the NDA sponsor or patent owner files a patent infringement suit against the ANDA applicant within 45 days of the receipt of notice, the FDA may not give final approval to the ANDA for at least 30 months from the date of the notice. This 30-month stay will apply unless the court reaches a decision earlier in the patent infringement case, or otherwise orders a longer or shorter period for the stay.

*2 The statute provides an incentive of 180 days of market exclusivity to the " first" generic applicant who challenges a listed patent by filing a paragraph IV certification and running the risk of having to defend a patent infringement suit. The statute provides that the first applicant to file a substantially complete ANDA containing a paragraph IV certification to a listed patent will be eligible for a 180-day period of exclusivity beginning either from the date it begins commercial marketing of the generic drug product, or from the date of a court decision finding the patent invalid, unenforceable or not infringed, whichever is first. These two events-first commercial marketing and a court decision favorable to the generic-are often called " triggering" events, because under the statute they can trigger the beginning of the 180-day exclusivity period.

In some circumstances, an applicant who obtains 180-day exclusivity may be the sole marketer of a generic competitor to the innovator product for 180 days. But 180-day exclusivity can begin to run, with a court decision, even before an applicant has received approval for its ANDA. In that case, some, or all, of the 180-day period could expire without the ANDA applicant marketing its generic drug. Conversely, if there is no court decision and the first applicant does not begin commercial marketing of the generic drug, there may be prolonged or indefinite delays in the beginning of the first applicant's 180-day exclusivity period. Approval of an ANDA has no effect on exclusivity, except if the sponsor begins to market the approved generic drug. Until an eligible ANDA applicant's 180-day exclusivity period has expired, the FDA cannot approve subsequently submitted ANDAs for the same drug, even if the later ANDAs are otherwise ready for approval and the sponsors are willing to immediately begin marketing. Therefore, an ANDA applicant who is eligible for exclusivity is often in the position to delay all generic competition for the innovator product.

### III. BACKGROUND

Merck is the owner of nine patents listed in the Orange Book for the drug alendronate sodium, which Merck markets and sells under the trademark Fosamax.[FN2] On February 24, 2006, Apotex sent Merck a letter informing Merck that Apotex filed ANDA No. 077-982, seeking approval from the FDA to market a generic version of Merck's Fosomax tablets. Apotex certified in its ANDA submission that certain Merck patents were invalid, unenforceable and/or will not be infringed by the commercial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 4

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

manufacture, use, or sale of Apotex's generic version. Apotex was not the first generic filer to challenge Merck's patents on the Fosamax drug.

In the absence of any further information than what Apotex provided in its February 2006 letter, on April 7, 2006, Merck filed this action to protect its rights under the Hatch-Waxman Act. Apotex counterclaimed for a declaratory judgment of invalidity and noninfringement of the nine patents at issue. In August 2006, after receiving more detailed information from Apotex regarding its generic version of Fosamax, Merck granted Apotex a comprehensive covenant not to sue.

### IV. LEGAL STANDARD

*3 [1][2] The exercise of judicial power under Article III of the United States Constitution requires the existence of a case or controversy. The Declaratory Judgment Act " requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment." EMC Corp. v. Norand Corp., 89 F.3d 807, 810 (Fed.Cir.1996). The actual controversy requirement is met when, " the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment." Id. (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 213 U.S. 270, 273 (1941)). When an actual controversy does exist sufficient to warrant subject matter jurisdiction, however, " the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction." EMC Corp., 89 F.3d at 810.

### V. DISCUSSION

Merck argues that, as a result of its covenant not to sue Apotex on the asserted patents, this action is moot and the court lacks subject matter jurisdiction over the purported controversy. Conversely, Apotex asks that the court deny Merck's motion for the following reasons: (1) a dismissal without a finding of invalidity and/or noninfringement would operate to deny Apotex " its right to compete with Merck for want of a ' triggering event' " and that Apotex would be injured by delayed entry into the market; (2) the court should not sanction Merck's " manipulating the court's jurisdiction" by filing a patent infringement suit, later presenting a covenant not to sue, and then attempting to dismiss Apotex's

counterclaims for lack of subject matter jurisdiction; and (3) the court has subject matter jurisdiction because this case satisfies the Supreme Court's test for determining an actual case or controversy. (D.I. 19 at 2.)

### Existence of an Actual Case or Controversy

In Teva v. Novartis, the Court of Appeals for the Federal Circuit (" Federal Circuit" ) acknowledged that the Supreme Court, in MedImmune v. Genentech, --- U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), disagreed with the Federal Circuit's " reasonable apprehension of suit" test, and refocused the declaratory judgment jurisprudence on earlier Supreme Court precedent. Teva Pharms. USA, Inc. v. Novartis Pharms. Corp., 482 F.3d 1330, 1339 (Fed.Cir.2007). Thus, " the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune v. Genentech, 127 S.Ct. at 771 (citing Md. Cas. Co., 312 U.S. at 273). In support of its argument that an actual case or controversy exists in this case, Apotex points to the Federal Circuit's observation in Teva v. Novartis:
*4 A justiciable declaratory judgment controversy arises for an ANDA filer when a patentee lists patents in the Orange Book, the ANDA applicant files its ANDA certifying the listed patents under paragraph IV, and the patentee brings an action against the submitted ANDA on one or more of the patents. The combination of these three circumstances is dispositive in establishing an actual declaratory judgment controversy as to all the paragraph IV certified patents, whether the patentee has sued on all or only some of the paragraph IV certified patents.

482 F.3d at 1344. The court agrees with the Federal Circuit's observation about what **establishes** a justiciable declaratory judgment controversy in the Hatch-Waxman context. Further, the court recognizes that, when filed, this case also presented a justiciable controversy. A significant distinction between the scenario in Teva v. Novartis and the case here is that Novartis had declined to give Teva a covenant not to sue. Here, after the case was filed, and Merck received further information upon which it could evaluate the infringement action, Merck presented Apotex with a comprehensive covenant not to sue. The actual controversy must be in existence at all stages of the litigation and cannot merely be present

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 5

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

at the filing of the complaint. *Super Sack v. Chase,* 57 F.3d 1054, 1058 (Fed.Cir.1995).

[3] Article III standing requires " [a] plaintiff [to] allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Here, having received a covenant not to sue, Apotex does not and cannot allege " *unlawful* conduct" attributable to Merck in connection with its declaratory judgment claim. Further, Apotex's articulated injury-delayed entry to the market-is not fairly traceable to Merck. There is no evidence to conclude that Apotex's delayed entry into the market is any different than what it would have been had Merck never sued it. Thus, Apotex's advancement of this case against Merck becomes merely a means to an end, where the desired " end" is a triggering event but the means to that end, the litigation itself, is not sanctioned under the current legal framework. To proceed to a substantive " court decision" on the merits of Apotex's claims of noninfringement or invalidity would amount to an impermissible advisory opinion. *See Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (holding that courts may not render advisory opinions or decide questions that do not affect the rights of the parties to the case).

