# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | : |
| | : |
| **AMTROL HOLDINGS, INC.,** *et al.,* | :  **Bankruptcy Case No. 06-1146** |
| | : |
| Debtors. | : |
| | : |
| **NEW ENGLAND GAS COMPANY,** *et al.,* | : |
| | : |
| Appellants, | : |
| | : |
| | :  **Civil Action No. 07-75-GMS** |
| | : |
| **AMTROL HOLDINGS, INC.,** *et al.,* | : |
| | : |
| Appellees. | : |

## APPELLANTS' OPPOSITION TO APPELLEES' MOTION TO DISMISS APPEAL

Dated:  June 29, 2007

John D. Demmy (I.D. No. 2802)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, Delaware  19801
Phone:  (302) 425-3308
Fax:  (610) 371-8515
E-mail: jdd@stevenslee.com

-and-

Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, VA 23103
Phone:  (804) 749-8861
Fax:  (804) 749-8862
E-mail: russj4478@aol.com

*Counsel for Appellants New England Gas*
*Company and Narragansett Electric*
*Company, both d/b/a National Grid*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF THE ISSUES PRESENTED .................................................... 1

SUMMARY OF ARGUMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 7

ARGUMENT ....................................................................................................... 7

A.    THE APPEAL SHOULD NOT BE DISMISSED AS BEING
      CONSTITUTIONALLY MOOT ................................................................. 7

B.    THE APPEAL SHOULD NOT BE DISMISSED ON
      CONSTITUTIONAL MOOTNESS GROUNDS BECAUSE THE
      ISSUES PRESENTED IN THE APPEAL ARE "CAPABLE OF
      REPETITION, YET EVADING REVIEW" ............................................... 9

C.    THE APPEAL SHOULD NOT BE DISMISSED ON
      EQUITABLE MOOTNESS GROUNDS .................................................. 14

      1.    Whether the Plan Has Been Substantially Consummated ............. 15

      2.    Reliance on Confirmation By Parties Not Before the Court .......... 15

      3.    Whether the Relief Requested Would Affect the Success of
            the Plan .......................................................................................... 16

      4.    General Public Policy Affording Finality to Bankruptcy
            Judgments ...................................................................................... 16

CONCLUSION .................................................................................................. 17

## TABLE OF AUTHORITIES

### CASES

*In re Aurora Foods Inc.*, 2006 WL 3747306 (D. Del. 2006).................................................. 14, 15

*In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993) .................................................. 16

*Church of Scientology v. United States,* 506 U.S. 9, 113 S.Ct. 447 (1992).................................... 7

*In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) ................................................ 4, 7, 9, 14, 16

*Globe Newspaper Co. v. Superior Court,*
    457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed. 2d 248 (1982).............................................. 13

*Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed. 2d 686 (1988) ........................................ 12

*Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173 (1979) ....................................... 10

*Isidor Paiewonsky Associates, Inc. v. Sharp Properties, Inc.,*
    998 F.2d 145 (3d Cir. 1993)..................................................................... 7

*Kirby v. United States Dep't of Housing & Urban Dev.,*
    745 F.2d 204 (3d Cir. 1984)..................................................................... 8

*Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313 (3d Cir. 2004).................................... 12

*Luther v. Molina*, 627 F.2d 71 (7th Cir. 1980) ...................................................... 13

*Murphy v. Hunt*, 455 US. 478 (1982) .................................................................. 9, 10

*Nordhoff Investments, Inc. v. Zenith Electronics Corp.,*
    258 F.3d 180 (3d Cir. 2001)..................................................................... 14, 16, 20

*Potomac Electric Power Co. v. The Rowe Companies,*
    2007 WL 656897 (E.D. Va.)...................................................................... 10

*Praxis Props., Inc. v. Colonial Sav. Bank, S.L.A.*, 947 F.2d 49 (3d Cir. 1991) ............................. 13

*Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984).................................... 13

*In re PWS Holding*, 228 F.3d 224 (3d Cir. 2000) .................................................. 14, 15

*Reschini v. First Federal Savings And Loan Association Of Indiana,*
   46 F.3d 246 (3d Cir. 1995)............................................................................. 8

*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)................................................ 12

*Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) ................................. 12

*RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*
   16 F.3d 552 (3d Cir. 1994) (*in banc*) ......................................................... 7

*Sonsa v. Iowa,* 419 U.S. 393 (1975) ......................................................................... 10

*Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978 (1998)...................................................... 9

*In re Zenith Elecs. Corp. v. Official Comm. Of Equity Sec. Holders,*
   329 F.3d 338 (3d Cir. 2003)................................................................................. 15

## STATUTES

11 U.S.C. § 366............................................................................................ *passim*

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether the Appeal should be dismissed as being constitutionally moot.

2.  Whether the Appeal should not be dismissed on constitutional mootness grounds because the issues presented in the Appeal are "capable of repetition, yet evading review."

3.  Whether the Appeal should be dismissed on equitable mootness grounds.

## SUMMARY OF ARGUMENT

In entering the Final Utility Order, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") did not follow the requirements of amended Section 366 of the Bankruptcy Code. Section 366 was amended, effective October 2005, by adding subsection (c), which applies to Chapter 11 bankruptcy cases. Section 366(c)(1) sets forth what adequate assurance of payment means and Section 366(c)(2) provides that a utility may alter, refuse or discontinue service to a debtor if the utility does not receive adequate assurance of payment from the debtor that is satisfactory to the utility within 30 days of the petition date. Pursuant to Section 366(c)(3), the Debtor, after notice and a hearing, may move the Bankruptcy Court to modify the amount of assurance of payment under Section 366(c)(2).

There is no dispute that the foregoing requirements of Section 366(c) were not followed by the Bankruptcy Court. Accordingly, New England Gas Company and Narragansett Electric Company's (collectively, "National Grid") rights under Section 366(c) of the United States Bankruptcy Code were violated. Specifically, National Grid's rights under Section 366(c) were first violated with the entry of the Bridge Order on December 20, 2006 that granted, in part, the Utility Motion filed by the Debtors on December 19, 2006. *Appendix In Support Of Opening*

1

*Brief* at tabs 1 and 4. As a result of the foregoing violation, National Grid was forced to retain counsel and attend a hearing on January 11, 2007 to contest the violation of its rights. Despite the foregoing, the Bankruptcy Court again chose to ignore the requirements of Section 366(c) and entered the Final Utility Order that is the subject of this appeal. All of the foregoing was done in a case involving a mere 17 utility companies.

The action of the Bankruptcy Court was not an isolated incident. In fact, at the January 11, 2007 hearing, the Debtors asked the Court to grant the relief in the Utility Motion based on the fact that the Bankruptcy Court had entered similar orders on an either an *ex parte* or expedited basis in several other cases.fn1 In fact, the Bankruptcy Court in cases subsequent to the entry of the Final Utility Order in this case has continued to enter orders that are in violation of the requirements of Section 366(c) and the rights of utility companies. *See Transcript Of First Day Motions Judge Brendan L. Shannon United States Bankruptcy Judge* in the *Pac-West Telecom, Inc.*, Case No. 07-10562 at pages 35, 36 **(Attached as Exhibit 1)**; and *Transcript Of First Day Hearing Before Honorable Peter J. Walsh United States Bankruptcy Judge* in the *Tweeter Home Entertainment Group, Inc., et. al.,* Case No. 07-10787 at pages 11 to 17 **(Attached as Exhibit 2)**; *see also ABI Journal* article, *"Utilities after BAPCPA: What's Changed?, "* March 2007 **(Attached as Exhibit 3),** which provides:

> It could be safely assumed that utility providers were jumping for joy with the enactment of § 366(c) of the Bankruptcy Code, which easily could be read to put utility providers in the driver's seat when negotiating and determining adequate assurance of future payment. . . . But most bankruptcy courts have not allowed utility providers to dicate the terms of assurance of future payment. It appears that most bankruptcy courts have continued following the pre-BAPCPA practice and procedure.

---

1 National Grid objected to the introduction of these other orders on relevance grounds. The Bankruptcy Court did not address the merits of the objection because the Debtors never moved the foregoing orders into evidence.

*and also Pratt's Journal of Bankruptcy Law* article, *"BAPCPA: Review and Analysis of*

*Business Bankruptcy Provisions After One Year,"* January/February 2007 **(Attached as Exhibit**

**4)**, at p. 490, which provides:

> Somewhat surprisingly, the post-Reform Act utility order to date look remarkably like the pre-Reform Act utility orders despite the change in the law. . . [P]rocedures seem to have been adopted in major Delaware and New York cases that have been approved by courts with little variation. [citations omitted].
>
> In each of the cases, the debtor proposed a detailed process for utilities to contest a deposit equal to two weeks of utility service charges (or, in some cases, 50 percent of the total monthly invoices) as "adequate assurance." Among other things, for the utility to challenge what is effectively a presumption of "adequate assurance," the procedures require the utility to serve a written request that sets forth a summary of the debtors' payment history – despite that (sic) fact that new Section 366(c)(3) expressly prohibits a court from considering payment history in evaluating adequate assurance – and, while the challenge is being considered, the utility is required to continue to provide service. Although utilities objected in many of the cases, each bankruptcy court, with little fanfare and even less in terms of a written explanation, granted the debtor's motion.

National Grid filed this Appeal to have the Bankruptcy Court's Final Utility Order

reversed and found to be in violation of the requirements of Section 366(c) and National Grid's

rights under Section 366(c). In response, the Debtors filed a motion to dismiss the appeal on the

grounds that because their Plan has been confirmed, the Appeal is moot on either constitutional

or equitable grounds. As discussed herein, five issues in this Appeal are not moot under either

constitutional or equitable mootness grounds, and even if the issues in this Appeal could be

considered moot, the "capable of repetition, yet evading review" exception applies.

Regarding the issue of constitutional mootness, National Grid acknowledges that its

request that this Court order the Bankruptcy Court to order the Debtors to pay the two-month

deposits requested by National Grid is moot because the Plan has been consummated. However,

3

the fact that the Plan has been consummated with the Debtors emerging from bankruptcy protection has no impact whatsoever upon this Court's ability to provide National Grid with "effective relief" as to all five issues on appeal – all five of which request a ruling by this Court that the Bankruptcy Court violated the requirements of Section 366(c) and National Grid's rights under Section 366. Accordingly, this Court should reverse the Final Utility Order because: (1) it was contrary to the requirements of Section 366(c); (2) violated National Grid's rights under Section 366(c); and (3) caused National Grid to incur unnecessary fees and expenses that it should not have had to incur had the Debtors and the Bankruptcy Court followed the requirements of Section 366(c). A ruling in favor of National Grid by this Court would certainly provide them with "some effective relief," and as such, their Appeal is not constitutionally moot. *See In re Continental Airlines*, 91 F.3d 553, 558 (3d Cir. 1996) (if a court can impose at least one of the remedies enumerated by the appellant, and thereby provide it "some effective relief," the appeal is not moot).

The five issues in this Appeal are not equitably moot because there is no evidence that granting the relief requested in this Appeal concerning National Grid's rights under Section 366 that were violated by the Bankruptcy Court would unravel the Debtors' Plan, especially since National Grid acknowledges that their request that this Court order the Bankruptcy Court to order the Debtors to pay the two-month deposits requested by National Grid would be moot as a result of Plan confirmation.

Furthermore, even if either the constitutional or equitable mootness doctrines may be applicable in this Appeal, the "capable of repetition, yet evading review" exception to the mootness doctrine is applicable with respect to all five issues on appeal. Regarding the first

4

factor of whether "the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration," National Grid has evidence in the form of the two attached charts **(Attached as Exhibit 5)** reflecting (i) *Recent Chapter 11 Cases With Prompt Plan Confirmation Dates* and (ii) *Recent Chapter 11 Cases: Expedited Sale Cases.* Those two charts reflect that the opportunity for appellate review of Section 366 issues, such as those set forth in the instant Appeal, prior to a plan being consummated or prior to an expedited sale of assets are being continually evaded. Indeed, as one commentator noted regarding the recent number of so-called prepackaged or pre-negotiated bankruptcy filings, "[a]ssuming the requisite acceptances are obtained, the company can file chapter 11, skip most of the preliminary and intermediate steps of the chapter 11 process, and request the immediate scheduling of a hearing on confirmation of the plan." *"Prepackaged Bankruptcy Filings, A Harbinger of Practice Under the New Law,"* Debt, July/August 2006, Nicholas F. Kajon, Esq. **(Attached as Exhibit 6)**; *see also Pratt's Journal of Bankruptcy Law* article, *"BAPCPA: Review and Analysis of Business Bankruptcy Provisions After One Year,"* January/February 2007 **(Attached as Exhibit 4),** at p. 523, which stated:

> [The] change to the Bankruptcy Code [pursuant to the BAPCPA], taken in conjunction with the shortening of the exclusivity period provided in Section 1121, makes the filing of a pre-packaged plan by a debtor more enticing. Some evidence suggests that this enticement has worked. In a June 29, 2006 article, the Daily Bankruptcy Review reported that a study [examining cases with $50M or more in debt] found that pre-packaged plans increased after the [BAPCPA] provisions took effect by 17 percent (from 16 percent to 33 percent) of all Chapter 11 cases filed. . .

Based upon the new fast-track plan confirmation trend and expedited asset sales trend, it is clear that the Debtors' claim that "opportunities abound for [the issues in this Appeal] to be litigated in other cases pending in the District of Delaware and elsewhere" (Motion To Dismiss at p. 18) is not correct.

5

In addition, National Grid can satisfy the second "capable of repetition, yet evading review" factor of whether "there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again" because there is a reasonable expectation that National Grid will be and has been subjected in the future to the same Section 366 violations committed by the Bankruptcy Court in the underlying bankruptcy matter. For instance, during the final hearing on the Utility Motion, the Debtors identified other bankruptcy cases filed in this District where procedures in violation of Section 366 that are the subject of this Appeal, were improperly approved by the Bankruptcy Court in contravention of Section 366, and reflect that the Bankruptcy Court in this District is not following the express provisions of Section 366 of the Bankruptcy Code. Final Hear. Tr. at p. 45, lines 16-19. Indeed, as discussed in the ABI Journal article, *"Utilities after BAPCPA: What's Changed?,"* March 2007 (**Attached as Exhibit 3**) and in *Pratt's Journal of Bankruptcy Law* article, *"BAPCPA: Review and Analysis of Business Bankruptcy Provisions After One Year,"* January/February 2007 (**Attached as Exhibit 4**), at p. 490, bankruptcy courts have ignored the new provisions of Section 366 and continue to follow the pre-BAPCPA practice and procedure. It is hypocritical of the Debtors to even contend that the Bankruptcy Court's procedures that are the subject of the five issues in this Appeal and which resulted in the entry of the Final Utility Order, will never arise in the future as to National Grid, especially since the charts attached as **Exhibit 5** provide otherwise. Accordingly, the "capable of repetition, yet evading review" exception to the mootness doctrine is applicable with respect to all five issues in this Appeal.

Based upon premises set forth herein, the Motion To Dismiss should be denied.

6

**STATEMENT OF FACTS**

National Grid's *Opening Brief*, including but not limited to the Procedural History

Factual Background set forth therein, is incorporated herein by reference in its entirety.

Additionally, on May 24, 2007, the Bankruptcy Court entered the *Findings of Fact, Conclusions*

*of Law and Order Confirming First Amended Joint Chapter 11 Plan of Reorganization For*

*Amtrol Holdings, Inc., Amtrol Inc., Water Soft Inc. and Amtrol International Investments Inc.,*

*Proposed By The Official Committee of Unsecured Creditors and the Debtors.*

**ARGUMENT**

**A.      The Appeal Should Not Be Dismissed As Being Constitutionally Moot.**

Constitutional mootness refers to the case or controversy requirement of Article III to the

United States Constitution and it arises where events have taken place during the pendency of the

appeal that make it impossible for the court to grant "any effectual relief whatever." *In re*

*Continental Airlines*, 91 F.3d 553, 338 (3d Cir. 1996).  However, an appeal is not

constitutionally moot "merely because a court cannot restore the parties to the *status quo ante*.

Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially

redresses the grievances of the prevailing party, the appeal is not moot." *In re Continental*

*Airlines,* 91 F.3d at 558, *citing RTC v. Swedeland Dev. Group, Inc. v. United States (In re*

*Swedeland Dev. Group, Inc.),* 16 F.3d 552, 560 (3d Cir. 1994) (*in banc*), *quoting Church of*

*Scientology,* 506 U.S. 9, 12-14, 113 S.Ct. 447, 450 (1992).  In *Continental Airlines*, the Third

Circuit noted their conclusion in *Isidor Paiewonsky Associates, Inc. v. Sharp Properties, Inc.*,

998 F.2d 145, 152 (3d Cir. 1993) that because they could impose at least one of the remedies

enumerated by the appellant, and thereby provide it "some effective relief," the appeal is not

7

moot. *Id.* Moreover, "it is the court's obligation to grant the relief to which the prevailing party

is entitled whether it has been specifically demanded or not." *Reschini v. First Federal Savings*

*And Loan Association Of Indiana*, 46 F.3d 246, 249 (3d Cir. 1995) *quoting Kirby v. United*

*States Dep't of Housing & Urban Dev.*, 745 F.2d 204, 207 (3d Cir. 1984).

The Debtors contend that the Appeal is constitutionally moot because (i) reversal of the

Final Utility Order would not provide National Grid with "any effectual relief whatever" because

"the Debtors have substantially consummated their Plan and have emerged from bankruptcy,"

(ii) the Final Utility Order is "effectively moot," and (iii) any decision of this Court finding that

the Final Utility Order was not in compliance with Section 366 or finding that the Bankruptcy

Court violated the procedural mandates of Section 366 would be tantamount to an advisory

opinion. (Brief of Appellees at p. 14-15).

National Grid acknowledges that its request to order the Debtors to pay the two-month

deposits requested by National Grid would be moot because the Plan has been consummated.

However, the fact that the Plan has been consummated with the Debtors emerging from

bankruptcy protection has no impact whatsoever upon this Court's ability to provide National

Grid with "effective relief" as to all five issues on appeal – all five of which request a ruling by

this Court that the Bankruptcy Court's entry of the Bridge Order the Final Utility Order: (1)

violated the requirements of Section 366(c); and (2) National Grid's rights under Section 366.

In connection with the foregoing, this Court could award National Grid costs and expenses it

incurred as a result of the Debtors' violation of its rights under Section 366(c).

Moreover, because the Bankruptcy Court did not apply the correct legal standard in

making its determination of adequate assurance of payment, the Court could provide National

8

Grid with effective relief by setting forth the correct legal standard for a motion filed under

Section 366(c)(3). Specifically, the correct legal standard for a debtor's motion filed under

Section 366(c)(3) is that the debtor bears the burden of proof and they must present evidence as

to why the amount of adequate assurance of payment established by the utility under Section

366(c)(2) must be modified. As set forth in National Grid's Opening Brief, the Bankruptcy

Court incorrectly held that the standard was that the Debtors had the burden to establish that

National Grid was being provided with adequate assurance of payment. *Opening Brief at* page

20. Absent a reversal of the Final Utility Order, the Bankruptcy Court may continue to apply the

incorrect legal standard to motions filed under Section 366(c)(3).

Therefore, because all five of National Grid's issues presented on appeal request a ruling

by this Court that concern whether the Bankruptcy Court violated National Grid's rights under

Section 366, and the reversal of the Final Utility Order as to National Grid only, a ruling in favor

of National Grid by this Court would certainly provide National Grid with "some effective

relief." *See In re Continental Airlines,* 91 F.3d at 558 (if a court can impose at least one of the

remedies enumerated by the appellant, and thereby provide it "some effective relief," the appeal

is not moot).

> **B.      The Appeal Should Not Be Dismissed On Constitutional Mootness Grounds
> Because the Issues Presented in the Appeal Are "Capable of Repetition, Yet
> Evading Review."**

An exception to the mootness doctrine is whether the issues presented on appeal are

"capable of repetition, yet evading review." *Murphy v. Hunt,* 455 US. 478, 482 (1982); *see also*

*Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988 (1998). When an appellate court cannot

change the factual outcome of a matter on appeal due to a change in circumstances during the

pendency of the appeal, the "capable of repetition, yet evading review" exception to the

mootness doctrine allows an appellate court to overturn a lower court decision without concern

as to whether the appellate ruling would be advisory.

The "capable of repetition, yet evading review" exception to the mootness doctrine is

applicable in appeals involving the following two elements: "(1) the challenged action [is] in its

duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a

reasonable expectation that the same complaining party [will] be subjected to the same action

again." *Id.*, *citing Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 187 (1979);

*Sonsa v. Iowa*, 419 U.S. 393 (1975).  Both factors are present in the instant Appeal.

The Debtors contend that National Grid cannot assert the "capable of repetition, yet

evading review" exception because National Grid purportedly cannot show that future

bankruptcy cases will consummate plans within a short time-period following the filing of the

petition. (Motion To Dismiss at pp. 17-18).  The Debtors also rely upon *Potomac Electric*

*Power Co. v. The Rowe Companies*, 2007 WL 656897 (E.D. Va.) in support of their contention

that National Grid cannot assert the "capable of repetition, yet evading review" exception.  In

*Potomac Electric Power Co.*, the Court held that the appellants failed to show that future,

similarly situated chapter 11 debtors would sell assets and cease operations as quickly as the

debtors in that case.

Unlike the appellants in *Potomac Electric Power Company*, National Grid has produced

evidence in the form of the two attached charts (**Attached as Exhibit 5**) reflecting (i) *Recent*

*Chapter 11 Cases With Prompt Plan Confirmation Dates* and (ii) *Recent Chapter 11 Cases:*

*Expedited Sale Cases*.  Those two charts reflect that the opportunity for appellate review of

Section 366 issues, such as those set forth in the instant Appeal, prior to a plan being

consummated or prior to an expedited sale of assets, are being continually evaded. *See also*

*"Prepackaged Bankruptcy Filings, A Harbinger of Practice Under the New Law," Debt,*

July/August 2006, Nicholas F. Kajon, Esq. **(Attached as Exhibit 6)**; *and also Pratt's Journal of*

*Bankruptcy Law* article, *"BAPCPA: Review and Analysis of Business Bankruptcy Provisions*

*After One Year,"* January/February 2007 **(Attached as Exhibit 4),** at p. 523. Accordingly, based

upon the new fast-track plan confirmation trend and expedited asset sales trend, the Debtors'

bald claim that "opportunities abound for [the issues in this Appeal] to be litigated in other cases

pending in the District of Delaware and elsewhere" (Motion To Dismiss at p. 18) is without

merit. Therefore, National Grid has satisfied the first requirement of the "capable of repetition,

yet evading review" exception to the mootness doctrine.

National Grid also has satisfied the second requirement of the "capable of repetition, yet

evading review" exception because there is a reasonable expectation that National Grid will be

subjected in the future to the same Section 366 violations committed by the Bankruptcy Court in

the underlying bankruptcy matter. Indeed, during the final hearing on the Utility Motion, the

Debtors even identified other bankruptcy cases filed in this District where procedures in

violation of Section 366 that are the subject of this Appeal, were improperly approved by the

Bankruptcy Court in contravention of Section 366. Final Hear. Tr. at p. 45, lines 16-19.

Moreover, as set forth in the attached transcripts, the Bankruptcy Court's avoidance of the

requirements of Section 366(c) and the entry of orders violating the rights of utilities under

Section 366 have become "routine." *See Transcript Of First Day Motions Judge Brendan L.*

*Shannon United States Bankruptcy Judge* in the *Pac-West Telecom, Inc.*, Case No. 07-10562 at

11

pages 35, 36 **(Attached as Exhibit 1)**; and *Transcript Of First Day Hearing Before Honorable Peter J. Walsh United States Bankruptcy Judge* in the *Tweeter Home Entertainment Group, Inc., et. al.,* Case No. 07-10787 at pages 11 to 17 **(Attached as Exhibit 2);** *see also ABI Journal* article, *"Utilities after BAPCPA: What's Changed?,"* March 2007 **(Attached as Exhibit 3);** *and also Pratt's Journal of Bankruptcy Law* article, *"BAPCPA: Review and Analysis of Business Bankruptcy Provisions After One Year,"* January/February 2007 **(Attached as Exhibit 4).** Furthermore, National Grid has been the subject of a recent Bankruptcy Court Order that violated the requirements of Section 366(c) in *In re Tweeter Home Entertainment Group, Inc.,* JA Case No. 07-10787 **(Order Attached as Exhibit 7).** Therefore, there is a reasonable expectation that National Grid will be subjected to the same violations of Section 366 by the Bankruptcy Court in this District in the future.

