## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AMTROL HOLDINGS, INC., *et al.*, | Bankruptcy Case No. 06-11446 (KG) |
| Debtors. | |
| NEW ENGLAND GAS COMPANY, *et al.*, | |
| Appellants, | |
| v. | CA 07-75-GMS |
| AMTROL HOLDINGS, INC., *et al.*, | |
| Appellees. | |

# REPLY BRIEF OF APPELLEES, AMTROL HOLDINGS, INC., *ET AL.* IN SUPPORT OF MOTION TO DISMISS APPEAL

**EDWARDS ANGELL PALMER & DODGE LLP**
Stuart M. Brown (No. 4050)
Denise S. Kraft (No. 2778)
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 777-7770

*Counsel for Appellees*

Dated:  July 11, 2007
          Wilmington, Delaware

## TABLE OF CONTENTS

I.    INTRODUCTION AND PRELIMINARY STATEMENT................................................ 1

II.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................. 6

III.  ARGUMENT....................................................................................................... 8

    A.    The Appeal Should Be Dismissed as Constitutionally Moot
        Because the Court cannot Grant "Any Effectual Relief
        Whatever"..........................................................................................................8

    B.    The Court Can Not Consider National Grid's Request for
        Fees and Expenses ...........................................................................................11

    C.    National Grid is Unable to Establish That The Issue on
        Appeal is "Capable of Repetition Yet Evading Review" .....................................12

        1.    The Issues on Appeal Are Not Too Short To Be Fully Litigated ............ 13

        2.    There is No Reasonable Expectation That National Grid Will Be
            Subject To The Same Action Again by Appellees ................................... 15

    D.    EQUITABLE MOOTNESS...............................................................................16

IV.   CONCLUSION.................................................................................................... 16

WLM_509628_3.DOC/MOLIVERE

# TABLE OF AUTHORITIES

## Cases

Ballas v. Tedesco, 41 F.Supp.2d 531 (D.N.J. 1999)......................................................... 12

Belitskus v. Pizzingrilli, 343 F.3d 632 (3d Cir. 2003)..................................................... 15

Carroll v. President & Commrs. of Princess Anne, 393 U.S. 175, 895 S.Ct. 347,
    21 L.Ed.2d 325 (1968)................................................................................................. 15

Church of Scientology of California v. United States, 506 U.S. 9, 113 S.Ct. 447,
    121 L.Ed.2d 313 (1992).......................................................................................... 11, 12

City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675
    (1983)........................................................................................................................... 13

D'Alessandro v. Bugler Tobacco Co., 2007 WL 130798 (D.N.J. Jan. 12, 2007) ........... 12

Deakins v. Monaghan, 484 U.S. 193, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988)................. 9

Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)......................... 8, 10

Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)..................... 10

Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) .................................. 9

Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) ............................ 15

Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186 (3d Cir. 1990) ................... 12

In re Astle, 338 B.R. 855 (Bankr. D. Idaho 2006).................................................... 4, 14

In re Lucre, Inc., 333 B.R. 151 (Bankr. W.D. Mich. 2005)....................................... 4, 14

International Raw Materials, Lted v. Stauffer Chem. Co., 978 F.2d 1318 (3d Cir.
    1992) ........................................................................................................................... 12

Kastel v. Winnetka Bd. of Educ., Dist. 36, 946 F.Supp. 1329 (N.D.Ill. 1996) ............. 12

Korioth v. Briscoe, 523 F.2d 1271 (5th Cir. 1975)........................................................ 10

Merck & Co., Inc. v. Apotex, Inc., 2007 WL 1470453 (D.Del. May 21, 2007) ........... 10

Merle v. United States, 351 F.3d 92 (3d Cir. 2003)....................................................... 15

Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d
    683 (1976)................................................................................................................... 15

WLM_509628_3.DOC/MOLIVERE

Potomac Electric Power Co. v. The Rowe Companies, 2007 WL 656897 (E.D.Va.
    Feb. 26, 2007) ............................................................................................ 9, 11, 15

Rendell v. Runsfeld, 484 F.3d 236 (3d Cir. 2007)..................................................... 12

SEC v. Medical Comm. For Human Rights, 404 U.S. 403, 92 S.Ct. 577, 30
    L.Ed.2d 560 (1972)............................................................................................. 9

Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) ...................... 13

Taylor v. The Peoples Natural Gas Company, 49 F.3d 982 (3d Cir. 1995) ................. 10

United Public Workers of American (C.I.O.) v. Mitchell, 330 U.S. 75, 67 S.Ct.
    556, 91 L.Ed. 754 (1947)................................................................................. 10

United States v. Fruehauf, 365 U.S. 146, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961).............. 8

United States v. Leon, 468 U.S. 897, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984) ........... 10

Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) ............... 13

**Other Authorities**

C. Wright, Federal Courts 34 (1963) ........................................................................ 7

## I.    INTRODUCTION AND PRELIMINARY STATEMENT

It is easy to sympathize with New England Gas Company's and Narragansett Electric Company's (together, **"National Grid"**) requests for an appellate court to provide an interpretation of section 366 of the Bankruptcy Code[1], and for that appellate court to issue a ruling that will instruct future chapter 11 cases in which a "utility motion" is filed under section 366. With the amendments to the Bankruptcy Code enacted in 2005 through the Bankruptcy Abuse Prevention and Consumer Protection Act (**"BAPCPA"**), National Grid, as a utility provider and recipient of certain benefits under the amended section 366 is searching for that "test case" where an appellate court will interpret section 366(c) consistent with National Grid's tortured reading. This Court in this appeal should deny the request.

The amendment to section 366(c) that is at issue in this appeal is limited to chapter 11 cases. That section permits a utility to seek the bankruptcy court's reconsideration of a determination of the amount of adequate assurance provided by a debtor and focuses on the action that the utility must take. National Grid, however, takes issue with the structure of the shifting burdens in sections 366(b) and (c) and the process approved by the bankruptcy court below and seeks to have this Court read in to section 366(c) the requirement that every debtor post adequate assurance in an amount demanded by the utility, regardless of the reasonableness of the demand, then the debtor should be provided with an opportunity to seek relief from such demand. The statute simply is not so constructed, and this Court should not countenance National Grid's reading.

---

[1] Any capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Appellees' Motion to Dismiss Appeal and Brief in Opposition to the Appeal (the **"Motion to Dismiss"**).

The issue before the Court in this Motion, however, primarily is whether the appeal should be dismissed as constitutionally moot, or whether a narrow exception to constitutional mootness – the "capable of repetition" exception – should apply to permit the appeal to proceed. National Grid principally argues that many bankruptcy cases proceed too quickly to permit it any meaningful opportunity to appeal the decisions of bankruptcy courts approving debtors' provision of adequate assurance of payment of National Grid's post-petition administrative claim. However, as this Court is well aware, chapter 11 cases are filed in several forms: (i) pre-packaged chapter 11 cases; (ii) pre-negotiated chapter 11 cases; and (iii) "traditional" chapter 11 cases. Under a pre-packaged case, the company's plan of reorganization is negotiated prior to the filing of the petition, the company has received all the necessary votes, and the plan can be confirmed once the company actually files its petition for relief, thereby resulting in a very short case. Similarly, in a pre-negotiated chapter 11 case, a company negotiates with its major creditor constituencies and agrees on terms that will be incorporated into a plan. In such a pre-negotiated case, the chapter 11 case is often short in duration with the company's plan of reorganization being filed and approved shortly after the petition date. Notably, however, these two types of cases consist of only a small percentage of chapter 11 cases filed annually and always result in the utility's post-petition administrative claim being paid in full. Consequently, National Grid cannot take issue with the process or result of these cases, as National Grid and all other utilities involved in such cases are not impaired or damaged. Nevertheless, it is these cases on which National Grid requests the Court to focus in analyzing the application of the "capable of repetition" exception, but without bringing to the Court's attention the fact that in everyone of these cases utilities suffer no harm.

WLM_509628_3.DOC/MOLIVERE

In a "traditional" chapter 11 case, the company's case will often proceed for an extended period of time, during which the debtor either restructures its business or liquidates and sells its assets. In those cases where a plan of reorganization has been filed, a company often takes advantage of the entire 18-month period provided for under section 1121 of the Bankruptcy Code (as amended by BAPCPA). In such cases, National Grid may pursue its rights and remedies under section 366, including the right to seek reconsideration under section 366(c), or seek leave to appeal any decision under sections 366(b) or (c).

Amtrol Holdings, Inc. and its debtor direct and indirect, wholly-owned subsidiaries' (collectively, **"Debtors"**)[2] cases were pre-negotiated chapter 11 cases. The Debtors filed for relief on December 18, 2006, had their joint Plan of Reorganization filed on March 1, 2007, and obtained their Confirmation Order on May 24, 2007. The Plan became effective on June 5, 2007 – less than 6 months after the Petition Date. At no time after the Final Utility Order was entered in January 2007 did National Grid seek to avail itself of its right to seek the bankruptcy court's reconsideration of the amount of adequate protection provided by the Debtors; rather, National Grid elected simply to pursue this appeal of an interlocutory order.

Despite the relative quickness in which a confirmation order was entered in the Debtors' cases, statistics on chapter 11 cases filed post-BAPCPA show conclusively that the vast majority of chapter 11 cases are neither pre-packaged nor pre-negotiated cases. See e.g., Appellants' Opposition to Appellees' Motion to Dismiss Appeal (the **"Opposition Brief"**) at page 5, and Exhibit 4 (stating that pre-packaged chapter 11 cases consist of only 33% of all post-BAPCPA

---

[2]    As discussed more fully in the Motion to Dismiss, on May 24, 2007, the Bankruptcy Court confirmed the Debtors' Plan, which became effective and was substantially consummated on June 5, 2007. Pursuant to the Plan, the Debtors are now known as the "Reorganized Debtors," however, for purposes of clarity herein Appellee will be referred to only as the "Debtors" throughout this brief.

cases filed). While the percentage of pre-packaged cases may have increased post-BAPCPA, those cases remain in the minority, but still always result in the utilities' post-petition administrative claims being paid in full. Necessarily then, since section 366 is intended in part to protect a utility from "funding the case," and balances the interests of debtors, the dictates of section 366 and its process to provide adequate assurance of post-petition payment are satisfied in each and every one of these cases, as such claims are paid in full, as required by section 1129(a)(9) of the Bankruptcy Code. Therefore, both prospectively and retrospectively, the adequate assurance provided and the process employed by the courts to provide adequate assurance to utilities satisfies both the letter and spirit of section 366.