Merck's covenant not to sue removes any cause for concern that Apotex could be held liable for infringement of the patents in suit. *See Super Sack,* 57 F.3d at 1059. Moreover, " ' [i]t is well-established that a trial court may be divested of or deprived of subject matter jurisdiction over a particular patent claim if the patentee covenants not to assert an infringement claim against a putative infringer.' " *Crossbow Tech., Inc. v. YH Tech., Inc.,* No. C 03-04360, 2007 WL 174422, at *2 (N.D.Cal. Jan.22, 2007) (quoting *Eli Lilly & Co. v. Zenith Goldline Pharms.,* 101 F.Supp.2d 1139, 1142 (S.D.Ind.2000)). Federal Rule of Civil Procedure 12(h)(3) states " [w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Accordingly, the court must dismiss this action for lack of subject matter jurisdiction.[FN3]

**Manipulation of Court Jurisdiction**

*5 Notwithstanding the body of law that mandates dismissal, the court is sensitive to Apotex's argument

that Merck is manipulating the court's jurisdiction. Indeed, the court must guard its jurisdiction jealously. Apotex highlights an interesting yet troublesome practice that has emerged from the interplay of the Hatch-Waxman regulatory scheme, covenants not to sue, subject-matter jurisdiction, and the typical time cycle of a patent litigation. This lawsuit exposes the ability of pioneer drug companies to potentially hold generics at bay by suing them, as they are authorized to do when a paragraph IV certification is made in an ANDA, and then granting a covenant not to sue, which divests the court of subject-matter jurisdiction. In this way, district courts can be viewed as unwitting agents in a pioneer drug company's ability to defer competition for as long as possible. As unfortunate as it may be for Apotex, this is the framework that the Hatch-Waxman Act created.[FN4] The legislative history suggests that, in fact, Congress contemplated the use of covenants not to sue as a means of resolving any controversy created by the filing of an ANDA:

The provision [a " civil action to obtain patent certainty" ] ... is intended to clarify that Federal district courts are to entertain such suits for declaratory judgments so long as there is a " case or controversy" under Article III of the Constitution. We fully expect that, in almost all situations where a generic applicant has challenged a patent [by filing an ANDA with a paragraph IV certification] and not been sued for patent infringement, a claim by the generic applicant seeking declaratory judgment on the patent will give rise to a justiciable " case or controversy" under the Constitution. *We believe that the only circumstance in which a case or controversy might not exist would arise in the rare circumstance in which the patent owner and brand drug company have given the generic applicant a covenant not to sue, or otherwise formally acknowledge that the generic applicant's drug does not infringe.*

149 Cong. Rec. S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy, ranking member of Senate HELP committee) (emphasis added)).

ANDA litigation reaches the federal courts through specialized legislation enacted by Congress, perhaps without the prescience of the maze it would be creating, and the ingenuity of motivated business persons and lawyers to capitalize on its imperfections. These cases represent the intersecting roles of all three branches of government and the pharmaceutical industry: the court's interest in interpreting the existing law so that it can provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 6

justice and equity to injured parties; congressional interest in making laws that will encourage research and development, as well as to speed entry of generic drugs into the market; a regulatory agency's interest in advancing the public health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and the pharmaceutical industry's interest in protecting its bottom line. This court is without the power, however, to ameliorate the problems that have emerged from this interplay.

*6 Apotex argues that the Federal Circuit, in *Teva v. Novartis,* recognized that a patentee's actions of civil suing on one of its patents frustrated the central purpose behind Hatch-Waxman, and that this court should similarly recognize the gamesmanship behind suing, covenanting not to sue, and moving to dismiss without a decision on the merits. In finding a justiciable controversy in *Teva v. Novartis,* however, the Federal Circuit found frustration of the Hatch-Waxman Act's purpose to be just one of numerous circumstances, in the " totality of circumstances" analysis, that warranted a finding of an actual controversy. 482 F.3d at 1344. Moreover, in the past, both innovator and generic companies have been accused of " gaming" the Hatch-Waxman regulatory regime to their respective benefit.[FNS] Congress responded through legislation. *See* 149 Cong. Rec. S15882-03, S15885 (Nov. 25, 2003) (" [I]n recent years both brand-name and generic drug companies have exploited certain aspects of the Hatch-Waxman Act to delay generic competition. The changes to the [ ] Act ... will stop these abuses." ) (remarks of Sen. Kennedy, ranking member of the Senate HELP committee regarding the ' civil action to obtain patent certainty' provision under 21 U.S.C. § 355(j)(5)(C)). Likewise, if it is the view of Congress that pharmaceutical companies are abusing the Act in the way that Apotex complains here, Congress can reform the Hatch-Waxman Amendments as it deems necessary.

### Right to Competition-Antitrust Claim

Apotex's argument that a dismissal without a finding of invalidity or noninfringement would operate to deny Apotex " its right to compete with Merck for want of a ' triggering event" ' coincides with its proposed antitrust counterclaim presented in its motion to amend. As such, the court will address this argument and Apotex's motion together.

Recognizing that motions to amend shall be granted

freely under Federal Rule of Civil Procedure 15(a), the court has discretion to deny leave to amend when there is undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). In assessing futility, the court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.* Thus, the court looks to whether Apotex's antitrust claim, if allowed, would survive a motion to dismiss.

[4] The Supreme Court has outlined the factors that courts should consider when determining whether a party has standing to bring a private action under the antitrust laws: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998) (citing *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 537-45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

*7 Apotex argues, both in its opposition to Merck's motion to dismiss and in Apotex's motion to amend, that if the court grants Merck's motion to dismiss, the 30-month stay on Apotex's ANDA application will not be terminated, the 180-day exclusivity period will not be triggered, and Apotex, as well as the other secondary generic applicants, will be prevented from entering the generic market until 180 days after the first generic applicant enters the market. With these consequences in mind, Apotex asserts that Merck's actions of filing suit, covenanting not to sue, and moving to dismiss for lack of subject matter jurisdiction, are an unlawfully anticompetitive and monopolistic scheme to delay entry by Apotex and other generic filers into the market for generic alendronate sodium.