The Debtors, without citation to applicable Third Circuit Court of Appeals authority, also contend that there is a third element to the "capable of repetition, yet evading review" exception to the mootness doctrine that is not satisfied, i.e., that National Grid will be subjected to the same action by the Debtors (that the same parties may be subject to the same action in the future). However, as noted by Justice Scalia in his dissent in *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed. 2d 686 (1988), the *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and some election law decisions, *e.g., Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), differed from the Court's normal mootness jurisprudence by "dispensing with the same-party requirement entirely." *Honig*, 484 U.S. at 335, 108 S.Ct. 592 (Scalia, J., dissenting).

The Third Circuit decision of *Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313

(3d Cir. 2004) is an example where a court dispensed with the same-party requirement entirely.

In *Lorillard*, the Third Circuit held that with respect to the "capable of repetition, yet evading review" exception to the mootness doctrine:

> "[W]hat matters with respect to mootness is whether the party seeking the order can demonstrate that it is likely to request such orders in the future against *some* defendant (not necessarily the *same* defendant). At bottom, "capable of repetition, yet evading review" is a pragmatic exception that tempers the mootness doctrine in situations where denial of appellate review works a hardship on the parties. When there is only one party exposed to such hardship . . .it seems needlessly inflexible to say that that party must demonstrate that it will again confront the same defendants. Lorillard has amply demonstrated that cigarette counterfeiting is a serious and widespread problem for it . . . Thus we conclude that the appeals fall within the 'capable of repetition, yet evading review' exception to mootness." c*iting* *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 602-03, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Praxis Props., Inc. v. Colonial Sav. Bank, S.L.A.*, 947 F.2d 49, 61-62 (3d Cir. 1991); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1065-66 (3d Cir. 1984); *Luther v. Molina*, 627 F.2d 71, 73-74 (7th Cir. 1980).

As in the Third Circuit decision in *Lorillard*, in the instant Appeal there is only one party – National Grid -- that will be exposed to the "hardships" complained on in this Appeal, i.e., the Bankruptcy Court's violations of Section 366 that are set forth in the five issues on Appeal. Indeed, because the Debtors' Plan has been confirmed and they have emerged from bankruptcy protection, if this Court ruled in favor of National Grid as to all five issues on Appeal, no hardship whatsoever would befall the Debtors, who even concede that the Final Utility Order is effectively moot as to them (Motion To Dismiss at p. 15). Accordingly, based upon the facts of this matter, the Court should not invoke a third element to the "capable of repetition, yet evading review" exception to the mootness doctrine, i.e., that National Grid will be subjected to the same action by the Debtors.

Based upon the foregoing, even if constitutional mootness is applicable, which National

13

Grid denies, the "capable of repetition, yet evading review" exception to the mootness doctrine is applicable with respect to all five issues in this Appeal. Accordingly, the Appeal should not be dismissed on mootness grounds.

### C.    The Appeal Should Not Be Dismissed On Equitable Mootness Grounds.

Under the doctrine of "equitable mootness," an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable. *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996). "[W]hen a court can fashion some form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." *In re Aurora Foods Inc.*, 2006 WL 3747306 at p. 3 (D. Del. 2006), *citing Continental Airlines*, 91 F.3d at 558. The Third Circuit in *In re Continental* established five factors to consider when evaluating equitable mootness:

(1)  whether the plan has been substantially consummated;

(2)  whether a stay has been obtained;

(3)  whether the relief requested would affect the rights of parties not before the Court;

(4)  whether the relief requested would affect the success of the plan; and

(5)  the public policy of affording finality to bankruptcy judgments.

*In re Continental*, 203 F.3d at 560. The five factors are given varying weight, depending on the particular circumstances. *Nordhoff Investments, Inc. v. Zenith Electronics Corp.*, 258 F.3d 180, 185 (3d Cir. 2001), *quoting In re PWS Holding*, 228 F.3d 224, 236 (3d Cir. 2000). In effect, the equitable mootness doctrine prevents a court from unscrambling a complex bankruptcy reorganization when the appealing party should have acted before the plan became extremely difficult to retract. *Id.*

14

1.    **Whether the Plan Has Been Substantially Consummated**

As this Court stated in *Aurora Foods Inc.*, satisfaction of the "substantially consummated" factor is only the first step in applying that factor. *In re Aurora Foods Inc.*, 2006 WL 3747306 at p. 3, *citing In re Zenith Elecs. Corp. v. Official Comm. Of Equity Sec. Holders*, 329 F.3d 338, 344 (3d Cir. 2003). In *Aurora Foods Inc.*, this Court held that although the plan was substantially consummated in a definitional sense, there was no evidence that the appellant's claim would unravel the reorganization plan, and therefore, the appeal was not equitably moot. *Id.* at 4. In support of that holding, this Court in *Aurora Foods Inc.* noted that like the case of *In re PWS Holding Corp.,* 228 F.3d 224 (3d Cir. 2000) (holding that the appeal was not equitably moot because it would not unravel the debtor's reorganization), but unlike the *Continental Airlines* case where granting the appeal would unravel the plan, the debtor did not offer sufficient evidence that the appeal would unravel the reorganization plan. *Id.*

As in the *Aurora Foods Inc.* case, there is no evidence whatsoever that granting National Grid's requested relief in this Appeal would unravel the Plan, especially since National Grid acknowledges that its request that this Court order the Bankruptcy Court to order the Debtors to pay the two-month deposits requested by National Grid would be moot because the Plan has been consummated. The Plan clearly would not unravel if this Court ruled in favor of National Grid as to all five issues presented on appeal that concern whether the Bankruptcy Court violated National Grid's rights under Section 366, and reversed the Final Utility Order as to the National Grid only.

2.    **Reliance on Confirmation By Parties Not Before the Court**

In addition to the first two elements, i.e. (i) substantial consummation of the plan and (ii)

whether a stay was obtained, "high on the list of prudential considerations taken into account by

courts considering whether to allow an appeal following a consummated reorganization is the

reliance by third parties, in particular investors, on the finality of the transaction." *Nordhoff*

*Investments*, 258 F.3d at 188, *quoting In re Continental*, 91 F.3d at 562. The "concept of

mootness from a prudential standpoint protects the interests of non-adverse third parties who are

not before the reviewing court but who have acted in reliance on the plan as implemented." *Id.*

The relief sought by National Grid only concerns its rights under Section 366 that were violated

by the Bankruptcy Court, and has no impact whatsoever upon non-adverse third parties.

### 3.    Whether the Relief Requested Would Affect the Success of the Plan

The fourth factor is whether the appellant's concerns could be remedied without

unraveling the entirety of the plan or whether they seek to "knock the props out from under the

authorization for every transaction that has taken place and create an unmanageable,

uncontrollable situation for the Bankruptcy Court." *Nordhoff Investments*, 258 F.3d at 189,

*quoting In re Chateaugay Corp.*, 10 F.3d 944, 952 (2d Cir. 1993). As previously discussed,

there is no evidence whatsoever that granting National Grid's requested relief in this Appeal

would unravel the Plan.

### 4.    General Public Policy Affording Finality to Bankruptcy Judgments

Because the relief sought by National Grid would not unravel the Plan or otherwise have

an impact upon non-adverse third parties, the "general public policy factor" does not weigh in

favor of dismissing the Appeal on equitable mootness grounds. Moreover, National Grid

contends that public policy would be benefited if this Court were to reverse the Final Utility

Order and set forth the correct legal standard for pleadings filed under Section 366(c)(3).

16

For the foregoing reasons, the Appeal should not be dismissed on equitable mootness grounds.

## CONCLUSION

For all of the foregoing reasons, this Court should deny the Debtors' Motion To Dismiss Appeal.

Dated:  June 29, 2007

STEVENS & LEE, P.C.

/s/ John D. Demmy
John D. Demmy (I.D. No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware  19801
Phone:  (302) 425-3308
Fax:  (610) 371-8515
E-mail: jdd@stevenslee.com

-and-

Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, VA 23103
Phone:  (804) 749-8861
Fax:  (804) 749-8862

*Counsel for Appellants New England Gas Company
and Narragansett Electric Company, both d/b/a
National Grid*

17

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              )   Case No. 07-10562 (BLS)
                                    )   Chapter 11
PAC-WEST TELECOMM, INC.,            )
et al.,                             )
                                    )   Courtroom No. 1
                                    )   824 Market Street
                        Debtor.     )   Wilmington, Delaware 19801
                                    )
                                    )
                                    )   May 2, 2007
                                    )   10:21 A.M.

TRANSCRIPT OF FIRST DAY MOTIONS
JUDGE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Saul Ewing, LLP
                            By:  NORMAN PERNICK, ESQ.
                                 JEREMY RYAN, ESQ.
                            222 Delaware Avenue, Suite 1200
                            P.O. Box 1266
                            Wilmington, Delaware 19899

                            Jenner & Block LLP
                            By:  MELISSA HINDS, ESQ.
                                 MICHAEL TERRIEN, ESQ.
                                 PHILLIP NELSON, ESQ.
                            330 N. Wabash
                            Chicago, Illinois 60611

ECRO:                       Jason Smith

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

---

## TRANSCRIPTS PLUS
435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail CourtTranscripts@aol.com

215-862-1115     (FAX) 215-862-6639

2

APPEARANCES:
(Continued)

For PAC West Funding          Pachulski Stang Ziehl Young
Co., LLC:                     Jones & Weintraub
                              By:  TIMOTHY P. CAIRNS, ESQ.
                              919 North Market Street, 16th Floor
                              Post Office Box 8705
                              Wilmington, Delaware 19899-8705

                              Pachulski Stang Ziehl Young
                              By:  ROBERT FEINSTEIN, ESQ.
                              780 Third Avenue 36th Floor
                              New York, New York 10017-2024

For AT&T:                     Potter Anderson & Corroon, LLP
                              By:  LAURIE SELBER SILVERSTEIN, ESQ.
                                   GABRIEL R. MACCONAILL, ESQ.
                              Hercules Plaza, P.O. Box 951
                              1313 N. Market Street
                              Wilmington, Delaware 19899-0951

For Wells Fargo:              Arent Fox LLP
                              By:  LEAH EISENBERG, ESQ.
                              1675 Broadway, 25th Floor
                              New York, New York 10019

For Merrill Lynch             Monzack & Monaco
Capital:                      By:  JOSEPH BODNAR, ESQ.
                              1201 N. Orange Street, Suite 400
                              Wilmington, Delaware 19801

                              Latham & Watkins LLP
                              By:  CAROLINE RECKLER, ESQ.
                              Sears Tower, Suite 5800
                              Chicago, Illinois 60606

The U.S. Trustee:             Office of the U.S. Trustee
                              By:  RICHARD L. SCHEPACARTER, ESQ.
                              844 King Street
                              Wilmington, Delaware 19899

For Verizon, et al:           Arnall Golden Gregory LLP
                              By:  DARRYL LADDIN, ESQ.
                              171 17th Street NW Suite 2100
                              Atlanta, Georgia 30363-1032

3

APPEARANCES:
(Continued)

For Kelley Drye &            Kelley Drye & Warren, LLP
Warren, LLP:                 By:  ERIC WILSON, ESQ.
                             101 Park Avenue
                             New York, New York 10178

4

INDEX

AGENDA ITEMS                                                      PAGE

Item 2     Interim compensation motion                            6*
Item 9     CXO retention                                          6*
Item 13    Lease rejections                                       6*
Item 1     Joint administration motion                           11
Item 3     motion of the debtors for authority to
           pay certain obligations to its employees              13
Item 4     Bank account and cash management motion               18
Item 5     Pre-petition taxes                                    20
Item 6     Pre-petition customer obligations                     21
Item 7     Essential suppliers motion                            21
Item 8     Motion to continue payments under
           insurance financing agreement                         31
Item 10    Motion approving and authorizing
           appointment of Kurtzman Carson Consultants            32
Item 11    Utilities motion                                      35
Item 12    DIP financing motion                                  47

*Put out on notice

1  order.  I'm not sure -- we'll submit it later today, I think.

2              THE COURT:  I'll look for it under certification.

3              MR. TERRIEN:  Thank you, Your Honor.

4              THE COURT:  Okay.  Next item is Agenda Item Number

5  11, which was the utilities -- which one is that in the binder?

6  15.

7              MR. TERRIEN:  Okay.  This is our utilities motion, a

8  motion that's routine in so many cases, and a bigger deal when

9  you're a CLEC.  We have really two -- two sides to the relief

10  we're seeking in the utilities motion:

11             The one side is what I think we called end user

12  utilities, or something like that.  This is the people who

13  bring the power and lights and heat and what not into our

14  offices.  And --

15             THE COURT:  A small fraction of it.

16             MR. TERRIEN:  A very small fraction.  And we propose

17  to treat them the way I understand is pretty standard.  I think

18  it's a two-week deposit for those utility services.

19             THE COURT:  Right.

20             MR. TERRIEN:  And -- and that -- that, we think,

21  adequately assures them.  I think the Courts in this District

22  have routinely found that that adequately assures utilities in

23  that kind of a position.

24             THE COURT:  And their rights are fully reserved to

25  come in --

36

1     MR. TERRIEN:  Yes.

2     THE COURT:  -- contend that it's inadequate and --

3     MR. TERRIEN:  Absolutely.

4     THE COURT:  -- we'll move forward.

5     MR. TERRIEN:  There's -- there are -- there are two

6  separate provisions we've made available.  One is the sort of

7  send us a letter and we'll negotiate route.  And the other is

8  file an objection and, you know, we'll either negotiate it out

9  or bring it before Your Honor.  And all these utilities have

10  that option under this order.

11     The other side that's just much more significant in

12  terms of the dollars involved is the circuit providers, the

13  people we lease telecommunications lines and the ability to

14  transmit telecommunication services over lines from.  We pay

15  them -- and this -- this -- figuring on how -- what we were

16  going to propose to the Court was probably one of the hardest

17  things we did in preparing for this -- for this filing.

18     We pay for circuits generally, and that's what most

19  of this is -- involves -- in two ways.  We pay a fixed monthly

20  recurring charge for a circuit.  And we pay a usage charge that

21  varies with the volume of traffic that goes over a circuit.

22     The monthly recurring charges are paid typically in

23  advance.  They're known and they're paid.  And we believe that

24  we've paid for April.  We don't believe that any or certainly

25  any substantial portion of our ILEC utility providers should be

37

1  owed for monthly recurring charges for April --

2          THE COURT:  Are --

3          MR. TERRIEN:  -- they may differ but --

4          THE COURT:  -- they typically due on the first of the

5  month for the -- for the coming month?

6          MR. TERRIEN:  First few days.  I'm not sure if it's

7  actually one or two or three.  But, yeah, they're due --

8  they're due -- if you look at the budget again -- if you look

9  at the budget, Your Honor, we -- we call, for reasons that are

10  not entirely clear to me, payments to ILEC for line charges

11  COGS, cost of goods sold.

12          And if you look in the budget in week one, the week

13  ending 5/6, which is basically this week, you'll see a very

14  large payment in there, nearly $2 million.

15          And that reflects our intention to pay monthly

16  recurring charges in the first week of this case.

17          THE COURT:  Okay.

18          MR. TERRIEN:  The other side of the -- the other side

19  of the equation is the access charges, which, because they're

20  based on access, are -- not access, excuse me.  Usage.  Because

21  they're based on volume of usage, are necessarily billed in

22  arrears.  And on that side, there may be some pre-petition

23  amounts owed, quite possibly are.

24          But in any event, we've tried to put together a

25  package that our goal is to make sure that whatever we may have

38

1   owed them pre-petition, on a post petition basis, the utilities

2   don't become administrative creditors.  We try to keep them

3   ahead at all times.  And how it works on the MRC side or how we

4   propose it works on the MRC side is that we're -- we're going

5   to make our MRC payments basically in the ordinary course,

6   beginning of the case, which it's possible to do simply because

7   we filed on the 30th of the month and the new ones become due

8   beginning of the next month.

9       Middle of the month no what we call the effective

10  date in our motion, two weeks from today, we are going to top

11  that up a little bit by giving them basically a quarter of the

12  following month.  So, that even as the month runs down and we

13  get toward the end of the month, they never run -- they should

14  never run into a position where they're behind us.  They may

15  not be five weeks ahead of us, they may only be a week ahead of

16  us at the end of the month, but they never get behind us.

17      And so beginning of June, we'll make another MRC

18  payment, get them five weeks ahead.  Run it down to one week

19  ahead.  Following month, same thing.

20      On the usage charge side, slightly more difficult

21  because, as I say, those things are ordinarily paid in arrears.

22  And I think -- I think they're only ordinarily paid second to

23  third week of the month, I think that's one of those bills that

24  typically come in.

25      And -- so what we propose to do is, again, on the

1   effective date there, make a payment.

2           But in the case of the usage charges, which are much

3   smaller, they're 10, 11, 12 percent of the monthly recurring

4   charges, we're going to pay them for basically six weeks.

5   We're going to catch them up from the beginning of May until

6   mid-May.  We're going to pay them a month forward so that

7   they're four weeks ahead of us as of that date.  And then every

8   two weeks, we're going to give them another two weeks worth of

9   payments and keep them between two and four weeks ahead of the

10  usage charges the whole time.

11          We submit -- I mean 366 identifies -- deposits may be

12  more common.  But 366 identifies pre-payments as a valid form

13  of adequate assurance.  And if I were a utility and I had a

14  choice between having all my services paid for in advance or

15  having a two-week deposit that I could rely on if somebody

16  defaulted when they were four or six weeks behind on me, this

17  system is about the best adequate assurance one could get.  And

18  we'd ask the Court to bless it.

19          THE COURT:  Anyone wish to be heard?  Ms.

20  Silverstein?

21          MR. TERRIEN:  Oh --

22          THE COURT:  Yes, sir?

23          MR. TERRIEN:  Well, there was -- there was -- there's

24  somebody on the phone, I believe, for Verizon.

25          THE COURT:  Mr. Laddin.

1          MR. TERRIEN: Mr. Laddin. And, Mr. Laddin, none of

2    this -- none of what I said is to exclude what we discussed

3    earlier, but let's get through the basic stuff and then we'll

4    describe our -- what we agreed on.

5          MR. LADDIN: Fine, Your Honor. This is Darryl Laddin

6    of Arnall Golden Gregory on behalf of the subsidiaries of

7    Verizon Communications, Inc., Kathy Miller of Smith Katzenstein

8    and Furlow will be serving as my co-counsel in the case. I'll

9    wait to make my comments until after Mr. Terrien has finished

10   his presentation and Ms. Silverstein has spoken.

11         THE COURT: Very good. Ms. Silverstein?

12         MS. SILVERSTEIN: Thank you, Your Honor. Laurie

13   Silverstein, again, on behalf of AT&T for the record.

14         Your Honor, the motion itself does have several

15   options to it. And so it can accommodate us, I think, if we

16   want to proceed with the first option or go with the opt out.

17         THE COURT: Um-hum.

18         MS. SILVERSTEIN: And we will be talking with the

19   debtors, I assume, and Mr. Katzenstein has already spoken to me

20   this morning about wanting to sit down with my client.

21         I will note preliminarily, because there has been

22   some discussion, about the billing methods. And we'll have to

23   look specifically and talk to the operational billing people on

24   this.

25         But it may not necessarily be that the debtors

41

1    actually pay in advance for the monthly recurring charges.

2    They get billed in advance for those charges, your monthly bill

3    that anyone gets has a line charge that's billed in advance.

4    And the usage charge, which is billed in arrears. But unless

5    the debtors pay on the day they receive the invoice, and not on

6    the due date of the invoice, which could be 30 days out, they

7    may not actually be paying in advance.

8            THE COURT: Okay.

9            MS. SILVERSTEIN: And so, Your Honor, what I -- what

10   my client needs to do is to drill down on how this particular

11   arrangement is -- the arrangement with this particular debtor.

12   But it may be, in fact, that this adequate assurance is, in

13   fact, not.

14           In any event, I think we have a particular

15   circumstance. Obviously as even the debtors indicate, it's a

16   million two every month. I am not certain that the budget is

17   going to be sufficient when we get to that for the DIP motion.

18           And I would note in the proposed form of order,

19   Paragraph 10 provides that notwithstanding anything in this

20   order, or any payments Your Honor may order, everything is

21   subject to the budget.

22           So, if it's not in the budget, the debtor doesn't

23   propose to pay it. And I'm not sure that gives parties then

24   sufficient adequate assurance. So, again, a -- a budget issue,

25   Your Honor.

42

1          THE COURT:  Okay.

2          MS. SILVERSTEIN:  That being said, given that we have

3     the ability to negotiate and opt out and have a hearing before

4     Your Honor in 30 days, we don't object except with respect to

5     Paragraph 10 to inclusion of that paragraph in the -- the

6     order.

7          We believe if Your Honor orders it, it should get

8     paid.

9          Thank you.

10          THE COURT:  Mr. Laddin?

11          MR. LADDIN:  Yeah, thank you, Your Honor.  Your

12     Honor, Verizon -- just to give the Court a little bit of

13     perspective -- is owed approximately a million dollars pre-

14     petition.  And its monthly run rate is approximately $300,000 a

15     month.

16          To additionally add to what Ms. Silverstein had to

17     say with respect to Your Honor's questions concerning whether

18     bills are, in fact, prepaid for monthly recurring charges, I

19     believe it is the case with respect to those charges, as Ms.

20     Silverstein indicated, that those charges are billed in

21     advance, but not paid in advance.

22          So, that if a bill, for example, is issued on the

23     first of the month, it would not be due until the 30th of the

24     month after the services have all been used during that month.

25     So, it's not a traditional prepayment in that respect.

43

1    I have not seen the budget, so I can't comment on
2 what Ms. Silverstein had to say, or anyone else has had to say
3 with respect to the budget.  I will need to review that.
4    I have had conversations with Mr. Terrien and we've
5 agreed that our clients will speak regarding adequate
6 assurance.  And that the order that Your Honor enters today
7 initially will not apply to Verizon while our clients are
8 negotiating.  If they don't reach an agreement the next couple
9 of days, then the order would apply with Verizon electing to
10 opt out and we would file an objection and expect that to be
11 heard within the next 30 days at the next hearing.
12    THE COURT:  Okay.  Mr. Terrien?
13    MR. TERRIEN:  A couple of things I want to clarify
14 with respect to AT&T and Verizon.  First -- and these are just
15 so that the allegations don't go unrebutted, they don't need to
16 be resolved today.  We obviously have differences of views in
17 terms of what is owed pre-petition.  But that's a matter for
18 another day.
19    In addition, and I think this is sort of an important
20 point to clarify on the record.  As I said, the budget shows us
21 paying MRCs in fairly large dollar amounts for this company
22 today.  We are not asking for authority to pay pre-petition
23 amounts owed to these utilities.
24    So, whether what we paid on last April 1st was a
25 prepayment or a payment of something due from arrears, the

44

1  payment we're making this week is a prepayment for May.  We

2  don't want authority to pay pre-petition amounts owed to these

3  ILECs at this point.

4         So, even if the old regime was pay in arrears, this

5  is a new regime.  And -- and I don't think we're required to

6  adequately assure them for amounts that they were stuck with as

7  of the petition date.  We're required to adequately assure them

8  of future performance, which I think our proposed regime of

9  payments does.

10        Lastly, with respect to Verizon, what we've agreed to

11  -- and I think we need to put a time frame on it.  I think we

12  talked about 48 hours.  We want either an agreement with

13  Verizon or we want this interim order applicable to Verizon.

14        We did agree, and Mr. Katzenstein knows Mr. Linelle's

15  client quite well and -- Laddin, excuse me.  And they'll be

16  talking to each other over the course of the next couple of

17  days.  We want the order to automatically go into effect with

18  respect to Verizon, say, close of business Friday.  If we don't

19  file a notice that says Verizon is out of the order, and he's

20  absolutely right, the order provides for an opt out procedure.