Moreover, National Grid cannot establish that no case exists in which a court can address and interpret section 366 of the Bankruptcy Code and the routine "utility motions" filed thereunder. Rather, with the majority of chapter 11 cases being filed as "traditional" cases, opportunities exist for a successful appeal of a "utility motion" and for a court to interpret section 366(c). In fact, courts have already reviewed other issues under amended section 366 – conclusively establishing that these issues are not "capable of repetition yet evading review." See, e.g., In re Lucre, Inc., 333 B.R. 151 (Bankr. W.D. Mich. 2005); In re Astle, 338 B.R. 855 (Bankr. D. Idaho 2006).

The exhibits attached to National Grid's Opposition Brief are nothing more than a red herring. First, the exhibits constituting evidence are not part of the record below or part of the record in this appeal. The evidence has not been admitted in any proceeding providing Debtors with an opportunity to cross examine it and such evidence has not been tested for its authenticity, admissibility or credibility.

Second, while certainly <u>some</u> chapter 11 cases proceed quickly, the vast majority of chapter 11 cases simply do not. In fact, a quick review of the docket for the Bankruptcy Court for the District of Delaware reflects that no fewer than 15 cases are currently pending <u>in this district alone</u> in which an appeal of a "utility order" could timely be decided. <u>See</u> <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.[3] These examples, however, do not reflect the many cases in jurisdictions outside of Delaware in which chapter 11 cases are pending, and in which the opportunity to interpret section 366 remains.

Third, the mere fact that a case proceeds quickly is not relevant, and it is not relevant whether National Grid has an opportunity for review in such cases. What is germane is whether the Court's determination under 366 that the utility has received adequate assurance of payment of its post-petition claim was clearly erroneous as to facts and correct on the law. Conclusion of the case and payment in full of such claims leads only to one conclusion: the determination of adequate assurance of payment by the Bankruptcy Court was dead on correct. The issue is whether a utility can appeal a decision by the bankruptcy court when there is no damage suffered by the utility, or only when there is a risk of damage – non-payment of its post-petition claim. Ironically, only in cases where time permits an appeal is the utility at risk for such non-payment.

National Grid's attempt to mislead this Court from the issue at hand – that there exists no relief which this Court can grant to National Grid on this appeal absent issuing an advisory opinion, and that the "capable of repetition yet evading review" exception to constitutional mootness does not apply – should be recognized by the Court for what it is, a last-ditch effort by

---

[3] <u>Exhibit "A"</u> consists of only a sample list of cases and by no means includes all relevant cases applicable to this proposition. Furthermore, contrary to the exhibits attached to the Opposition Brief, the information contained in Exhibit "A" came directly from the Bankruptcy Court's Public Access to Electronic Court Records (**"PACER"**) from which this Court can take judicial notice.

a utility provider to resurrect a coveted "test case" for itself and other utility companies in future chapter 11 cases involving a section 366 utility motion.

Simply stated, this appeal, given the specific facts of these cases, is not the "test case" that National Grid is looking for. National Grid admits in it Opposition Brief that their request for payment of a two-month deposit is now moot based on the Debtors' Plan being confirmed. Notably, however, nowhere in the Opposition Brief does National Grid address the fact that the only relief that remains as requested prior to Debtors filing their Motion to Dismiss, is for this Court to issue an advisory opinion interpreting section 366 of the Bankruptcy Code for future chapter 11 cases. Because there is no effective relief that can be granted to National Grid in these cases, and because it is improper for this Court to issue an advisory opinion, this appeal must be dismissed as constitutionally moot.

## II.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

The entire premise of National Grid's Appeal and Opposition Brief is that section 366(c) of the Bankruptcy Code, as amended by BAPCPA, benefits utilities by providing them with heightened leverage for negotiating adequate assurance when a company files for relief under chapter 11, and that since the enactment of BAPCPA, certain courts have allegedly misinterpreted or misapplied section 366. Furthermore, although the appeal is constitutionally moot as no relief can be granted to National Grid in these cases, National Grid argues that this Court should apply an extremely narrow exception to the mootness doctrine – the "capable of repetition yet evading review" exception – because more pre-packaged cases are being filed post-BAPCPA. As evidence of this, National Grid attaches journal articles and a select assortment of bankruptcy cases collected from a variety of jurisdictions. In actuality, what National Grid is attempting to do is mislead this Court into applying an exception to the

constitutional mootness doctrine that is available only in exceptional circumstances, and asks for an advisory opinion for utilities to look to solely in <u>future</u> chapter 11 cases and in support thereof, asking the Court to consider untested, unreliable and inadmissible evidence that was not introduced into evidence at the trial court level of the proceeding.

The "capable of repetition yet evading review" exception is a limited exception, to be used in extraordinary situations, such as abortion or voting rights, where the relief requested is impossible given the inherently short nature of the issue being decided and where the harm or damage is suffered and irreversible – the baby is born, the election results tallied. Chapter 11 cases, however, are of varying forms and durations. While some are shorter in duration such as pre-package or pre-negotiated cases, the majority of post-BAPCPA chapter 11 cases involve long periods of time between the petition date and the filing of a plan of reorganization, during which a successful appeal of a section 366 "utility motion" may successfully be completed. <u>See</u>, <u>e.g.</u>, <u>Exhibit "A"</u> (identifying 15 chapter 11 cases involving a "utility motion" with 8-16 months between the petition date and expected end of exclusivity of plan confirmation). In fact, debtors often maximize the 18-month period provided for under section 1121 before filing their plan. Furthermore and most notably, the utilities in all such cases suffer no harm or damage – their post-petition claims are paid in full, thereby reaffirming the bankruptcy court's determination that indeed adequate assurance of payment was provided.

A "utility motion" filed under section 366 is not, however, unique to pre-packaged or pre-negotiated chapter 11 cases. Rather, they are routine filings made in all types of chapter 11 bankruptcy cases. Contrary to this, National Grid argues that because Debtors' pre-negotiated chapter 11 case happened to move efficiently and quickly, and because select other cases identified in Exhibit 5 to the Opposition Brief did as well, that **all** chapter 11 cases will confirm

or liquidate too quickly for a successful appeal of a first day "utility motion." Therefore, under National Grid's twisted rational, this Court must first apply a narrow exception to the mootness doctrine so that it can retain jurisdiction where none exists, and then grant relief in the form of an advisory opinion, contrary to fundamental rulings dating back the history of the federal courts. See, e.g., Flast v. Cohen, 392 U.S. 83, 96 and n.14, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("it is quite clear that 'the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.' The rule against advisory opinions was established as early as 1793 ... and the rule has been adhered to without deviation.") (internal citations omitted) (quoting C. Wright, Federal Courts 34 (1963); citing United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961)). As set forth below and in the Motion to Dismiss, this appeal should be dismissed as the appeal is constitutionally moot and no exception applies.

### III. ARGUMENT

#### A. The Appeal Should Be Dismissed as Constitutionally Moot Because the Court cannot Grant "Any Effectual Relief Whatever"

As set forth in Debtors' Motion to Dismiss, this appeal should be dismissed as constitutionally moot because the court cannot grant "any effectual relief whatever," since there is no longer a case or controversy pending before the Court. National Grid's post-petition claim has been paid in full and section 366 is intended only to provide National Grid with adequate assurance that such claim will be paid, not a guarantee.

There is no dispute between the parties over the legal standard utilized by the courts when applying the constitutional mootness doctrine. The constitutional mootness doctrine is a basis for dismissal when a case or controversy no longer exists due to a change in the facts which renders the case moot. The doctrine is derived from Article III's prohibition against federal

courts issuing advisory opinions. See, e.g., SEC v. Medical Comm. For Human Rights, 404 U.S.

403, 406, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); Hall v. Beals, 396 U.S. 45, 48, 90 S.Ct. 200, 24

L.Ed.2d 214 (1969). "Under Article III of the United States Constitution, federal courts may

adjudicate only actual cases or controversies, rather than advising what the law would be for a

hypothetical state of facts." See Potomac Electric Power Co. v. The Rowe Companies, 2007 WL

656897 (E.D.Va.) (citing Deakins v. Monaghan, 484 U.S. 193, 199, 108 S.Ct. 523, 98 L.Ed.2d

529 (1988)).

Despite National Grid's arguments to the contrary, there is no question that the appeal is

constitutionally moot. As identified in National Grid's (i) Notice of Appeal, (ii) Appellants'

Designation of the Record, and (iii) Opening Brief in their appeal, National Grid seeks the

following relief:

> (i)    the reversal of the Final Utility Order together with a holding that the procedures approved in the Final Utility Order were not in compliance with section 366;
> (ii)   an order directing the Bankruptcy Court to compel Debtors to pay National Grid a two-month adequate assurance deposit;[4] and
> (iii)  in recognition of National Grid's argument that the debtor must pay whatever a utility demands as adequate protection then seek relief from the court, an instruction to the Bankruptcy Court that a debtor must comply with section 366(c)(3) if it desires to modify a utility's adequate assurance of payment request.

National Grid is unable to establish that the remaining relief requested in the appeal is

available given the particular facts of these specific cases. Rather, National Grid attempts to

cloud the issue by introducing articles and reports that are not before the Court in this appeal, not

relevant to this specific appeal, which have no relevance to the issue of constitutional mootness,

---

[4]     In their Opposition Brief, National Grid acknowledges that the second relief requested is moot as Debtors' Plan has been substantially consummated and National Grid is no longer entitled to the adequate assurance guaranteed by section 366. See Opposition Brief at 3 and 8. Accordingly, Debtors will not re-address the application of the constitutional mootness doctrine to this specific request for relief.

and most importantly ignore the fact that National Grid's claims have been paid in full.   Indeed, National Grid was provided adequate assurance of payment of its post-petition claim.

As to the first relief requested, a reversal of the Final Utility Order, together with a holding that the Final Utility Order was not in compliance with section 366, would provide no relief to National Grid.  In these cases, where the Debtors have emerged from bankruptcy and the Final Utility Order entered by the Bankruptcy Court has been rendered moot as to both Debtors and its utility providers, a decision by this Court reversing the Bankruptcy Court's ruling with regard to the Final Utility Order, and holding that the Final Utility Order was not in compliance with section 366, is a request for an advisory opinion interpreting section 366(c) of the Bankruptcy Code, and is, at the bottom line, the only relief National Grid truly seeks in this appeal.  It is not the role of the Court to issue advisory opinions. Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) ("'[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'") (quoting United Public Workers of American (C.I.O.) v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947)); Flast v. Cohen, 392 U.S. at 96 and n.14; Merck & Co., Inc. v. Apotex, Inc., 2007 WL 1470453 at *4 (D.Del.); Taylor v. The Peoples Natural Gas Company, 49 F.3d 982, 991 (3d Cir. 1995) ("federal courts are not to render advisory opinions, but rather are to decide specific issues for parties with real disputes.") (citing Korioth v. Briscoe, 523 F.2d 1271, 1274-75 (5th Cir. 1975); United States v. Leon, 468 U.S. 897, 963, 104 S.Ct. 3430, 3447, 82 L.Ed.2d 677 (1984) (Stevens, J., Concurring) ("[W]hen the Court goes beyond what is necessary to decide the case before it, it can only encourage the perception that it is pursuing its own notions of wise social policy, rather than adhering to its judicial role.")).