One material aspect of this discussion is whether the FDA's 30-month stay on Apotex's ANDA will terminate upon the court's dismissal of the action.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                    Page 7

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

The 30-month stay was introduced to give the generic applicant and NDA holder the opportunity to resolve patent issues prior to commercial marketing. Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf, at 39. 21 U.S.C. § 355(j)(5)(B)(iii)(2003) provides:
If such an action is brought before the expiration of [45 days after the date that the paragraph IV notice is received], the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that-
**(I)** if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on-
**(aa)** the date on which the court enters judgment reflecting the decision; or
**(bb)** the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

Merck argues that the parenthetical clause of § 355(j)(5)(B)(iii)(I), " (including any substantive determination that there is no cause of action for patent infringement or invalidity)," instructs that a dismissal for lack of subject matter jurisdiction would lift the 30-month stay on an ANDA. Apotex contends that the FDA has not yet construed the provision, and that the FDA's construction of similar, previously disputed language suggests that nothing less than a court decision of invalidity, noninfringement or unenforceability would affect the stay.[FN6] Neither the parties nor the court can be certain of how the provision will be applied to Apotex. Moreover, the matters pending before the court do not mandate this court's interpretation of the statute. It is noteworthy, however, that the FDA considered a precise answer, by way of a proposed rule, but later withdrew it without comment. The FDA's proposed rule § 314.107(g) provided in pertinent part:
**\*8** *Effect of dismissal of litigation on 30-month stay.*
If the patent litigation between the ANDA applicant and the patent owner or NDA holder described in paragraph (b)(3)(A) of this section is dismissed without a court decision on the merits of the patent claim, whether the dismissal is with or without

prejudice, the agency may immediately approve the ANDA that was the subject of the litigation, if it is otherwise eligible for approval.

180-Day Generic Exclusivity for Abbreviated New Drug Applications, 64 Fed.Reg. 42873, 42886 (1999) (to be codified at 21 C.F.R. pt. 314) (proposed Aug. 6, 1999), withdrawal of proposed rule reflected in 67 Fed.Reg. 66593 (2002).

Certainly, if the mere filing of a patent infringement suit can result in an irrevocable 30-month stay on an ANDA application, except in the limited circumstances of a " substantive decision" on the merits or other narrower circumstances where a court may shorten the stay, then Apotex has a legitimate concern about how such a policy is susceptible to abuse by pioneer drug companies. Ultimately, however, the court cannot remedy every harm or prejudice a party endures. Moreover, not every business disadvantage is appropriately deemed legal injury. The fiercely competitive pharmaceutical industry does not escape these realities. The existing law does not provide an absolute right of a generic drug company to enter the market in which a pioneer drug company and a first-filing generic applicant have legally achieved some market exclusivity.

**[5]** The court understands that Apotex is at a competitive disadvantage, but as to the harm it claims to have endured, and the relief it seeks, the court's hands are tied. In *Teva v. Pfizer,* the Federal Circuit stated:
The fact that Teva is disadvantaged from a business standpoint by Ivax's 180-day exclusivity period and the fact that Pfizer's decision not to sue Teva creates an impediment to Teva's removing that disadvantage are matters separate and distinct from whether an Article III controversy exists between Teva and Pfizer. The injury about which Teva complains is the product of the Hatch-Waxman scheme and the fact that Pfizer has acted in a manner permitted under that scheme. It is not the product of a threat of suit by Pfizer.

395 F.3d 1324, 1338 (Fed.Cir.2005), *abrogated by MedImmune v. Genentech,* --- U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). Notwithstanding the Supreme Court's abrogation of the Federal Circuit's reasonable apprehension test, the Federal Circuit's analysis of the distinction between a business disadvantage and an Article III controversy applies with equal force to Apotex's opposition to Merck's motion to dismiss, as well as its motion to add an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 8

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

antitrust counterclaim on the same grounds.

Apotex attempts to distinguish its case from *Teva v. Pfizer* by emphasizing that, unlike Pfizer, Merck chose to sue Apotex, knowing there was no infringement, and then covenanted not to sue. The court will not engage in fact finding as to the disputed accounts of what Merck knew about the merits of an infringement claim against Apotex at the time it filed suit, and whether and under what circumstances, Merck attempted to glean further information before filing suit. The court does not need to resolve these issues because the mere filing of a paragraph IV certification in an ANDA constitutes infringement. *See* 35 U.S.C. § 271(e)(2)(A). Accordingly, Apotex's filing of its ANDA on Merck's Fosamax drug was an act of infringement that afforded Merck the right to sue. The statutory provisions that allow suit under these circumstances render the patentee's subjective motivations for filing suit irrelevant.[FN7]

*9 [6] Intellectual property law and principles foster the creation of market power and antitrust law and principles respond to market power abuses, however, both systems operate to advance consumer welfare by allocating resources, cultivating innovation, and promoting technological progress. *See, e.g.,* Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust: An Integrated Handbook,* (West Group 2000), §§ 15.1 at 800-801. A patent " is an exception to the general rule against monopolies and to the right to access to a free and open market." *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Thus, " [b]y their nature, patents create an environment of exclusion, and consequently, cripple competition. The anticompetitive effect is already present." *Schering-Plough v. Federal Trade Comm'n,* 402 F.3d 1056, 1065-1066 (11th Cir.2005). When patentees attempt to extend their legal monopoly beyond that which is permitted by their statutory grants, such actions can trigger antitrust liability. *Andrx Pharms., Inc. v. Biovail Corp. Intern.,* 256 F.3d 799, 813 (3d Cir.2001) (" [E]ven a patent-right holder is not immune from antitrust liability." ).

[7] Any adverse effects within the scope of a patent or statutory right to exclude, however, cannot be redressed by antitrust law. *See United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122, 1127 (D.C.Cir.1981) (" [T]he conduct at issue is illegal if it threatens competition in areas other than those protected by the patent *and is otherwise legal.*"

) (emphasis added). The existing body of case law involving antitrust allegations in the context of ANDA litigation tends to fall within two categories: cases in which the parties bilaterally entered into a collusive agreement that exceeded the scope of a patent grant, thus warranting antitrust scrutiny,[FN8] and cases in which the patentee was considered to have lawfully enforced its patent right, albeit with the consequence of delaying or inhibiting competition. *See, e.g., In re Cardizem CD Antitrust Litig.,* 332 F.3d 896 (6th Cir.2003) and *Valley Drug Co. v. Geneva Pharm., Inc.,* 344 F.3d 1294 (11th Cir.2003) (involving agreements among innovator and generic drug companies that incurred antitrust liability).