21  And if they want to exercise that, they're welcome to.

22        But lastly, and we talked about this yesterday, I

23  don't think it's controversial.  We're in the 20-day period at

24  this time.  There are going to be no disconnects between now

25  and Friday or at any time between now and the end of the 20-day

45

1   period presumably from Verizon.  Otherwise, I think what he

2   said, roughly reflects our agreement.

3            THE COURT:  Okay.  I will enter the order approving

4   the procedures an on interim basis that the debtor has

5   proposed.

6            And I'd make an observation that I -- I think this is

7   a really creative approach to cut a knot that is unique to this

8   industry.  And so I think it's creative, I think it's helpful

9   and appropriate that there's an opt out procedure.  Clearly

10  their relationships with the -- with the ILECs and with those

11  service providers are the central focus of the debtors'

12  business.  And I'm confident that both Mr. Terrien and Mr.

13  Katzenstein have Verizon, AT&T and the other survivors -- the

14  other suppliers on speed dial.

15                    (Laughter)

16           THE COURT:  The other survivors, as I watch Ms.

17  Silverstein's client gobble up more and more of the industry.

18  That probably ought to be off the record.

19                    (Laughter)

20           THE COURT:  The -- so, I think that the -- the relief

21  that is requested is appropriate.

22           The only question that I'm -- and I'm prepared to

23  enter the interim order.  The only question that I'm not

24  certain of is exactly how Mr. Terrien and Mr. Laddin will

25  memorialize the current posture of Verizon.  Is the order going

1  to be modified so that they --

2          MR. TERRIEN:  I think -- I think we will modify --

3  what I proposed, and Mr. Laddin, correct me if I'm wrong, I

4  think we will modify the order to say the effect of this order

5  as to Verizon is stayed until five o'clock Eastern time Friday,

6  whatever the date is, the 4th or -- I've lost track of what day

7  of the week it is.

8          And -- and the -- and will be stayed permanently or

9  further to the extent the debtors and Verizon file a notice

10  that the stay is continuing.

11          MR. LADDIN:  That's fine.  And Friday is the 4th.

12          MR. TERRIEN:  Okay.

13          THE COURT:  Okay.  Then I'll look for a slightly

14  modified or revised form of order.  If the parties are

15  satisfied with the record, then I'll look for the order as it

16  currently stands and I'll let Mr. Terrien and Laddin deal with

17  that.

18          But otherwise, I'm satisfied with the relief and the

19  procedures that have been proposed, both as to the end users

20  and as to the ILECs and the circuit providers.  So --

21          MR. TERRIEN:  Mr. Laddin --

22          THE COURT:  -- I think we'll go from there.

23          MR. TERRIEN:  Mr. Ryan just asked me if -- is -- is

24  our confirmation of our understanding on the record sufficient?

25  And can we submit the order we have now?  Do you have a problem

47

1  with that?

2                    (No audible response heard)

3         MR. TERRIEN:  We may have lost him.

4         MR. LADDIN:  I think -- I tend to think we ought to

5  just have one sentence in the order that reflects that

6  agreement.

7         MR. TERRIEN:  That's -- that's fine.

8         THE COURT:  All right.  I'll look for that under

9  certification from the parties.  I expect I'll probably see

10  that this afternoon.

11         All right.  That covers the utilities motion.  Now

12  Agenda Item Number 12 is the DIP financing, is that correct?

13         MR. TERRIEN:  Well, Your Honor, the budget you have

14  before you is sort of the basis for the presentation on the DIP

15  financing, I think.  It has been approved by the lender.  And

16  the interim borrowing cap we are seeking is $2.5 million.

17         It doesn't -- these numbers have been scrubbed and

18  produced and prepared with more care and more energy and more

19  effort than I think I've ever seen a budget prepared in my

20  life.  And we -- we think this company has a chance of

21  reorganizing.

22         A lot of its problems are costs that it can get rid

23  of with the help of Chapter 11.  And I think CVC, or Pac-West

24  Funding believed this company can reorganize or they wouldn't

25  be here.

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              )    Case No. 07-10787 (PJW)
                                    )    Chapter 11
TWEETER HOME ENTERTAINMENT          )
GROUP, INC., et al.,                )    Courtroom No. 2
                                    )    824 Market Street
                    Debtors.        )    Wilmington, Delaware 19801
                                    )
                                    )    June 12, 2007
                                    )    4:33 P.M.


TRANSCRIPT OF FIRST DAY HEARING
BEFORE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:            Skadden Arps, Slate, Meagher & Flom
                           By:  GREGG GALARDI, ESQ.
                                MARK DESGROSSEILLERS, ESQ.
                                SARAH PIERCE, ESQ.
                           One Rodney Square, P.O. Box 636
                           Wilmington, Delaware 19899-0636

                           Goulston & Storrs
                           By:  JAMES WALLACK, ESQ.
                           400 Atlantic Avenue
                           Boston, Massachusetts 02110-3333

For Gordon Brother         Pepper Hamilton
Retail Partners:           By:  HENRY JAFFEE, ESQ.
                           Hercules Plaza, 1313 Market Street
                           Suite 5100, P.O. Box 1709
                           Wilmington, Delaware 19899-1709


ECRO:                      Brandon McCarthy

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

## TRANSCRIPTS PLUS
435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail CourtTranscripts@aol.com

215-862-1115     (FAX) 215-862-6639

2

Appearances:
(Continued)

For GECC:                          Richards Layton & Finger, PA
                                   By:  PAUL HEATH, ESQ.
                                        MARK COLLINS, ESQ.
                                   One Rodney Square, P.O. Box 551
                                   Wilmington, Delaware 19899

                                   Bingham McCutchen LLP
                                   By:  PATRICK TROSTLE, ESQ.
                                        ANNA BOELITZ, ESQ.
                                        BOB BARRY, ESQ.
                                   One State Street
                                   Hartford, Connecticut 06103

For Polk Industries:               Stevens & Lee, P.C.
                                   By:  JOSEPH H. HUSTON, JR., ESQ.
                                        THOMAS G. WHALEN, JR., ESQ.
                                   1105 North Market Street, 7th Floor
                                   Wilmington, Delaware 19801

                                   DLA Piper US LLP
                                   By:  DANIEL J. CARRIGAN, ESQ.
                                   1775 Wiehle Avenue, Suite 400
                                   Reston, Virginia 20190-5159

The U.S. Trustee:                  Office of the U.S. Trustee
                                   By:  MARK KENNEY, ESQ.
                                   844 King Street
                                   Wilmington, Delaware 19899

For Zurch:                         Eckert Seamans Cherin & Mellott, LLC
                                   By:  MARGARET ENGLAND, ESQ.
                                   300 Delaware Avenue, Suite 1210
                                   Wilmington, Delaware 19801

For Kimco Realty                   Law Offices of William A. Hazeltine
Corp.:                             By:  WILLIAM A. HAZELTINE, ESQ.
                                   110 West 9th Street, PMB 345
                                   Wilmington, Delaware 19801

For Centro Property                Ballard Spahr Andrews & Ingersoll
Group, Federal Realty              By:  LESLIE C. HEILMAN, ESQ.
Investment Trust:                  919 North Market Street, 12th Floor
                                   Wilmington, Delaware 19801

3

Appearances:
(Continued)

For Inland Commercial          Connolly Bove Lodge & Hutz, LLP
Property Management:           By:  CHRISTINA THOMPSON, ESQ
                              The Nemours Building
                              1007 North Orange Street
                              P.O. Box 2207
                              Wilmington, Delaware 19899

For Developers                 Kelley Drye & Warren LLP
Diversified Realty            By:  ROBERT LeHANE, ESQ.
Corporation:                  101 Park Avenue
                              New York, New York 10178

11

1          THE COURT:  Well, I had a question on Page 7, in

2    footnote, it refers to a former employee being entitled to in

3    excess of 10,000.

4          MR. GALARDI:  It is severance and we are not paying

5    that employee pursuant to this motion, Your Honor.  I think

6    that was just to make a reference that it was more than 10,000,

7    but it's not being paid.

8          THE COURT:  Okay.

9          MR. GALARDI:  Severance.

10         THE COURT:  Okay.

11         MR. GALARDI:  We can clarify in the order that that

12   employee will not receive that payment, if necessary.

13         THE COURT:  Okay.

14         MR. GALARDI:  I think, Your Honor, 7 -- Your Honor, 8

15   is not a standard motion.  The U.S. Trustee had no objection to

16   8, it's the utility motion.

17         Your Honor may recall in Radnor, we filed this

18   motion.  That provides, given the new bankruptcy law, we have

19   an obligation as a debtor to put forth security for the first

20   20 days.  Then after that 20 days, you have the right to

21   negotiate with the utility.  But whatever the utility says

22   goes, in essence, unless you get a court determination.

23         What we have done here -- and there is a modification

24   to the order, and I'll explain the basis of the modification --

25   is we did what we did in Radnor.  First, we are going to set

12

1 up a reserve at GE.  The number in the budget -- and maybe now

2 is a good time for me to hand up a budget as we go through some

3 of these papers.

4         May I approach, Your Honor?

5         THE COURT:  Yes.  Okay.  This -- is this the same

6 budget referenced in the DIP facility?

7         MR. GALARDI:  The DIP has a 13-week budget, Your

8 Honor, that goes out longer than this.  This was eight week.

9 Admittedly, the weeks after eight just get worse in the

10 negative.  So, we wanted to make sure that Your Honor was

11 aware.  And because of the kinds of information in there, we

12 thought it was sensitive.

13         So, the -- this is the same first eight weeks of that

14 budget, though.

15         THE COURT:  Okay.

16         MR. GALARDI:  Your Honor, what we have done is we

17 have, as I've mentioned, 150 stores.  The monthly utility bill

18 for all 150 stores is about $900,000.

19         When you go to -- but, as I've mentioned, and the --

20 50 of those stores will be closed by the end of June.  So,

21 within the first 20 days of the case, and the Bankruptcy Code

22 says I don't really have to do anything in the first 28 days of

23 the case on the case on adequate protection.

24         So, what we've done is then there's $600,000 as a

25 monthly expense.  So, what we did, as we did in Radnor, is we

13

1   put in a reserve that's being held by GE.  Money that the

2   debtors cannot touch in the amount of $300,000, which is

3   equivalent to two weeks of our monthly obligation for the rent.

4        We are offering that up as the Bankruptcy Code says

5   we must offer up something in the form of other security.  We

6   see it very much like the LC that we put up in Radnor, and that

7   that is being available to all utility companies.

8        It is also without prejudice to the utility companies

9   coming in within that 30 days and demanding, as some did in

10  Radnor, to ask for more.

11       THE COURT:  Okay.  I'm sorry.  What'd you say the

12  reserve is?

13       MR. GALARDI:  The reserve is now thirty -- $300,000,

14  I'm sorry.  It's --

15       THE COURT:  It says five hundred in the motion --

16       MR. GALARDI:  You'll see in that budget --

17       THE COURT:  -- doesn't it?

18       MR. GALARDI:  It was five hundred in the motion and we

19  reduced it to three hundred.  We did five hundred based on --

20       THE COURT:  Because of the closing of the --

21       MR. GALARDI:  Yes.

22       THE COURT:  -- forty some stores.

23       MR. GALARDI:  Exactly.  Because of the closing of the

24  stores.  So, the five hundred was calculated on roughly a

25  million, but it was 900,000, I rounded up.

1      The three hundred is calculated on the six hundred,

2  which is what we believe the utility monthly payment on -- on

3  the 100 stores remaining is.

4      We then cut it in half to two weeks. We've offered

5  up two weeks. Again, this case is, as Your Honor can see from

6  the budget, we will go cash flow negative in week eight. And I

7  will tell you Weeks 6 and 7 are skinny, to say the least, if

8  you look at the bottom, there is negative availability in Week

9  8, and positive availability both Week 6 and 7, which is why we

10  will be talking about a quick schedule for various types of

11  sales situation.

12      So, we've put up the $300,000. And what our motion

13  says is that if utilities wants something more than that, come

14  in, make your demand and do so in the time frame that the

15  Bankruptcy Code says basically between now and 30 days. We

16  will either negotiate out settlements, as we did in Radnor, or

17  we will have a hearing and we would request a hearing from Your

18  Honor on that 30 days to show that this is actually adequate

19  security.

20      The way the security works is that there is a reserve

21  set by GE. If, at any time, a utility, on account of a post

22  petition default on the utility payment makes a demand on GE,

23  says I've not been paid, and there's a process. They make it

24  first with us. We don't pay, they make -- they essentially do

25  a draw request on GE. If they do a draw request on GE, the

15

1  debtor is directed by the Court order to turnover whatever that

2  money is.  And then just have the fight between us and them as

3  to whether it's proper.  We can't ask any questions, the Court

4  says pay it.

5        GE would then would -- would increase the reserve,

6  subject to availability.  So, that reserve will always remain

7  at the three hundred.

8        THE COURT:  Okay.

9        MR. GALARDI:  Your Honor, there are a lot of

10 utilities in this case.  But the reason that we structured it

11 this way is if this case goes as fast as I think it does, it

12 could take a number of courses.  It could take a liquidation

13 course.  It could take a sale of substantially all of the

14 assets to the -- to a bidder.  Or maybe we'll get financing and

15 there will be a restructuring.

16        In the first two scenarios, we have found

17 historically that once you give a utility a deposit, especially

18 of this sort, it is very difficult post closing to get those

19 deposits back or make it somebody else's problem.

20        This way we don't have to have the money back, get it

21 back two months later.  Because once we get rid of the stores,

22 we just can take it out of the reserve.  But they're still

23 protected because it works very much like an LC.

24        In Radnor, we had no court hearings in front of you.

25 We managed to work out these as a matter of course.  And so we

16

1  think that this procedure is one that is well adopted to this

2  case.

3          The worse thing is, we're going to have a lot more

4  utilities here, and we may have a lot of negotiations between

5  now and 30 days, but that's a risk that we're prepared to take.

6          And since the Bankruptcy Code doesn't look at past

7  history, we thought this would be the best way with the limited

8  resources instead of putting a big reserve or fighting or

9  yielding to their demands in the first 30 days of the case.

10         THE COURT:  Okay.  Since -- and since most of the

11 utilities are being furnished to small stores, I assume --

12         MR. GALARDI:  Correct.

13         THE COURT:  -- I don't think they're probably worried

14 about a major claim.

15         MR. GALARDI:  No.  What happens is in --

16         THE COURT:  And so --

17         MR. GALARDI:  -- you know --

18         THE COURT:  -- typically in a retail situation, you

19 don't see any utilities coming in.

20         MR. GALARDI:  Well, no, but I -- I will be honest,

21 having done this for many years with the retail companies, I

22 know already there will be four e-mails when I get back from

23 one person that represents somebody at PECO or some -- that I

24 will have to address that issue because they all -- you know,

25 PECO has it in five or six stores.

17

1          THE COURT:  Okay.

2          MR. GALARDI:  Nevertheless, no particular store is at

3   risk for a very large utility bill.  And that will also enable

4   us to knock out stores if they decide what to do and take down

5   this reserve.

6          THE COURT:  Okay.

7          MR. GALARDI:  So, with that, Your Honor, I don't

8   think the U.S. Trustee had any objection.

9          The time frame for filing these things is really set

10  by the Bankruptcy Code and the new changes in 366 that says 20

11  days, 30 days.  So, we really do need to resolve this within 30

12  days.

13         So, I will, later on, ask for a hearing to be

14  scheduled within that 30-day period.

15         But, again, we've managed to generally resolve these

16  things.  And I think if you read 366(b), it says other security

17  for service after that date.  And it refers to the 20 days.

18  So, I really don't have to cover those 50 closing stores unless

19  -- unless they remain open into the 21st day.

20         THE COURT:  Okay.

21         MR. GALARDI:  So, we would ask Your Honor to approve

22  that order.  And we'll talk about setting a schedule for that.

23         THE COURT:  Okay.  I'll sign it.

24         MR. GALARDI:  Thank you, Your Honor.

25         Your Honor, the next matter on the agenda is the

# EXHIBIT 3

# Utilities after BAPCPA: What's Changed?

**Contributing Editor:**
Kenneth M. Misken
McGuireWoods LLP, McLean, Va.
kmisken@mcguirewoods.com

**Also Written by:**
Sarah Beckett Boehm
McGuireWoods LLP, Richmond, Va.
sboehm@mcguirewoods.com

### About the Authors

*Kenneth Misken is in the Bankruptcy Department at McGuireWoods LLP and is also a contributing editor to the News at 11 column. Sarah Beckett Boehm is a senior associate in the Bankruptcy Department at McGuireWoods LLP, where she focuses on representing corporate debtors and creditors in a variety of bankruptcy proceedings.*

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), effective for the most part for cases filed after Oct. 16, 2005, brought many changes to the world of bankruptcy practice. It could be safely assumed that utility providers were jumping for joy with the enactment of §366(c) of the Bankruptcy Code, which easily could be read to put utility providers in the driver's seat when negotiating and determining adequate assurance of future payment. Indeed, one bankruptcy court, discussed more fully below, has so held.



Kenneth M. Misken

But most bankruptcy courts have not allowed utility providers to dictate the terms of assurance of future payment. It appears that most bankruptcy courts have continued following pre-BAPCPA practice and procedure. This article discusses this difference in practice by first looking at §366 pre- and post-BAPCPA, followed by a discussion of the analysis and holding of *In re Lucre Inc.*,[1] the only published opinion that analyzes the new §366(c). Finally, the article focuses on the bankruptcy case of Storehouse Inc. and the utility procedures established by the debtor-in-possession (DIP) as an example of post-BAPCPA practice.

## New Rules under §366

Before BAPCPA was enacted (and became effective), the procedures that a DIP had to follow to maintain its utilities was straightforward. As part of their first-day motions, DIPs routinely filed motions to establish procedures to determine adequate assurances of payment to utilities.

Under §366(a) of the Code, a utility is prohibited from altering, refusing or discontinuing post-petition services "solely on the basis of the commencement of a [bankruptcy] case...or that a debt is owed by the debtor to such utility for service rendered before the order for relief was not paid when due." However, in an effort to protect utility providers, in §366(b) Congress authorized a utility provider to "alter, refuse or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date." Neither §366(a) nor (b) specifically required the DIP to furnish any deposit or any other form of monetary security to satisfy the "adequate assurance of payment" standard in §366(b).



Sarah Beckett Boehm

It was common for DIPs who remained current on their pre-petition utility bills to argue that the utility providers already were adequately assured of future payment, and therefore, no deposit or other monetary security was required. Since the DIPs paid their utility bills on time pre-petition, there was no reason to doubt that they would not continue to do so post-petition, according to the DIPs, of course. In addition, DIPs also would argue that the utility providers were entitled to an administrative expense claim in case of nonpayment, and therefore, they were adequately protected.[2]

## Practice & Procedure

With the enactment of BAPCPA, and §366(c) in particular, it appeared that DIPs would not be able to file a routine first-day motion requesting procedures for determining the adequate assurance of payment for utilities. Section 366(c) appeared to give utility service providers additional protections and leverage. This section, which is only applicable in chapter 11 proceedings, provides that:

a utility referred to in subsection (a) may alter, refuse or discontinue utility service if, during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service *that is satisfactory to the utility*.[3]

But not only did BAPCPA require that the adequate assurance of payment be satisfactory to the utility, it also defined what constitutes adequate assurance of payment. Under new §366(c)(1), and for purposes of that subsection only, assurance of payment is defined as "(1) a cash deposit, (2) a letter of credit, (3) a certificate of deposit, (4) a surety bond, (5) a prepayment of utility consumption or (6) another form of security that is mutually agreed upon between the utility and the debtor or the trustee."[4] Moreover, an administrative expense priority claim is specifically excluded from the definition of "assurance of payment."[5] Congress also provided a procedure for a DIP to modify the utility provider's request for adequate assurance of payment: "On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2)."[5]

Thus, as stated above, given the plain language of §366(c), the ballgame appeared to change and utility providers could dictate to the DIPs, at least initially, the amount *and* type of security that they

---

[1] 333 B.R. 151 (Bankr. W.D. Mich. 2005).

[2] *See* 3 King, Lawrence P., Collier on Bankruptcy ¶366.03[1] (15th ed. rev. 2006) ("The legislative history suggests that in some cases, a simple administrative priority will constitute adequate security.").

[3] Emphasis added.

[4] This definition of assurance of payment does not apply to §366(b); therefore, DIPs can still provide such things as an administrative expense claim as adequate assurance of payment to a utility during the first 20 days of the bankruptcy case.

[5] 11 U.S.C. §366(c)(1)(B) ("For purposes of this subsection, an administrative expense priority shall not constitute an assurance of payment.").

wanted.[7] It would be up to a DIP to file a motion under §366(c)(3)(A) requesting modification of that amount.[8] Moreover, the DIP would have to contact all of its utility providers, obtain from them what they thought constituted assurance of payment, and then either meet the utilities' demands or obtain an order within 30 days after the filing of the petition modifying that amount to continue to receive service.

### In re Lucre

Surprisingly, there are only a few published opinions discussing §366(c), especially given that it appeared to change utility motions procedurally. Only *In re Lucre Inc.*[9] analyzes the new subsection.[10]

Lucre Inc., a telecommunications provider, filed for chapter 11 on Oct. 21, 2005, just four days after §366(c) became applicable. On the petition date, Lucre received utilities from seven different providers.[11] As to five of those providers, Sprint, Consumers Energy, SBC, Verizon and U.S. Signal, Lucre is the end-user of the services. As to the other two, IXC and Opex, Lucre purchased telecommunication services and then supplied those services to its customers.

Shortly after it filed for chapter 11, Lucre contacted four of the utility providers and offered assurances of payment. Only Opex responded to Lucre's offer and countered by demanding a $4,500 deposit, rather than the $1,000 offered by Lucre.

On Nov. 3, 2005, Lucre filed its "Emergency Motion of Debtor Pursuant to 11 U.S.C. §366 for Authority to Provide Adequate Assurance of Future Performance to Utility Providers."[12] The bankruptcy court granted the emergency motion and held a hearing on Nov. 8, 2005. At the hearing, Lucre went forward with the motion as to Sprint, Consumers Energy, IXC and Opex.

Lucre requested that the bankruptcy court continue the §366(c) injunction as to Sprint, Consumers Energy and IXC because they had failed to respond to its offer of adequate assurance. But the bankruptcy court refused, explaining that subsection (c) of §366 specifically and unequivocally "requires as a condition to continuing the injunction either the utility's acceptance of the adequate assurance offered by the chapter 11 trustee or [DIP] or the chapter 11 trustee's or [DIP's] acceptance of the adequate assurance offered by the utility."[13] Once either of those two conditions occurs, the bankruptcy court explained, the DIP then has a right to have the adequate assurance payment modified by the court.[14] The bankruptcy court further explained that "[i]n other words, the trustee or [DIP] has no recourse to modify the adequate assurance of payment the utility is demanding until the trustee or [DIP] actually accepts what the utility proposes."[15]

Thus, according to the *Lucre* court, the utility provider could demand whatever it wants as adequate assurance of payment and it would be up to the DIP to agree to the request and then and only then seek modification from the bankruptcy court.[16]

### In re Storehouse Inc.: *An Example of Post-BAPCPA Practice*

Practically speaking, despite the addition of subsection (c) to §366, large corporate debtors continue to file first-day motions asking bankruptcy courts to determine adequate assurance of payment for future utility providers. Many utility providers have taken the position—with mixed results—that §366(c) no longer permits a DIP to seek such relief.

For example, in *In re Storehouse Inc.*,[17] the DIP filed a typical pre-BAPCPA first-day pleading seeking, among other things, an interim order

14. *Id.*

15. *Id.*

16. The *Lucre* court recognized that utility providers may have a duty to negotiate in good faith when exercising their rights under subsection (c). Thus, if a utility provider refuses to negotiate, the DIP could then file a motion seeking a determination of assurance of payment. If the utility provider requests assurance of payment and the DIP disagrees with the amount, the DIP can always file a request to modify the amount. Thus, the DIP is protected by a utility provider who fails to negotiate and a utility provider who requests a large and unreasonable assurance of payment.

continued on page 52

12. *In re Lucre*, Case No. 05-21732 (Bankr. W.D. Mich. Nov. 3, 2005).

13. *In re Lucre*, 333 B.R. at 154.

6.

7.

8.

9. 333 B.R. 151 (Bankr. W.D. Mich. 2005).