Furthermore, in their appeal, National Grid requests that this Court issue an instruction to the Bankruptcy Court that a debtor must comply with section 366(c)(3) if it desires to modify a utility's adequate assurance of payment request. What National Grid asks for in this relief is for this Court to issue a ruling interpreting section 366 of the Bankruptcy Code to cases in which the Final Utility Order no longer does—or can—apply. It is undeniable that should this Court rule in the abstract on the application of section 366, this Court would be issuing an advisory opinion, contrary to well established precedent. See Potomac Electric, 2007 WL 656897 at * 1 ("It has been long settled that a federal court has no authority to 'give opinions upon moot questions or abstract proposition, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'") (quoting Church of Scientology of California v. United States, 506 U.S. 9, 12, 113 S.Ct 447, 121 L.Ed.2d 313 (1992)). Such relief also ignores the broader question, whether the process employed by the debtor or the court provided the utility with adequate assurance of payment. Since National Grid has been paid in full there no longer is any relief available to National Grid to right a wrong. The issuance of such an advisory opinion, in the context of cases where the debtor has emerged from bankruptcy or otherwise provided for payment in full of a utility's administrative claim, would not provide any relief to National Grid.

### B.    The Court Can Not Consider National Grid's Request for Fees and Expenses

Finally, in a desperate attempt to prevent their appeal from being dismissed, National Grid raises **for the first time** in their appeal that this Court should award "fees and expenses." See Opposition Brief at 4 and 8; see also Appellants' Reply to the Brief of Appellees, Amtrol Holdings, Inc., et al. (the **"Reply Brief"**) at 18. This specific relief, however, was not once requested by National Grid in any pleading prior to the Debtors filing their Motion to Dismiss. In fact, the request for "fees and expenses" appears only in National Grid's Reply Brief which

WLM_509628_3.DOC/MOLIVERE

was filed **concurrently** with their Brief in Opposition. Despite this last ditch effort to resurrect
an appeal that must be dismissed, this Court cannot entertain this request for relief. As this Court
is undoubtedly aware, a "party may not raise new issues and present new factual materials in a
reply brief that it should have raised in its initial brief." See Ballas v. Tedesco, 41 F.Supp.2d
531, 533 n.1 (D.N.J. 1999) (refusing to consider request for costs and attorneys fees raised for
the first time in reply brief) (citing International Raw Materials, Ltd. v. Stauffer Chem. Co., 978
F.2d 1318, 1327 n.11 (3d Cir. 1992) (refusing to consider an issue raised for the first time in a
reply brief); Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 204-05 n.29 (3d Cir.
1990); Kastel v. Winnetka Bd. of Educ., Dist. 36, 946 F.Supp. 1329, 1335 (N.D.Ill. 1996));
D'Alessandro v. Bugler Tobacco Co., 2007 WL 130798 at *2 (D.N.J. Jan. 12, 2007).

Because the Debtors have substantially consummated their Plan and have effectuated
their exit from Chapter 11, no relief can be granted to National Grid in this appeal. A ruling by
this Court as to the application of section 366 provides no benefit to National Grid other than to
serve as a guide for National Grid and other utility providers to look to in future chapter 11
cases. Vacating the Final Utility Order will only serve to "declare principles or rules of law
which cannot affect the matter in issue in the case." Church of Scientology of California, 506
U.S. at 12, 113 S. Ct. at 449. Accordingly, this Court must dismiss the Appeal as it is
constitutionally moot.

## C.    National Grid is Unable to Establish That The Issue on Appeal is "Capable of Repetition Yet Evading Review"

As stated in Debtors' Motion to Dismiss, an extremely limited exception applies to the
doctrine of constitutional mootness. The exception to the mootness doctrine is for "wrongs
capable of repetition yet evading review." This exception "is narrow and available 'only in
exceptional situations.'" Rendell v. Runsfeld, 484 F.3d 236 (3d Cir. 2007) (quoting City of Los

Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675, (1983); Weinstein v.

Bradford, 423 U.S. 147, 148-49, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)).  As explained by the

United States Supreme Court:

> the capable-of-repetition doctrine applies only in exceptional
> circumstances where the following two circumstances are
> simultaneously present:  (1) the challenged action is in its duration
> too short to be fully litigated prior to cessation or expiration, and
> (2) there is a reasonable expectation that the same complaining
> party will be subject to the same action again.

Spencer v. Kemna, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

### 1.    The Issues on Appeal Are Not Too Short To Be Fully Litigated Prior To Cessation Or Expiration

National Grid cannot show that an appeal of a section 366 "utility motion" that has been

filed at the very beginning of a debtor's chapter 11 case is of a "duration too short to be fully

litigated prior to cessation or expiration."  Section 366 provides that a utility may file a motion

seeking reconsideration of the bankruptcy court's determination of adequate assurance of

payment at any time after the 30th day of a bankruptcy case.  National Grid and any other utility

may exploit the dictates of such provision, but National Grid in the cases at bar never sought to

avail itself of such rights even once.  Despite National Grid's arguments to the contrary, the issue

for this Court to address is not whether a section 366 utility motion entered in a pre-packaged or

liquidating case will always be too short for an appeal to be fully litigated; rather, the issue is

whether a "utility motion" filed in any chapter 11 case will always be likely to become moot

before an appeal can be fully litigated.  It will not be.  National Grid's Opposition Brief does

nothing but attempt to distract this Court with irrelevant articles discussing the increased

popularity of pre-packaged chapter 11 bankruptcy cases (i.e., from 17% to 33% of all chapter 11

cases), which does nothing to change the fact that opportunities exist for a court to address and

interpret section 366(c) – the very issue on appeal in these cases. While the Debtors' cases were pre-negotiated and, therefore, proceeded to confirmation quickly, the fact remains that National Grid did not seek reconsideration under section 366(c)[5] and cannot show that all or even most current and future chapter 11 cases will proceed to confirmation or liquidate so quickly as to merit the application of an extremely narrow exception reserved for situations where the nature of the harm litigated is by its nature so inherently short that a court could not otherwise address the wrong absent application of the "capable of repetition yet evading review" exception, and indeed, that a wrong continues to be suffered following the expiration of such a short duration. Rather, a cursory review of some recent chapter 11 cases filed in the District of Delaware illustrates that numerous cases exist in this jurisdiction alone in which a chapter 11 debtor has filed a case and the plan of reorganization is not filed sooner than eight months after the petition date. See Exhibit "A." As Exhibit "A" illustrates, no less than 15 chapter 11 cases are readily identifiable in the District of Delaware alone in which a debtor filed a section 366 "utility motion," and for which adequate time for an appeal exists. Moreover, issues relating to the interpretation of amendments under section 366 have already reached the courts. See, e.g., In re Lucre, Inc, 333 B.R. 151 (Bankr. W.D. Mich. 2005); In re Astle, 338 B.R. 855 (Bankr. D. Idaho 2006). This conclusively establishes that the issues raised in National Grid's appeal are not so inherently short as to never be litigated prior to expiration or cessation.

　　As explained by the Supreme Court, for this exception to the mootness doctrine to apply, the injury must be of a type inherently limited in duration so that it is likely to always become

---

[5] The existence of such right of reconsideration under section 366(c) also speaks to the issue why this appeal should be dismissed for lack of jurisdiction, as this is an appeal of an interlocutory order and this Court has not granted leave to National Grid to appeal such interlocutory order.

moot before the federal court litigation is completed and the injury not cured upon such

expiration. See, e.g., Carroll v. President & Commrs. of Princess Anne, 393 U.S. 175, 89 S.Ct.

347, 21 L.Ed.2d 325 (1968) (deeming a ten-day restraining order on a protest demonstration to

be capable of repetition but always likely to evade review because litigation never would be

completed before the ten days expired); Nebraska Press Association v. Stuart, 427 U.S. 539, 96

S.Ct. 2791, 49 Led.2d 683 (1976) (holding that trial court's restraint on media regarding a

pending murder trial to be a wrong capable of repetition yet evading review). National Grid

simply cannot meet this element of the exception as it has been paid in full and sustained no

injury or damage as a result of the bankruptcy cases, the Final Utility Order or otherwise.

Because both elements must simultaneously be present, and because National Grid

cannot satisfy this element to the exception, the appeal must be dismissed.

### 2.    There is No Reasonable Expectation That National Grid Will Be Subject To The Same Action Again by Debtors

As set forth in the Motion to Dismiss, a recent case on point, addressing substantially

similar facts and addressing the amended section 366, is Potomac Electric Power Company v.

The Rowe Companies, 2007 WL 656897 (E.D.Va.). As the Potomac Electric court held, there

must be a "reasonable expectation that the[] same parties will be subject to the same action in the

future." Id. at *3. Further, the Third Circuit has stated on numerous occasions when examining

the "capable of repetition" exception that there must be "a 'demonstrated probability' that the

same parties will again be involved in the same dispute." See Belitskus v. Pizzingrilli, 343 F.3d

632, 648 n.11 (3d Cir. 2003) (citing Honig v. Doe, 484 U.S. 305, 318 n.6, 108 S.Ct. 592, 98

L.Ed.2d 686 (1988)); Merle v. United States, 351 F.3d 92, 95 (3d Cir. 2003). Accordingly,

because the Confirmation Order has been entered, thereby finding the Plan to be feasible, and

because Debtors' Plan has been substantially consummated, there is no reasonable expectation that these same parties will be subject to the same action in the future.

Finally, because both elements must simultaneously be present, and because National Grid cannot satisfy both elements, the appeal must be dismissed.

### D.    EQUITABLE MOOTNESS

National Grid raises the issue of equitable mootness in Section C of its Opposition Brief. This issue, however, was not raised by Debtors in their Motion to Dismiss as it is the Debtors' position that the equitable mootness doctrine does not apply to the specific facts of this appeal. Accordingly, in an effort to conserve judicial resources and maintain the Court's focus on the specific issue at hand in this appeal, constitutional mootness, the Debtors will not reply further to this argument.

## IV.    CONCLUSION

For the foregoing reasons, this Court should (i) dismiss the appeal of National Grid with prejudice; and (ii) grant such further relief as the Court deems just and proper.