The futility of Apotex's proposed amendment is further demonstrated by previously unsuccessful efforts to attach antitrust liability to pharmaceutical companies acting within the Hatch-Waxman regulatory framework and patent grant. *See, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F.Supp.2d 514, 524 (E.D.N.Y.2005) (holding that conduct within the scope of the patent grant is exempt from antitrust scrutiny); *In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d 187 (2d Cir.2006) (affirming district court decision, which held that the claimed injury was not " antitrust injury," which must be caused by something other than the regulatory action limiting entry to the market); *Bristol-Myers Squibb Co. v. Copley Pharm., Inc.,* 144 F.Supp.2d 21, 23-25 (D.Mass.2000) (dismissing an antitrust counterclaim of second ANDA filer against pioneer drug company because the counterclaimant failed to show antitrust injury where the statutory scheme, and not the pioneer drug company, prevented it from entering the market).

*10 Thus, Merck's challenged conduct-filing suit upon notice of Apotex's paragraph IV certification and covenanting not to sue-are expressly sanctioned by the Hatch-Waxman Amendments or contemplated by its legislative history. Likewise, the consequences to Apotex-delayed entry in the market for alendronate sodium tablets-are specific products of the statute. Having failed to establish antitrust injury and causal connection between Merck's legal actions and Apotex's alleged harm, which are necessary requirements for antitrust standing, the court considers Apotex's requested amendment to be futile.

## VI. CONCLUSION

Accordingly, Merck's motion to dismiss (D.I.15) is granted as Apotex has failed to establish the

--- F.Supp.2d ----                                              Page 9

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

existence of an actual case or controversy under the current state of the law. The Clerk of the Court shall mark this action closed and all other pending motions are denied.

## ORDER

IT IS HEREBY ORDERED that:

1. Merck's motion to dismiss for lack of subject matter jurisdiction (D.I.15) is GRANTED.

2. Apotex's motion for leave to file a surreply (D.I.26) is DENIED.

3. Apotex's motion for leave to file its first amended answer, affirmative defenses, and counterclaims (D.I.28) is DENIED.

4. Apotex's motion for leave to substitute corrected exhibits to its pending motion for leave (D.I.36) is DENIED as moot.

5. Merck's motion to stay (D.I.68) is DENIED as moot.

6. All claims in Merck's Complaint (D.I.1) are DISMISSED.

7. All counterclaims in Apotex's Answer, Affirmative Defenses, and Counterclaims (D.I.8) are DISMISSED.

8. Each party shall bear its own costs and attorneys' fees.

> FN1. The Hatch-Waxman Amendments were modified by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. Pub.L. No. 108-173, § 1101(a)(2)(A)(ii), 117 Stat.2066 (amended 2003). Herein, all references to the Hatch-Waxman Amendments and its regulatory framework include the scope of the provisions as later modified.

> FN2. The patents listed in Merck's NDA, which are the patents-in-suit, are U.S. Patent Nos. 5,358,941; 5,681,590; 5,849,726; 6,008,207; 6,090,410; 6,194,004; 5,994,329; 6,015,801; and 6,225,294.

> FN3. Apotex also contends that the collateral consequences doctrine permits the

court to retain jurisdiction. The court has considered the parties' arguments and finds Apotex's position to be without merit.

> FN4. The court is also troubled by the practical realities of a scheme, which in effect, if left as is, enmeshes the district courts in unnecessary, and in this court's opinion, improper involvement in business competition. This cycle not only contributes to court congestion but it wastes the court's valuable time and limited resources by conducting the business it must for these cases, until it reaches the merits of such contested motions to dismiss. The time-triggered provisions of the statute unrealistically presuppose the time in which the district courts are to manage their cases. While the court endeavors to be efficient and expeditious in resolving the matters pending before it, time proscriptions such as those that Congress has assumed in the Hatch-Waxman provisions, and those upon which the litigants press the court, are idealistic at best and unfeasible in practice. The joint effort of the branches of government to balance the interests of consumers with those of innovator and generic drug companies should not be so tunnel-visioned as to facilitate litigants in their attempts to catapult ANDA litigation as a priority in the district courts.

> FN5. The Federal Trade Commission issued studies in 2002 and 2003 that examined and commented on the conduct of drug companies in the generic drug approval process. Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf; Fed. Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy, (2003), available at http://www.ftc.gov/os/2003/10/innovationrpt.pdf.

> FN6. See Apotex, Inc. v. FDA, 449 F.3d 1249 (D.D.C.2006) (upholding FDA's decision finding that dismissal for lack of subject matter jurisdiction did not qualify as a " court decision" sufficient to trigger the 180-day exclusivity period).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

Page 10

FN7. The court is by no means discharging the requirements of Rule 11 in the context of Hatch Waxman litigation. In this case, however, there are no alleged facts from which the court can conclude that, in fact, Merck knew that Apotex's generic version of Fosamax did not infringe Merck's patents at the time it filed suit pursuant to its statutory right to do so upon Apotex's paragraph IV certification. Although the Rule 12(b)(6) standard requires the court to accept all well-pleaded allegations as true, and to view them in the light most favorable to plaintiff, the court will not credit bald and conclusory allegations. *See United States v. Vespe,* 868 F.2d 1328, 1340 (3d Cir.1989) (stating conclusory statements need not be credited).

FN8. " It is widely understood that the 180-day exclusivity period offers the potential for collusive settlement arrangements between pioneers and generics. A pioneer could initiate a patent infringement suit against a first generic ANDA filer and settle the litigation with a ' non-entry' payment to the generic, under which the generic would delay commercialization of the generic product, thus postponing the commencement of the 180-day exclusivity period and locking other generics out of the market indefinitely." Herbert Hovenkamp et al., *Anticompetitive Settlement of Intellectual Property Disputes,* 87 Minn. L.Rev. 1719, 1755 (2003).

D.Del.,2007.
Merck & Co., Inc. v. Apotex, Inc.
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 2



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 2401908 (D.Del.), 45 Bankr.Ct.Dec. 136

**(Cite as: Not Reported in F.Supp.2d)**

**H**
In re Onco Inv. Co.
D.Del.,2005.

United States District Court,D. Delaware.
In re: ONCO INVESTMENT COMPANY, et al.,
Debtors.
MW POST PORTFOLIO FUND LTD., et al.,
Appellants,
v.
NORWEST BANK MINNESOTA, National
Association (n/k/a Wells Fargo Bank, MN, National
Association), Oglebay Norton Company, and the
Depository Trust Company, Appellees.
**No. 04-10558, 04-54122(JBR), Civ. 04-1543-SLR.**

Sept. 29, 2005.

Amy Denise Brown, Werb & Sullivan, Wilmington,
DE, for Appellant.
Paul Heath, Richards, Layton & Finger, Wilmington,
DE.
David W. Carickhoff, Jr., Pachulski, Stang, Ziehl,
Young & Jones, P.C., Brian A. Sullivan, Werb &
Sullivan, Gregory Thomas Donilon, Morris, Nichols,
Arsht Tunnell, Mark E. Felger, Cozen & O'Connor,
Wilmington, DE, for Appellees.