10. *See, e.g., Darby v. Time Warner Cable Inc.* (*In re Darby*), 470 F.3d 573, 574 (concluding that a cable operator is not a utility contemplated by §366 of the Code); *In re Astle*, 338 B.R. 855, 859 (Bankr. D. Idaho 2006) (concluding that since the case was filed under chapter 12, §366(c) did not apply).

11. The bankruptcy court did not conduct an analysis concerning whether the seven were in fact utilities for purposes of §366 of the Code. For purposes of this column, we analyze and discuss *In re Lucre* as if the seven were indeed utilities, but do not take a position whether they were in fact utilities.

6. 11 U.S.C. §366(c)(3)(A) ("In making the determination under this paragraph whether an assurance of payment is adequate, the court may *not* consider (i) the absence of security before the date of filing of the petition, (ii) the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition or (iii) the availability of an administrative expense claim." Thus, some of the arguments that DIPs made pre-BAPCPA were now specifically excluded from any consideration of what constitutes assurance of payment to a utility provider.

7. 3 *Collier on Bankruptcy* ¶366.03[2] ("Section 366(c)(2) alters the procedures applicable to the provision of adequate assurance by essentially requiring, in the first instance, that the debtor pay what the utility demands, unless the court orders otherwise.").

8. Interestingly, §366(c)(3) does not state that the bankruptcy court can modify the type of assurance of payment requested by the utility provider.



We are pleased to announce

SSG
CAPITAL ADVISORS, L.P.



has merged with and is now known as

Special Situations Group of NatCity Investment Banking

A subsidiary of

National City®

| J.W. Sean Dorsey | J. Scott Victor | Mark E. Chesen |
|---|---|---|
| Senior Managing Director | Senior Managing Director | Senior Managing Director |
| Head of Investment Banking | Co-head Special Situations Group | Co-head Special Situations Group |
| 216-222-9117 | 610-940-5802 | 610-940-5801 |
| Sean.Dorsey@NationalCity.com | jsvictor@ssgca.com | mchesen@ssgca.com |

CS-24272

# Value & Cents: Ten Elements of the Bankruptcy Business Valuation

*from page 51*

condition is a condition that is contrary to actual reality. For example, a hypothetical condition would exist in the business valuation of Debtor Company without the influence of the unprofitable C division. This condition is hypothetical if, on the valuation date, Debtor Company does actually own and operate the C division.

Simply described, an extraordinary assumption is an assumption that, if proven wrong, would have a material effect on the value conclusion. For example, an extraordinary assumption would exist in the business valuation of Debtor Company, assuming it consummates its proposed acquisition of XYZ Company. If Debtor Company does not complete its acquisition of XYZ Company, then the business value of Debtor Company would be materially different. Therefore, the assumption of the XYZ Company acquisition is an extraordinary assumption.

## Compliance with Recognized Professional Standards

While not part of the 10 elements of the business valuation assignment, the analyst should also consider if it is appropriate to apply a particular set of professional standards to the subject valuation assignment. Most business valuation assignments do not require compliance with any specific set of promulgated standards. However, the analyst should be aware of when a particular assignment does require compliance with a specific set of standards. The analyst should also prepare each valuation analysis and valuation report in compliance with the generally accepted practices of the profession.

Various professional membership organizations have promulgated standards for their individual membership. For example, the American Society of Appraisers, the Institute of Business Appraisers and the National Association of Certified Valuation Analysts have all published some form of business valuation standards applicable to their individual members. As of the date of this writing, the American Institute of Certified Public Accountants has exposed a draft set of business valuation standards for CPA valuation analysts.

USPAP is a set of standards that is often referenced in bankruptcy valuations. USPAP includes standards for business appraisals, as well as for other appraisal disciplines. USPAP is promulgated by the Appraisal Standards Board of The Appraisal Foundation. Valuation analysts should generally be aware of the USPAP business valuation professional guidance. However, it is noteworthy that compliance with the USPAP business valuation standards is only required in the three relatively rare circumstances when the application of USPAP (1) is required by law, (2) is required by regulation or (3) is required by an agreement with the client.

## Summary and Conclusion

Bankruptcy valuation analysts should consider all 10 elements of the business/security valuation before (1) accepting the valuation assignment, (2) performing the valuation analysis and (3) preparing the valuation report. If possible, the analyst should document the elements of the valuation assignment in a client engagement letter. This documentation

should minimize the opportunity for a misunderstanding by, or dispute with, the client. In addition, this engagement letter documentation should help keep the analyst on track during the bankruptcy valuation assignment.

A written discussion of the elements of the valuation assignment (either in an engagement letter or in the workpaper files) helps the analyst to document (1) the scope of work performed, (2) compliance with any applicable specific professional standards and (3) compliance with generally accepted professional practices. The determination of the 10 elements of the valuation assignment will influence the analyst's selection of the appropriate valuation approaches, methods and procedures.

Finally, the determination of the 10 elements of the valuation assignment will affect the final value conclusion. For example, debtor company business values change over time, so the valuation date will affect the value conclusion. The analyst will conclude different values for the same debtor company stock depending on the selected ownership interest. The analyst will conclude different values for the same ownership interest depending on the selected standard of value. The analyst will conclude different values for the same standard of value depending on the selected premise of value. The valuation client/user and intended purpose will affect both the scope of analytical work performed in the business valuation, and the format and content of the business valuation report. ▣

---

# Practice & Procedure: Utilities after BAPCPA: What's Changed?

*from page 37*

prohibiting its utilities from altering, refusing or discontinuing services pending entry of a final order, deeming that the utilities had received adequate assurance of future payment, and establishing procedures for the utilities to request additional adequate assurance and to opt out of the proposed procedures (the "Utility Motion").[18] The DIP did not serve the Utility Motion on any of its utility

providers. At the first day hearing, the U.S. Bankruptcy Court for the Eastern District of Virginia entered an interim order approving the Utility Motion,[19] which apparently was served on all utilities by sending a copy of the order to the various Post Office boxes that the DIP had on file.[20] Several utilities objected to the Utility Motion (collectively, the "Objecting Utilities"), arguing that the DIP's proposed

procedures were directly contrary §366(c) of the Code.[21]

In support of the Utility Motion, the DIP stated that it intended to timely pay all post-petition obligations owed to the utilities, and the DIP already had posted

---

18 Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Sept. 18, 2006) (Docket No. 22) (hereinafter the "Utility Motion").

19 Interim Order Determining Adequate Assurance of Payment for Future Utility Services, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Sept. 21, 2006) (Docket No. 29).

---

17 *Case No. 06-11144-SSM (Bankr. E.D. Va. Sept. 18, 2006).*

deposits with many of its utilities.[22] Additionally, the DIP would provide a deposit equal to two weeks of service based on the historical average over a 12-month period, *but only if* (1) the utility requested such a deposit in writing and provided specific account information, (2) the utility already did not hold a deposit equal to or greater than such amount and (3) the utility was not paid in advance for its services.[23] Any utility provider that requested and accepted the DIP's two-week deposit was deemed to have received adequate assurance and waived any right to seek additional adequate assurance during the case.[24]

Moreover, the DIP asserted that the revisions to §366 did not limit the bankruptcy court's ability to review and/or determine requests for adequate assurance payments and it did not give utilities the unilateral right to demand satisfactory adequate assurance in their sole discretion and terminate service to a debtor if their demands were not met within the first 30 days of a case.[25] Citing numerous post-BAPCPA cases in which various bankruptcy courts had approved similar procedures, the DIP contended that its process for handling adequate assurance requests was reasonable and that the bankruptcy court was authorized to grant such relief.[26]

The Objecting Utilities argued (citing *In re Lucre*) that the DIP's payment procedures violated the express provisions of revised §366(c) by (1) extending the 20- and 30-day periods in §§366(b) and (c), respectively; (2) making the process of obtaining a deposit time-consuming and burdensome by requiring the utilities to provide account history information and an explanation as to why the DIP's proposed two-week deposit was insufficient; and (3) shifting the burden from the DIP to the utilities by requiring the utilities to request additional adequate assurance from the bankruptcy court rather than the DIP paying the

amount requested by the utilities and then the DIP having to go to the bankruptcy court seeking to have such amount modified.

Additionally, the Objecting Utilities asserted that the DIP's "prediction" that it could pay post-petition obligations and the fact that a utility holds a pre-petition deposit specifically could not be considered by the bankruptcy court under §366(c)[27] Finally, all of the Objecting Utilities requested a two-month deposit based on the average number of days the utilities would have delivered service to the DIP prior to being able to terminate service pursuant to state law regulations. In response to the Objecting Utilities' requests for a two-month deposit, the DIP stated that a two-month deposit was unnecessary and unreasonable in this case because the utility expenses would be paid under an agency agreement entered into with a liquidator, and the payment of such expenses by the liquidation agent was secured by an irrevocable and unconditional standby letter of credit.[28]

---

*[T]he Storehouse bankruptcy case and cases cited by the DIP in its motion highlight the fact that bankruptcy courts are not following the Lucre interpretation and analysis of §366(c). Bankruptcy courts are instead allowing DIPs to dictate the amount and type of assurance and procedures for obtaining modification of them...*

---

Twenty-five days after the petition was filed, the bankruptcy court held a final hearing on the objections to the Utility Motion and the Objecting Utilities' requests for additional adequate assurance payments. Although the bankruptcy court overruled the objections, it held that the DIP must provide a one-month security deposit to the Objecting Utilities.[29]

Several of the Objecting Utilities have appealed the bankruptcy court's final order (collectively, the "Appellant

Utilities").[30] Among other things, the Appellant Utilities are challenging the DIP's burden-shifting procedures, the DIP's failure to properly serve the Utility Motion and the bankruptcy court's authority to enter an interim order prescribing the terms of utility service an on *ex parte* basis.[31] It is unclear, however, whether the district court will get to hear these issues because all of the Storehouse locations have been closed and all utility service in the DIP's name has been discontinued.[32]

## Conclusion

Section 366(c) of the Code appeared to change the way that DIPs and trustees would have to deal with utility providers procedurally. *Lucre* confirmed this. However, the *Storehouse* bankruptcy case and cases cited by the DIP in its motion highlight the fact that bankruptcy courts are not following the *Lucre* interpretation and analysis of §366(c). Bankruptcy courts are instead allowing DIPs to dictate the amount and type of assurance and procedures for obtaining modification of them, and if the utility provider is not satisfied with what the DIP proposes, then it is up to the utility provider to object to the procedures established by the DIP and to request additional assurance of payment.

If bankruptcy courts are going to allow this type of procedure, then perhaps one way to strike a balance would be for bankruptcy courts to require DIPs to serve their utility motions, and any subsequent motions or orders relating to utilities, in accordance with Federal Rule of Bankruptcy Procedure 7004 rather than on the Post Office box where the utility payments are sent.[33] This would give the utility provider better notice and an opportunity to object to the procedures established by the DIP and to contest any adequate assurance of payment proposed by the DIP, especially since these types of motions are usually heard at the beginning of a case. ◼

20 Affidavit of Administar Services Group Inc., Case No. 06-11144-SSM (Bankr. E.D. Va. Sept. 29, 2006) (Docket No. 63).

21 Objection of Certain Utility Companies to Utility Motion, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Oct. 5, 2006) (Docket No. 138); Objection of Alabama Power Company to Utility Motion, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Oct. 11, 2006) (Docket No. 169); Objection of Potomac Electric Power Co., Delmarva Power & Light Co. and Entergy to Utility Motion, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Oct. 11, 2006) (Docket No. 192).

22 Utility Motion at ¶14-15.

23 *Id.* at ¶16.

24 *Id.*

25 Debtors' Omnibus Response to Objections to the Utility Motion, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Oct. 12, 2006) (Docket No. 192).

26 *Id.* at p. 6 (citing §§366(c)(3) and 105(a) for authority); *see, e.g., In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Jan 18, 2006); *In re Three A's Holdings LLC*, Case No. 05-10886 (Bankr. D. Del. Sept. 20, 2006).

27 Objection of Alabama Power Company to Utility Motion at p. 7; *see, also,* 11 U.S.C. §366(c)(3)(B).

28 Debtors' Omnibus Response to Objections to the Utility Motion at p. 9.

29 Final Order Determining Adequate Assurance of Payment for Certain Utilities, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Oct. 23, 2006) (Docket No. 232) (noting that one objection was withdrawn as a result of settlement).

30 Notices of Appeal by Objecting Utilities, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Oct. 30, 2006) (Docket Nos. 310, 311).

31 *See* Appellants' Designations of Items to be Included in Record and Statement of Issues to be Presented, *In re Storehouse Inc.*, Case No. 06-11144-SSM (Bankr. E.D. Va. Nov. 9, 2006) (Docket Nos. 379, 380).

32 *See* Brief in Support of Motion of Storehouse Inc. to Dismiss Appeal as Moot and for Lack of Standing, and to Toll Briefing Schedule; *Potomac Electric Power Co., et al. v. Storehouse Inc. (In re Storehouse Inc.)*, Civil Action No. 01-0466-GBL (E.D. Va. Jan. 11, 2007) (Docket No. 4).

33 Bankruptcy Rule 7004 requires service to be made within the United States by first-class mail postage prepaid. When serving a domestic corporation, the motion must be mailed to the attention of "an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process" and not to a P.O. box.

# EXHIBIT 4

# BAPCPA: Review and Analysis of Business Bankruptcy Provisions After One Year

DOUGLAS DEUTSCH AND DAVID LEMAY

*The authors highlight the first year of the Bankruptcy Code's business bankruptcy changes by reviewing bankruptcy opinions and everyday changes in bankruptcy practice and procedure that resulted from the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.*

On October 17, 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Reform Act" or "BAPCPA") became effective. While the media focused on significant changes to consumer provisions of the Bankruptcy Code brought about by the Reform Act, the amendments also made substantial changes to the business provisions of the Bankruptcy Code.

A few themes are evident in the Reform Act. The amendments generally reflect a significant limitation on the bankruptcy courts' discretion

---

Mr. LeMay is a partner and Mr. Deutsch is an associate in the Bankruptcy and Financial Restructuring Department at Chadbourne & Parke LLP. The authors wish to thank their colleagues Francisco Vazquez (for preparing the foreign proceedings section), Seven Rivera (for preparing the lease and tax sections), and Claire Torchia (for her general assistance). This article reflects developments through October 18, 2006. The authors can be reached at dlemay@chadbourne.com and ddeutsch@chadbourne.com, respectively.

485

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

in numerous areas including, perhaps most glaringly, by effectively prohibiting key employee retention plans (commonly called "KERPs"), by imposing various non-extendible timing deadlines on debtors, and by requiring the conversion or dismissal of a case (with but one exception) when "cause" is found. The Reform Act changes also effectively modify the priority of payments to the benefit of some creditors and the detriment of others. For example, suppliers of goods and landlords clearly benefit from the Reform Act changes; general unsecured creditors do not.

This analysis examines the highlights of the first year of the new amendments in the business bankruptcy context by reviewing bankruptcy opinions and everyday changes in bankruptcy practice and procedure that resulted from the Reform Act. (Please note that case citations and summaries are provided at the end of each analysis section.) Given that the vast majority of the Reform Act amendments generally became effective only for cases filed on or after October 17, 2005, it should be noted that the application of some of the new provisions have not yet been considered by courts.

## CLAIMS AND CREDITORS

### "Seller of Goods" Reclamation Rights Are Expanded

*Relevant Bankruptcy Code Sections:* 546(c) and 503(b)(9)

*Background/Reform Act Change:*

State law reclamation rights allow a seller to recover goods shipped to and received by an insolvent buyer within a defined period if the seller shipped without knowledge of the buyer's insolvency. Pre-Reform Act, the Bankruptcy Code protected those state law rights but limited the time the seller was able to exercise those rights until 10 days after a debtor's receipt of the goods (unless the 10 day period ended after the bankruptcy filing, in which case, the seller had 20 days after receipt of the goods to make a reclamation demand).

The Reform Act modified Bankruptcy Code Section 546 to establish reclamation as a substantive bankruptcy law right, rather than a mere

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

recognition of state law rights, and substantially increased the period within which a seller may reclaim goods to up to 45 days prior to the bankruptcy case filing (unless the 45 day period ends after the filing of the bankruptcy case, in which case the seller has until 20 days after the bankruptcy filing to make a reclamation demand). Additionally, where pre-Reform Act Section 546(c) granted a bankruptcy court the authority to deny reclamation and instead grant the seller an administrative priority claim or a lien, revised Section 546(c) removes this provision, arguably abrogating the court's discretion in this regard. Finally, while former Section 546(c) was silent as to the rights of secured creditors, bankruptcy courts generally held that the interests of a reclaiming seller were subject to the prior interests of secured lenders. Revised Section 546(c) now expressly acknowledges this limitation on the seller's reclamation remedy.

In another provision created to benefit sellers of goods, the Reform Act amends Section 503 to provide a seller who fails to make a reclamation demand (or who otherwise cannot establish a reclamation remedy) an administrative expense claim for the value of the goods received by the debtor within 20 days of the bankruptcy filing.

*Effect on Bankruptcy Practice:*

The amended Bankruptcy Code seems to now include (some commentators would disagree) a federal reclamation right that is more powerful than any state law right to reclamation, exposing more shipments to reclamation demands than ever before. This is a substantial benefit to providers of goods and creates new challenges in, among other types of cases, retail bankruptcies. In such cases, because a bankruptcy court now apparently lacks the authority to grant an administrative claim in lieu of reclamation, it appears likely that a bankruptcy court will be much more inclined to grant debtors the authority to pay prepetition claims of vendors who have the right to compel the return of goods. After all, as a vendor who sells goods that are critical to the debtor's operations has a broad right to the immediate return of goods, it would be inefficient for the vendor to physically reclaim goods that the debtor would then simply reorder on a postpetition basis. Moreover, requiring

487

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

PRATT'S JOURNAL OF BANKRUPTCY LAW

a retail debtor to pull inventory off the shelves soon after a bankruptcy filing could create negative perceptions with the public that could be too damaging to overcome.

Although we have yet to see disputes on the amendments to Section 546(c), we note that the effect of the amendment on practice may be muted somewhat by the fact that, where the buyer has financed its working capital with loans secured by inventory, the reclaiming seller's rights remain subject to the interests of the buyer's secured lenders. Even in this case, however, a seller still has new valuable rights derived from the Reform Act's creation of Section 503(b)(9).

New Section 503(b)(9) entitles a seller of goods to an administrative priority if the goods have been received by the debtor within the 20 day period preceding the case and the goods were sold to the debtor in the ordinary course of the *debtor's* business. Unlike reclamation, there is no requirement that the goods still be in the possession of the debtor. Although there are no reported cases construing Section 503(b)(9), future disputes seem likely. These disputes will likely include valuation questions (the seller's invoice price is not necessarily controlling), issues relating to whether the administrative expense claim is automatic or must be affirmatively asserted by the seller of the goods, and skirmishes over whether the goods were sold to the debtor in the ordinary course of the debtor's business.

## Heightened Protections for Utility Providers

*Relevant Bankruptcy Code Section:* 366

*Background/Reform Act Change:*

As many utilities are monopolies that provide services that a debtor could not survive without, Section 366 of the Bankruptcy Code has always required a utility to continue to provide service to the debtor immediately after it files for bankruptcy and requires the utility to continue service on an ongoing basis if the utility is provided "adequate assurance of payment" for future services. Under the pre-Reform Act law, courts generally found that a projection of strong postpetition cash flow, a history of timely prepetition payments, and the assurance of an

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law. Copyright ALEXeSOULTIONS, INC.

administrative expense for postpetition services constituted "adequate assurance of payment" and often did not require the debtor to make a cash deposit or post additional security. Congress sought to a limit a court's discretion in determining "adequate assurance" by amending the relevant section of the Bankruptcy Code.

The Reform Act made a significant change to Section 366 by bifurcating the statute into a 20 day "adequate assurance" analysis (found in Section 366(b)) seemingly applicable in all cases and a more stringent 30 day "adequate assurance" analysis (found in Section 366(c)) applicable only in Chapter 11 cases. The 20 day analysis allows a utility to discontinue service if, within 20 days of the entry of the order for relief, "adequate assurance of payment" in the form of a deposit or other security is not provided. "Adequate assurance of payment" for this test is not further defined. The 30 day analysis still requires "adequate assurance of payment" but limits the form of assurance to include *only* a cash deposit, letter of credit, certificate of deposit, surety bond, prepayment, or similar security satisfactory to the utility. Importantly, the Reform Act also specifically precludes a court from considering, among other things, payment history, or the availability of an administrative expense claim in its evaluation of the adequacy of the assurance of payment.

*Effect on Bankruptcy Practice:*

One published opinion, *In re Lucre*, suggests the real hurdles that the changes to Section 366(c) could create. Lucre highlights that Section 366(c)(2) requires the debtor to provide adequate assurance within 30 days that is "satisfactory to the utility" or risk losing utility service. Furthermore, according to the opinion, the court has no discretion thereafter to modify the amount of an assurance of payment (as contemplated by Section 366(c)(3)(A)) unless and until the utility has first determined that the assurance originally provided is "satisfactory" to it. In other words, and although somewhat counterintuitive, the debtor "has no recourse to modify the adequate assurance payment the utility is demanding until [the debtor]… actually accepts what the utility proposes." Since most local tariffs require deposits of three months or more, making utilities the arbiter of not only the form of deposit but the

489

amount as well could sound the death knell for utility-dependent manu-facturing concerns. Actual practice since passage of the Reform Act suggests that most courts will be less demanding than the *Lucre* opinion would seem to require.

Somewhat surprisingly, the post-Reform Act utility orders to date look remarkably like the pre-Reform Act utility orders despite the change in the law. As indicated in the summaries set forth below, pro-cedures seem to have been adopted in the major Delaware and New York cases that have been approved by courts with little variation. *See, e.g., In re Calpine; In re J.L. French Automotive Castings Inc.; In re Refco; In re Copelands' Enterprises, Inc.*

In each of the cases, the debtor proposed a detailed process for util-ities to contest a deposit equal to two weeks of utility service charges (or, in some cases, 50 percent of the total monthly invoices) as "ade-quate assurance." Among other things, for the utility to challenge what is effectively a presumption of "adequate assurance," the procedures require the utility to serve a written request that sets forth a summary of the debtors' payment history — despite that fact that new Section 366(c)(3) expressly prohibits a court from considering payment history in evaluating adequate assurance — and, while the challenge is being considered, the utility is required to continue to provide service. Although utilities objected in many of the cases, each bankruptcy court, with little fanfare and even less in terms of a written explanation, grant-ed the debtor's motion.

*Case Summaries:*

- *In re Astle*, 338 B.R. 855 (Bankr. D. Idaho 2006). The debtor filed a Chapter 12 (family farmer) bankruptcy case. After the utility objected to the debtor's "assurance of payment" motion on Section 366(c) grounds, the court held that Section 366(c) only applied in Chapter 11 cases.

- *In re Lucre, Inc.*, 333 B.R. 151 (Bankr. W.D. Mich. 2005). The court found that Section 366(c) requires Chapter 11 debtors to reach agreement on "adequate assurance" that is "satisfactory to the utili-ty" and that the court lacked the jurisdiction to determine the

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

amount that is "adequate" unless the utility first received adequate assurance satisfactory to it. For that reason, as no agreement was reached with certain utilities, the court would not grant the debtor's request to continue the injunction set forth in Section 366(a) past the statutory period with respect to those utilities. The court cautioned the utilities, however, that it believed that they might be required to bargain in good faith under Section 366(c) before electing to discontinue service.

- *In re Copelands' Enterprises, Inc.*, No. 06-10853 (Bankr. D. Del. Sept. 8, 2006) (*unreported*). The debtor sought to adopt what were essentially the form utility procedures put forth in *In re Refco, Inc.* and *In re J.L. French Automotive Castings, Inc.* Southern California Edison Company ("SCE") objected to the motion, arguing that the proposed procedures were not appropriate as, among other things, they were merely seeking to "make the adequate assurance of payment process more time consuming and burdensome." From the public record, little can be gleaned other than that Copelands' motion was approved by the court on September 8, 2006.