DATED:   July 11, 2007                    EDWARDS ANGELL PALMER & DODGE LLP


                                          _____
                                          Stuart M. Brown (No. 4050)
                                          Denise S. Kraft  (No. 2778)
                                          William E. Chipman Jr. (No. 3818)
                                          Mark D. Olivere (No. 4291)
                                          919 North Market Street, Suite 1500
                                          Wilmington, Delaware 19801
                                          (302) 777-7770

                                          Attorneys for Appellees

WLM_509628_3.DOC/MOLIVERE

# EXHIBIT A

**Recent Chapter 11 Cases**

| Company | Court and Case No. | Filing Date | Plan Dates | Time Between Petition Date and Exclusivity or Confirmation |
|---|---|---|---|---|
| Advanced Marketing Services, Inc., et al., a Delaware corporation | 06-11480-CSS | Date Filed: 12/29/2006 | Exclusive Period to File Plan Extended to August 10, 2007 | 8 Months |
| Aphton Corporation, a Delaware corporation | 06-10510-CSS | Date Filed: 05/23/2006 | Plan Confirmed March 29, 2007 | 10 Months |
| Copelands' Enterprises, Inc. | 06-10853-MFW | Date Filed: 08/14/2006 | Plan Confirmed May 1, 2007 | 9 Months |
| Dura Automotive Systems, Inc., et al. | 06-11202-KJC | Date Filed: 10/30/2006 | Exclusive Period to File Plan Extended to September 30, 2007 | 11 Months |
| FLYi, Inc. | 05-20011-MFW | *Date Filed:* 11/07/2005 | Plan Confirmed March 15, 2007 | 16 Months |
| Global Home Products LLC | 06-10340-KG | Date Filed: 04/10/2006 | Exclusive Period to File Plan Extended to August 3, 2007 | 16 Months |
| Global Power Equipment Group Inc. | 06-11045-BLS | Date Filed: 09/28/2006 | Exclusive Period to File Plan Extended to July 12, 2007 | 10 Months |
| Medifacts International, Inc. | 07-10110-PJW | Date Filed: 01/28/2007 | Exclusive Period to File Plan Extended to November 27, 2007 | 10 Months |
| Mortgage Lenders Network USA, Inc. | 07-10146-PJW | Date Filed: 02/05/2007 | Exclusive Period to File Plan Extended to October 3, 2007 | 8 Months |

WLM_509732_1.DOC/CFOX

| Company | Court and Case No. | Filing Date | Plan Dates | Time Between Petition Date and Exclusivity or Confirmation |
|---|---|---|---|---|
| Nellson Nutraceutical, Inc. | 06-10072-CSS | Date Filed: 01/28/2006 | No Plan yet confirmed - Exclusive Period to File Plan Extended to March 26, 2007 | 14 Months |
| Nobex Corporation | 05-20050-CSS | Date Filed: 12/01/2005 | Plan Confirmed October 12, 2006 | 10 Months |
| PPH Liquidation LLC et al | 06-10269-CSS | Date Filed: 03/21/2006 | Plan Confirmed December 19, 2006 | 9 Months |
| Radnor Holdings Corporation | 06-10894-PJW | Date Filed: 08/21/2006 | Exclusive Period to File Plan Extended to July 17, 2007 | 11 Months |
| Three A's Holdings, L.L.C. | 06-10886-BLS | Date Filed: 08/20/2006 | Confirmation Hearing scheduled for 7/31/07 | 11 Months |
| Werner Holding Co. (DE), Inc. | 06-10578-KJC | Date Filed: 06/12/2006 | Plan filed June 19, 2007 – Hearing to Consider Approval of Disclosure Statement for Plan set for July 24, 2007 | 13 Months |

WLM_509732_1.DOC/CFOX

# EXHIBIT B

## UNREPORTED CASES

1.    D'Alessandro v. Bugler Tobacco Co., 2007 WL 130798 (D.N.J. Jan. 12, 2007)

2.    Merck & Co., Inc. v. Apotex, Inc., 2007 WL 1470453 (D.Del. May 21, 2007)

3.    Potomac Electric Power Co. v. The Rowe Companies, 2007 WL 656897 (E.D.Va. Feb. 26, 2007)

# EXHIBIT 1



Slip Copy                                                                    Page 1

Slip Copy, 2007 WL 130798 (D.N.J.)

**(Cite as: Slip Copy)**

**H**
D'Alessandro v. Bugler Tobacco Co.
D.N.J.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Michael R. D'ALESSANDRO, Plaintiff,
v.
BUGLER TOBACCO CO., et al., Defendants.
**Civil Action No. 05-5051 (JBS).**

Jan. 12, 2007.

Michael R. D'Alessandro, Bridgeton, NJ, pro se.
Anne Murray Patterson, Riker, Danzig, Scherer,
Hyland & Perretti, Esqs., Morristown, NJ, John C.
Barnoski, Cozen & O'Connor, Esqs., Philadelphia,
PA, Sarah Brie Campbell, Office of the NJ Attorney
General, Department of law & Public Safety RJ,
Trenton, NJ, David J. Bishop, Crammer, Bishop,
Marczyk & O'Brien, PC, Absecon, NJ, for
Defendants.

### MEMORANDUM OPINION
SIMANDLE, District Judge.
*1 This matter comes before the Court on the motion
of Defendant John Middleton, Inc. (" JMI" ) for
reconsideration of the Court's December 7, 2006
Opinion and Order (" the December Opinion" ),
which denied, in part, JMI's motion to dismiss and
permitted Plaintiff's state law claims to proceed
against JMI. For the following reasons, the Court will
deny the motion for reconsideration:

1. Local Civil Rule 7.1(i) of the United States District
Court, District of New Jersey, governs motions for
reconsideration. The rule requires that the moving
party set forth the factual matters or controlling legal
authority that it believes this Court overlooked when
rendering its initial decision. L. Civ. R. 7.1(i).
Whether to grant reconsideration is a matter within
the district court's discretion, but it should only be
granted where such facts or legal authority were
indeed presented but overlooked. DeLong Corp. v.
Raymond Int'l, Inc., 622 F.2d 1135, 1140 (3d
Cir.1980), overruled on other grounds by Croker v.
Boeing Co., 662 F.2d 975 (3d Cir.1981); Williams v.

Sullivan, 818 F.Supp. 92, 93 (D.N.J.1993). The
purpose of a motion for reconsideration " is to correct
manifest errors of law or to present newly discovered
evidence." Harsco Corp. v. Zlotnick, 779 F.2d 906,
909 (3d Cir .1985), cert. denied, 476 U.S. 1171
(1986). A motion for reconsideration is improper
when it is used solely to ask the court to rethink what
it has already thought through-rightly or wrongly.
Oritani Savings & Loan Assoc. v. Fidelity & Deposit
Co., 744 F.Supp. 1311, 1314 (D.N.J.1990)(citing
Above the Belt v. Mel Bohannan Roofing, Inc., 99
F.R.D. 99, 101 (E.D.Va.1983)), rev'd on other
grounds, 989 F.2d 635 (3d Cir.1993). Nor is
reconsideration warranted when the moving party
simply recapitulates the cases and arguments
considered by the court prior to rendering its initial
decision. Carteret Sav. Bank v. Shushan, 721 F.Supp.
705, 706-07 (D.N.J.1989).

2. In its December Opinion, the Court found that the
state law claims could survive JMI's motion to
dismiss. The Court noted, however, that it was not
making any findings on the timeliness of Plaintiff's
action because JMI had not moved to dismiss on
statute of limitations grounds.

In its motion for reconsideration, JMI claims that the
Court overlooked the statute of limitations arguments
it raised in its Reply Brief. JMI notes that the Court's
December Opinion did not cite to this brief at all and,
thus, JMI hypothesizes that the Court may have
overlooked it. (JMI Br. at 4-5.) JMI concedes,
however, that it did not raise the statute of limitations
argument in its initial brief on the motion. (Id. at 5.)

4. JMI is correct in noting that the Court did not
consider its Reply Brief in formulating the decision
on JMI's motion to dismiss. However, the Court did
not simply " overlook" this brief; rather JMI failed to
properly file the brief. Although JMI filed the brief
electronically, Local Civil Rule 7.1(g) required JMI
to submit a courtesy copy of the brief to the Judge's
chambers in paper form as well. If JMI had addressed
this rule, the brief would have come to the Court's
attention. Unfortunately, the Court did not search for
a reply brief on the electronic docket, since its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 130798 (D.N.J.)
**(Cite as: Slip Copy)**

absence did not seem noteworthy. Nonetheless, in fairness to JMI, the Court has read the reply brief and addresses it now.

**\*2** 5. The Court declines to consider the statute of limitations argument because it was not raised on the initial motion, as JMI concedes. " A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief. *See International Raw Materials, Ltd. v. Stauffer Chem. Co.,* 978 F.2d 1318, 1327 n. 11 (3d Cir.1992) (refusing to consider an issue raised for the first time in a reply brief); *see also Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 204-05 n. 29 (3d Cir.1990)." *Ballas v. Tedesco,* 41 F.Supp.2d 531, 533 (D.N.J.1999). The reason for not considering new bases for relief raised for the first time in a reply brief is self evident: No sur-reply is permitted, so the opponent has no opportunity to address the new defense.

6. Although the Court did not consider the statute of limitations issue, that is not grounds for reconsideration because JMI did not properly raise the issue in its motion to dismiss. JMI is free to raise the issue properly and brief it, giving Plaintiff an opportunity to respond to any arguments JMI raises and the Court a full opportunity to determine whether the action is barred on statute of limitations grounds. An accompanying Order shall be entered.

D.N.J.,2007.
D'Alessandro v. Bugler Tobacco Co.
Slip Copy, 2007 WL 130798 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**



--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

Page 1

Merck & Co., Inc. v. Apotex, Inc.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
MERCK & CO., INC., Plaintiff,
v.
APOTEX, INC., Defendant.
**C.A. No. 06-230(GMS).**

May 21, 2007.

**Background:** Pioneer drug company brought patent infringement action against generic competitor. Competitor counterclaimed for declaratory judgment of invalidity and noninfringement. Pioneer drug company moved to dismiss complaint, and generic manufacturer moved to amend its answer.

**Holdings:** The District Court, Sleet, J., held that:

(1) court lacked jurisdiction over counterclaim, and

(2) pioneer drug company's alleged manipulation of Drug Price Competition and Patent Term Restoration Act did not violate federal antitrust laws.

Pioneer drug company's motion granted.