MEMORANDUM ORDER
ROBINSON, J.
*1 At Wilmington this 29th day of September, 2005,
having reviewed the motion to dismiss filed by
appellees and the papers filed in connection
therewith;

IT IS ORDERED that said motion (D.I.10) is
granted, for the reasons stated below.

1. Introduction. Pending before the court are four
appeals filed by plaintiffs-appellants from orders
entered by the United States Bankruptcy Court for
the District of Delaware in the above referenced
adversary proceeding. Appellants are some of the
holders of Senior Notes issued by defendant/appellee
Oglebay Norton Company (" debtor" ) FN1 in October
2002 in the aggregate principal amount of $75

million which were due October 2008 (" the Senior
Notes" ). (D.I.15, ex. J) Defendant/appellee Wells
Fargo Bank, MN, National Association (" Wells
Fargo" ) was the Indenture Trustee under an
Indenture dated February 1, 2004 (" the Indenture" )
between debtor (as issuer), Wells Fargo (as Indenture
Trustee), and certain guarantors named therein,
pursuant to which debtor issued 10% Senior
Subordinated Notes in the aggregate principal
amount of $100 million, due February 1, 2009 (" the
Subordinated Notes" ). (D.I.15, ex. G)
Defendant/appellee The Depository Trust Company
(" DTC" ) is a limited purpose trust company
designated to be the disbursing agent with respect to
the Subordinated Note Holders. This court has
jurisdiction to hear this matter pursuant to 28 U.S.C.
§ 158(a).

> FN1. Although there are multiple debtors
> whose chapter 11 cases were jointly
> administered in the above captioned
> bankruptcy case, for purposes of this
> proceeding, only one debtor will be
> referenced, the named defendant in the
> adversary proceeding, Oglebay Norton
> Company.

2. Background. Oglebay commenced its chapter 11
cases in February 2004. Prior to the filing, Oglebay
was current in its payment of principal and interest on
the Senior Notes. The filing of the bankruptcy
petitions, however, constituted a technical default
under the Senior Notes Purchase Agreement,
resulting in the automatic acceleration of Oglebay's
obligations thereunder. Appellants claim that, as a
result of the default and acceleration of the debt, in
addition to the entire unpaid principal amount of the
Senior Notes, they are also entitled to be paid (a) a
prepayment premium in an amount equal to 18% of
the original principal amount of the Senior Notes ("
the Early Prepayment Premium" ) and (b) post-
petition interest at a higher, default rate (" the Default
Rate of Interest" ).

3. Oglebay filed its original plan of reorganization on
April 27, 2004 and its first amended plan of

Not Reported in F.Supp.2d                                                      Page 2

Not Reported in F.Supp.2d, 2005 WL 2401908 (D.Del.), 45 Bankr.Ct.Dec. 136

**(Cite as: Not Reported in F.Supp.2d)**

reorganization on July 1, 2004. Under the first amended plan, the Senior Note Holders were given the option of accepting either 104% of the principal amount plus interest at a non-default rate, or else participating in a litigation reserve through which the Senior Note Holders were entitled to litigate their entitlement to the Early Prepayment Premium or Default Rate of Interest. The first amended plan also provided that distributions to Subordinated Note Holders would be made to Wells Fargo as the Indenture Trustee. (D.I.15, ex. M) On June 24, 2004, appellants initiated the above referenced adversary proceeding to contest what they understood their treatment would be under the first amended plan; they filed a motion for summary judgment on July 22, 2004. (D.I.15, exs.L, O)

*2 4. On July 30, 2004, Oglebay filed a second amended plan of reorganization (" the Plan" ). (D.I.15, ex. H) The Plan (modified in September and November 2004) was ultimately approved by creditors and confirmed by the bankruptcy court. According to the provisions of the Plan, the claims of the Senior Note Holders were classified as Class 3 Claims; on the " Effective Date" , the Senior Notes would be " reinstated" pursuant to 11 U.S.C. § 1124(2). FN2 The Plan went on to provide that, on or after October 25, 2004, Oglebay would exercise its redemption rights under the Senior Notes Purchase Agreement and redeem the Senior Notes in full with a cash payment of 106% of the principal amount of the Senior Notes, plus all accrued and unpaid interest thereon at the non-default rate through the date of such payment, consistent with the terms of the Senior Notes Purchase Agreement.FN3

> FN2. Section 1124(2) provides as follows:
> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default -
> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;
> (B) reinstates the maturity of such claim or interest as such maturity existed before such

> default;
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
> (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

> FN3. Consistent with § 1124 and as explained in the disclosure statement approved by the bankruptcy court:
> Under the Plan, the [Senior Notes] will be Reinstated on the Effective Date, pursuant to section 1124(2) of the Bankruptcy Code and Section I.A.91b of the Plan. Specifically, (a) section 1124(2) of the Bankruptcy Code and Section I.A.91b of the Plan permit the Debtors to Reinstate debt obligations, such as the [Senior Notes], which, among other things, de-accelerates the debt, cures all defaults and reinstates the original terms and maturity and (b) the terms of the [Senior Notes Purchase Agreement] permit the Debtors to redeem the [Senior Notes] on or after October 25, 2004 for a prepayment premium of 6%.
> (D.I. 15, ex. P at 26) (emphasis added).

5. The Plan further classified the claims of the Subordinated Note Holders as Class 7 Claims. These claims were deemed impaired under the Plan and the Subordinated Notes were converted into equity having a value equal to 24% of the underlying indebtedness. The Plan provided that, on the " Effective Date" , the reorganized debtors would distribute new common stock to DTC; DTC, in accordance with its SEC-approved rules, would then allocate the distributions to those of its participants who had an entitlement under the Plan to receive such.