- *In re 1945 Route 23 Associates, Inc.*, No. 06-17475 (Bankr. D.N.J. Aug. 10, 2006) (*unreported*). The debtor sought approval of a motion pursuant to Section 366 that: (a) prohibited utilities from modifying or refusing service if the debtor provided adequate assurance of payment; (b) deemed adequate assurance to be the funding of a utility security deposit equal to two weeks estimated utility consumption; and (c) established procedures for resolving additional requests for adequate assurance. The established procedures allowed a utility to submit a request for additional assurance to the debtor within 30 days of the petition date. The utility request was required to (i) identify why such additional assurance was needed, and (ii) propose a way for the debtor to provide such assurance. If the debtor could not satisfy the request or otherwise reach agreement with the utility, the motion provided that a court hearing would be scheduled. The court ultimately granted the debtor's motion.

- *In re J.L. French Automotive Castings, Inc.*, No. 06-10119 (Bankr.

491

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

D. Del. March 8, 2006) (*unreported*). The debtor in a prearranged Chapter 11 case sought to adopt similar utility procedures to the form procedures outlined in *In re Refco, Inc.* with a deposit of two weeks service charges as "adequate assurance." A number of objections were filed to the motion. Some noted that *In re Lucre, Inc.* required that the adequate assurance be satisfactory to the utility. In response to the objections, the debtor appears to have compromised with each of the objectors, filing stipulations to that end. With respect to non-objectors, the court approved the adequate assurance deposit and the proposed "form" procedures.

- *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Jan. 18, 2006) (*unreported*). The debtor proposed detailed procedures for addressing the adequate assurance requests of its utilities. Sixteen objections were filed to the debtor's motion, including on Section 366(c) grounds. The debtor argued that Congress did not intend to require the debtor to reach affirmative agreement with every utility provider in the first 30 days after the filing of a bankruptcy case. In fact, argued the debtor, the court can approve a procedure under Section 366(c)(3) to address utility concerns so that a mechanism is created where each adequate assurance request "can be analyzed, responded to and addressed in a rational, timely process." The court granted the relief sought without a written opinion or other public analysis.

- *In re Refco, Inc.*, No. 05-60006 (Bankr. S.D.N.Y. Dec. 9, 2005) (*unreported*). The debtor sought a determination that a sum equal to 50 percent of the estimated costs for utilities for one month deposited into an interest bearing escrow account constituted "adequate assurance." If a utility was not satisfied with the assurance of payment, it was required to file a written demand that included details on balances and summaries of account history. Certain additional procedures were then to be followed by the debtor and the utility. No objections were filed to the motion and the court granted the relief sought.

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

## Additional Protections for Tax Claims

*Relevant Bankruptcy Code Sections:* 362(b)(26), 505(a)(2)(C), 507(a)(8), 511, 724(b) and 1129(a)(9)(C)

*Background/Reform Act Change:*

When Congress enacted the Bankruptcy Code in 1978, it recognized the need to balance the "three-way tension that exists among (1) general creditors, who should not have the funds available for payment of debts exhausted by an excessive accumulation of taxes for past years; (2) the debtor, whose 'fresh start' should likewise not be burdened with such an accumulation; and (3) the tax collector, who should not lose taxes which he has not had reasonable time to collect or which the law has restrained him from collecting."[1] The National Bankruptcy Review Commission, which was involved in the development of the Reform Act, included representatives from the Department of Justice, Internal Revenue Service, and the National Association of Attorneys General. The influence of these representatives on the final form of the Reform Act is clearly evident as the Reform Act contains several provisions which adjust the "three-way tension" noted by Congress significantly in favor of the tax collector.

Some of the more important changes brought about by the Reform Act are outlined below. Unfortunately, there have been few published opinions addressing these provisions, but as more cases are filed that are subject to the Reform Act, litigation over these provisions will surely increase.

*Section 362(b)(26)*

One example of a Reform Act provision which primarily benefits the taxing authorities is the revised Section 362(b)(26). Outside of the context of a bankruptcy, the IRS is usually permitted to setoff tax refunds against unpaid taxes owed by the taxpayer. Prior to the Reform Act, the taxing entity's authority to setoff the refund was preserved; however, the automatic stay prevented the taxing entity from actually effectuating the setoff. The new Section 362(b)(26) permits the taxing authority to withhold the prepetition income tax refund as a setoff

493

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

against prepetition tax liabilities if the taxable periods giving rise to both the overpayment and the deficiency are prepetition. Further, even if the underlying non-bankruptcy law does not allow for setoff of the refund if the matter is in dispute, the government entity may still withhold the refund until the dispute is resolved.

The changes to Section 362(b)(26) essentially mean that the normal setoff rules applicable to other creditors do not apply to the taxing authorities. They are now seemingly exempt from the necessity of obtaining stay relief from the bankruptcy court before the prepetition setoffs can take place. Setting off refunds against prepetition tax liabilities elevates the taxing authority's prepetition claim to a secured claim for the amount of the refund. This elevation in status will result in fewer assets of the estate available for other creditors or for the debtor's reorganization efforts.

*Section 505(a)(2)(C)*

Another important change brought about by the Reform Act is the amendment to Section 505(a)(2)(C), which now prevents a bankruptcy court from determining the amount or legality of an *ad valorem*[2] property tax on real or personal property of the debtor if the period for contesting such liability has expired under applicable non-bankruptcy law. Previously, the bankruptcy courts had wide-ranging authority over tax liability disputes regardless of whether the applicable non-bankruptcy law still allowed the liability to be challenged. The revised Section 505(a)(2)(C) provides that if the liability for an *ad valorem* tax has become fixed and the debtor's time to contest that liability outside of bankruptcy court has expired, the debtor may not use the bankruptcy court as a venue for contesting the liability. Notably, this only applies to *ad valorem* tax liabilities. Other tax liabilities may generally still be challenged in bankruptcy court regardless of whether the tax liability arose many years before and the applicable non-bankruptcy law deadline for disputing the claim has past. Regardless, this revision represents a significant curtailing of the bankruptcy court's authority to determine the amount of tax liability claims in bankruptcy cases.

494

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

*Section 507(a)(8)*

Previous bankruptcy cases had held that income tax liability of a debtor for the year in which a bankruptcy filing occurs (known as the "Straddle Year") must be bifurcated into a prepetition component and postpetition component, with only the postpetition component being treated as an administrative expense claim entitled to first priority status. The Reform Act amended Section 507(a)(8), however, to expressly give the entire Straddle Year tax claim administrative expense priority.

This change may prove economically damaging to debtors as potentially significant prepetition tax liability is shifted to a postpetition administrative expense claim. That shift will affect liquidity going forward, since administrative priority claims must be paid in full as a condition of a debtor's ability to emerge from reorganization. Some of the other aspects of the Reform Act will make the effect of this change less significant, however. First, corporate debtors frequently took advantage of the Straddle Year bifurcation system in order to classify as much tax liability as possible as a prepetition priority tax liability. Debtors were often able to defer the payment on prepetition tax obligations for several years after the confirmation of the plan. However, as noted below in the discussion regarding the revisions to Section 1129(a)(9)(C), the period in which a debtor can defer payments on account of prepetition priority tax claims under a plan has been dramatically reduced, thereby restricting or eliminating the primary advantage to debtors of the Straddle Year bifurcation system. Second, commentators have noted that from a practical standpoint, the elimination of the bifurcation may prove easier on a debtor administratively. The debtor will no longer have to allocate its income and deductions between the prepetition and postpetition tax portions of the filing year without having the benefit of separate tax returns on which to rely, nor will the debtor have to defend bifurcation allocation decisions when challenged. Putting the entire liability at the same level of priority and treatment will save time and effort that can thus be spent on other aspects of the reorganization. Even prior to the enactment of the Reform Act, several debtors would come to agreements with the taxing authorities to treat all tax liabilities for the Straddle Year as entirely postpetition.

495

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

*Section 511*

The Reform Act has added Section 511 to the Bankruptcy Code which provides that the interest rate paid on prepetition priority tax claims and administrative expense tax claims (as well as the interest rate applied to deferred tax payments made under Section 1129(a)(9)(C)) shall be the rate used under applicable non-bankruptcy law. This provision will generally increase the rate of interest that debtors must pay on oversecured prepetition tax claims or deferred tax payments on account of priority tax claims made after the debtors' emergence from bankruptcy. This will make reorganizing more expensive for debtors and make tax deferral options less favorable.

*Section 724(b)*

When property is sold in Chapter 7 liquidations, the proceeds first go to satisfy the claims of secured creditors with perfected liens on the property before any priority or unsecured claims can be paid. However, prior to the enactment of the Reform Act, secured tax claims were excepted from this rule and the taxing authorities' secured claims were subordinated to the payment of administrative expense claims and certain other priority claims. Under the Reform Act, Section 724(b) has been amended to remove this exception but only for secured claims that are based upon *ad valorem* real and personal property taxes. This means that *ad valorem* tax claims secured by valid and perfected liens on the property being sold are no longer subordinated to administrative expense claims or other priority claims (except for certain specified wage and employee benefit claims). This change will have the effect of possibly reducing, in some cases dramatically, the recoveries obtained by holders of administrative and other priority claims (other than certain wage and employee benefit plan claims that will remain senior to tax liens under the new law). With tax liens held by state and local taxing authorities generally the most often subordinated under the previous system, it is the state and local taxing authorities who have long argued that the old system was an unconstitutional deprivation of rights. The Reform Act seems to vindicate their position.

496

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law. Copyright ALEXeSOULTIONS, INC.

*Section 1129(a)(9)(C)*

Finally, and perhaps the most substantial proof of the influence of the taxing authorities on the development of the Reform Act, is revised Section 1129(a)(9)(C).  As noted above, prior to the Reform Act, a debtor was able to provide in its plan of reorganization for the deferral of payment on its prepetition tax liability for unsecured priority taxes over a period of six years from the date of the assessment of the tax (provided that the taxing authority eventually received full payment having a value not less than the allowed amount of the claim and at an interest rate on the deferrals that the bankruptcy court found to be compensatory).  Under the revised 1129(a)(9)(C), however, in order for a debtors' plan of reorganization to be confirmable, it must provide for the payment of the priority tax claims in "regular installment payments in cash" within five years of the bankruptcy filing.  Thus, debtors must now pay their priority tax obligations in amortizing installments; they will no longer be allowed to propose plans calling for interest-only "bullet" principal payments at maturity or for negative amortization payment schedules.  Moreover, the section provides that for a plan to be confirmable, the priority tax claim cannot be treated less favorably than the most favored holders of other non-priority unsecured claims.  That means if any general unsecured creditors are paid in cash or on an accelerated schedule then the taxing authority claims must also be paid in the same manner.  It is not clear, however, how this provision requiring equal treatment will actually work in practice.  Without guidance from the statute, it will be left to the bankruptcy courts to determine whether the "manner" of payment refers to the kind, timing, amount, or percentage of consideration paid or some other factors.  This may get complicated when plans provide for equity distributions for creditors or when the plan provides creditors with distribution options.  For example, if a plan gives creditors the option for quicker payouts in lieu of higher interest rates or greater recoveries — it is not at all clear from the statute what will be necessary to confirm the plan since the government arguably cannot negotiate either the interest or the amount of payment.

This reduced deferral period and requirement for principal amortization will dramatically affect many large corporate bankruptcies.

497

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

Under the prior law, debtors could defer the tax payments over a period of six years from the date of assessment, often with little or no principal amortization, and the date of assessment was often determined to be at or near the date of confirmation of the plan of reorganization, as the assessment date was usually delayed during the case. Under the amended Section 1129(a)(9)(C), however, the five year deferral period begins running from the filing of the bankruptcy petition. If it is a large case that goes for several years, then the remaining available deferral period may be negligible or even nonexistent. This is important because under the prior law, many debtors took advantage of the opportunity to pay off their tax obligations over an extended period after confirmation as part of their reorganization, frequently with minimal or even no amortization or principal, and sometimes even with negative amortization. Losing that option may prove fatal for the reorganizing efforts of debtors facing significant prepetition tax liabilities.

*Case Summary*
- *In re Davis*, No. 06-41279, 2006 Bankr. LEXIS 2046 (Bankr. N.D. Tex. Aug. 30, 2006). In one of the few reported cases addressing the tax-related provisions of the Reform Act, the debtors' *ad valorem* property taxes were paid by a third party tax loan service which then sought to charge interest on its claim against the estate at the rate specified in the loan agreement with the debtor. The court applied the new Section 511 to this claim even though the claim (and tax lien) was held by the loan service and not a taxing authority. The court applied the interest rate on the claim which would apply under applicable non-bankruptcy law, here the contract rate.

## Restoration of Retiree Benefits

*Relevant Bankruptcy Code Section:* 1114

*Background/Reform Act Change:*

Section 1114 of the Bankruptcy Code governs the modification of retiree benefits. It requires that the debtor first try to reach agreement with an appropriate representative of the retirees on a proposed modifi-

498

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

cation of retiree benefits. If agreement is not reached, the court may order the modification to be made if it is necessary to the reorganization, the parties are treated fairly and equitably, and the modification is favored by the balance of the equities.

The Reform Act provides some additional rights to retirees. Under the Reform Act, Section 1114 has been amended to require a court to unwind any modification made to retiree benefits during the 180 day period before the filing of the petition if the debtor was insolvent on the date of the modification *unless* the court finds that the balance of equities clearly favors the modification.

*Effect on Bankruptcy Practice:*

The amendment to Section 1114 appears to be, based on the fact that no case has yet been reported on this new subsection, rarely disputed and less frequently invoked. Moreover, even if a retiree benefit modification is made during the applicable prepetition time period, this provision does not necessarily mean the retirees win. The standard — that the equities clearly favor modification — is easier for a debtor to satisfy than the three part test noted above for modifying retiree benefits after a petition is filed. In that light, it seems somewhat likely that a bankruptcy court will often find for the debtor when it considers the administrative hurdles of retroactively "fixing" a modified benefit. Nevertheless, the amendment does provide retirees a new weapon in their arsenal that will have to be addressed by debtors.

## EXECUTORY CONTRACTS AND LEASES

### 210 Day Limit for Debtor to Assume Real Property Leases

*Relevant Bankruptcy Code Section:* 365(d)(4)

*Background/Reform Act Change:*

The leading bankruptcy treatise, *Collier on Bankruptcy*, indicates that the pre-Reform Act version of Section 365(d)(4) was amended in 1984 to "reduce the time that a lessor must wait to reacquire property or learn that the debtor … has decided to assume the benefits and burdens

499

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

of the lease." The old section provided a debtor 60 days from the commencement of the case to assume or reject its non-residential real estate leases or its leases would be deemed rejected. The courts were allowed to extend this deadline, however, if the debtor was able to show adequate cause why such an extension was necessary. The reality has been that the courts often easily found such cause and the deadlines were routinely extended several times. These extensions often lasted for many months and, especially in large cases, delayed the landlord's ability to require the debtor to assume or reject for years, perhaps until confirmation of a plan or reorganization. With the Reform Act, Congress sought to put a cap on the courts' discretion by amending Section 365(d)(4) to include a strict deadline for assumption decisions.

The Reform Act actually expands the amount of time that a debtor initially has to assume or reject a non-residential real property lease; however, the statute now specifically limits the number and length of extensions that a court may grant beyond that initial period. Specifically, the revised Section 365(d)(4) provides that a debtor-lessee of a non-residential real property lease will initially have until the earlier of (i) 120 days after the petition date or (ii) the confirmation date, to assume its leases of non-residential real property. The new provision states that a court may, and still only "for cause," extend the deadline to assume or reject the lease only once and only for an additional 90 days unless the landlord consents in writing to an additional extension. As noted below, this hard and fast 210 day deadline significantly increases the leverage that landlords will have in large bankruptcy cases, specifically those, like retail bankruptcy cases, with multiple non-residential real property leases.

*Effect on Bankruptcy Practice:*

The new time constraints will have the practical effect of requiring debtors to make quicker, perhaps hasty, decisions with respect to assumption or rejection of real property leases or, at the very least, to consult with and involve landlords more prominently in the assumption/rejection decisions. In large cases with several real property leases, such as retail cases, seven months will likely prove to be a difficult

500

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

time frame for evaluating and identifying leases worthy of assumption. Depending on when during the year a particular case is filed, the time-honored strategy of waiting for one more Christmas selling season's results before deciding which leases to assume may no longer be available. Already in the larger cases that have been filed since the Reform Act became effective and that are now coming upon the 210 day deadline, the dockets are showing numerous stipulations with landlords to consensually extend the decision period. This additional leverage for landlords will manifest itself in several ways as they aggressively negotiate the terms of amended and assumed leases.

The tighter deadlines have also led landlords to question a debtor's ability to provide adequate assurance of future performance under leases assumed early in a case. This issue has arisen in the *Calpine* case as a landlord requested a letter of credit or other credit enhancement as adequate assurance of future performance for a proposed lease assumption. The landlord argued that it was too early in the case to reliably predict that the debtor would be able to successfully reorganize and perform under the lease, therefore, additional credit support was justified before approving the assumption. Judge Lifland summarily dismissed the landlord's argument, unfortunately without any real analysis or opinion. Judge Lifland noted that the debtor had access to approximately two billion dollars in debtor-in-possession financing and other assets and, therefore, further adequate assurance was not necessary. This issue will surely arise again, however, as smaller and weaker debtors attempt to assume leases while still in the early stages of reorganization. Landlords will use these issues either to seek to block the assumption or as an opportunity to obtain additional concessions in the lease assumption negotiations.

There have been few published opinions addressing the new time limit as the 210 day deadlines are only recently starting to come into play. One case, however, has entered two separate opinions which clarify some of the particulars of the deadline. In one opinion, the court in *In re Tubular Technologies, LLC*, examined the plain language of the revised statute as well as the legislative history behind the amendment and determined that if an extension of the initial 120 day deadline is to

501

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

be granted, the order approving the extension must be entered before the expiration of the deadline. A debtor will therefore need to think ahead and file a motion for an extension well in advance of the deadline. And in its other opinion on the topic, the *Tubular* court held that the revised Section 365(d)(4) is self-executing in that any unexpired non-residential real property lease that is not expressly assumed by the deadline will automatically be deemed rejected.

Taken together, these two opinions highlight the importance of making a timely decision on each unexpired real property lease. If a debtor fails to assume a real property lease, or to obtain an extension of the assumption deadline, within the 120 days, the lease is not only deemed rejected, but the debtor loses the ability to revisit the issue or even get more time to decide.

*Case Summaries:*

- *In re Tubular Technologies, LLC*, No. 06-00228, 2006 Bankr. LEXIS 1653 (Bankr. D.S.C. July 18, 2006). The debtor filed its motion to extend the deadline to assume or reject an unexpired commercial property lease 112 days after the petition date, but it did not request an expedited hearing or take further action to request that the court address the motion prior to the expiry of the 120 day deadline. The court denied the extension request.

- *In re Tubular Technologies, LLC*, No. 06-00228, 2006 Bankr. LEXIS 1282 (Bankr. D.S.C. June 21, 2006). The court held that Section 365(d)(4) is self-executing and a real property lease that was not assumed within 120 days from the petition date as required by the statute was deemed rejected.

- *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. July 11, 2006) (*unreported*). Landlord of commercial real estate lease opposed debtor's attempt to assume the lease and requested additional credit enhancements as adequate assurance of future performance. The court denied this request and authorized the lease assumption requested by the debtor.

502

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law. Copyright ALEXeSOULTIONS, INC.

## Cap on Landlord's Administrative Expense Claim Arising From the Rejection of a Previously Assumed Lease

*Relevant Bankruptcy Code Section:* 503(b)(7)

*Background/Reform Act Change:*

In something of a trade-off for drastically reducing the deadline to assume unexpired real property leases, the Reform Act also places a two year cap on the amount of administrative expense damages that the landlord may claim under an assumed lease that is later rejected. Pre-Reform Act, if a real property lease was first assumed by a debtor and subsequently rejected, the landlord was entitled to an administrative priority claim in the amount of the net present value of the payments due under the lease for the full remaining term of the lease. Effectively, all of the rejection damages on the prepetition assumed lease were elevated to postpetition damages as a result of the debtor's assumption of the lease. Under the new Section 503(b)(7), however, only the rent due for the two year period subsequent to the rejection (or the date of actual turnover of the property, whichever is later), is entitled to administrative priority. The Reform Act further provides that a landlord's claim for rent beyond the two year period is capped by Section 502(b)(6)[3] and will be treated as a prepetition claim.

*Effect on Bankruptcy Practice:*

Many of the cases filed after the effective date of the Reform Act are only now reaching the new 210 day deadline, so the new Section 503(b)(7) cap on administrative damages has not yet been addressed in any published decisions. This provision is an important addition to the Reform Act, however, because without this change, debtors that make quick decisions to assume real property leases and then later reject the leases when they realize their error, could have created vast administrative priority claims that would overwhelm the claims pools to the detriment of every other creditor. It is important to note that the administrative claim to which the landlord would be entitled is without reduction or setoff for any reason other than for amounts actually received or to be received from another entity, such as a guarantor. This may enable the

503

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

landlord to receive a windfall if the property is re-let at the same or greater rent, and it will clearly bring the doctrine of mitigation of damages, which might be authorized or even required under state landlord-tenant law, into conflict with the provisions of the amended Bankruptcy Code. It will be interesting to see how this plays out in the courts.

## Debtor's Ability to Assume Leases Notwithstanding the Inability to Cure Incurable Non-Monetary Defaults

*Relevant Bankruptcy Code Section:* 365(b)

*Background/Reform Act Change:*

In order for a debtor to assume an executory contract or unexpired lease, it must first cure any defaults under the contract or lease prior to assumption and also provide adequate assurance of its ability to perform under the assumed agreement going forward. However, non-monetary defaults (for example, the breach of a "going dark provision" in a commercial lease, which requires a retail tenant to remain open) can occur that are difficult, or sometimes even impossible, for a debtor to cure prior to assumption. Prior to the enactment of the Reform Act, there was case law which interpreted the Bankruptcy Code to mean that such incurable non-monetary defaults could effectively bar a debtor from assuming an otherwise valuable and attractive executory contract or unexpired lease. However, the Reform Act revised Section 365(b)(1)(A) to generally (i) exempt debtors who are seeking to assume residential real property leases from the obligation to cure historical non-monetary defaults which are impossible to cure, and (ii) give the debtors an opportunity to cure through prospective performance otherwise incurable historical non-monetary defaults which resulted from a breach of operational requirements in commercial leases. It is important to note, however, that the landlord in either scenario is entitled to compensation for the pecuniary loss, if any, that resulted from the non-monetary breach of the lease.

The revisions to Section 365(b)(1)(A) represent a Congressional attempt to clarify conflicting case law with respect to non-monetary defaults and assumption. In 1997, the Ninth Circuit Court of Appeals in

504

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

*In re Claremont Acquisition Corporation, Inc.*, upheld a bankruptcy court decision denying a debtor's request to assume a franchise agreement for a car dealership. Prior to the debtor's bankruptcy filing, the debtor had ceased operations for a period of approximately two weeks. The shutdown breached a provision in the franchise agreement that required continuous operation of the dealership. When the debtor attempted to assume the franchise agreement, the franchisor objected and argued that the failure to maintain continuous operation constituted a historical non-monetary default which the debtor could not possibly cure. The court read the language of the former Section 365(b)(1)(A) to prevent the assumption of the agreement and upheld the bankruptcy court's denial of the request.

In 2004, the First Circuit Court of Appeals addressed the same issue in *In re Bankvest Capital Corp.*, and took the exact opposite approach from the one taken by the *Claremont* court. The *Bankvest* court held that the *Claremont* ruling produced a harsh result for debtors by creating situations in which it would be impossible for a debtor to assume executory contracts that were the subject of an incurable historical non-monetary default. The First Circuit concluded that such a doctrine is at odds with the underlying principles of the Bankruptcy Code, which is designed to reorganize debtors, and instead held that debtors may assume executory contracts and unexpired leases without having to cure *any* non-monetary defaults.

Faced with this inconsistency, Section 365(b)(1)(A) was revised to clarify the legislative intent and effectively compromise the two positions. In the case of real property leases, the revised provision prevents the harsh result that concerned the First Circuit in *Bankvest* (namely that incurable non-monetary defaults would effectively render the lease unassumable) by excusing the debtor of its obligation to cure the incurable non-monetary defaults. However, in all other situations, including franchise agreements, leases of personal property and any other executory contracts or unexpired leases which are not real property, the existence of an incurable historical non-monetary default seems to provide the non-debtor party a means to block the assumption of the contract or lease.