**[1] Declaratory Judgment 118A** 61

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(D) Actual or Justiciable Controversy
      118Ak61 k. Necessity. Most Cited Cases
Declaratory Judgment Act requires actual controversy between parties before federal court may exercise jurisdiction over action for declaratory judgment. 28 U.S.C.A. § 2201.

**[2] Declaratory Judgment 118A** 62

118A Declaratory Judgment

  118AI Nature and Grounds in General
    118AI(D) Actual or Justiciable Controversy
      118Ak62 k. Nature and Elements in General. Most Cited Cases

**Declaratory Judgment 118A** 64

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(D) Actual or Justiciable Controversy
      118Ak64 k. Adverse Interests or Contentions. Most Cited Cases
Actual controversy requirement in declaratory judgment action is met when facts alleged, under all circumstances, show that there is substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issue of declaratory judgment. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201.

**[3] Declaratory Judgment 118A** 232

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak232 k. Validity of Patents. Most Cited Cases

**Declaratory Judgment 118A** 234

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak234 k. Claim of Infringement as Condition Precedent. Most Cited Cases
District court lacked subject matter jurisdiction over generic drug manufacturer's counterclaim against pioneer drug company for declaratory judgment of patent invalidity and noninfringement, despite generic manufacturer's contentions that dismissal


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                  Page 2

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

would operate to deny it right to compete with pioneer drug company for want of triggering event under Drug Price Competition and Patent Term Restoration Act, and would injure it by delaying its entry into market, where pioneer drug company presented generic manufacturer with comprehensive covenant not to sue and then voluntarily dismissed its patent infringement suit, and there was no evidence that generic manufacturer's delayed entry into market was any different than what it would have been had pioneer drug company never sued it. Hatch-Waxman Act, § 101(j)(5), 21 U.S.C.A. § 355(j)(5).

**[4]  Antitrust  and  Trade  Regulation  29T**

960

29T Antitrust and Trade Regulation
  29TXVII Antitrust Actions, Proceedings, and Enforcement
    29TXVII(B) Actions
      29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
        29Tk960 k. In General. Most Cited Cases
When determining whether party has standing to bring private action under antitrust laws, courts should consider: (1) causal connection between antitrust violation and harm to plaintiff and intent by defendant to cause that harm, with neither factor alone conferring standing; (2) whether plaintiff's alleged injury is of type for which antitrust laws were intended to provide redress; (3) directness of injury, which addresses concerns that liberal application of standing principles might produce speculative claims; (4) existence of more direct victims of alleged antitrust violations; and (5) potential for duplicative recovery or complex apportionment of damages.

**[5]  Antitrust  and  Trade  Regulation  29T**

587(1)

29T Antitrust and Trade Regulation
  29TVI Antitrust Regulation in General
    29TVI(E) Particular Industries or Businesses
      29Tk584 Intellectual Property
        29Tk587 Patents
          29Tk587(1) k. In General. Most Cited Cases
Pioneer drug company's alleged manipulation of Drug Price Competition and Patent Term Restoration

Act by filing patent infringement action against generic drug manufacturer after it filed abbreviated new drug application (ANDA) and then voluntarily dismissing suit after offering comprehensive covenant not to sue did not violate federal antitrust laws, even though pioneer drug company's actions placed generic manufacturer at competitive disadvantage, where pioneer drug company's actions were expressly sanctioned by Act or contemplated by its legislative history, and consequences to generic manufacturer were specific products of Act. Hatch-Waxman Act, § 101(j)(5), 21 U.S.C.A. § 355(j)(5).

**[6]  Antitrust  and  Trade  Regulation  29T**

587(1)

29T Antitrust and Trade Regulation
  29TVI Antitrust Regulation in General
    29TVI(E) Particular Industries or Businesses
      29Tk584 Intellectual Property
        29Tk587 Patents
          29Tk587(1) k. In General. Most Cited Cases
When patentees attempt to extend their legal monopoly beyond that which is permitted by their statutory grants, such actions can trigger antitrust liability.

**[7]  Antitrust  and  Trade  Regulation  29T**

587(1)

29T Antitrust and Trade Regulation
  29TVI Antitrust Regulation in General
    29TVI(E) Particular Industries or Businesses
      29Tk584 Intellectual Property
        29Tk587 Patents
          29Tk587(1) k. In General. Most Cited Cases
Any adverse effects within scope of patent or statutory right to exclude cannot be redressed by antitrust law.

Mary B. Graham, James W. Parrett, Jr., of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and John DeQ. Briggs, John F. Lynch, Kenneth W. Donnelly, Aaron Myers, of Howrey LLP, Washington, D.C., and Nicholas G. Barzoukas, Suzy S. Harbison, Jason C. Abair, of Weil, Gotshal & Manges, Houston, Texas, and Paul D. Matukaitis, Edward W. Murray, Gerard M. Devlin, of Merck &

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 3

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

Co., Inc. Attorneys for Plaintiff.
Richard L. Horwitz, Kenneth L. Dorsney, of Potter Anderson & Corroon, LLP, Wilmington, Delaware, and A. Sidney Katz, Robert B. Breisblatt, Louise T. Walsh, Esquire, Michael Krol, of Welsh & Katz, Ltd., Chicago, Illinois, Attorneys for Defendant.

### OPINION

SLEET, District Judge.

### I. INTRODUCTION

*1 The plaintiff Merck & Co., Inc. (" Merck" ) filed suit against the defendant Apotex, Inc. (" Apotex" ) in the above-captioned matter, alleging that Apotex committed an act of patent infringement under 35 U.S.C. § 271(e)(2)(A). Merck moves to dismiss its complaint for lack of subject matter jurisdiction because, since filing suit, it has given Apotex a comprehensive covenant not to sue, which removed the controversy between the parties. For the reasons that follow, Merck's motion is granted.

### II. SUMMARY OF STATUTORY FRAMEWORK

The provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 (the " Hatch-Waxman Amendments" ) govern the generic drug approval process.[FN1] The Food and Drug Administration (" FDA" or " Agency" ), provides the following summary explanation of the Act's statutory provisions, at http://www .fda.gov/cder/about/smallbiz/generic-exclusivity.htm, which the court incorporates in pertinent part:

The Hatch-Waxman Amendments are intended to balance two important public policy goals. First, drug manufacturers need meaningful market protection incentives to encourage the development of valuable new drugs. Second, once the statutory patent protection and marketing exclusivity for these new drugs has expired, the public benefits from the rapid availability of lower priced generic versions of the innovator drug.

The Hatch-Waxman Amendments amended the Federal Food, Drug, and Cosmetic (" FD & C" ) Act and created section 505(j). Section 505(j) established the abbreviated new drug application (" ANDA" ) approval process, which permits generic versions of previously approved innovator drugs to be approved without submission of a full new drug application ("

NDA" ). An ANDA refers to a previously approved new drug application (the " listed drug" ) and relies upon the Agency's finding of safety and effectiveness for that drug product. The timing of an ANDA approval depends in part on patent protections for the innovator drug. Innovator drug applicants must include in an NDA information about patents for the drug product that is the subject of the NDA. The FDA publishes patent information on approved drug products in the Agency's publication " Approved Drug Products with Therapeutic Equivalence Evaluations," otherwise known as the " Orange Book." The FD & C Act requires that an ANDA contain a certification for each patent listed in the Orange Book for the innovator drug. This certification must state one of the following: (i) that the required patent information relating to such patent has not been filed; (ii) that such patent has expired; (iii) that the patent will expire on a particular date; or (iv) that such patent is invalid or will not be infringed by the drug, for which approval is being sought.

A certification under paragraph I or II permits the ANDA to be approved immediately, if it is otherwise eligible. A certification under paragraph III indicates that the ANDA may be approved on the patent expiration date. A paragraph IV certification begins a process in which the question of whether the listed patent is valid or will be infringed by the proposed generic product may be answered by the courts prior to the expiration of the patent. The ANDA applicant who files a paragraph IV certification to a listed patent must notify the patent owner and the NDA holder for the listed drug that it has filed an ANDA containing a patent challenge. The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent is not valid or will not be infringed. The submission of an ANDA for a drug product claimed in a patent is an infringing act if the generic product is intended to be marketed before expiration of the patent, and therefore, the ANDA applicant who submits an application containing a paragraph IV certification may be sued for patent infringement. If the NDA sponsor or patent owner files a patent infringement suit against the ANDA applicant within 45 days of the receipt of notice, the FDA may not give final approval to the ANDA for at least 30 months from the date of the notice. This 30-month stay will apply unless the court reaches a decision earlier in the patent infringement case, or otherwise orders a longer or shorter period for the stay.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** The statute provides an incentive of 180 days of market exclusivity to the " first" generic applicant who challenges a listed patent by filing a paragraph IV certification and running the risk of having to defend a patent infringement suit. The statute provides that the first applicant to file a substantially complete ANDA containing a paragraph IV certification to a listed patent will be eligible for a 180-day period of exclusivity beginning either from the date it begins commercial marketing of the generic drug product, or from the date of a court decision finding the patent invalid, unenforceable or not infringed, whichever is first. These two events-first commercial marketing and a court decision favorable to the generic-are often called " triggering" events, because under the statute they can trigger the beginning of the 180-day exclusivity period.

In some circumstances, an applicant who obtains 180-day exclusivity may be the sole marketer of a generic competitor to the innovator product for 180 days. But 180-day exclusivity can begin to run, with a court decision, even before an applicant has received approval for its ANDA. In that case, some, or all, of the 180-day period could expire without the ANDA applicant marketing its generic drug. Conversely, if there is no court decision and the first applicant does not begin commercial marketing of the generic drug, there may be prolonged or indefinite delays in the beginning of the first applicant's 180-day exclusivity period. Approval of an ANDA has no effect on exclusivity, except if the sponsor begins to market the approved generic drug. Until an eligible ANDA applicant's 180-day exclusivity period has expired, the FDA cannot approve subsequently submitted ANDAs for the same drug, even if the later ANDAs are otherwise ready for approval and the sponsors are willing to immediately begin marketing. Therefore, an ANDA applicant who is eligible for exclusivity is often in the position to delay all generic competition for the innovator product.

### III. BACKGROUND

Merck is the owner of nine patents listed in the Orange Book for the drug alendronate sodium, which Merck markets and sells under the trademark Fosamax.[FN2] On February 24, 2006, Apotex sent Merck a letter informing Merck that Apotex filed ANDA No. 077-982, seeking approval from the FDA to market a generic version of Merck's Fosomax tablets. Apotex certified in its ANDA submission that certain Merck patents were invalid, unenforceable

and/or will not be infringed by the commercial manufacture, use, or sale of Apotex's generic version. Apotex was not the first generic filer to challenge Merck's patents on the Fosamax drug.