6. On August 9, 2004, appellants filed an amended complaint in the adversary proceeding, and filed as well an amended motion for summary judgment against Oglebay and Wells Fargo. (D.I.15, exs.E, K, Q) Appellants asserted therein that, pursuant to the subordination provisions in the Indenture, the Subordinated Note Holders were not entitled to any distributions under the Plan until the Senior Note Holders had been paid-out of the consideration

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2401908 (D.Del.), 45 Bankr.Ct.Dec. 136

**(Cite as: Not Reported in F.Supp.2d)**

distributed to Subordinated Note Holders-both the Early Prepayment Premium and the Default Interest Rate (notwithstanding reinstatement of the Senior Notes by Oglebay through the Plan). The amended complaint sought three forms of relief: (a) a declaration against all defendants that no distributions may be made to Subordinated Note Holders under the Plan unless and until all Senior Note Holders " have been paid in full in cash all amounts owed to them under the Senior Notes" including, without limitation, principal, the Early Prepayment Premium and the Default Rate of Interest; (b) turnover from the Indenture Trustee and/or DTC of any amounts received from Oglebay for the benefit of the Subordinated Note Holders until all obligations allegedly owed to Senior Note Holders had been paid in full in cash; and (c) damages from the Indenture Trustee and/or DTC in the event they received any distributions under the Plan for the benefit of Subordinated Note Holders but failed to turn them over to the Senior Note Holders. (D.I. 15, ex. E at ¶¶ 56-65)

7. Wells Fargo asserted six counterclaims against appellants and a cross-claim against Oglebay. (D.I. 15, ex. F at ¶¶ 127-138) The appellees filed their respective oppositions to appellants' motion for summary judgment; both Wells Fargo and DTC filed cross-motions for summary judgment against appellants. (D.I.15, exs.I, S, T, W) While these motions were pending, on September 17, 2004, appellants filed a written objection to confirmation of the Plan, arguing that, pursuant to the subordination provisions in the Indenture, the Subordinated Note Holders should not be permitted to receive any distributions under the Plan until the Senior Note Holders were paid the Early Prepayment Premium and the Default Interest Rate (notwithstanding reinstatement by Oglebay). (D.I.15, ex. Y)

*3 8. On September 27, 2004, the bankruptcy court issued its opinion and orders granting Wells Fargo's motion for summary judgment and denying appellants' motion for summary judgment. (D.I.15, exs.A-B, Z) In its decision, the bankruptcy court noted that the parties' dispute involved whether the subordination provisions created a right for the Senior Note Holders to recover " a debt no longer owed by" Oglebay. (D.I. 15, ex. Z at 6) The bankruptcy court concluded that the intended effect of reinstatement under § 1124(2) was to " roll back the clock to the time before the default existed" " as to all parties and for all purposes." (*Id.* at 7-8)

9. The chapter 11 case continued to proceed toward confirmation while the cross-motions for summary judgment were being litigated in the adversary proceeding. At the confirmation hearing held on October 5, 2004, the bankruptcy court stated on the record that it was overruling appellants' objections to confirmation, " [f]or the reasons set forth in [its September 27] memorandum of decision on [appellants'] summary judgment in the adversary proceedings, and on Wells Fargo's cross motion for summary judgment entered on the docket in the adversary proceeding...." (D.I. 15, ex. AA at 109-110)

10. On October 11, 2004, appellants filed opposition to DTC's cross-motion to dismiss the adversary proceeding. (D.I.15, ex. BB) The bankruptcy court issued a memorandum decision and two orders on November 15, 2004 granting DTC relief. (D.I.15, exs.C, D, GG) More specifically, the bankruptcy court explained:

The Plaintiffs allege that DTC must turn over to them all distributions received by DTC on account of the so-called Subordinated Notes until the Plaintiffs' Senior Secured Notes are paid in full, including what they described as the Early Prepayment Premium and the interest calculated at the " Default Rate." The responsibility to turn over the distribution arises from the agreements including the Subordination Agreement. This Court has previously determined that the Plaintiffs' right to payment, if the claim is reinstated and paid in full as proposed by the Debtors' Plan of Reorganization, does not include the right to collect either the Early Prepayment Penalty or Default rate of interest.... Consequently, the claim against DTC, which arises only from an alleged liability which the Court determined does not exist, cannot stand.

(D.I. 15, ex. GG at 2)

11. The bankruptcy court entered the Confirmation Order on November 17, 2004. The Order overruled appellants' objections to the Plan " in their entirety and on their merits" and directed the parties to effect distributions to creditors in accordance with the terms of the Plan. (D.I. 15, ex. EE at 14, 22) On November 24, 2004, appellants filed their notices of appeal from all four orders entered in the adversary proceeding. Appellants did not seek a stay of or appeal from the Confirmation Order, which became final and non-appealable on November 27, 2004.

*4 12. On January 31, 2005, the Effective Date, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2005 WL 2401908 (D.Del.), 45 Bankr.Ct.Dec. 136

**(Cite as: Not Reported in F.Supp.2d)**

Plan was consummated. The Subordinated Notes were cancelled and distributions of New Common Stock were made to Subordinated Note Holders through DTC. Since the Effective Date, the New Common Stock that was distributed for the benefit of the Subordinated Note Holders has been traded on the over-the-counter market for unlisted securities and is being held by various institutions in street name. (D.I.13, 14)

13. Pursuant to the Plan, the Indenture was cancelled on the Effective Date, except to the extent that Oglebay's indemnification obligations to the Indenture Trustee will survive until final resolution of the adversary proceeding. (D.I. 15, ex. H at § IV.G.1) As expressly provided in the Plan, the Indenture Trustee has no further duties or obligations with respect to distributions to or for the benefit of the Subordinated Note Holders.

14. Of significance to the dispute at bar, the Plan provided the following:
Notwithstanding anything to the contrary contained in this Section XI.C, any and all rights, arguments and defenses relating to the subordination provisions contained in the Old Senior Subordinated Note Indenture are expressly preserved solely for the holders of Class 3 Claims and Class 7 Claims, the Debtors, the Reorganized Debtors, the Indenture Trustee and the Creditors' Committee and shall be enforced in accordance with a Final Order of the Bankruptcy Court resolving the parties' respective rights under such subordination provisions.

(D.I. 15, ex. H at § XI.C.4) (emphasis added) " Final Order" is defined in the Plan as an order or judgment " as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court or which the order or judgment was appealed or from which certiorari was sought." (D.I. 15, ex. H at § I.A.40)

15. Analysis. Appellees move for dismissal of the appeals on several grounds. In the first instance, the court agrees with appellants that the appeals are from final orders, as required by Third Circuit precedent. Although the bankruptcy court did not resolve all of the claims of all of the parties by virtue of the orders in dispute, it is evident from the record that the bankruptcy court does not intend to do so and, instead, " has divested itself of the case entirely," thus giving finality to the appeals. See *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 198 n.

3 (3d Cir.2001).

16. Nevertheless, the court lacks subject matter jurisdiction over the appeals, as the events that have occurred, both during and after consummation of the Plan, have rendered appellants' claims constitutionally moot. Constitutional mootness is a jurisdictional doctrine rooted in the requirement of Article III of the United States Constitution that " the exercise of judicial power depends upon the existence of a case or controversy." *Int'l Broth. of Boilermakers v. Kelly,* 815 F.2d 912, 914 (3d Cir.1987). Thus, " if an event occurs while a case is pending on appeal that makes it impossible for the court to grant ' any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)). *See also Whiting v. Krassner,* 391 F.3d 540, 544 (3d Cir.2004) (claims become moot whenever " ' changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." ' ) (quoting *Jersey Cent. Power & Light Co. v. New Jersey,* 772 F.2d 35, 39 (3d Cir.1985)). The question that must be determined, therefore, is whether events have occurred since the commencement of litigation that have foreclosed the granting of any effective relief to appellants.