505

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

*Effect on Bankruptcy Practice:*

There have not been any published cases addressing the revised Section 365(b)(1)(A), however, there will surely be litigation over this complex provision. For example, under the revised section, the debtor is not excused of its obligation to cure every non-monetary obligation under leases of real property, but rather, is only excused of its obligation to cure those non-monetary defaults which are "impossible" to cure at the time of assumption. What will constitute "impossible" for purposes of the debtor's ability to cure the non-monetary default will surely be the subject of litigation.

Further, in the case of non-residential real property leases, the debtor is required to cure any non-monetary default that "arises from a failure to operate" in accordance with the terms of the underlying lease. This type of non-monetary default is cured by specific performance of that obligation at and after the time of assumption in accordance with the terms of the lease. Although the new section was written with the specific issue of "going dark" clauses in mind, the distinction between monetary defaults and non-monetary defaults may also be a source of conflict with respect to other lease terms.

Again, as with the new deadline for assumption and rejection of real property leases, the revised Section 365(b)(1)(A) will likely have the greatest effect on large retail debtors as they evaluate their obligations under unexpired commercial leases in order to determine what, if any, cure is required. Generally, the revised provision makes it possible to cure otherwise incurable defaults under real property leases and, therefore, it will be easier for these retail debtors to assume commercial leases which may have otherwise been subject to objection by landlords. For all other types of executory contracts, however, the revised Section 365(b)(1)(A) will potentially give the non-debtor counterparties the ability to block the assumption of otherwise valuable executory contracts or unexpired leases to the detriment of the estate and its creditors. At the very least, the new provision gives the non-debtor counterparties additional leverage when negotiating amendments to the underlying contract.

506

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law. Copyright ALEXeSOULTIONS, INC.

*Citations*
- *In re Bankvest Capital Corp.*, 360 F.3d 291 (1st Cir. 2004).

- *In re Claremont Acquisition Corporation, Inc.*, 113 F.3d 1029 (9th Cir. 1997).

## BUSINESS OPERATIONS AND CASE ADMINISTRATION

### Restricting Payments On Key Employee Retention Plans

*Relevant Bankruptcy Code Section:* 503(c)

*Background/Reform Act Change:*

The administration of a bankruptcy case means substantially more work and more pressure for the debtor's management. A commercial debtor is understandably concerned about losing key employees when the services of those employees may be critical to the debtor's rehabilitation. Under such circumstances, prior to the Reform Act, it had become common for a debtor to provide senior management and key employees with retention compensation (commonly called "key employee retention plans" or "KERPs") to encourage these employees to remain through the administration of the bankruptcy case. But the practice was not without its critics. Concerns were raised as to why lavish retention plans were provided to the same high level employees who (it was alleged, not always fairly) brought the company to the bankruptcy court. Congress apparently heard these criticisms and sought to severely limit this practice.

Under the Reform Act, a court may not authorize retention payments to an "insider" — essentially a senior manager or director — unless the debtor proves that (i) the services provided by the individual are "essential" to the survival of the debtor's business, (ii) the individual has a bona fide job offer from another business at the same or higher rate of compensation, and (iii) the proposed payment is less than ten times the mean amount offered to non-management persons within the year in which the payment is to be made or the obligation incurred or, if no such payments or obligations were made or incurred, less than 25 percent of

507

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

PRATT'S JOURNAL OF BANKRUPTCY LAW

the amount of any similar benefit made to or incurred for the benefit of the individual in the prior year. Severance payments were also substantially curtailed by another provision of the amended Section 503 of the Bankruptcy Code. This subsection states that severance payments cannot be provided unless part of a program that is generally applicable to all full time employees and the payment cannot be greater than ten times the mean severance pay given to non-management employees.

*Effect on Bankruptcy Practice:*

As is evident from the above summary of changes, providing any retention or severance payments to senior executives in a bankruptcy has been made much more difficult by the Reform Act amendments. Given the need to keep certain senior executives on board after a bankruptcy filing, this does not mean that such payments have simply gone away. Post-Reform Act debtors have sought to characterize proposed payments to senior executives as performance-based incentive payments falling entirely outside the restrictions of Section 503(c). In the main, this seems to have worked so far, although with one unexpected twist and at least one notable exception. The notable exception may set a trend toward limitation.

The unexpected twist is the recent practice in several Delaware cases of courts dealing with the details of the proposed incentive program in "sealed" courtrooms; that is, the hearing and the record of the hearing are kept hidden from the public. The result is that the details of the incentive program are secret and then, following the hearing, an order is entered approving the program, details of which are not publicly known. *See, e.g., In re Werner Holding Co. (DE), Inc.; In re Nellson Nutraceutical, Inc.* Of course, this makes it difficult to determine if the debtor has complied with Section 503(c).[4]

The notable exception comes from New York. It is the much talked about recent opinion of Judge Lifland in the *In re Dana Corp.* case. There the court found that proposed incentive targets were too easily satisfied and that proposed completion payments were really tied to the emergence of the case from Chapter 11. The primary lesson of the *Dana* ruling is, as stated by Judge Lifland: "If it walks like a duck (KERP) and

508

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

quacks like a duck (KERP), it's a duck (KERP)." The other lesson from *Dana* is that objections from the U.S. Trustee and the creditors' committee do matter to a bankruptcy judge. Judge Lifland's opinion suggests that had the debtor demonstrated to these important constituencies the importance of these payments and had they not objected, the outcome might have been different.

Finally, it should be noted that bankruptcy judges are often pragmatists. They understand the need to keep key employees and that abuses like the one reported in *Kmart* (where a newly hired CEO received, among other benefits, a $2.5 million inducement payment; payment was not well spent as he was fired within a year), allegedly the reason that Senator Kennedy introduced this amendment to the Bankruptcy Code, are the exception and not the rule. Accordingly, their more liberal reading of the amended statute may not be viewed favorably when eventually reviewed by less pragmatic appeals courts. To date, no decision involving this statutory section has been the subject of a decided appeal.

*Case Summaries:*

- *In re Dana Corp.*, No. 06-10354, 2006 Bankr. LEXIS 2181 (Bankr. S.D.N.Y. Sept. 5, 2006). The court considered the issue of whether an executive compensation package was a "pay to stay" KERP, which the revised Section 503 disallows, or an incentivizing "produce Value for Pay" plan. The court found that: (a) while some of the executives' bonuses were conditioned on satisfying productivity thresholds, the thresholds were artificially low; (b) a so-called "completion bonus" which became payable upon the company's emergence from Chapter 11 was not tied to anything other than staying with the company until emergence; and (c) proposed "payments in exchange for non-compete agreements upon dismissal or resignation" were really prohibited severance payments. As numerous objections had been filed to the debtor's proposal, the court denied the request and found that the compensation package was really a KERP in disguise.

- *In re Nobex Corp.*, No. 05-20050, 2006 Bankr. LEXIS 417 (Bankr.

509

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

D. Del. Jan. 19, 2006). The debtor sought authority to provide incentive pay to two senior managers. The payments were structured as a percentage of proceeds related to the sale of substantially all of the debtor's assets. The debtor argued that because this was an incentive payment, rather than a severance or retention payment, the Section 503(c) restrictions did not apply. The court agreed and granted the motion, finding that the senior managers possessed unique skills and expertise necessary to effectuate the sale, thus justifying the sale-related incentive pay.

- *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (Bankr. D. Del. July 28, 2006 and Aug. 22, 2006) (*unreported*). The debtor sought approval to pay bonuses to 116 supervisory personnel, including its top ten managers, pursuant to two "incentive" plans that had been authorized by the company *prepetition*. Although objections were filed to the motion, the court quickly authorized the bonuses for mid-level supervisors (non-insiders) but scheduled a hearing with respect to the nine senior managers' bonuses. The debtor then sought to hold that hearing under seal (making the court record non-public) arguing that (a) much of the information that they planned to present was highly confidential, (b) competitors might try to use this information to gain a competitive advantage or to lure away employees, and (c) publication of the bonus terms might create low morale and an unhealthy work environment. The court granted the request to seal the hearing. Ultimately, in an order that was made public, the court authorized payment of all the bonuses but conditioned payment to the nine senior managers on, among other things, the debtor providing individual manager performance details to the creditors' committee.

- *Nellson Nutraceutical, Inc.*, No. 06-10072 (Bankr. D. Del. July 18, 2006) (*unreported*). The debtor filed a motion seeking approval of a management incentive plan which included payment of a maximum of $1.4 million in "incentive" payments to nine senior executives based on budgeted EBITDA targets. Among the plan details disclosed were that (a) no incentive payment would be made unless 75 percent of the budgeted EBITDA target was satisfied, and (b)

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

certain events — for example, a sale of company assets — would trigger a change in the EBITDA targets. The creditors' committee and the U.S. Trustee objected on grounds that the program was a poorly disguised KERP and that the debtor provided insufficient information to justify payments under Section 503(c). The debtor agreed to provide information at a hearing, albeit under seal. The bankruptcy court authorized the debtor's request to close the hearing and ultimately issued an order – without explanation – authorizing the proposed management incentive plan.

- *In re Riverstone Networks, Inc.*, No. 06-10110 (Bankr. D. Del. March 28, 2006) (*unreported*). The debtor sought approval for certain bonus programs for, among others, 15 members of the senior management team. The debtor argued that although these payments were partially to "insiders," the bonus program (which was in place the year before the debtor filed for bankruptcy) was based on specific performance criteria (rather than retention incentives) and, therefore, Section 503(c) did not apply. The debtor's motion also noted that certain severance benefits existed but that these proposed payments to insiders were less than the severance benefit cap under Section 503(c)(2). The court approved the programs.

- *In re FLYi, Inc.*, No. 05-20011 (Bankr. D. Del. Feb. 3, 2006) (*unreported*). The debtor's compensation plan included payments to six insiders. An objection was lodged under revised 503(c). As the debtor was being liquidated, the debtor then amended the plan and sought to pay the insiders through severance payments (payable on termination) at less than the prohibited ten times the "mean severance pay given to nonmanagement employees during the calendar year during which the payment is made." Upon analysis of the mean, the debtor showed that the cap was not exceeded with respect to most of the insiders and agreed to modify the bonus plan to reduce the payment to two insiders so that Section 503(c)(2) would not come into play. One objection was filed to the debtor's new proposal which argued that the pool from which the "mean" was determined — 171 employees were part of the current severance program — was incorrect and that the severance treatment of former employ-

511

ees should also be considered. Noting some lack of clarity in the statute, the court found that the current severance plan was the appropriate measure of the "mean" as it was from the current calendar year, and granted the motion.

- *In re Refco, Inc.*, No. 05-60006 (Bankr. S.D.N.Y. Jan. 17, 2006) (*unreported*). The debtor sought to implement a key employee compensation program that provided (a) for the payment of year end bonuses and (b) for an incentive program. The debtor would not identify or provide specific compensation information for the key employees that were to obtain these benefits although the debtor claimed that none were officers or directors or otherwise "insiders" (the group identified in Section 503(c)). One party objected and questioned whether one individual was an "insider." The court would not allow testimony in that regard and took the debtor's representation on its face. The court further questioned whether the issue for the objectant was really an expense allocation issue (the objectant seemed to agree). The court then granted the motion, concluding that new Section 503(c) did not apply as the employees were not insiders. The program at issue in *Refco* did not cover any members of the debtors' most senior management.

## Information Sharing

*Relevant Bankruptcy Code Section:* 1102(b)(3)

*Background/Reform Act Change:*

The Reform Act imposes new disclosure requirements on creditors' committees in a Chapter 11 case. Through amendments to Section 1102(b)(3) of the Bankruptcy Code, official committees are now required to, among other things, grant access to information to non-committee creditors and solicit and receive their comments. Neither the Bankruptcy Code nor the legislative history provide an explanation of what kind of information the committee must provide.

512

*Effect on Bankruptcy Practice:*

The addition of Section 1102(b)(3) caused concern in bankruptcy circles that creditors committees would be *required* to share confidential information with creditors not bound by confidentiality restraints. Fortunately, a more or less formulaic procedure has developed that should alleviate many of those concerns. Often now, as part of the first day motions, a debtor will file a motion that seeks confirmation that, once formed, the committee cannot share confidential, non-public propriety or privileged information. *See, e.g., In re Nellson Nutraceutical, Inc.; In re Dana Corp.* After the committee is formed, the committee (at least in cases to date) supports the motion and the judge enters the requested order. The parties may then seek to file a stipulation and order which sets forth the exact duties the committee has under Section 1102 with respect to dissemination of information.

Another option is for the debtor to wait and allow the creditors' committee to file a motion that seeks to keep "confidential information" confidential and that outlines (and seeks court approval for) the steps that the committee has to take to satisfy Section 1102(b)(3). *See, e.g., In re Refco, Inc.* The prevailing approach, given the need for certainty at the outset of the case and given that the general protocol now seems to be well-established, appears to be for the debtor to file the motion.

*Case Summaries:*

- *In re Refco, Inc.*, 336 B.R. 187 (Bankr. S.D.N.Y. 2006). Upon motion by the creditors' committee to clarify its obligations under amended Section 1102, the bankruptcy court first found that a pre-Reform Act Bankruptcy Code provision — Section 704(7) — could be reviewed as a source for interpretation as that section required similar disclosures by trustees. In light of its analysis of Section 704 and the related case law, the court then held that, absent a court order, the creditors' committee did not have to provide information that was confidential or proprietary, that might result in a waiver of the attorney-client privilege, or that could result in a securities law violation. The court then required, to comply with Section 1102, that the committee (a) establish a Web site for general information

513

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

on the case, (b) distribute case updates via e-mail to creditors who request such information, (c) establish a contact number and e-mail for creditor inquiries, and (d) create a process by which creditors could seek to obtain confidential information pursuant to appropriate confidentiality agreements.

- *In re Dana Corp.*, No. 06-10354 (Bankr. S.D.N.Y. March 29, 2006) (*unreported*). The debtor filed a motion seeking confirmation that official committees are not authorized or required to provide access to confidential or privileged information. The court entered an order that Section 1102(b)(3) neither authorized nor compelled the committee to provide access to confidential or privileged information to non-committee members.

- *Nellson Nutraceutical, Inc.*, No. 06-10072 (Bankr. D. Del. Feb. 22, 2006) (*unreported*). On the petition date, because of the perceived ambiguity in Section 1102(b)(3), the debtor filed a motion seeking confirmation that the creditors' committee (once formed) was neither authorized nor required to provide access to the debtors' confidential, non-public, proprietary, or privileged information. After the committee was formed, it filed a response to the motion in which it acknowledged the ambiguity that existed in Section 1102(b)(3) and asked the court to provide the same protections with respect to non-public information independently developed by the committee and its professionals. The committee also proposed to meet with the debtor to formulate guidelines for information sharing. The court granted the relief sought in the amended form requested by the creditors' committee.

- *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Feb. 9, 2006) (*unreported*). The committee first filed a motion seeking (i) clarification of its information sharing obligations under Section 1102(b)(3) and (ii) to confirm that it did not have to disseminate confidential, proprietary, non-public, or privileged information. The court provisionally granted the committee's motion. Soon after, the committee and the debtors entered into a stipulation and agreed order establishing procedures for information dissemination.

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

Among other things, the committee agreed to (a) make documents available on a Web site, (b) distribute case updates, and (c) respond to information requests. The committee was not required to disseminate confidential or privileged information, but the stipulation provided a mechanism by which the committee could provide such information should it choose to do so.

## Composition of Official Committees

*Relevant Bankruptcy Code Section:* 1102(a)(4)

*Background/Reform Act Change:*
The old Bankruptcy Code did not provide the courts with any explicit authority to overrule the U.S. Trustee's decisions concerning the membership on an official committee. The Reform Act grants the court authority to order the U.S. Trustee to change the membership of an official committee. The court must find, upon notice and a hearing, that the change "is necessary to ensure adequate representation of creditors or equity security holders." The Reform Act also authorizes the court to order the U.S. Trustee to add a "small business concern" to a committee if that business's claim against the debtor is disproportionately large in comparison to its own annual gross revenue.

*Effect on Bankruptcy Practice:*
The change to this section of the Bankruptcy Code provides a real opportunity for creditors who are initially passed over for a committee seat to obtain a committee appointment. Although there are no reported decisions applying the new provision, the filing of the motion itself seems to be somewhat effective in creating leverage to force an appointment. *See, e.g., In re Werner* (U.S. Trustee agreed to appoint two disgruntled creditors after they brought a motion under revised Section 1104(a)(4)); *In re Refco* (U.S. Trustee agreed to certain changes outlined in summaries below). The lesson learned here is perhaps one we have all heard before: the squeaky wheel gets the grease.

It is also important to note that there are questions with the revisions to Section 1102 that we do not yet have an answer to. For example, does

515

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

this revision strip the U.S. Trustee of any authority to modify the composition of the creditors' committee given that the Bankruptcy Code now expressly provides only the bankruptcy court with the power to do so? And what standard of review should a court use to evaluate the U.S. Trustee's actions in appointing or removing creditors from the committee? While these issues have been raised in cases, the disputes to date have been settled before a court has had the opportunity to rule on these issues.

*Case Summaries:*

- *In re Refco, Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y. August 10, 2006) (*unreported*). The U.S. Trustee removed six members from the Refco creditors' committee, leaving three bondholders to serve. The removed creditors filed a motion seeking reversal of the U.S. Trustee's decision and reinstatement to the committee. They argued that (a) amended Section 1102 provides the court, and not the U.S. Trustee, the discretion to modify the composition of the creditors' committee and (b) alternatively, that the U.S. Trustee abused her discretion in removing a large number of representative creditors. Ultimately, the U.S. Trustee formed an additional official committee to placate the removed creditors.

- *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (Bankr. D. Del. July 12, 2006) (*unreported*). Two noteholders who had been denied seats on the creditors' committee filed a motion seeking appointment to the committee pursuant to amended Bankruptcy Code Section 1102(a)(4). The disgruntled creditors argued that without their participation, the committee — with $18 million in unsecured trade debt represented by three (of the five) committee seats and $140 million in unpaid notes represented by the other two seats — would not adequately represent the unsecured creditors as a whole. The U.S. Trustee initially strongly disagreed, arguing that "this blatant and unmasked power struggle should not be considered or rewarded by the court." Before the court had the opportunity to rule on the motion, the U.S. Trustee relented and appointed both moving creditors to the committee and also appointed the Pension Benefit

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

Guaranty Corporation, thereby ensuring that the bondholders would still not constitute a majority of the entire committee.

## Grounds for Appointment of Trustee, Dismissal, or Conversion ofthe Case

*Relevant Bankruptcy Code Sections*: 1104 and 1112.

*Background/Reform Act Change:*

Where pre-Reform Act law *permitted* courts to convert or dismiss a case for "cause," the Reform Act amended Section 1112 of the Bankruptcy Code to *require* the court, subject to the exceptions set forth below, to convert or dismiss the case if "cause" is established. The Reform Act also added to the definition of "cause" by including, as new elements of "cause" among others, gross mismanagement of the estate, unauthorized use of cash collateral, and failure to comply with an order of the court.

Amended Section 1112(b)(1) provides that (with the exception described below) once cause (as defined in new Section 1112(b)(4)) is found, the court *must* convert or dismiss unless it specifically finds that unusual circumstances (which must be specifically identified by the court) establish that the requested conversion or dismissal is not in the best interest of creditors and the estate. However, Section 1112(b)(2) then limits the foregoing broad mandate for conversion or dismissal by providing that such relief will not be granted (again, in the absence of unusual circumstances specifically identified by the court) if it is established that there is (i) a reasonable likelihood that a plan will be timely confirmed and (ii) a reasonable justification for the act or omission that created "cause" exists and the act or omission will be cured in a reasonable period of time fixed by the court. Additionally, new Section 1104(3) allows the court to appoint a trustee or examiner if grounds exist to convert or dismiss the case but the court determines such an appointment is in the best interests of the creditors and the estate. Finally, the Reform Act requires that any motion that is brought for conversion or dismissal be placed on a "fast track" (where a motion must be

517

heard within 30 days after filing and must be decided within 15 days after the commencement of the hearing unless the movant consents to a continuance or compelling circumstances prevent the court from meeting the statutory timetable).

*Effect on Bankruptcy Practice:*

In yet another swipe at the courts' discretion, the Reform Act's changes to Section 1112 make it extremely difficult for a court not to take some action — whether dismissal, conversion or the appointment of a trustee or examiner — if a well-grounded motion seeking such relief is brought.  Opinions on the new provisions have, so far, not focused on that change but have reached several rather non-controversial conclusions.  For example, a few post-Reform Act cases have found that the "cause" listing is not exhaustive and that the court can still dismiss a case for other non-enumerated reasons.  *See, e.g., In re 3 RAM, Inc.*  A number of other opinions have taken the opportunity to write about the glaring error in Section 1112's use of "and" in the enumerated "cause" list (thus literally making all 15 "cause" factors required for such a finding) to illustrate the poor drafting of BAPCPA, *see, e.g., In re TCR of Denver, LLC.*  Finally, one court addressed its own delay in not abiding by the "fast-track" schedule required by new Section 1112 and found the rather pedestrian excuse it cites to be, as is required by Section 1112(b)(3), "compelling." *See In re Jayo.*  As there seems to be no penalty for such delay, one wonders what would happen if the court just ignored the fast track provisions altogether.

*Case Summaries:*
- *In re 3 RAM, Inc.*, 343 B.R. 113 (Bankr. E.D. Pa. 2006).  The court determined that the list of factors for "cause" is an illustrative rather than an exhaustive list.  Furthermore, the court held that while the feasibility of confirming a plan is a factor that was removed from the revised Section 1112, it is still a factor upon which the court may rely.
- *In re TCR of Denver, LLC*, 338 B.R. 494 (Bankr. D. Colo. 2006).  In addressing a motion to dismiss the case, the court noted that if

518

amended Section 1112 is read literally, *all 15 factors* demonstrating "cause" must be satisfied to dismiss a case. Given that the result of such a reading of the statute would be absurd, the bankruptcy court ignored the conjunctive reading of the subparts and dismissed the case.

- *In re Jayo*, No. 06-20051, 2006 Bankr. LEXIS 1996 (Bankr. D. Idaho July 28, 2006). Although this was a Chapter 11 filing made for an individual, the case is interesting in two respects: (1) the court recognized that Congress made a mistake and that Section 1112(b)(4) should be read in the disjunctive; and, (2) more importantly, the court acknowledged that it issued its decision later than the 15 day "fast track" deadline that Section 1112(b)(3) required. To justify its delay, the court simply held that, "compelling circumstances" prevented it from meeting the time limits established under Section 1112(b)(3). The compelling circumstances, cited by the court were essentially its everyday trial and work schedule.

## Removal of Certain Limitations on the Employment of Investment Bankers

*Relevant Bankruptcy Code Section*: 101(14)

*Background/Reform Act Change:*

A debtor-in-possession may only employ professionals that are "disinterested persons," as that term is defined in the Bankruptcy Code. Pre-Reform Act, "disinterested persons" specifically excluded investment bankers for any outstanding security issued by the debtor or for certain other securities of the debtor, as well as certain parties related to such an investment banker. The Reform Act maintains the "disinterestedness" requirement but repeals the foregoing automatic disqualification of investment bankers and related parties.

*Effect on Bankruptcy Practice:*

The purpose of the amendment to Section 101(14) is to allow investment banks to stay involved with a company and also to open up addi-

519

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

PRATT'S JOURNAL OF BANKRUPTCY LAW

tional possible positions for investment bankers in Chapter 11 cases, such as by serving as financial advisors. Although we have yet to see any scientific study, anecdotal evidence suggests that large, full service investments banks will no longer cede the debtor-side advisory area to bankruptcy boutiques, but will be using the leeway granted by this change to seek a bigger role in bankruptcy cases.

## PLAN ISSUES

### Limitation on Debtor's Exclusive Periods to File Plan and Solicit Acceptance

*Relevant Bankruptcy Code Section:* 1121

*Background/Reform Act Change:*
Under pre-Reform Act law, a debtor in possession had the exclusive right to file a plan of reorganization for 120 days and the exclusive right to solicit acceptances of that plan for 180 days, each measured from the date of the order for relief. This period could be extended an indefinite number of times. Extensions were, in fact, the norm in larger and more complex cases. Congress apparently believed the inherent leverage provided to the debtors by virtually unlimited exclusivity extensions commonly granted by the courts in larger cases was unfair and sought to level the playing field by amending Bankruptcy Code Section 1121.