In the absence of any further information than what Apotex provided in its February 2006 letter, on April 7, 2006, Merck filed this action to protect its rights under the Hatch-Waxman Act. Apotex counterclaimed for a declaratory judgment of invalidity and noninfringement of the nine patents at issue. In August 2006, after receiving more detailed information from Apotex regarding its generic version of Fosamax, Merck granted Apotex a comprehensive covenant not to sue.

### IV. LEGAL STANDARD

**\*3** [1][2] The exercise of judicial power under Article III of the United States Constitution requires the existence of a case or controversy. The Declaratory Judgment Act " requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment." *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed.Cir.1996). The actual controversy requirement is met when, " the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment." *Id.* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). When an actual controversy does exist sufficient to warrant subject matter jurisdiction, however, " the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction." *EMC Corp., 89 F.3d at 810.*

### V. DISCUSSION

Merck argues that, as a result of its covenant not to sue Apotex on the asserted patents, this action is moot and the court lacks subject matter jurisdiction over the purported controversy. Conversely, Apotex asks that the court deny Merck's motion for the following reasons: (1) a dismissal without a finding of invalidity and/or noninfringement would operate to deny Apotex " its right to compete with Merck for want of a ' triggering event' " and that Apotex would be injured by delayed entry into the market; (2) the court should not sanction Merck's "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                              Page 5

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

manipulating the court's jurisdiction" by filing a patent infringement suit, later presenting a covenant not to sue, and then attempting to dismiss Apotex's counterclaims for lack of subject matter jurisdiction; and (3) the court has subject matter jurisdiction because this case satisfies the Supreme Court's test for determining an actual case or controversy. (D.I. 19 at 2.)

### Existence of an Actual Case or Controversy

In _Teva v. Novartis_ Appeals for the Federal Circuit (" Federal Circuit" ) acknowledged that the Supreme Court, in _MedImmune v. Genentech,_ ---U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), disagreed with the Federal Circuit's " reasonable apprehension of suit" test, and refocused the declaratory judgment jurisprudence on earlier Supreme Court precedent. _Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,_ 482 F.3d 1330, 1339 (Fed.Cir.2007). Thus, " the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." _MedImmune v. Genentech,_ 127 S.Ct. at 771 (citing _Md. Cas. Co.,_ 312 U.S. at 273, 61 S.Ct. 510). In support of its argument that an actual case or controversy exists in this case, Apotex points to the Federal Circuit's observation in _Teva v. Novartis:_

\*4 A justiciable declaratory judgment controversy arises for an ANDA filer when a patentee lists patents in the Orange Book, the ANDA applicant files its ANDA certifying the listed patents under paragraph IV, and the patentee brings an action against the submitted ANDA on one or more of the patents. The combination of these three circumstances is dispositive in establishing an actual declaratory judgment controversy as to all the paragraph IV certified patents, whether the patentee has sued on all or only some of the paragraph IV certified patents.

482 F.3d at 1344. The court agrees with the Federal Circuit's observation about what **establishes** a justiciable declaratory judgment controversy in the Hatch-Waxman context. Further, the court recognizes that, when filed, this case also presented a justiciable controversy. A significant distinction between the scenario in _Teva v. Novartis_ and the case here is that Novartis had declined to give Teva a covenant not to sue. Here, after the case was filed, and Merck received further information upon which it could evaluate the infringement action, Merck presented

Apotex with a comprehensive covenant not to sue. The actual controversy must be in existence at all stages of the litigation and cannot merely be present at the filing of the complaint. _Super Sack v. Chase,_ 57 F.3d 1054, 1058 (Fed.Cir.1995).

[3] Article III standing requires " [a] plaintiff [to] allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." _Allen v. Wright,_ 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Here, having received a covenant not to sue, Apotex does not and cannot allege " _unlawful_ conduct" attributable to Merck in connection with its declaratory judgment claim. Further, Apotex's articulated injury-delayed entry to the market-is not fairly traceable to Merck. There is no evidence to conclude that Apotex's delayed entry into the market is any different than what it would have been had Merck never sued it. Thus, Apotex's advancement of this case against Merck becomes merely a means to an end, where the desired " end" is a triggering event but the means to that end, the litigation itself, is not sanctioned under the current legal framework. To proceed to a substantive " court decision" on the merits of Apotex's claims of noninfringement or invalidity would amount to an impermissible advisory opinion. _See Preiser v. Newkirk,_ 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (holding that courts may not render advisory opinions or decide questions that do not affect the rights of the parties to the case).

Merck's covenant not to sue removes any cause for concern that Apotex could be held liable for infringement of the patents in suit. _See Super Sack,_ 57 F.3d at 1059. Moreover, " ' [i]t is well-established that a trial court may be divested or deprived of subject matter jurisdiction over a particular patent claim if the patentee covenants not to assert an infringement claim against a putative infringer.' " _Crossbow Tech., Inc. v. YH Tech., Inc.,_ No. C 03-04360, 2007 WL 174422, at \*2 (N.D.Cal. Jan.22, 2007) (quoting _Eli Lilly & Co. v. Zenith Goldline Pharms.,_ 101 F.Supp.2d 1139, 1142 (S.D.Ind.2000)). Federal Rule of Civil Procedure 12(h)(3) states " _[w]henever_ it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Accordingly, the court must dismiss this action for lack of subject matter jurisdiction.[FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                           Page 6

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

### Manipulation of Court Jurisdiction

**\*5** Notwithstanding the body of law that mandates dismissal, the court is sensitive to Apotex's argument that Merck is manipulating the court's jurisdiction. Indeed, the court must guard its jurisdiction jealously. Apotex highlights an interesting yet troublesome practice that has emerged from the interplay of the Hatch-Waxman regulatory scheme, covenants not to sue, subject-matter jurisdiction, and the typical time cycle of a patent litigation. This lawsuit exposes the ability of pioneer drug companies to potentially hold generics at bay by suing them, as they are authorized to do when a paragraph IV certification is made in an ANDA, and then granting a covenant not to sue, which divests the court of subject-matter jurisdiction. In this way, district courts can be viewed as unwitting agents in a pioneer drug company's ability to defer competition for as long as possible. As unfortunate as it may be for Apotex, this is the framework that the Hatch-Waxman Act created.[FN4] The legislative history suggests that, in fact, Congress contemplated the use of covenants not to sue as a means of resolving any controversy created by the filing of an ANDA:

The provision [a " civil action to obtain patent certainty" ] ... is intended to clarify that Federal district courts are to entertain such suits for declaratory judgments so long as there is a " case or controversy" under Article III of the Constitution. We fully expect that, in almost all situations where a generic applicant has challenged a patent [by filing an ANDA with a paragraph IV certification] and not been sued for patent infringement, a claim by the generic applicant seeking declaratory judgment on the patent will give rise to a justiciable " case or controversy" under the Constitution. *We believe that the only circumstance in which a case or controversy might not exist would arise in the rare circumstance in which the patent owner and brand drug company have given the generic applicant a covenant not to sue, or otherwise formally acknowledge that the generic applicant's drug does not infringe.*

149 Cong. Rec. S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy, ranking member of Senate HELP committee) (emphasis added).

ANDA litigation reaches the federal courts through specialized legislation enacted by Congress, perhaps without the prescience of the maze it would be creating, and the ingenuity of motivated business persons and lawyers to capitalize on its imperfections. These cases represent the intersecting roles of all three branches of government and the pharmaceutical industry: the court's interest in interpreting the existing law so that it can provide justice and equity to injured parties; congressional interest in making laws that will encourage research and development, as well as to speed entry of generic drugs into the market; a regulatory agency's interest in advancing the public health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and the pharmaceutical industry's interest in protecting its bottom line. This court is without the power, however, to ameliorate the problems that have emerged from this interplay.

**\*6** Apotex argues that the Federal Circuit, in *Teva v. Novartis*, recognized that a patentee's actions of only suing on one of its patents frustrated the central purpose behind Hatch-Waxman, and that this court should similarly recognize the gamesmanship behind suing, covenanting not to sue, and moving to dismiss without a decision on the merits. In finding a justiciable controversy in *Teva v. Novartis*, however, the Federal Circuit found frustration of the Hatch-Waxman Act's purpose to be just one of numerous circumstances, in the " totality of circumstances" analysis, that warranted a finding of an actual controversy. 482 F.3d at 1344. Moreover, in the past, both innovator and generic companies have been accused of " gaming" the Hatch-Waxman regulatory regime to their respective benefit.[FN5] Congress responded through legislation. *See* 149 Cong. Rec. S15882-03, S15885 (Nov. 25, 2003) (" [I]n recent years both brand-name and generic drug companies have exploited certain aspects of the Hatch-Waxman Act to delay generic competition. The changes to the [ ] Act ... will stop these abuses." ) (remarks of Sen. Kennedy, ranking member of the Senate HELP committee regarding the " civil action to obtain patent certainty" provision under 21 U.S.C. § 355(j)(5)(C)). Likewise, if it is the view of Congress that pharmaceutical companies are abusing the Act in the way that Apotex complains here, Congress can reform the Hatch-Waxman Amendments as it deems necessary.

### Right to Competition-Antitrust Claim

Apotex's argument that a dismissal without a finding of invalidity or noninfringement would operate to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                        Page 7

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

deny Apotex " its right to compete with Merck for want of a ' triggering event' " coincides with its proposed antitrust counterclaim presented in its motion to amend. As such, the court will address this argument and Apotex's motion together.

Recognizing that motions to amend shall be granted freely under Federal Rule of Civil Procedure 15(a), the court has discretion to deny leave to amend when there is undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). In assessing futility, the court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.* Thus, the court looks to whether Apotex's antitrust claim, if allowed, would survive a motion to dismiss.

[4] The Supreme Court has outlined the factors that courts should consider when determining whether a party has standing to bring a private action under the antitrust laws: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998) (citing *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 537-45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

**\*7** Apotex argues, both in its opposition to Merck's motion to dismiss and in Apotex's motion to amend, that if the court grants Merck's motion to dismiss, the 30-month stay on Apotex's ANDA application will not be terminated, the 180-day exclusivity period will not be triggered, and Apotex, as well as the other secondary generic applicants, will be prevented from entering the generic market until 180 days after the first generic applicant enters the market. With these consequences in mind, Apotex asserts that Merck's actions of filing suit, covenanting not to sue, and moving to dismiss for lack of subject matter

jurisdiction, are an unlawfully anticompetitive and monopolistic scheme to delay entry by Apotex and other generic filers into the market for generic alendronate sodium.