*5 17. The court concludes that dismissal on the grounds of mootness is required. In their amended complaint, appellants sought three forms of relief against the named defendants: declaratory relief against all defendants, turnover relief against Wells Fargo (as Indenture Trustee) and DTC, and money damages against Wells Fargo and DTC. Such relief is no longer available against these defendants.[FN4]

> FN4. The court agrees with appellants that the relief sought in the form of damages would not " unravel" the Plan and make the appeals constitutionally moot. Rather, the lack of a justiciable controversy flows from the way the litigation was framed-who was sued and under what (if any) theory of recovery-given the events that occurred in connection with the underlying bankruptcy proceeding.

a. In their first claim for relief in the amended complaint, appellants sought a declaration that " no distributions may be made by any of the Debtors,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 5

Not Reported in F.Supp.2d, 2005 WL 2401908 (D.Del.), 45 Bankr.Ct.Dec. 136

**(Cite as: Not Reported in F.Supp.2d)**

under a plan of reorganization or otherwise, to any Subordinated Noteholder or the Subordinated Notes Trustee ... unless and until Senior Noteholders have been paid in full in cash all amounts owed to them under the Senior Notes, including, without limitation, principal, the Early Prepayment Premium, and unpaid pre- and post-petition interest, including interest at the Default Rate of Interest...." (D.I. 15, ex. E at § 57) Of course, such distributions have been made, pursuant to a Plan and final Confirmation Order. Because this particular form of relief is no longer attainable, there no longer is a justiciable controversy.

b. In their second and fourth claims for relief, appellants sought judgment against Wells Fargo and DTC requiring them to " turn over any property received from the Debtors for the benefit of any Subordinated Noteholder, under a plan of reorganization or otherwise, to [appellants] to the extent necessary to pay in full in cash all amounts owed to [appellants] under the Senior Notes, including, without limitation, principal, the Early Prepayment Premium, and unpaid pre- and post-petition interest, including interest at the Default Rate of Interest...." (D.I. 15, ex. E at §§ 59, 63) Wells Fargo, as the Indenture Trustee, was taken out of the distribution chain in the Plan; appellants have conceded in this regard that, " [i]f the Subordinated Notes Trustee never receives any property from the Debtors, it will have nothing to turn over to the Senior Noteholders." (D.I. 15, ex. R at 22) Such is the case. As to DTC, under the Plan and Confirmation Order, DTC was expressly directed to, and in fact did, distribute the New Common Stock to those of its participants who had accounts for the beneficial holders of the Subordinated Notes on the Effective Date. The record indicates that DTC completed its task and presently has no property to turn over to appellants, thus mooting the turnover claim against DTC.

c. In their third and fifth claims for relief, appellants sought damages against Wells Fargo and DTC " in the amount of the value of any property received from the Debtors on account of the Subordinated Notes." Again, because Wells Fargo, as the Indenture Trustee, never received property under the Plan, appellants cannot seek damages relief from Wells Fargo. (D.I. 15, ex. R at 22) As to DTC, appellants never identified in their amended complaint their theory of recovery against DTC, a securities depository with no interest in the outcome of the chapter 11 case at bar. Under the Plan and

Confirmation Order, DTC was directed to allocate the New Common Stock to those of its participants who had deposited the Subordinated Notes (on behalf of the Subordinated Note Holders) at DTC. DTC did so in the ordinary course of its business, and was expressly relieved under the Plan and Confirmation Order of any " liability to any party for actions taken in accordance with the Plan...." (D.I. 15, ex, H at § VI.D.1.b.v) Having never articulated a theory of recovery against DTC, and under the circumstances of record, appellants' damages claim against DTC is nonjusticiable.

**\*6** 18. Conclusion. For the reasons stated, IT IS ORDERED that Appellees' motion to dismiss the four appeals of record (D.I.10) is granted.

D.Del.,2005.

In re Onco Inv. Co.

Not Reported in F.Supp.2d, 2005 WL 2401908 (D.Del.), 45 Bankr.Ct.Dec. 136

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 3



Slip Copy

Slip Copy, 2007 WL 656897 (E.D.Va.)

**(Cite as: Slip Copy)**

Page 1

Potomac Elec. Power Co. v. Rowe Companies
E.D.Va.,2007.
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.
POTOMAC ELECTRIC POWER COMPANY, et
al., Appellants
v.
The ROWE COMPANIES, et al., Appellees.
**Nos. 1:06CV1464, 1:06CV1465, 1:06CV1466
(JCC).**

Feb. 26, 2007.

Kevin R. McCarthy, McCarthy & White PLLC,
McLean, VA, for Appellants.
Dylan Gillespie Trache, Wiley Rein LLP, McLean,
VA, for Appellee.

### *MEMORANDUM OPINION*

JAMES C. CACHERIS, United States District Court
Judge.
**\*1** This case arises from the appeal of a decision by
the United States Bankruptcy Court for the Eastern
District of Virginia. The instant matter before the
Court is Appellees' motion to dismiss the appeal for
mootness and lack of standing. For the following
reasons, the Court will grant Appellees' motion.[FN1]

> FN1. Recently, the United States
> Bankruptcy Court for the Eastern District of
> Virginia entered an order converting the
> Rowe Furniture bankruptcy case
> (1:06cv1465) to Chapter 7. At oral
> argument, Rowe Furniture's trustee was not
> present, but the same arguments and issues
> in its pending motion to dismiss were
> addressed. In accordance with the Court's
> ruling as to The Rowe Companies' and
> Storehouse's motions, this Court also will
> grant Rowe Furniture's motion.

### I. Background

On September 18, 2006, Rowe Furniture, Inc., The
Rowe Companies, and Storehouse, Inc. (collectively,

" Appellees" or " Debtor-Appellees" ) filed
voluntary petitions for relief under Chapter 11 of the
Bankruptcy Code with the United States Bankruptcy
Court for the Eastern District of Virginia, Alexandria
Division (the " Bankruptcy Court" ). At the time of
the Petition's filing, Alabama Power Company,
Potomac Electric Power Company, Delmarva Power
& Light Company, Entergy Louisiana, LLC, and
Entergy Gulf States, Inc. (collectively, " Appellants"
) provided electric service to the Debtor-Appellee's
retail locations.