Under the provisions of the Reform Act, the initial exclusive periods are the same but extensions are limited so that a debtor only has a maximum of 18 months' exclusivity to file a plan of reorganization and 20 months of exclusivity to solicit acceptance of the plan.

*Effect on Bankruptcy Practice:*
This Reform Act change is significant for more complex bankruptcy cases but, given the 18 month time lag, has yet to come into play in any public dispute. Clearly, all debtors who filed for bankruptcy after passage of the Reform Act are aggressively seeking to file a plan within 18 months but the precise ramifications of this provision have yet to be seen. Will the largest and most complex bankruptcy cases — those

520

similar, for example, to Enron and Adelphia — really be able to emerge from bankruptcy in 20 months?  What about the asbestos or other mass tort cases that often remain in the bankruptcy system for over five years?  Will the loss of exclusivity foster plan competition and create a better result or will it simply burden the bankruptcy estate as debtor control is lost and the costs of competing plans are much more likely to be incurred?  Moreover, will the debtor make the right decisions in its rush to cross the plan finish line?

A recent study by the Federal Reserve, released after the effective date of the Reform Act, suggests that the optimal time for a debtor to spend in bankruptcy, as measured by creditor recovery rates, is — consistent with the Reform Act change — roughly 18 months.  *See* Daniel M. Covitz, Song Han, Beth Anne Wilson, *Are Longer Bankruptcies Really More Costly?* (February 2006) (paper for the Board of Governors of the Federal Reserve System).  The Federal Reserve study specifically found that creditor recovery rates increase with duration for roughly 18 months following default but decrease thereafter.  However, recognizing perhaps that asbestos cases and Enron might be of a different ilk, the Federal Reserve authors cautioned that while there may be an optimal time for most bankruptcy cases, the "risk of setting a fixed limit on the reorganization time, …is that such limits may be too low comparing to the optimal time for…complex cases."

## Changes To Solicitation Requirements

*Relevant Bankruptcy Code Section:* 1125(a)

*Background/Reform Act Change:*

For a court to approve a disclosure statement, which is required before any solicitation of acceptances of a plan may be made, the court is required to make a determination that the disclosure statement contains "adequate information" such that a hypothetical investor can make an informed judgment as to whether to accept or reject the plan.  The Reform Act amended the definition of "adequate information" to require the court to consider "the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost

521

of providing additional information." The Reform Act changes also now require that "adequate information" include a discussion of the potential material federal tax consequences of the plan to the debtor and a "hypothetical investor typical of the holders of claims or interests" in each voting class.

*Effect on Bankruptcy Practice:*

The changes to Section 1125(a)'s definition of "adequate information" do two things: (a) they make the disclosure process cheaper for smaller cases by allowing the court to consider case size in a cost-benefit analysis; and (b) they make the disclosure process more expensive by requiring a discussion of potential material federal tax consequences. The cost-benefit analysis is probably aimed at smaller and mid-sized cases for which the cost of a full blown detailed disclosure statement often burdens a bankruptcy estate with professional fees it can not afford. Since disclosure statements in larger cases have traditionally included a federal tax consequence section even before the Reform Act was enacted, this section was probably intended for small and mid-sized companies, and it may be of little consequence in larger reorganization cases.

For creditors, the cost-benefit change probably means little as cost-benefit considerations have long been taken into account by courts in practice. The federal tax consequence analysis requirement may, however, in smaller cases produce a change to the disclosure statement that creditors are actually likely to notice. It should be noted that there is not yet any proof that the additional cost to creditors (who will ultimately pay for this tax advice through higher debtor professional fees) for this debtor-provided public service of sorts is worth the generic tax advice received.

## Encouraging Prepackaged Chapter 11 Cases

*Relevant Bankruptcy Code Section:* 1125(g)

*Background/Reform Act Change:*

Pre-Reform Act, if a debtor commenced solicitation of acceptances of a prepackaged plan but a bankruptcy petition was filed before the end

522

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

of the solicitation period, the solicitation had to cease until a disclosure statement was approved. However, a Reform Act amendment to Section 1125 allows solicitation of a claim or interest holder to continue after the filing of the petition provided that (i) the solicitation to that holder began before the bankruptcy filing and (ii) the solicitation complies with applicable non-bankruptcy law. The requirement that any such solicitation comply with applicable non-bankruptcy law means that in situations when the requirements of the Securities Exchange Act of 1934, as amended, are applicable, those requirements must still be observed.

*Effect on Bankruptcy Practice:*

This change to the Bankruptcy Code, taken in conjunction with the shortening of the exclusivity period provided in Section 1121, makes the filing of a pre-packaged plan by a debtor more enticing. Some evidence suggests that this enticement has worked. In a June 29, 2006 article, the Daily Bankruptcy Review reported that a study[5] found that pre-packaged plans increased after the Reform Act provisions took effect by 17 percent (from 16 percent to 33 percent) of all Chapter 11 cases filed. We will see if this apparent trend continues.

## AVOIDANCE ACTIONS

### Financial Contracts Are Further Protected

*Relevant Bankruptcy Code Sections: 555, 556, 559, 560-62*

*Background/Reform Act Change:*

Certain sections of the pre-Reform Act Bankruptcy Code were designed to protect the commodities and securities markets in the event of a bankruptcy filing of a participant. As explained in the legislative history to those provisions, "protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market."

The pre-amendment Bankruptcy Code identified and defined a group of financial contracts — including forward contracts, repurchase agreements, swap agreements, commodities contracts and securities

523

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

contracts — and allowed counterparties to, among other things, use self-help against a debtor to close out or liquidate the financial contracts (an action which would typically be enjoined for non-financial contracts by the operation of the automatic stay). This, noted the legislative history, minimized "the potential massive losses and chain reaction that could occur if the market were to move sharply in the wrong direction." Counterparties were also allowed to net all payment obligations and foreclose on pledged collateral. In addition, a debtor could generally not recover prepetition payments made pursuant to a financial contract.

The Reform Act changes to these provisions were evolutionary as opposed to revolutionary. The Reform Act expanded the applicability of the protections to additional and new financial products through amendments to the definition of various financial contracts including "securities contract," "commodity contract," "forward contract," "repurchase agreement," and "swap agreement." The Reform Act also expressly defined "Master Netting Agreement," permitting a creditor to "net out" or reduce the obligation it has to the debtor pursuant to different categories of financial products.

Additionally, the Reform Act made clear that the right of a non-debtor party to exercise its contractual rights included the right to liquidate or accelerate for qualified financial contracts and clarified the date from which related damages were to be measured. The amendments provide that the damages for a financial contract which is rejected, terminated, liquidated, or accelerated are measured from the earlier of (i) the date of such rejection, or (ii) the date(s) of such liquidation, termination, or acceleration.

*Effect on Bankruptcy Practice:*

We have yet to see any published cases or other analyses of these provisions but they appear to be well-crafted provisions that address the more important role financial markets now play. Financial market contracts are used by a variety of businesses, including insured banks, agribusinesses, exporters, and insurers. The growth of and changes in the financial markets necessitated the updated and more uniform set of insolvency rules that the Reform Act provides and made them harmo-

524

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

nious with the Federal Deposit Insurance Improvement Act and the Federal Credit Union Act.

## Added Hurdle for Debtor to Recover Pre-Bankruptcy "Preference" Payments

*Relevant Bankruptcy Code Sections:* 547(c)(2), 547(c)(9)

*Background/Reform Act Change:*

A preference action is a bankruptcy created right designed to implement one of the primary purposes of bankruptcy law: fair and equal treatment of all creditors. It enables the estate under certain conditions, to force the return of value paid to one unsecured creditor who was able to obtain a greater percentage of payment from the debtor prepetition than other unsecured creditors. The returned funds are then distributed pro rata to all unsecured creditors. The typical "preference" period is 90 days prior to the bankruptcy filing. Preference actions, of course, are subject to certain defenses. One frequently invoked defense is the "ordinary course" defense. Under its pre-amendment incarnation, the defense prevented a debtor from recovering a transfer if the transfer was (i) a payment of debt incurred by the debtor in the ordinary course of business of the debtor and the transferee; (ii) made in the ordinary course of business of the debtor and the transferee; and (iii) made according to ordinary business terms.

The Reform Act made proving an ordinary course defense easier by requiring the preference defendant to demonstrate only that the underlying debt was incurred in the ordinary course of business of the debtor and the transferee and *either* the transfer (i) was made in the ordinary course of the business dealing between the debtor and the transferee, *or* (ii) was made according to ordinary business terms. Additionally, new Section 547(c)(9) limits preference actions to transfers where the aggregate value is equal to or greater than $5,000 and 28 U.S.C. § 1409(b) requires the preference action be brought in the defendant's home district if the action seeks to collect less than $10,000.

525

*Effect on Bankruptcy Practice*

The amendments to Section 547 are clearly designed to make defending preferences easier for creditors. Nevertheless, the one published decision on the Section 547 revisions does not necessarily support this goal. Where the pre-Reform Act norm was that an action allegedly on "ordinary business terms" be examined only from the creditor's perspective, the bankruptcy court in *In re National Gas* examined an action allegedly on "ordinary business terms" from *both* the creditor's and debtor's perspective. Based on that analysis, the court found that the ordinary business terms defense was not satisfied. While currently the only case on the Section 547(c)(2) revisions, we believe the *National Gas* analysis is probably inconsistent with the revised Section 547(c) and should be relied on with caution.

*Case Summary:*
- *In re National Gas Distributors, LLC*, 346 B.R. 394 (Bankr. E.D.N.C. 2006). In what appears to be the first published case to consider the new revised ordinary course defense, the debtor made two large payments to a bank within the preference period. The bank argued that the payments were made according to ordinary business terms and were therefore protected by Section 547(c)(2). Reviewing the "ordinary business terms" prong of that subsection, the court considered the standard practices in *both* the debtor's and creditor's industries, focusing on the debtor's conduct: "It is clear what was going on here: [National Gas] was going out of business and was paying off those debts which [the owner of National Gas] guaranteed and for which [the owner's] assets stood as collateral." There did not appear to be any evidence that the terms of the loans were unusual or that the payments were not made in accordance with the terms. Nevertheless, the court found the defense did not apply and granted summary judgment to the debtor.

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

## FOREIGN PROCEEDINGS

### While Recognition Process Is Streamlined, Courts Maintain Flexibility

*Relevant Bankruptcy Code Provisions:*  Chapter 15

*Background/Reform Act Change:*

Pre-amendment Section 304 of the Bankruptcy Code authorized United States bankruptcy courts to assist in the administration of insolvency, bankruptcy, or debt restructuring proceedings pending in foreign courts. With the enactment of the Reform Act, Section 304 was repealed and replaced with new Chapter 15 of the Bankruptcy Code.

Relief under Section 304 was dependent upon a court's analysis of the so called Section 304(c) factors, which included comity. Under Chapter 15, those factors play less of a role when a court considers whether to grant relief. Additionally, the process for obtaining recognition of a foreign proceeding has been simplified. In general, a debtor's foreign proceeding is entitled to automatic recognition under Chapter 15, unless recognition would be "manifestly contrary to the public policy of the United States." The legislative history of Chapter 15 states that this exception should be limited to the most fundamental public policies of the United States.

Under Chapter 15, foreign proceedings are divided into two types: foreign main and foreign nonmain. A foreign main proceeding is one that is pending in the debtor's center of main interest ("COMI"). While COMI is not defined under Chapter 15, the debtor's registered office is presumed to be its COMI. Recognition of a foreign main proceeding has certain immediate and automatic effects. For example, the automatic stay generally applicable to U.S. substantive bankruptcy cases applies with respect to the debtor and its property located in the United States upon recognition. A foreign nonmain proceeding is one that is pending where the debtor has an "establishment," which is defined as a place of operations where the debtor carries out nontransitory economic activity. While a foreign nonmain proceeding may be granted recognition, such recognition does not have any immediate effect.

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

Upon recognition of a debtor's foreign proceeding, whether foreign main or foreign nonmain, a court may grant "any appropriate relief." Appropriate relief includes (i) injunctions broader than the automatic stay, (ii) discovery concerning the debtor's assets, liabilities, and affairs, and (iii) additional relief available to a trustee.  Prior to recognition, a court may grant immediate relief upon the filing of a Chapter 15 case, such as a temporary restraining order, if it is urgently needed to protect the debtor's assets or creditors' interests.  A court, however, cannot authorize the use of U.S. bankruptcy law to permit the recovery of pre-bankruptcy transfers under Chapter 15.  Furthermore, Chapter 15 expressly authorizes U.S. courts, trustees and other persons authorized by a U.S. court to cooperate and communicate directly with foreign courts.  Such cooperation can be accomplished by, *inter alia*, (a) coordinating the administration and supervision of the debtor's assets and affairs, (b) implementing agreements relating to the coordination of proceedings, and (c) coordinating concurrent proceedings.

*Effect on Bankruptcy Practice:*
Under Chapter 15, courts retain the flexibility to grant relief that would best assist in the administration of the foreign proceeding.  A good example of such flexibility under Chapter 15 is the Yukos case.

Yukos is a Russian company that was the subject of bankruptcy application filed against it in Russia.  In the Russian bankruptcy case, a Russian commercial court appointed a receiver (the "Russian Receiver") with certain duties, including the preservation of Yukos' assets. Consistent with his duties, the Russian Receiver sought and obtained orders from the Russian court enjoining Yukos and its management from engaging in certain transactions, including the sale of certain assets, without the consent of the Russian Receiver (the "Russian Court Orders").

At the time of the commencement of the Russian bankruptcy case, Yukos through its managers, several of whom were U.S. citizens and none of whom were in Russia, was in the process of selling significant assets of a Dutch subsidiary.  Notwithstanding the terms of the Russian Court Orders, Yukos continued to proceed with a sale of these signifi-

528

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

cant assets without the Russian Receiver's consent. In order to preserve Yukos's estate, the Russian Receiver commenced a case under Chapter 15 in the United States to obtain recognition of the Russian proceeding and the Russian Orders. Consistent therewith, the Russian Receiver sought and obtained a temporary restraining order from the United States Bankruptcy Court for the Southern District of New York enjoining Yukos and its managers from proceeding with the proposed sale.

Yukos and a major creditor objected to the issuance of a further injunction enjoining the sale, given that, among other things, the proceeds of the sale would be used to pay certain creditors with attachments in the Netherlands. Ultimately, the Russian Receiver determined that while the purchase price for the asset was fair, he could not consent to the proposed sale because under Dutch law the proceeds would benefit only those creditors with attachments in the Netherlands to the detriment of other creditors.

As a result, the United States bankruptcy court was faced with a tough choice: it could (i) permit Yukos to sell a significant asset to the detriment of creditors without attachments in the Netherlands or (ii) enjoin the sale. Given that the proposed sale was for a fair price, the bankruptcy court was not inclined to permanently enjoin the sale. However, the court recognized the need to preserve the proceeds for the benefit of all creditors. Consistent with its authority under Chapter 15, the bankruptcy court issued an order, prior to recognition of the Russian bankruptcy case, that permitted the sale to proceed, and made recommendations to the Dutch court to adopt certain procedures to safeguard the proceeds.

We would expect that United States bankruptcy courts will continue to adopt pragmatic approaches like that adopted in Yukos in future Chapter 15 cases.

*Case Summaries:*

- *In re Seok Lee*, 348 B.R. 799 (W.D. Wash. 2006). The bankruptcy court issued a permanent injunction to prevent creditors from recovering any debt in an amount in excess of the amount provided for under the debtor's Korean plan of reorganization. The bankruptcy

529

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

PRATT'S JOURNAL OF BANKRUPTCY LAW

court held that Chapter 15 did not require the commencement of an adversary proceeding to issue injunctive relief. Rather, Chapter 15 permitted courts to grant injunctive relief by motion.

- *United States v. J.A. Jones Construction Group, LLC*, 333 B.R. 637 (E.D.N.Y. 2005). The district court held that a foreign representative appointed in a Canadian bankruptcy case must obtain recognition from a U.S. court under Chapter 15 before requesting relief directly from other U.S. courts.

- *In re Tri-Continental Exchange, Ltd.*, No. 06-22652, 2006 Bankr. LEXIS 2224 (Bankr. E.D. Cal. Sept. 11, 2006). Noting the Bankruptcy Code's mandate to interpret Chapter 15 in a manner consistent with the application of similar statutes adopted by foreign jurisdictions, the bankruptcy court considered the European Union regulations in analyzing COMI. The EU regulations states that COMI "should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." Therefore, the bankruptcy court equated COMI with a debtor's "principal place of business" under U.S. law. As a result, the court held that the winding up proceedings of companies that had their registered offices and conducted regular business in the St. Vincent and the Grenadines ("SVG") qualified as foreign main proceedings. The court was also asked by a secured creditor to place restrictions on the foreign representatives' ability to use the debtors' funds located in the U.S. However, although Chapter 15 permitted the court to grant this type of relief, the court refused to restrict the use of the debtors' funds because the foreign representatives were being entrusted with the "administration or realization of," and not "the distribution of" the funds. Moreover, given that there had been substantial cross-border law enforcement and the laws of the SVG were structured to protect against the "depredation" of estate assets by professionals, the court was not inclined to place restrictions on the use of the secured creditor's collateral, other than those set forth in Section 363 of the Bankruptcy Code.

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

- *In re Sphinx, Ltd.*, No. 06-11760, 2006 Bankr. LEXIS 2078 (Bankr. S.D.N.Y. Sept. 6, 2006). The bankruptcy court held that notwithstanding that the debtors were registered in (and therefore their COMI presumed to be) the Cayman Islands, the proceedings pending in the Cayman Islands did not qualify as the foreign main proceedings. In its decision, the court acknowledged that while it would "normally" conclude that Cayman Islands was the debtors' COMI, the result of such recognition in this case would automatically stay an appeal of a settlement previously approved in another U.S. bankruptcy case. In turn, the stay of the appeal would effectively overturn the approved settlement without addressing the underlying merits of the appeal. Accordingly, the bankruptcy court refused the grant recognition to the proceedings as foreign main proceedings but granted recognition to the proceedings as foreign non-main proceedings. Subsequent to the bankruptcy court's original determination, the foreign representatives requested that the court reconsider the request to recognize the foreign proceedings as a "main proceedings" on the condition that granting such recognition would not stay the pending appeal. The bankruptcy court has yet to rule on the foreign representatives' request.

- *In re Ephedra Products Liability Litigation*, Nos. 04 MD 1598, 06 Civ. 538, 06 Civ. 539, 2006 U.S. Dist. LEXIS 57595 (S.D.N.Y. Aug. 15, 2006). The district court granted recognition to Canadian foreign claims resolution procedure where it provided claimants with a "fair and impartial proceeding." The district court concluded that the lack of a jury trial in the foreign proceeding did not prevent recognition of the foreign claims resolution process or violate a fundamental public policy of the U.S. such that enforcement of the claims resolution procedure would fall into the "manifestly contrary" to public policy exception.

## NOTES

[1] *See* S. Rep. No. 95-989, at 13-14 (1978), *reprinted in* 1978 U.S.C.A.N. 5787, 5799-5800; *see also*, Carl M. Jenks, *The Bankruptcy Abuse*

531

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

*Prevention and Consumer Protection Act of 2005; Summary of Tax Provisions,* 012606 ABI-CLE 429 (2006).

[2]   An *ad valorem* tax is a tax imposed proportionally on the value of something, rather than on its quantity or some other measure.

[3]   Under Section 502(b)(6) of the Bankruptcy Code, a landlord's claims for damages resulting from the rejection of a real property lease is limited to the rent reserved by the lease, without acceleration, for the greater of either one year or 15 percent, not to exceed three years, of the remaining lease term following the earlier of the bankruptcy filing or the date on which the landlord repossessed or the debtor surrendered the property.

[4]   In *Nellson*, the debtor's initial response to several objections (apparently filed before the debtor determined it was going to seek to seal the hearing on its own plan) notes that it is difficult to obtain guidance from unpublished court approvals relating to 503(c) because the precise terms of such benefit plans have been filed under seal.

[5]   The study examined 33 cases with $50 million or more in debt filed on or after October 17, 2005 (the Reform Act's effective date) and 103 cases with $50 million or more in debt filed in 2004 and pre-October 17, 2005 in 2005.

Published in the January/February 2007 issue of Pratt's Journal of Bankruptcy Law.
Copyright ALEXeSOULTIONS, INC.

# EXHIBIT 5

### Recent Chapter 11 Cases With Prompt Plan Confirmation Dates

| Company | Court and Case No. | Filing Date | Plan Confirmation Date |
|---|---|---|---|
| ABB Lummus Global, Inc. | Del. 06-10401 | 4/21/06 | 6/16/06 |
| Amtrol Holdings, Inc. | Del. 06-11446 | 12/18/06 | 5/24/07 |
| Anvil Knitwear, Inc. | S.D.N.Y. 06-12345 | 10/2/06 | 1/10/07 |
| Bally Total Fitness Holding Corp. | | | Anticipated filing with prepackaged plan[1] |
| Blue Bird Body Co. | Nev. 06-50026 | 1/26/06 | 1/27/06 |
| Citation Corporation | N.D. Ala. 07-1153 | 3/12/07 | 4/5/07 |
| Copelands' Enterprises, Inc. | Del. 06-10853 | 8/14/06 | 4/24/07 |
| Curative Health Services, Inc. | S.D.N.Y. 06-10552 | 3/27/06 | 5/22/06 |
| Davis Offshore LP | S.D. Tex. 06-20152 | 3/7/06 | 3/10/06 |
| Easy Gardener Products, Ltd. | Del. 06-10396 | 4/19/06 | 11/14/06 |
| Home Products International, Inc. | Del. 06-11457 | 12/20/06 | 3/8/07 |
| Inland Fiber Group, LLC | Del. 06-10884 | 8/18/06 | 11/9/06 |
| InSight Health Services Corp. | Del. 07-10701 | 5/29/07 | Proposed prepackaged plan |
| Integrated Electrical Services, Inc. | N.D. Tex. 06-30602 | 2/14/06 | 4/28/06 |
| J.L. French Automotive Castings, Inc. | Del. 06-10119 | 2/10/06 | 6/21/06 |
| McLeod USA Incorporated | N.D. Ill. 05-63230 | 10/28/05 | 12/16/05 |
| Neoplan USA Corporation | Del. 06-10872 | 8/17/06 | 12/22/06 |
| Oneida Ltd. | S.D.N.Y. 06-0489 | 3/19/06 | 8/30/06 |
| Pliant Corporation | Del. 06-10001 | 1/3/06 | 6/23/06 |
| PTC Alliance Corp. | W.D. Pa. | 3/10/06 | 7/14/06 |

---

[1] *Bally Says Bondholders Agree to Back Bankruptcy Plan*, Bloomberg.com, 6/18/07, http://www.bloomberg.com/apps/news?pid=20601205&refer=consumer&sid=aU9IIk05I.4M

| | 06-22110 | | |
|---|---|---|---|
| Remy International Inc. | | | Anticipated filing with prepackaged plan[2] |
| Satelites Mexicanos, S.A. de C.V. | S.D.N.Y. 06-11868 | 8/11/06 | 10/26/06 |
| Silicon Graphics, Inc. | S.D.N.Y. 06-10977 | 5/8/06 | 9/19/06 |
| Vesta Insurance Group, Inc. | N.D. Ala. 06-02517 | 7/18/06 | 12/22/06 |

---

[2] *Remy To File For Bankruptcy*, Bostom.com, 6/15/07, http://www.boston.com/business/articles/2007/06/15/remy_to_file_for_bankruptcy/

## Recent Chapter 11 Cases: Expedited Sale Cases

*In re Amcast Automotive of Indiana, Inc.*, Case No. 05-33322 (S.D. Ind.)

    A.    Petition Date – December 1, 2005
    B.    Sale Hearing – March 22, 2006

*In re APX Holdings, LLC,* Case No. 06-10875 (C.D. Cal.)

    A.    Petition Date – March 16, 2006
    B.    Sale Hearing – May 17, 2006

*In re Best Manufacturing Group, LLC*, Case Nos. 06-17415 through 06-17417, 06-17420 and 06-17422 (D. N.J.)