One material aspect of this discussion is whether the FDA's 30-month stay on Apotex's ANDA will terminate upon the court's dismissal of the action. The 30-month stay was introduced to give the generic applicant and NDA holder the opportunity to resolve patent issues prior to commercial marketing. Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf, at 39. 21 U.S.C. § 355(j)(5)(B)(iii)(2003) provides: If such an action is brought before the expiration of [45 days after the date that the paragraph IV notice is received], the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that-

**(I)** if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on-

**(aa)** the date on which the court enters judgment reflecting the decision; or

**(bb)** the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

Merck argues that the parenthetical clause of § 355(j)(5)(B)(iii)(I), " (including any substantive determination that there is no cause of action for patent infringement or invalidity)," instructs that a dismissal for lack of subject matter jurisdiction would lift the 30-month stay on an ANDA. Apotex contends that the FDA has not yet construed the provision, and that the FDA's construction of similar, previously disputed language suggests that nothing less than a court decision of invalidity, noninfringement or unenforceability would affect the stay.[FN6] Neither the parties nor the court can be certain of how the provision will be applied to Apotex. Moreover, the matters pending before the court do not mandate this court's interpretation of the statute. It is noteworthy, however, that the FDA considered a precise answer,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by way of a proposed rule, but later withdrew it without comment. The FDA's proposed rule § 314.107(g) provided in pertinent part:

*8 *Effect of dismissal of litigation on 30-month stay.* If the patent litigation between the ANDA applicant and the patent owner or NDA holder described in paragraph (b)(3)(A) of this section is dismissed without a court decision on the merits of the patent claim, whether the dismissal is with or without prejudice, the agency may immediately approve the ANDA that was the subject of the litigation, if it is otherwise eligible for approval.

180-Day Generic Exclusivity for Abbreviated New Drug Applications, 64 Fed.Reg. 42873, 42886 (1999) (to be codified at 21 C.F.R. pt. 314) (proposed Aug. 6, 1999), withdrawal of proposed rule reflected in 67 Fed.Reg. 66593 (2002).

Certainly, if the mere filing of a patent infringement suit can result in an irrevocable 30-month stay on an ANDA application, except in the limited circumstances of a " substantive decision" on the merits or other narrower circumstances where a court may shorten the stay, then Apotex has a legitimate concern about how such a policy is susceptible to abuse by pioneer drug companies. Ultimately, however, the court cannot remedy every harm or prejudice a party endures. Moreover, not every business disadvantage is appropriately deemed legal injury. The fiercely competitive pharmaceutical industry does not escape these realities. The existing law does not provide an absolute right of a generic drug company to enter the market in which a pioneer drug company and a first-filing generic applicant have legally achieved some market exclusivity.

[5] The court understands that Apotex is at a competitive disadvantage, but as to the harm it claims to have endured, and the relief it seeks, the court's hands are tied. In *Teva v. Pfizer*, the Federal Circuit stated:

The fact that Teva is disadvantaged from a business standpoint by Ivax's 180-day exclusivity period and the fact that Pfizer's decision not to sue Teva creates an impediment to Teva's removing that disadvantage are matters separate and distinct from whether an Article III controversy exists between Teva and Pfizer. The injury about which Teva complains is the product of the Hatch-Waxman scheme and the fact that Pfizer has acted in a manner permitted under that scheme. It is not the product of a threat of suit by

Pfizer.

395 F.3d 1324, 1338 (Fed.Cir.2005), *abrogated by MedImmune v. Genentech,* --- U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). Notwithstanding the Supreme Court's abrogation of the Federal Circuit's reasonable apprehension test, the Federal Circuit's analysis of the distinction between a business disadvantage and an Article III controversy applies with equal force to Apotex's opposition to Merck's motion to dismiss, as well as its motion to add an antitrust counterclaim on the same grounds.

Apotex attempts to distinguish its case from *Teva v. Pfizer* by emphasizing that, unlike Pfizer, Merck chose to sue Apotex, knowing there was no infringement, and then covenanted not to sue. The court will not engage in fact finding as to the disputed accounts of what Merck knew about the merits of an infringement claim against Apotex at the time it filed suit, and whether and under what circumstances, Merck attempted to glean further information before filing suit. The court does not need to resolve these issues because the mere filing of a paragraph IV certification in an ANDA constitutes infringement. *See* 35 U.S.C. § 271(e)(2)(A). Accordingly, Apotex's filing of its ANDA on Merck's Fosamax drug was an act of infringement that afforded Merck the right to sue. The statutory provisions that allow suit under these circumstances render the patentee's subjective motivations for filing suit irrelevant.[FN7]

*9 [6] Intellectual property law and principles foster the creation of market power and antitrust law and principles respond to market power abuses, however, both systems operate to advance consumer welfare by allocating resources, cultivating innovation, and promoting technological progress. *See, e.g.,* Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust: An Integrated Handbook,* (West Group 2000), §§ 15.1 at 800-801. A patent " is an exception to the general rule against monopolies and to the right to access to a free and open market." *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Thus, " [b]y their nature, patents create an environment of exclusion, and consequently, cripple competition. The anticompetitive effect is already present." *Schering-Plough v. Federal Trade Comm'n,* 402 F.3d 1056, 1065-1066 (11th Cir.2005). When patentees attempt to extend their legal monopoly beyond that which is permitted by their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 9

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

statutory grants, such actions can trigger antitrust liability. *Andrx Pharms., Inc. v. Biovail Corp. Intern.,* 256 F.3d 799, 813 (D.C.Cir.2001) (" [E]ven a patent-right holder is not immune from antitrust liability." ).

[7] Any adverse effects within the scope of a patent or statutory right to exclude, however, cannot be redressed by antitrust law. *See United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122, 1127 (D.C.Cir.1981) (" [T]he conduct at issue is illegal if it threatens competition in areas other than those protected by the patent *and is otherwise legal.*" ) (emphasis added). The existing body of case law involving antitrust allegations in the context of ANDA litigation tends to fall within two categories: cases in which the parties bilaterally entered into a collusive agreement that exceeded the scope of a patent grant, thus warranting antitrust scrutiny,[FN8] and cases in which the patentee was considered to have lawfully enforced its patent right, albeit with the consequence of delaying or inhibiting competition. *See, e.g., In re Cardizem CD Antitrust Litig.,* 332 F.3d 896 (6th Cir.2003) and *Valley Drug Co. v. Geneva Pharm., Inc.,* 344 F.3d 1294 (11th Cir.2003) (involving agreements among innovator and generic drug companies that incurred antitrust liability).

The futility of Apotex's proposed amendment is further demonstrated by previously unsuccessful efforts to attach antitrust liability to pharmaceutical companies acting within the Hatch-Waxman regulatory framework and patent grant. *See, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F.Supp.2d 514, 524 (E.D.N.Y.2005) (holding that conduct within the scope of the patent grant is exempt from antitrust scrutiny); *In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d 187 (2d Cir.2006) (affirming district court decision, which held that the claimed injury was not " antitrust injury," which must be caused by something other than the regulatory action limiting entry to the market); *Bristol-Myers Squibb Co. v. Copley Pharm., Inc.,* 144 F.Supp.2d 21, 23-25 (D.Mass.2000) (dismissing an antitrust counterclaim of second ANDA filer against pioneer drug company because the counterclaimant failed to show antitrust injury where the statutory scheme, and not the pioneer drug company, prevented it from entering the market).

**\*10** Thus, Merck's challenged conduct-filing suit upon notice of Apotex's paragraph IV certification and covenanting not to sue-are expressly sanctioned by the Hatch-Waxman Amendments or contemplated by its legislative history. Likewise, the consequences to Apotex-delayed entry in the market for alendronate sodium tablets-are specific products of the statute. Having failed to establish antitrust injury and causal connection between Merck's legal actions and Apotex's alleged harm, which are necessary requirements for antitrust standing, the court considers Apotex's requested amendment to be futile.

## VI. CONCLUSION

Accordingly, Merck's motion to dismiss (D.I.15) is granted as Apotex has failed to establish the existence of an actual case or controversy under the current state of the law. The Clerk of the Court shall mark this action closed and all other pending motions are denied.

## ORDER

IT IS HEREBY ORDERED that:

1. Merck's motion to dismiss for lack of subject matter jurisdiction (D.I.15) is GRANTED.

2. Apotex's motion for leave to file a surreply (D.I.26) is DENIED.

3. Apotex's motion for leave to file its first amended answer, affirmative defenses, and counterclaims (D.I.28) is DENIED.

4. Apotex's motion for leave to substitute corrected exhibits to its pending motion for leave (D.I.36) is DENIED as moot.

5. Merck's motion to stay (D.I.68) is DENIED as moot.

6. All claims in Merck's Complaint (D.I.1) are DISMISSED.

7. All counterclaims in Apotex's Answer, Affirmative Defenses, and Counterclaims (D.I.8) are DISMISSED.

8. Each party shall bear its own costs and attorneys' fees.

FN1. The Hatch-Waxman Amendments were modified by the Medicare Prescription

--- F.Supp.2d ----                                                          Page 10

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

Drug, Improvement, and Modernization Act of 2003. Pub.L. No. 108-173, § 1101(a)(2)(A)(ii), 117 Stat.2066 (amended 2003). Herein, all references to the Hatch-Waxman Amendments and its regulatory framework include the scope of the provisions as later modified.

FN2. The patents listed in Merck's NDA, which are the patents-in-suit, are U.S. Patent Nos. 5,358,941; 5,681,590; 5,849,726; 6,008,207; 6,090,410; 6,194,006; 5,994,329; 6,015,801; and 6,225,294.

FN3. Apotex also contends that the collateral consequences doctrine permits the court to retain jurisdiction. The court has considered the parties' arguments and finds Apotex's position to be without merit.

FN4. The court is also troubled by the practical realities of a scheme, which in effect, if left as is, enmeshes the district courts in unnecessary, and in this court's opinion, improper involvement in business competition. This cycle not only contributes to court congestion but it wastes the court's valuable time and limited resources by conducting the business it must for these cases, until it reaches the merits of such contested motions to dismiss. The time-triggered provisions of the statute unrealistically presuppose the time in which the district courts are to manage their cases. While the court endeavors to be efficient and expeditious in resolving the matters pending before it, time proscriptions such as those that Congress has assumed in the Hatch-Waxman provisions, and those upon which the litigants press the court, are idealistic at best and unfeasible in practice. The joint effort of the branches of government to balance the interests of consumers with those of innovator and generic drug companies should not be so tunnel-visioned as to facilitate litigants in their attempts to catapult ANDA litigation as a priority in the district courts.

FN5. The Federal Trade Commission issued studies in 2002 and 2003 that examined and commented on the conduct of drug companies in the generic drug approval

process. Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf; Fed. Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy, (2003), available at http://www.ftc.gov/os/2003/10/innovationrpt.pdf.