On October 19, 2006, the Bankruptcy Court entered
the Final Order Approving Adequate Assurance
Procedures and Determining Adequate Assurance of
Payment for Future Utility Services (the " Procedure
Order" ). This Order established the procedures under
11 U.S.C. § 366 regarding requests for adequate
assurance of payment to Appellants for future utility
services provided to Appellees. After a hearing, the
Bankruptcy Court entered the Final Order
Determining Adequate Assurance of Payment for
Certain Utilities (the " Assurance Order" ) on
October 24, 2006. This Order established adequate
assurance of payment to Appellants by each of the
Appellees, requiring them to post deposits of one
month's average utility bill for each of the Appellants.
Appellants appealed both of these orders (together,
the " 366 Orders" ) to this Court on the grounds that
the Bankruptcy Court's interpretation and application
of 11 U.S .C. § 366 was erroneous.

After this appeal was commenced, all three
Appellees, The Rowe Companies, Rowe Furniture
Inc., and Storehouse Inc., ceased operations at the
locations serviced by Appellees, and utility service to
the Appellees was accordingly discontinued.
Appellees now move this Court to dismiss this appeal
on the grounds of mootness and lack of standing.

### II. Analysis

Under Article III of the United States Constitution,
federal courts may adjudicate only actual cases or
controversies, rather than advising what the law
would be for a hypothetical state of facts. *Deakins v.*

Slip Copy, 2007 WL 656897 (E.D.Va.)

**(Cite as: Slip Copy)**

_Monaghan,_ 484 U.S. 193, 199 (1988). " It has been long settled that a federal court has no authority to ' give opinions upon moot questions or abstract proposition, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " _Church of Scientology of California v. United States,_ 506 U.S. 9, 12 (1992)(citing _Mills v. Green,_ 159 U.S. 651, 653 (1895)). " If an event occurs while a case is pending on appeal that makes it impossible for the court to grant ' any effectual relief whatever' to a prevailing party, the appeal must be dismissed." _Id._

*2 The requirements of constitutional mootness are clearly satisfied by the circumstances of this case. The 366 Orders entered by the Bankruptcy Court established the framework for the provision of adequate assurance of payment to utilities as authorized by 11 U.S.C. § 366. Specifically, the 366 Orders prevented Appellants from discontinuing future utility service to certain Appellee locations but also protected Appellants from the risk of non-payment for services provided in the future. However, while on appeal, operations at these locations ceased. The Appellants discontinued utility service, and there is no risk of non-payment. Thus, the relief granted is no longer necessary to the Appellants, and this Court cannot grant " any effectual relief whatever." _Mills,_ 159 U.S. at 653.

Appellants do not dispute that this case falls within these traditional requirements of mootness doctrine. Instead, they argue that an exception applies because the issues presented are " capable of repetition, yet evading review." _See, e.g., Spencer v. Kemma,_ 523 U.S. 1 (1998). The United States Supreme Court has stated that:
The capable-of-repetition doctrine applies only in exceptional circumstances where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.

_Spencer,_ 523 U.S. at 17(internal citations omitted). The circumstances of the instant appeal fail to satisfy either requirement, and thus, the exception does not apply.

First, as to the duration of the challenged action, while the Debtors-Appellees in this specific case terminated their accounts relatively quickly,

Appellants have not shown that future, similarly situated chapter 11 debtors will cease operations as quickly, if at all. Chapter 11 of Title 11 of the United States Code is only a reorganization of a company's contractual and debt obligations. _See_ 11 U.S.C. §§ 101-1532. While this Court is unfamiliar with what percentage of Chapter 11 debtors cease operations (and Appellants have not demonstrated such a figure), many Chapter 11 debtors, if not most, continue to operate indefinitely and sometimes emerge from bankruptcy. If the Chapter 11 debtor continues operations, any concerns of a duration too short to fully litigate an appeal is obviously eliminated.

Furthermore, even if a company eventually does cease operations, Appellants have provided no reason for this Court to believe that cessation would _repeatedly_ occur so quickly as to evade review. There is no dispute that the Appellees ceased operations quickly after the appeal commenced, but that is of little moment. This Court cannot conclude that the majority of future, similarly situated debtors-in-possession will cease operations as quickly as Appellees in this case, and thus, the Court cannot draw the conclusion that the duration of time to fully litigate the challenged action is so brief as to come within the a capable-of-repetition doctrine. Accordingly, this exception to the mootness doctrine does not apply, and the appeal will be dismissed as moot.

*3 The second requirement to apply the capable-ofrepetition exception is that there must be a reasonable expectation that the complaining party will be subject to the same action. Not unexpectedly, there is considerable disagreement between the parties as to this requirement's application. Appellants argue that they must demonstrate only that they have a reasonable likelihood of being subject to the same action. However, Appellees argue that, as stated by the Sixth Circuit, " when the suit involves two private parties, the complaining party must show a reasonable expectation that he would again be subjected to the same action by the _same defendant." Chirco v. Gateway Oaks, LLC,_ 384 F.3d 307, 309 (6th Cir.2004). The Fourth Circuit has not directly ruled on this issue, and applying the Sixth Circuit's interpretation to this case, the capable-of-repetition exception also fails with respect to the second requirement. Appellees entirely ceased to operate in any locations that received utility service from Appellants. Therefore, there is no reasonable expectation that these same parties will be subject to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 656897 (E.D.Va.)

**(Cite as: Slip Copy)**

the same action in the future, and the capable-of-repetition exception also fails as to the second requirement.

In sum, there is no actual case of controversy as required by Article III of the United States Constitution. The Utilities' appeal of the Bankruptcy Court's decision clearly falls within the mootness doctrine, and the " capable-ofrepetition, yet evading review" exception does not apply. Accordingly, this Court could not grant any effectual relief to the prevailing party other than a mere advisory opinion, and must be dismissed.[FN2]

> FN2. Since this Court finds that this appeal should be dismissed as moot, it does not reach Appellee's motion to dismiss for lack of standing.

### III. Conclusion

For the foregoing reasons, Appellees' motion to dismiss the appeal as moot will be granted. An appropriate Order will issue.

E.D.Va.,2007.
Potomac Elec. Power Co. v. Rowe Companies
Slip Copy, 2007 WL 656897 (E.D.Va.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Denise Seastone Kraft, certify that on this 11th day of June, 2007, I caused true and correct copies of the **Brief of Appellees, Amtrol Holdings, Inc., et al.** to be served on the following parties in the manner indicated:

**HAND DELIVERY**

John D. Demmy, Esq.
Stevens & Lee, P.C.
1105 North Market Street
7th Floor
Wilmington, DE 19801
Phone: 302-425-3308

**VIA FEDERAL EXPRESS**

Russell R. Johnson, III
2258 Wheatlands Drive
Manakin-Sabot, VA 23103
Phone: 804-749-8861

Denise S. Kraft (#2778)