    A.    Petition Date – August 9, 2006
    B.    Sale Hearing – October 4, 2006

*In re Bronco Hazelton Co.,* Case No. 06-70378 (S.D. Ind.)

    A.    Petition Date – May 22, 2006
    B.    Sale Hearing – August 22, 2006

*In re Brook May Music Company,* Case No. 06-32816-11 (N.D. of Tex.)

    A.    Petition Date – July 11, 2006
    B.    Sale Hearing – July 20, 2006

*In re CEP Holdings, LLC, et. al.*, Case No. 06-51848 (N.D. Ohio)

    A.    Petition Date – September 20, 2006
    B.    Sale Hearing – November 30, 2006

*In re Communications Corporation of America,* Case No. 06-50410 (W.D. of La.)

    A.    Petition Date – June 7, 2006
    B.    Sale Hearing – January 18, 2007

*In re Crafts Retail Holding Corp., et. al.,* JA Case No. 07-42272 (E.D.N.Y.)

    A.    Petition Date - May 2, 2007
    B.    Sale Hearing – June 14, 2007

*In re Custom Food Products, Inc.,* JA Case No. 07-10495 (D. Del.)

    A.    Petition Date – April 13, 2007
    B.    Sale Hearing – June 13, 2007

*In re Easy Gardener Products, Ltd.*, Case No. 06-10396 (D. Del.)

    A.    **Petition Date – April 19, 2006**
    B.    **Sale Hearing – May 4, 2006**

*In re G+G Retail, Inc.*, Case No. 06-10152 (S.D.N.Y.)

    A.    **Petition Date – January 25, 2006**
    B.    **Sale Hearing – February 15, 2006**

*In re Joan Fabrics Corporation*, Case No. 07-10479 (D. Del.)

    A.    **Petition Date – April 10, 2007**
    B.    **Sale Hearing – June 28, 2007**

*In the Matter of Engineered Plastic Products, Inc.*, Case No. 06-42714 (E.D. Mich.)

    A.    **Petition Date – March 9, 2006**
    B.    **Sale Hearing – June 28, 2006**

*In re Midland Food Services III, LLC*, Case No. 07-61704 (N.D. Ohio)

    A.    **Petition Date – June 12, 2007**
    B.    **Sale Hearing – August 21, 2007**

*In re Procare Automotive Service Solutions, LLC,* Case No. 06-10605 (N.D. Ohio)

    A.    **Petition Date – March 5, 2006**
    B.    **Sale Hearing – March 24, 2006**

*In re Radnor Holdings Corporation*, Case No. 06-10894 (D. Del.)

    A.    **Petition Date – August 21, 2006**
    B.    **Sale Hearing – September 22, 2006**

*In re Rockaway Bedding, Inc., JA* Case No. 07-14890 (D. N.J.)

    A.    **Petition Date – April 9, 2007**
    B.    **Sale Hearing**

        1.    **Initial Hearing – June 20, 2007**
        2.    **Rescheduled Hearing Date – July 9, 2007**

*In re 2nd Swing, Inc.*, Case No. 06-41759 (D. Minn.)

    A.    **Petition Date – August 23, 2006**
    B.    **Sale Hearing – September 21, 2006**

*In re Steel Parts Corporation,* Case No. 06-52972 (E.D. Mich.)

      A.    Petition Date – September 15, 2006
      B.    Sale Hearing – November 16, 2006

*In re The Rowe Companies*, Case No. 06-11142 (E.D. of Va.)

      A.    Petition Date –  September 18, 2006
      B.    Sale Hearing – October 5, 2006

*In re Three A's Holdings, L.L.C.* (Tower Records), Case No. 06-10886 (D. Del.)

      A.    Petition Date – August 20, 2006
      B.    Sale Hearing – September 6, 2006

*In re Trans-Industries, Inc., et.al.*, Case No. 06-43993 (E.D. Mich.)

      A.    Petition Date – April 3, 2006
      B.    Sale Hearing – June 28, 2006

*In re Treasure Island, Inc.*, Case. No. 06-10416 (D. N.J.)

      A.    Petition Date – January 20, 2006
      B.    Sale Hearing – March 3, 2006

*In re Tweeter Home Entertainment Group, Inc.,* JA Case No. 07-10787 (D. Del.)

      A.    Petition Date – June 11, 2007
      B.    Proposed Hearing To Approve Sale Of Assets – July 13, 2007

*In re Weld Wheel Industries, Inc., et. al.*, Case No. 06-42105 (W.D. of Missouri)

      A.    Petition Date – August 17, 2006
      B.    Sale Hearing – August 23, 2006

*In re World Health Alternatives, Inc.*, Case No. 06-10166 (D. Del.)

      A.    Petition Date – February 20, 2006
      B.    Sale Hearing – March 17, 2006

# EXHIBIT 6



# Prepackaged Bankruptcy Filings

## A Harbinger of Practice Under the New Law

by Nicholas F. Kajon[1]

There has been a recent spate of so-called prepackaged or pre-negotiated bankruptcy filings, including ABB Lummus Global Inc., Blue Bird Body Co., Curative Health Services Inc.,[2] Davis Petroleum Corp., Gemini Air Cargo Inc., Integrated Electrical Services Inc., Oneida Ltd. and PTC Alliance Corp. Prepackaged bankruptcy filings (referred to as "prepacks") entail the pre-petition solicitation of votes on a plan of reorganization to be filed in a chapter 11 case that has not yet been commenced. Because companies rarely achieve functional unanimity, a prepack can be utilized to make the pre-petition deal binding on dissenting creditors. Assuming the requisite acceptances are obtained, the company can file chapter 11, skip most of the preliminary and intermediate steps of the chapter 11 process, and request the immediate scheduling of a hearing on confirmation of the plan.

There will be no need to conduct a separate hearing on the adequacy of the disclosure statement accompanying the plan. Instead, at the confirmation hearing, the plan proponent will request that the court find that either (1) the solicitation of acceptances was in compliance with applicable nonbankruptcy law, *e.g.*, the securities laws; or (2) the pre-petition disclosure statement contained "adequate information."[3] In pre-negotiated bankruptcy filings, either the proponent did not solicit votes pre-petition, or did not obtain the acceptance of all impaired classes whose acceptance was required. In any event, the essential terms of the deal have been agreed to by all major constituencies, who also usually execute plan support agreements. The essence of both prepackaged and pre-negotiated bankruptcy filings is speed. The increasing prevalence of prepacks may be a harbinger of practice under the new law.

## Causes of the Increasing Prevalence of Prepacks

The major reasons for the increasing prevalence of prepacks are: (1) the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005[4] has made the chapter 11 process more expensive and more difficult; (2) the new 18-month limit on the debtor's exclusive right to file a plan reduces management's control over the chapter 11 process; (3) vulture funds are playing an increasing role in distressed situations; and (4) the need for speed. The provisions of the new law that make the chapter 11 process more expensive and more difficult include: (1) a new limit of 210 days on the debtor's deadline to assume or reject leases, with a damage claim for leases that are assumed and subsequently rejected capped at two-year's rent, but subject to administrative expense status; (2) the expansion of the grounds to convert the case to chapter 7, dismiss the case, and appoint a chapter 11 trustee or examiner; (3) a new administrative expense for the value of any goods received by the debtor within 20 days before the commencement of the case; (4) the expansion of the right to reclaim goods shipped while the buyer was insolvent, including increasing the reach-back period from 10 to 45 days and eliminating the ability to deny reclamation by granting an administrative expense or lien; (5) the bolstering of the rights of utilities, including the requirement that adequate assurance of payment be a cash deposit, a letter of credit, a certificate of deposit, a surety bond, a prepayment of utility consumption or another form of agreed security; and (6) new limits on Key Management Retention Programs (so-called "KERPs") and severance packages. Prepacks ameliorate at least the first two of these burdens, and may decrease the need to implement KERPs.

Adding to this difficulty and expense is management's concern that it will have less time to be in control of the chapter 11 process due to the new 18-month limit on the debtor's exclusive right to file a plan. Under the old law, time was on the debtor's side, as recalcitrant creditors, mindful of the time-value of money, could ultimately be worn down into accepting a less than optimal proposal. Under the new law,

each passing day mitigates management's leverage. While it is difficult and expensive for creditors to propose a plan, management is generally reluctant to run the risk, and vultures may be looming. The truncated timeframes with respect to exclusivity and lease assumption provide a powerful incentive for companies in distress to accomplish as much as possible (up to and including plan solicitation) before filing chapter 11.

Compounding these concerns is the increasing likelihood that vulture funds, flush with cash as a result of excess liquidity in our financial system, will purchase a sufficient amount of claims to block confirmation and then try to influence the outcome of the case.[5] Unlike many other creditors, vultures generally have the wherewithal and (by dint of a larger position) a greater economic incentive to investigate management, oppose relief sought by the debtor and propose their own plan if unsatisfied with management's proposal. Unlike trade creditors, vultures do not have a vested interest in the company's survival. More than other creditors, vultures' rates of return benefit from a quick deal, as opposed to a better deal achieved after delay. Thus, vultures are far likelier than other creditors to challenge management for control of the process. Prepacks mitigate many of these risks.

Confirming a plan with the alacrity afforded under a prepack may be particularly critical to preserving going concern value by preserving customer relations (especially with respect to businesses built on trust), maintaining the support of essential suppliers and avoiding the loss of foreign subsidiaries and assets that might be jeopardized by the parent company's chapter 11 filing.

## Effects of the Increasing Prevalence of Prepacks

As a result of these factors, the recent spate of prepacks and pre-negotiated bankruptcies is likely a harbinger of practice under the new law, at least in those instances where companies in distress are not forced to seek bankruptcy relief before a time of their choosing. This presents a host of challenging new issues for both debtors and their constituents. Because there is no automatic stay until a voluntary or involuntary petition is filed, companies in distress will have to build trust and work with creditors in order to buy the time to negotiate a deal, memorialize it in a plan and solicit acceptances. Creditors will have increased leverage because companies in distress will have tremendous incentives to avoid filing chapter 11 until a prepack can be negotiated or an impasse is reached. Assuming that creditors vote in favor of the prepack, both companies and the accepting classes of creditors will benefit from the cost-savings, speed and (relative) certainty associated with prepacks. Under a prepack, debtors will still have to file so-called first day motions, including DIP financing. However, companies in

*(continued on page 12)*

[1] Nicholas F. Kajon is a Shareholder of Stevens & Lee, P.C., and a member of the Bankruptcy and Corporate Restructuring Group practicing in the New York office. © 2006 Nicholas F. Kajon. The opinions expressed herein are those of the author, and not necessarily those of the firm.

[2] The author and his firm served as conflicts counsel to Linklaters in representing Curative. The views expressed herein are general observations. and do not reflect any of the events or circumstances of the Curative chapter 11 case, which was confirmed in May 2006 with overwhelming creditor acceptance.

[3] 11 U.S.C. § 1126(b) (validating pre-petition plan solicitation provided one of the two tests is satisfied). "Adequate information" is defined in 11 U.S.C. § 1125(a).

[4] Most provisions of the new law took effect on October 17, 2005.

[5] For a class of claims to accept a plan, at least two-thirds in amount and more than half in number of allowed claims who actually cast ballots must vote in favor of the plan. 11 U.S.C. § 1126(c). Thus, acquisition of anything more than one-third of the amount of a particular class would constitute a blocking vote. In practice, however, because some creditors will not vote, some will vote against the plan and some will be influenced by positions taken by holders of large positions, acquisition of any large position (even far less than one-third) could give rise to rise to substantial influence in the plan process if not a *de facto* veto.



For more information

on how these issues

may affect your

rights, contact

**Nicholas F. Kajon** at

nfk@stevenslee.com

or **212-537-0403**.

Stevens & Lee, P.C. is a

professional services firm

with 180 lawyers and 40

business and consulting

professionals located in

15 offices throughout the

Mid-Atlantic region.

You can find more

information about

Stevens & Lee, P.C. at

www.stevenslee.com.

*(continued from page 11)*

# Prepackaged Bankruptcy Filings

distress will not be delayed by the formation of a creditors' committee, and the committee's retention of professionals, due diligence and plan negotiation ordinarily encountered in chapter 11, because all that will have occurred pre-petition. Moreover, the so-called "triage" phase of the chapter 11 process will proceed far more smoothly where there has been ample pre-petition disclosure and all major constituencies are onboard.

The biggest losers are creditors and shareholders (whether dissenting classes or disgruntled members of accepting classes) who are out of the money or who are unsatisfied with their recoveries under the prepack. These players will have far less time to effect a more favorable outcome. Moreover, the enterprise value of complex business- es that languish for years in chapter 11 some- times increase dramatically as a result of a turn in the business cycle or other favorable exogenous events affecting the company or its industry. That is far less likely to occur in a prepack, where the duration of the chapter 11 is often measured in weeks if not days. Thus, in a prepack, creditors and shareholders who are out of the money as of the petition date are unlikely to find themselves in the money by confirmation. This effect may be exacerbated by management's control over the timing of the filing of the prepack. For example, management and/or credi- tors enjoying relative seniority may have an incen- tive to file a prepack before business prospects improve, so that lower levels in the capital structure can be wiped out and senior creditors get all of the upside as business conditions improve. Moreover, creditors and shareholders who are dissatisfied with their distributions will not have much time to shop the company. Similar ramifications are inherent in pre-negotiated bankruptcies, although dissenting classes and disgruntled members of accepting classes will generally have a little more time and leverage to enhance their recoveries.

# Conclusion

The increasing prevalence of prepacks will likely have salutary effects for companies in distress (especially where speed is critical to preserving going concern value) and the creditors who can be persuaded to support the prepack. If companies work with their creditors before filing chapter 11 to achieve a mutually advantageous solution (whether memorialized in a prepack or a pre-negotiated bankruptcy), the parties will bene- fit by avoiding the expense, difficulty and uncertainty engen- dered by the new law, as well as the increasing likelihood that vultures will acquire claims and thereby change the dynam- ic of negotiations. On the other hand, creditors and shareholders who are unsatisfied with the prepack will have to move aggressively at an early stage to (1) find an alternative transac- tion that creates more value to enhance their recoveries (e.g., a new investor or buyer who will issue securities that allow disgruntled constituents to share in any potential upside, rather than being wiped out at the bottom of the market), (2) investigate alternative sources of recov- ery such as claims against officers, directors, professional advisors, senior lenders and other parties, and/or (3) consider the filing of an involuntary petition. In fact, disgruntled cred- itors and shareholders will have to organize and take concerted action well before the petition is filed to avoid the steam-roller effect of the confirmation process inherent in a prepack. **Ⅾ**

**PROFESSIONAL • EXPERIENCED • ATTENTIVE**

# RoeWallace
## Esteve Taroff & Taitz LLP
### ATTORNEYS at LAW

31 Oak Street • P.O. Box 352 • Patchogue, New York 11772
Phone: (631) 475-4400 • Fax: (631) 475-9882
E-Mail: thefirm@roewallace.com

## Complete Creditors' Rights Service

- Commercial
- Retail
- Insurance
- Transportation
- Bankruptcy
- Subrogation
- Mortgage
  Foreclosure

## Competitive Rates • AV Rated
## Proven Track Record

### CONTACT:
Lester P. Taroff • l.taroff@roewallace.com
Steven Taitz • s.taitz@roewallace.com
Elliott Portman • e.portman@roewallace.com

**SERVING METROPOLITAN NEW YORK**

# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - x
               :   Chapter 11

In re:             :

               :   Case No. 07-10787 (PJW)

TWEETER HOME ENTERTAINMENT  :

GROUP, INC., et al.,       :   Jointly Administered

               :

        Debtors.   :   Related Docket No. 11

               :

- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 366 (I) APPROVING DEBTORS' ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING REQUESTS BY UTILITY COMPANIES FOR ADDITIONAL ASSURANCE OF PAYMENT, AND (III) SCHEDULING A HEARING WITH RESPECT TO CONTESTED ADEQUATE ASSURANCE OF PAYMENT REQUESTS**

Upon the motion (the "Motion")[1] of the Debtors

for an order, under Bankruptcy Code sections 105(a) and

366 (i) approving adequate assurance of postpetition

payment of the Utility Companies, set forth on Exhibit A

attached hereto, through the Debtors' establishment of

the Utility Blocked Account, (ii) establishing the

Additional Adequate Assurance Procedures for resolving

any Additional Adequate Assurance Requests under

Bankruptcy Code section 366(c), and (iii) scheduling a

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

hearing with respect to any Additional Adequate Assurance Requests that are received on or before the Additional Adequate Assurance Deadline; and upon the Hunt Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by this Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED that:

1.    The Motion is GRANTED, as set forth herein.

**A.    The Utility Blocked Reserve And The Payment Request.**

2.    The Debtors shall have reserved as part of their loan agreement with GECC, $300,000 (the "Utility Blocked Reserve") as adequate assurance, under Bankruptcy Code section 366(b), of payment of charges

incurred by the Debtors for Utility Services provided by the Utility Companies after the Petition Date, subject to the Debtors' rights to seek authority from the Court to decrease the funds reserved in the Utility Blocked Reserve.

3.    In the event the Debtors fail to timely pay for post petition Utility Services, the Utility Company to which any such payment is owed shall be entitled to submit a Payment Request, in the form attached hereto as Exhibit B, to the Debtors and GECC in the amount of the unpaid charges owed to such Utility Company for such postpetition Utility Services.

4.    Notice of any Payment Request shall be sent to the Debtors with copies to (i) counsel for the Debtors and (ii) counsel for GECC by facsimile and electronic mail, as indicated in the form of Payment Request attached hereto.  Through the Payment Request, such Utility Company shall only be permitted to seek payment for unpaid postpetition utility charges.

5.    In the Payment Request, the Utility Company shall (i) certify the amount owed for

3

postpetition Utility Services and (ii) provide the
Debtors with wire transfer or other payment
instructions.

6.   GECC shall have no obligation to
investigate the bona fides of any request to decrease
the Utility Blocked Reserve.  The Debtors assume all
risks with respect to the acts and omissions of, or
misuse of the Utility Blocked Reserve by the respective
Utility Companies that are the beneficiaries of such
Utility Blocked Reserve.  In furtherance and not in
limitation of the foregoing, GECC shall not be
responsible for: (i) the misapplication by any Utility
Company of the proceeds of any payment from funds
reserved pursuant to such Utility Blocked Reserve; or
(ii) any consequences arising from causes beyond the
control of GECC, including any act or omission by a
governmental authority.  The Debtors' only recourse in
the event of an improper Payment Request is against the
party making such Payment Request and not against GECC.

7.   Upon receipt of a Payment Request, the
Debtors shall be and hereby are ordered to request an

advance in the amount of the Payment Request from GECC

without further order of the Court, provided that there

are sufficient funds being reserved pursuant to the

Utility Blocked Reserve and/or pursuant to the Debtors'

post-petition financing (the "DIP Credit Agreement"), to

make such payment, without prejudice to any and all

rights, claims and/or defense of the Debtors with

respect to such Payment Request, including but not

limited to the Debtors' right to contest such Payment

Request in this Court, or any court with jurisdiction.

Any payments made with funds reserved in the Utilities

Blocked Reserve shall be made in the order that the

Payment Requests were actually received by the Debtors.

Following an advance from the Utility Blocked Reserve,

GECC shall take steps to ensure that the reserve of

$300,000 is maintained, provided that the Debtors have

sufficient availability under the DIP Credit Agreement

to make such replenishment.  In the event that the

Debtors' lack sufficient availability, GECC shall have

no obligation to replenish such Utility Blocked Reserve.

GECC will transfer any remaining funds held in the

5

Utility Blocked Reserve upon a commitment termination

date.

B.    The Additional Adequate Assurance Procedures

      8.    The Additional Adequate Assurance

Procedures are hereby approved as follows:

      (a)   Except as provided by the Additional
          Adequate Assurance Procedures, the
          Utility Companies are forbidden to
          discontinue, alter or refuse service on
          account of any unpaid prepetition
          charges, or require additional adequate
          assurance of payment other than the
          Utility Blocked Reserve.

      (b)   The Debtors will serve the Motion and a
          copy of this Order on the Utility
          Companies within two (2) business days
          after entry of the Order granting the
          relief requested herein.

      (c)   In the event that a Utility Company
          maintains that the Utility Blocked
          Reserve is not satisfactory adequate
          assurance of payment as contemplated by
          Bankruptcy Code section 366(c)(2), the
          Utility Company must serve an Additional
          Adequate Assurance Request for adequate
          assurance in addition to or in lieu of
          its rights with respect to funds held the
          Utility Blocked Reserve so that it is
          received by the Debtors and their counsel
          no later than five (5) business days
          prior to the Determination Hearing at the
          following addresses: Tweeter Home
          Entertainment Group, Inc., 40 Pequot Way,
          Canton, Massachusetts 02021, Attn: Duane

Oser, Vice President and Controller of Finance; and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attn: Sarah E. Pierce, Esquire.

(d)   Any Additional Adequate Assurance Request must: (i) be made in writing, (ii) set forth the location for which utility services are provided, (iii) set forth what the Utility Company would accept as satisfactory adequate assurance of payment, and (iv) set forth a fax and electronic mail address to which the Debtors may respond to the Additional Adequate Assurance Request.

(e)   Upon the Debtors' receipt of an Additional Adequate Assurance Request, the Debtors will either (a) advise the Utility Company in writing on or before a day that is no less than three (3) business days prior to the Determination Hearing  that the Additional Adequate Assurance Request is acceptable or (b) contest the Utility Company's request pursuant to Bankruptcy Code section 366(c)(3) at a the Determination Hearing to be held on June __, 2007, or such other date as the Debtors and the Utility Company may agree.

(f)   The Determination Hearing will be an evidentiary hearing at which the Court will determine whether the Utility Blocked Reserve and the additional adequate assurance of payment requested by the Utility Company should be modified pursuant to Bankruptcy Code section 366(c)(3)(A).

7

9.    Absent further order of this Court, the Utility Companies, including any subsequently added Utility Companies, are prohibited from altering, refusing, or discontinuing service to or discriminating against the Debtors on account of unpaid prepetition invoices or due to the commencement of these cases, or requiring the Debtors to pay a deposit or other security in connection with the provision of postpetition Utility Services, other than in accordance with the Additional Adequate Assurance Procedures contained herein.

10.    Any Utility Company that does not serve an Additional Adequate Assurance Request by the Additional Adequate Assurance Request Deadline shall be deemed to have received adequate assurance of payment that is satisfactory to such Utility Company within the meaning of Bankruptcy Code section 366(c)(2), and shall further be deemed to have waived any right to seek additional adequate assurance during the course of the Debtors' chapter 11 cases, except as provided in Bankruptcy Code section 366(c)(3).

11.    The Debtors are authorized, in their sole discretion, to amend Exhibit A attached hereto to add or delete any Utility Company, and this Order shall apply to any such Utility Company that is subsequently added to Exhibit A to the Motion.  For those Utility Companies that are subsequently added to Exhibit A, the Debtors shall serve a copy of this Order on such Utility Company, along with an amended Exhibit A, and such subsequently added entities shall have twenty (20) days from service of this Order to make an Additional Adequate Assurance Request.

12.    In the event that any Utility Company, including a subsequently added Utility Company, files and/or serves an Additional Adequate Assurance Request after the Additional Adequate Assurance Request Deadline, such request shall be treated as a request under Bankruptcy Code sections 366(b) or 366(c)(3), as applicable, and shall be granted, if at all, only after the Utility Company making such request schedules such request for hearing, on notice, in accordance with the provisions of the Bankruptcy Code and the Federal Rules

9

of Bankruptcy Procedure, including Bankruptcy Code sections 366(b) or 366(c)(3).

13.  The Debtors are authorized to pay on a timely basis in accordance with their prepetition practices all undisputed invoices in respect of postpetition Utility Services rendered by the Utility Companies to the Debtors.

14.  Nothing in this Order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365.

Dated:    Wilmington, Delaware
          June 12, 2007

_____
Honorable Peter J. Walsh
UNITED STATES BANKRUPTCY JUDGE

10

## CERTIFICATE OF SERVICE

John D. Demmy hereby certifies that on this 29th day of June, 2007, the foregoing *APPELLANTS' OPPOSITION TO APPELLEES' MOTION TO DISMISS APPEAL* was served via hand delivery on counsel of record, identified below:

Denise S. Kraft, Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

/s/ John D. Demmy
John D. Demmy