FN6. See Apotex, Inc. v. FDA, 449 F.3d 1249 (D.D.C.2006) (upholding FDA's decision finding that dismissal for lack of subject matter jurisdiction did not qualify as a " court decision" sufficient to trigger the 180-day exclusivity period).

FN7. The court is by no means discharging the requirements of Rule 11 in the context of Hatch Waxman litigation. In this case, however, there are no alleged facts from which the court can conclude that, in fact, Merck knew that Apotex's generic version of Fosamax did not infringe Merck's patents at the time it filed suit pursuant to its statutory right to do so upon Apotex's paragraph IV certification. Although the Rule 12(b)(6) standard requires the court to accept all well-pleaded allegations as true, and to view them in the light most favorable to plaintiff, the court will not credit bald and conclusory allegations. See United States v. Vespe, 868 F.2d 1328, 1340 (3d Cir.1989) (stating conclusory statements need not be credited).

FN8. " It is widely understood that the 180-day exclusivity period offers the potential for collusive settlement arrangements between pioneers and generics. A pioneer could initiate a patent infringement suit against a first generic ANDA filer and settle the litigation with a ' non-entry' payment to the generic, under which the generic would delay commercialization of the generic product, thus postponing the commencement of the 180-day exclusivity period and locking other generics out of the market indefinitely." Herbert Hovenkamp et al., Anticompetitive Settlement of Intellectual Property Disputes, 87 Minn. L.Rev. 1719, 1755 (2003).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 11

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**


D.Del.,2007.

Merck & Co., Inc. v. Apotex, Inc.

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



Slip Copy                                                                                      Page 1

Slip Copy, 2007 WL 656897 (E.D.Va.)

**(Cite as: Slip Copy)**

Potomac Elec. Power Co. v. Rowe Companies
E.D.Va.,2007.
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.
POTOMAC ELECTRIC POWER COMPANY, et
al., Appellants
v.
The ROWE COMPANIES, et al., Appellees.
**Nos. 1:06CV1464, 1:06CV1465, 1:06CV1466
(JCC).**

Feb. 26, 2007.

Kevin R. McCarthy, McCarthy & White PLLC,
McLean, VA, for Appellants.
Dylan Gillespie Trache, Wiley Rein LLP, McLean,
VA, for Appellee.

### *MEMORANDUM OPINION*
JAMES C. CACHERIS, United States District Court
Judge.
**\*1** This case arises from the appeal of a decision by
the United States Bankruptcy Court for the Eastern
District of Virginia. The instant matter before the
Court is Appellees' motion to dismiss the appeal for
mootness and lack of standing. For the following
reasons, the Court will grant Appellees' motion.FN1

> FN1. Recently, the United States
> Bankruptcy Court for the Eastern District of
> Virginia entered an order converting the
> Rowe Furniture bankruptcy case
> (1:06cv1465) to Chapter 7. At oral
> argument, Rowe Furniture's trustee was not
> present, but the same arguments and issues
> in its pending motion to dismiss were
> addressed. In accordance with the Court's
> ruling as to The Rowe Companies' and
> Storehouse's motions, this Court also will
> grant Rowe Furniture's motion.

### I. Background

On September 18, 2006, Rowe Furniture, Inc., The
Rowe Companies, and Storehouse, Inc. (collectively,

" Appellees" or " Debtor-Appellees" ) filed
voluntary petitions for relief under Chapter 11 of the
Bankruptcy Code with the United States Bankruptcy
Court for the Eastern District of Virginia, Alexandria
Division (the " Bankruptcy Court" ). At the time of
the Petition's filing, Alabama Power Company,
Potomac Electric Power Company, Delmarva Power
& Light Company, Entergy Louisiana, LLC, and
Entergy Gulf States, Inc. (collectively, " Appellants"
) provided electric service to the Debtor-Appellee's
retail locations.

On October 19, 2006, the Bankruptcy Court entered
the Final Order Approving Adequate Assurance
Procedures and Determining Adequate Assurance of
Payment for Future Utility Services (the " Procedure
Order" ). This Order established the procedures under
11 U.S.C. § 366 regarding requests for adequate
assurance of payment to Appellants for future utility
services provided to Appellees. After a hearing, the
Bankruptcy Court entered the Final Order
Determining Adequate Assurance of Payment for
Certain Utilities (the " Assurance Order" ) on
October 24, 2006. This Order established adequate
assurance of payment to Appellants by each of the
Appellees, requiring them to post deposits of one
month's average utility bill for each of the Appellants.
Appellants appealed both of these orders (together,
the " 366 Orders" ) to this Court on the grounds that
the Bankruptcy Court's interpretation and application
of 11 U.S .C. § 366 was erroneous.

After this appeal was commenced, all three
Appellees, The Rowe Companies, Rowe Furniture
Inc., and Storehouse Inc., ceased operations at the
locations serviced by Appellees, and utility service to
the Appellees was accordingly discontinued.
Appellees now move this Court to dismiss this appeal
on the grounds of mootness and lack of standing.

### II. Analysis

Under Article III of the United States Constitution,
federal courts may adjudicate only actual cases or
controversies, rather than advising what the law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 2
Slip Copy, 2007 WL 656897 (E.D.Va.)
**(Cite as: Slip Copy)**

would be for a hypothetical state of facts. *Deakins v. Monaghan,* 484 U.S. 193, 199 (1988). " It has been long settled that a federal court has no authority to ' give opinions upon moot questions or abstract proposition, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Church of Scientology of California v. United States,* 506 U.S. 9, 12 (1992)(citing *Mills v. Green,* 159 U.S. 651, 653 (1895)). " If an event occurs while a case is pending on appeal that makes it impossible for the court to grant ' any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Id.*

**\*2** The requirements of constitutional mootness are clearly satisfied by the circumstances of this case. The 366 Orders entered by the Bankruptcy Court established the framework for the provision of adequate assurance of payment to utilities as authorized by 11 U.S.C. § 366. Specifically, the 366 Orders prevented Appellants from discontinuing future utility service to certain Appellee locations but also protected Appellants from the risk of non-payment for services provided in the future. However, while on appeal, operations at these locations ceased. The Appellants discontinued utility service, and there is no risk of non-payment. Thus, the relief granted is no longer necessary to the Appellants, and this Court cannot grant " any effectual relief whatever." *Mills,* 159 U.S. at 653.

Appellants do not dispute that this case falls within these traditional requirements of mootness doctrine. Instead, they argue that an exception applies because the issues presented are " capable of repetition, yet evading review." *See, e.g., Spencer v. Kemma,* 523 U.S. 1 (1998). The United States Supreme Court has stated that:
The capable-of-repetition doctrine applies only in exceptional circumstances where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.

*Spencer,* 523 U.S. at 17(internal citations omitted). The circumstances of the instant appeal fail to satisfy either requirement, and thus, the exception does not apply.

First, as to the duration of the challenged action,

while the Debtors-Appellees in this specific case terminated their accounts relatively quickly, Appellants have not shown that future, similarly situated chapter 11 debtors will cease operations as quickly, if at all. Chapter 11 of Title 11 of the United States Code is only a reorganization of a company's contractual and debt obligations. *See* 11 U.S.C. §§ 101-1532. While this Court is unfamiliar with what percentage of Chapter 11 debtors cease operations (and Appellants have not demonstrated such a figure), many Chapter 11 debtors, if not most, continue to operate indefinitely and sometimes emerge from bankruptcy. If the Chapter 11 debtor continues operations, any concerns of a duration too short to fully litigate an appeal is obviously eliminated.

Furthermore, even if a company eventually does cease operations, Appellants have provided no reason for this Court to believe that cessation would *repeatedly* occur so quickly as to evade review. There is no dispute that the Appellees ceased operations quickly after the appeal commenced, but that is of little moment. This Court cannot conclude that the majority of future, similarly situated debtors-in-possession will cease operations as quickly as Appellees in this case, and thus, the Court cannot draw the conclusion that the duration of time to fully litigate the challenged action is so brief as to come within the a capable-of-repetition doctrine. Accordingly, this exception to the mootness doctrine does not apply, and the appeal will be dismissed as moot.

**\*3** The second requirement to apply the capable-of-repetition exception is that there must be a reasonable expectation that the complaining party will be subject to the same action. Not unexpectedly, there is considerable disagreement between the parties as to this requirement's application. Appellants argue that they must demonstrate only that they have a reasonable likelihood of being subject to the same action. However, Appellees argue that, as stated by the Sixth Circuit, " when the suit involves two private parties, the complaining party must show a reasonable expectation that he would again be subjected to the same action by the *same defendant.*" *Chirco v. Gateway Oaks, LLC,* 384 F.3d 307, 309 (6th Cir.2004). The Fourth Circuit has not directly ruled on this issue, and applying the Sixth Circuit's interpretation to this case, the capable-of-repetition exception also fails with respect to the second requirement. Appellees entirely ceased to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                              Page 3

Slip Copy, 2007 WL 656897 (E.D.Va.)

**(Cite as: Slip Copy)**

operate in any locations that received utility service from Appellants. Therefore, there is no reasonable expectation that these same parties will be subject to the same action in the future, and the capable-of-repetition exception also fails as to the second requirement.

In sum, there is no actual case of controversy as required by Article III of the United States Constitution. The Utilities' appeal of the Bankruptcy Court's decision clearly falls within the mootness doctrine, and the " capable-of-repetition, yet evading review" exception does not apply. Accordingly, this Court could not grant any effectual relief to the prevailing party other than a mere advisory opinion, and must be dismissed.[FN2]

> FN2. Since this Court finds that this appeal should be dismissed as moot, it does not reach Appellee's motion to dismiss for lack of standing.

### III. Conclusion

For the foregoing reasons, Appellees' motion to dismiss the appeal as moot will be granted. An appropriate Order will issue.

E.D.Va.,2007.
Potomac Elec. Power Co. v. Rowe Companies
Slip Copy, 2007 WL 656897 (E.D.Va.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Mark D. Olivere, certify that on this 11th day of July, 2007, I caused true and correct

copies of the **Reply Brief of Appellees, Amtrol Holdings, Inc., et al. to Motion to Dismiss**

**Appeal** to be served on the following parties in the manner indicated:

**HAND DELIVERY**

John D. Demmy, Esq.
Stevens & Lee, P.C.
1105 North Market Street
7th Floor
Wilmington, DE 19801
Phone: 302-425-3308

**VIA FEDERAL EXPRESS**

Russell R. Johnson, III
2258 Wheatlands Drive
Manakin-Sabot, VA 23103
Phone: 804-749-8861


_____
Mark D. Olivere (#4291)